UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                                  Chapter 11

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                      Case No. 8:24-bk-676-RCT

      Debtor.
_____/

## CHAPTER 11 CASE MANAGEMENT SUMMARY

THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC., as Debtor and Debtor in Possession (the "**Debtor**" or "**The Center**"), pursuant to Local Rule 2081-1, hereby files its Chapter 11 Case Management Summary (the "**Summary**").  For its Summary, the Debtor states the following:

### Introduction

On February 9, 2024 (the "**Petition Date**"), the Debtor filed its Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

### Case Management Items

**I. Description of the Debtor's Business**

The Center is a 501(c)(3) non-profit Florida corporation which provides comprehensive trust services for beneficiaries and their representatives related to the formation and administration of Special Needs Trusts ("**SNT**").  The term "Special Needs Trust" encompasses a variety of specialized trusts used for special needs planning, which are often funded from settlements or recoveries from catastrophic personal injury lawsuits.  While the various types of trusts under the SNT umbrella have some key differences, the primary purpose of an SNT is to allow someone

who receives means-tested public assistance benefits like Supplemental Security Income ("**SSI**") and Medicaid to also receive the benefit of distributions from their SNT, such as payment for beneficiary expenses.

Since its founding on December 8, 2000, The Center has grown to be one of the largest administrators of SNTs in the country, with beneficiaries located in almost every state as well as beneficiaries who are located internationally. As of the Petition Date, The Center administers over 2,000 SNTs. Although The Center outsources the investment management of the funds held in each SNT, it currently manages over $200,000,000 through both pooled and individual SNTs.[1]

## II. Location of Debtor' Operations and Whether Leased/Owned

The Center is located at 12425 28th Street N, Suite 301, St. Petersburg, Florida 33716. The Center leases its office space at that location.

## III. Reasons for Filing Chapter 11

The Center's leadership recently discovered that between 2009 and 2020 approximately $100 million of funds under The Center's control was paid out as a loan under a purported line of credit agreement. The funds utilized to make the fund this purported loan were taken from over 1,000 of The Center's beneficiaries and The Center itself. The Center's demands for the immediate repayment of these funds and for documents addressing the use of the funds have gone unanswered.

Upon learning of the existence of this alleged loan transaction, The Center embarked on an internal investigation to ascertain all facts and circumstances surrounding the transfer of approximately $100 million from The Center. Through its investigation, The Center determined that the purported $100 million loan was made to the Boston Finance Group ("**BFG**"), a company

---

[1] This figure includes amounts owed by BFG (as defined below), affiliated entities and by Govoni on account of a personal guarantee as otherwise discussed below.

controlled by The Center's founder, Leo Govoni ("**Govoni**"). BFG and Govoni appear to have undertaken a multi-year effort to access trust funds under The Center's management while simultaneously ensuring beneficiaries did not receive proper disclosure related to these funds and failing to take any meaningful steps to repay the funds.

Based on its investigation and the impact of the purported loan to BFG, The Center determined it was necessary to file a petition for relief under Chapter 11 of the Bankruptcy Code for three primary reasons. First, the bankruptcy filing provides The Center a means to provide all beneficiaries with notice of the transfer of $100 million to BFG, while simultaneously allowing The Center to pursue the recovery of these funds for the benefit of beneficiaries. Second, the Chapter 11 filing will facilitate The Center's ongoing investigation into the transfer and misuse of its funds, and the funds of the SNTs it administers. Third, and finally, The Center aims through this Chapter 11 proceeding to preserve the going-concern value of its assets and to restructure its obligations for the benefit of beneficiaries adversely impacted by the transfers.

A.  **The Center and Its Founder**

Govoni, a purported financial and investment advisor, founded The Center in December 2000 with the assistance of his business colleague John Staunton ("**Staunton**"), a Pinellas County-based trusts and estates attorney. Following The Center's founding in December 2000, Govoni, for all practical purposes, controlled The Center's activities and operations for nearly 20 years. Govoni served on The Center's Board of Directors from the company's founding until his resignation in 2008 or early to mid-2009. Govoni resigned from The Center's Board of Directors shortly before The Center made the first transfer of the alleged loan to BFG. Following his resignation, Govoni continued to control and exert his influence over The Center's operations and finances.

As explained in greater detail below, The Center discovered that between 2009 and 2020, numerous transfers were made to BFG totaling approximately $100 million. The funds utilized to make these transfer were taken from over 1,000 SNTs managed by The Center and the transfer was documented as a purported loan from The Center to BFG. The transfer of funds to BFG was documented as a purported loan from The Center to BFG. Govoni was able to cause the transfer of these funds to BFG through the control he maintained over various aspects of The Center, its finances, as well as its information technology ("**IT**") and human resources ("**HR**") infrastructure. This Summary discusses both the transfers to BFG and the means utilized to accomplish the transfers.

1. **The $50 Million in Transfers Initiated in 2009**

In or around 2009, The Center made its first purported loan to BFG in an amount up to $50 million. This alleged loan was identified a "credit facility" through which The Center would transfer funds belonging to the SNTs it managed to BFG[2] whose principals are listed as Govoni and Jonathan Golden ("**Golden**"), a lawyer who has worked for and with Govoni in some capacity for more than 15 years.

While the transfer of the approximately $50 million from The Center to BFG is purportedly a loan, The Center does not have copies of loan documents memorializing this alleged loan. These loan documents, however, are referenced in a letter from BFG to The Center dated August 31, 2011, and in certain amended and restated loan documents discussed below. Further, The Center does not possess any records showing that a loan or line of credit to BFG or any other party was authorized by The Center's Board of Directors or any other party at The Center.

---

[2] Staunton, who assisted with The Center's creation and was The Center's outside counsel, also has an ownership interest in BFG. The Center only recently became aware that Staunton has an ownership interest in BFG. Both Govoni and Staunton were directors of The Center through early- to mid-2009.

4

### 2. Additional $50 Million in Transfers Initiated in 2012

Starting around January 1, 2012, an additional approximately $50 million in funds was transferred from The Center to BFG in the form of draws. To document these transfers, Govoni had BFG execute an Amended and Restated Promissory Note ("**Note**") in favor of The Center in the amount of $100,000,000.00 (presumably representing the total transfers to BFG since 2009) and an Amended and Restated Revolving Line of Credit Agreement ("**Line of Credit Agreement**"). The Note and Line of Credit Agreement were executed by Govoni, as BFG's managing member. At the time of signing, the records on file with the Florida Secretary of State listed Govoni as BFG's managing member. The Line of Credit Agreement purports to have been executed by Todd Belisle on behalf of The Center. At the time, Mr. Belisle was an employee, the president, and member of The Center's Board of Directors. He remains an employee of The Center as of the Petition Date. Mr. Belisle, however, has no recollection of signing the Note or Line of Credit Agreement, or of the Board of Directors authorizing a $100 million loan to BFG. Further, through its investigation, The Center has been unable to locate any documents showing that a loan to BFG in any amount was ever authorized by The Center or its Board of Directors.

The Note and Credit Agreement matured on January 1, 2017. BFG failed to pay the Note on the maturity date or take any action to begin repaying the approximately $100 million taken from the SNTs. Instead, BFG continued to receive advances from The Center and SNTs until late 2020.

Although periodic interest payments and what was alleged to be a small principal reduction payment have been made to The Center, neither BFG nor Govoni have made any meaningful attempt to repay the $100 million.

### 3. Means of Control Over The Center's Financial Operations and Records

Govoni's control over The Center's finances took two primary forms: (i) employees of the Center would knowingly or unknowingly assist Govoni in transferring funds from The Center to BFG; and (ii) control of outside entities that were responsible for key aspects of The Center's operations and financial reporting.

First, to accomplish the transfer of funds, it appears Govoni relied on an employee by the name of Tracy Gregory ("**Gregory**"). Gregory was employed by the Boston Settlement Group, another company owned and controlled by Govoni, although a portion of her salary was paid by The Center. While Gregory was employed by Boston Settlement Group, she worked at The Center from 2008 until her resignation in 2020. During her tenure with The Center, she was both a Board member and The Center's accounting manager. In her position, Gregory had full access and control over The Center's bank accounts and financial records. For reasons that are unclear at this time, it appears that Gregory—presumably at the direction of Govoni and/or his associates—allowed the purported $100 million loan to be transferred from The Center to BFG.

Govoni was able to prevent beneficiaries from becoming aware of the $100 million transfer and ensuing default by exercising control over the information and financial disclosures the beneficiaries received. As a trustee for the SNTs, The Center is required to furnish each beneficiary with an accounting showing the receipts, disbursements, and inventory of their SNT. This accounting must be provided at least once annually. The Center retained the accounting firm Fiduciary Tax & Accounting Services, LLC ("**FTAS**"), which was purportedly owned by a Mr. John Witeck ("**Witeck**"), to provide all required annual trust accounting and the tax filing services for each trust. The Center relied on FTAS to provide beneficiaries with the required annual accountings and paid FTAS approximately $650,000 annually for these services.

Based on a review of the records filed with the Florida Secretary of State, Govoni formed FTAS. Golden, Govoni's business partner, was the registered agent of FTAS at the time of its formation. Through its investigation, The Center confirmed that Govoni—not Witeck—does in fact own FTAS. In a lawsuit filed by a former beneficiary of an SNT administered by The Center, Witeck testified that Govoni created FTAS and currently holds a majority ownership interest in FTAS. Witeck explained that Govoni gratuitously transferred a minority ownership interest in FTAS to Witeck shortly after FTAS's formation. According to Witeck, FTAS has prepared the trust accountings for The Center since FTAS's founding, and 95% of FTAS's work comes from The Center. Based on these facts, it is believed that Govoni formed FTAS and retained Witeck to prepare the required trust accountings specifically to ensure that Govoni could control the financial disclosures to The Center's beneficiaries and to further monetize his relationship with The Center.

### 4.     Means of Control Over The Center's IT and HR Operations

Govoni also controlled the company The Center hired and relied on for its IT and HR needs. After its founding, The Center contracted with Austin Colby Co. ("**Austin Colby**"), which is owned and operated by Govoni, to handle all of its IT and HR functions. Austin Colby only services entities affiliated with Govoni. Austin Colby controlled The Center's electronics, computer network, and records—including, importantly, employee access to any electronic systems and records.

With respect to HR, Austin Colby's services were comprehensive. The Center's employees were at times employees of Austin Colby that were leased to The Center. At other times, the same employees were listed as employees of The Center. Austin Colby controlled The Center's payroll processing and had control over The Center's payroll account. This control allowed Govoni to control the hiring and firing of The Center's employees and facilitated the

placement of trusted individuals in key positions of authority, including both Gregory and Caitlin Janicki ("**Janicki**"), Govoni's daughter and former head of case management and vice president of the Center.

B.  **Discovery of Purported Loan and Internal Investigation**

The withdrawal of approximately $100 million and effort used to hide these withdrawals began to unravel following Govoni's daughter's resignation in April 2022. When Janicki resigned from her positions with The Center, she left behind a copy of an unsigned letter dated November 11, 2021, from BFG to The Center's board of directors. Through this letter, Govoni sought to modify the terms of the Note and Line of Credit Agreement by extending the maturity date of the Note and reducing the required interest payments. It should be noted, at the time this letter was left with The Center, the Note had long since matured and BFG had made no attempt to repay the loan.

After Janicki resigned from The Center, Govoni approached The Center's board of directors and attempted to take control of The Center through a proposed management agreement that would allow him to run all of The Center's operations. The Board rejected this proposal. In response, Govoni suggested that The Center should enter into a "Third Party Agreement" with a separate company he controlled, Global Litigation Services, LLC, which would effectively allow this new company to run and manage The Center. This plan was also rejected by the Board. In a final attempt to maintain control of The Center, Govoni proposed that Golden become an employee of The Center and be paid a significant salary for his services. In exchange, Golden would oversee and run all of The Center's operations. This plan was rejected by The Center.

During this time, The Center notified Austin Colby that it was to discontinue all IT services for The Center. In response to this request, Austin Colby prevented The Center from accessing

the server where its electronic books and records are stored and continues to prevent The Center from accessing this information. Due to Austin Colby's conduct, The Center has lost access to many critical documents related to the purported loan with BGF and other critical financial records. Indeed, it is unclear to what extent those documents may have been altered or destroyed altogether. This dispute with Austin Colby is the subject of pending litigation in Pinellas County, in a 2022 case styled *The Center for Special Needs Trust Administration, Inc. v. Austin Colby Co.*, No. 22-2986-CI.  Although The Center and Austin Colby entered into a settlement agreement providing for the return of The Center's records and data, Austin Colby has refused to honor that agreement.

Following the (still ongoing) technology dispute and discovery of the November 2021 letter referencing the Line of Credit Agreement, on August 8, 2023, counsel for The Center sent a formal letter to BFG and Govoni requesting access to BFG's books and records pursuant to the terms of the Line of Credit Agreement, as well as documentation regarding how the millions of dollars in purported "loan" proceeds were used.  BFG and Govoni have failed to provide any documentation or information regarding the use of the so-called loan proceeds.  Then, by letter dated September 8, 2023, counsel for The Center demanded repayment of all sums owed pursuant to the Note and Line of Credit Agreement, such that the sums were due within five days of the letter/notice.  No funds were repaid, nor was there any response to the letter demand.

**IV.**     **List of Officers and Directors and Their Salaries and Benefits at Time of Filing and During the One Year Prior to Filing**

The Debtor is a non-profit corporation and, therefore, does not have any shareholders.  The Debtor has the following officers who receive the following annual compensation:

Michelle Diebert (President) – $160,000

Laura Davis (Vice President) – $150,000

Carl Schroeder (Secretary) – $105,000

9

William A. Long, Jr. (Chief Restructuring Officer[3]) – Hourly compensation

The Debtor has the following directors:

Michelle Diebert

Laura Davis

Carl Schroeder

## V. Debtor's Annual Gross Revenues

The Debtor's revenues for the calendar year ended 2023 were $5,931,472.42.

## VI. Amounts Owed to Various Classes of Creditors

Although the Debtor has not filed its Schedules or Statement of Financial Affairs, the Debtor believes that the creditors will consist of the following:

    a.  **Priority Claims:**

Other than amounts owed to current employees for pre-petition wages, the Debtor does not have any priority creditors.

    b.  **Secured Claims:**

The Debtor does not have any secured creditors.

    c.  **Unsecured claims:**

The Debtor does not have any trade payables. The Debtor owes approximately $105 million to the trust beneficiaries for exposure to the BFG loan (as discussed above).

---

[3] The Debtor will be filing an *Application for Authorization to Employ and Compensate Nperspective Advisory Services, LLC as Restructuring Advisor and to Appoint William A. Long, Jr. as Chief Restructuring Officer, Effective as of the Petition Date*, requesting Court approval of the appointment of Mr. Long as CRO.

**VII.     General Description and Approximate Value of the Debtor's Current & Fixed Assets**

The Debtor's most significant assets consist of litigation claims and claims for repayment of the note payable from BFG. As discussed above, the Debtor asserts significant claims against Leo Giovani, BFG, and other affiliated entities, based on breach of contract, breach of fiduciary duty, and other claims.

The balance of the note payable from BFG is in excess of $105 million. The Debtor has cash on hand in the amount of approximately $4.6 million. The Debtor has accounts receivables of $32,000, prepaid expenses of $98,000, and other receivables of approximately $60,000. The Debtor also owns a piece of real property located in Maine, with a book value of approximately $763,000. The Debtor owns fixtures and equipment which are fully deprecated on its books and records. The Debtor's other assets consist of litigation claims with an unknown value.

**VIII.    Number of Employees and Amount of Wages Owed as of Petition Date**

The Debtor employs twenty-three people, including its officers. The Debtor's payroll is managed by an outside payroll service and is funded every two weeks. The last payroll was paid on February 2, 2024, for the payroll period that ended on January 27, 2024. The Debtor's next payroll will be paid on February 16, 2024. This payroll will include $55,810.10 in prepetition wages for services rendered from January 28, 2024, through the Petition Date.

**IX.      Status of Debtor's Payroll and Sales Tax Obligations, if applicable**

The Debtor is current on payroll tax obligations and does not have any sales tax obligations.

**X.       Anticipated Emergency Relief Within 14 Days of Petition Date**

The Debtor will be filing the following emergency motions:

1. Debtor's Motion for Authorization to Pay Prepetition Wages and Salaries
2. Debtor's Emergency Motion for Interim and Final Orders Granting (A) Authority to (I) Maintain Trust Bank Accounts and to Continue to Use Existing Business Forms and Checks for Trust Bank Accounts, and (II) Continue to Use

      Existing Trust Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines

3. Debtor's Emergency Application for Authorization to Employ Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date

4. Debtor's Emergency Motion for Approval of Trust Distribution Procedures

5. Debtor's Emergency Motion To Authorize The Implementation Of Procedures To Maintain And Protect Confidential And Personally Identifiable Information

## XI. The Debtor's Strategic Objectives

The Center hopes to use the Chapter 11 process to restructure its indebtedness to its creditors. The Center intends to pursue all available claims against all appropriate parties to recover the transferred funds for the benefit of the beneficiaries, many of whom are permanently disabled and have limited—if any—access to alternative resources. The Center hopes to retain as many of its beneficiaries as possible, continue to accept and manage new trusts, and resolve any claims of those impacted by the scheme.

WHEREFORE, the Debtor respectfully submits the foregoing as its Chapter 11 Case Management Summary.

                                  */s/ Scott A. Stichter*
                                Scott A. Stichter (FBN 0710679)
                                Matthew B. Hale (FBN 0110600)
                                **STICHTER, RIEDEL, BLAIN & POSTLER, P.A.**
                                110 East Madison Street, Suite 200
                                Tampa, FL  33602
                                Telephone: (813) 229-0144
                                Email: sstichter@srbp.com
                                              mhale@srbp.com
                                Attorneys for Debtor

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing *Chapter 11 Case Management Summary* has been furnished on this 9th day of February, 2024, by the Court's CM/ECF electronic mail system to all parties receiving electronic noticing. Additionally, Epiq Corporate Restructuring, LLC will cause a true and correct copy of the foregoing document to be served on all parties required to be served, including the Local Rule 1007-2 Parties in Interest List, and will file a certificate or affidavit of service.

                                                */s/ Scott A. Stichter*
                                                Scott A. Stichter