UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Chapter 11

THE CENTER FOR SPECIAL NEEDS                    Case No. 8:24-bk-00676-RCT
TRUST ADMINISTRATION, INC.,

     Debtor.
_____/

**NOTICE OF FILING DECLARATION OF**
**WILLIAM A. LONG, JR., CHIEF RESTRUCTURING OFFICER**
**FOR THE DEBTOR IN SUPPORT OF FIRST DAY PLEADINGS**

The Debtor, The Center for Special Needs Trust Administration, Inc., hereby files the attached *Declaration of William A. Long, Jr., Chief Restructuring Officer for the Debtor in Support of First Day Pleadings* in connection with the preliminary hearing scheduled for February 13, 2024, at 3:30 p.m. in connection with the Debtor's "First Day Pleadings."

*/s/ Matthew B. Hale*_____
Scott A. Stichter (FBN 0710679)
Matthew B. Hale (FBN 0110600)
**Stichter, Riedel, Blain & Postler, P.A.**
110 East Madison Street, Suite 200
Tampa, FL  33602
Telephone: (813) 229-0144
Email: sstichter@srbp.com; mhale@srbp.com
Counsel for Debtor

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing *Notice of Filing* has been furnished on this 12th day of February, 2024, by the Court's CM/ECF electronic mail system to all parties receiving electronic noticing.

*/s/ Matthew B. Hale*
Matthew B. Hale

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Chapter 11

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                   Case No. 8:24-bk-00676-RCT

      Debtor.
_____/

**DECLARATION OF WILLIAM A. LONG, JR., CHIEF RESTRUCTURING
OFFICER FOR THE DEBTOR, IN SUPPORT OF FIRST DAY PLEADINGS**

I, William A. Long, Jr., declare as follows:

1.      I am William A. Long, Jr. I am employed by Nperspective Advisory Services, LLC ("**NP**"). Effective November 14, 2023, The Center For Special Needs Trust Administration, Inc. (the "**Debtor**" or "**The Center**"), a 501(c)(3) non-profit corporation, engaged NP to provide restructuring advisory services. The scope of services to be provided by NP also state that NP would provide me to be appointed as Chief Restructuring Officer ("**CRO**") for the Debtor.

2.      I have decades of experience as a senior level financial executive and have served as Chief Financial Officer for several Tampa Bay area companies across different business sectors. Additionally, I have served as Chief Restructuring Officer in several Chapter 11 cases in this district. I am a Certified Public Accountant, I hold a Bachelors of Science in Business Administration, Finance, from University of Central Florida, and a Masters of Accountancy from Florida State University.

3.      Prior to the Petition Date (as defined below) I, through NP, provided services to the Debtor as part of the restructuring advisory services under the title "Chief Restructuring Officer," with the understanding that I would be appointed, subject to Court approval, as CRO in any chapter

11 bankruptcy filing by the Debtor. Immediately prior to the Petition Date, I was appointed as CRO by resolution of the Debtor's board of directors, which appointment is subject to approval by the Court.

4.      In these capacities, I have a general familiarity with the Debtor's assets, business and financial affairs, and books and records. I have knowledge sufficient to support the facts stated herein, either through direct knowledge, through the Debtor's books and records and other information available to me as CRO and to NP, or information and belief.

5.      To enable the Debtor to commence the tasks relating to the administration of this chapter 11 case (the "**Chapter 11 Case**") and to maximize recoveries, as described herein, for the benefit of its estate, creditors, and the Beneficiaries (as defined below), the Debtor has requested various types of relief in "first day" pleadings and applications (each, a "**First Day Pleading**") described below.[1] I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to accomplish the goals of this Chapter 11 Case in an expedient fashion; and (b) best serves the Debtor's estate and the interests of its creditors.

6.      Except as otherwise indicated, all facts set forth herein are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; or (c) information supplied to me by other members of the Debtor's management, other employees of the Debtor, and/or the Debtor's advisors and professionals. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

4878-2714-6404, v. 3

## I.   The Debtor and the Chapter 11 Case

7.      On February 9, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, the "**Bankruptcy Code**"), commencing the Chapter 11 Case. The Debtor continues to possess and manage its assets as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case and, as of the date hereof, no official committees have been appointed or designated.

## II.    History of the Debtor and Summary of Its Operations

### A.  General Background

8.      The Center is a 501(c)(3) non-profit Florida corporation which provides comprehensive trust services for beneficiaries and their representatives related to the formation and administration of Special Needs Trusts ("**SNT**"). The term "Special Needs Trust" encompasses a variety of specialized trusts used for special needs planning, which are often funded from settlements or recoveries from catastrophic personal injury lawsuits. While the various types of trusts under the SNT umbrella have some key differences, the primary purpose of an SNT is to allow someone who receives means-tested public assistance benefits like Supplemental Security Income ("**SSI**") and Medicaid to also receive the benefit of distributions from their SNT, such as payment for beneficiary expenses.

9.      The Center operates from leased office space located at 12425 28th Street N., Suite 301, St. Petersburg, Florida 33716.

10.     Since its founding on December 8, 2000, The Center has grown to be one of the largest administrators of SNTs in the country, with beneficiaries located in almost every state as well as beneficiaries who are located internationally. As of the Petition Date, The Center

3

administers over 2,000 SNTs. Although The Center outsources the investment management of the funds held in each SNT, it currently manages over $200,000,000 through both pooled and individual SNTs.[2]

11.    The Debtor is the trustee or co-trustee of numerous special needs trusts, including both stand-alone trusts and pooled trusts (the "**Trusts**") for approximately 2,000 beneficiaries who suffer from various levels of disability (the "**Beneficiaries**"). The Debtor's primary service as trustee of the Trusts is to manage the Trusts, maintain records for assets managed by third-party investment managers, respond to request for distributions from Beneficiaries, and make distributions in a manner that still ensures that the Beneficiary meets the income and asset thresholds to qualify for certain public assistance benefits, such as Medicaid, Social Security, or Supplemental Security Income. The Debtor's services help to ensure that Beneficiaries maintain their qualification for these critical public assistance benefits.

12.    Each Beneficiary has its own trust account or sub-trust account (a "**Trust Account**") that reflects the specific assets in the respective Beneficiary's Trust, or in the case of a pooled Trust, the specific assets allocated to the Beneficiary's sub-trust account. The Trust investments are managed by different financial advisory companies, not the Debtor itself.

13.    Funds received by the Debtor have historically been allocated by either delivering funds to third-party investment managers, or as further described below, certain funds have been allocated to BFG (as defined below). The funds administered by third-party investment managers have been invested in marketable assets and investments that can readily be converted into cash ("**Liquid Assets**") to fund Beneficiaries' requests for distribution.

---

[2] This figure includes amounts owed by BFG (as defined below), affiliated entities and by Govoni on account of a personal guarantee as otherwise discussed below.

14.     In the ordinary course of its business, the Debtor will receive requests from Beneficiaries for payment of certain expenses to improve the Beneficiary's quality of life but which are not otherwise provided for by public assistance benefits. For example, distributions from a special needs trust can be used to fund expenses for a home, a vehicle, related maintenance, along with a variety of other items like a vacation, a computer, electronic equipment, educational expenses, and ongoing monthly bills such as phone, cable, and internet services. The Debtor fields these requests and evaluates whether payment of these expenses will ensure the Trust's continued compliance with governing law. If the expense can be paid, and the Beneficiary's Trust Account has sufficient remaining assets to pay the expense, the Debtor will pay the vendor or service provider directly on behalf of the Beneficiary.

**B.  Debtor's Discovery of Purported Loan Impacting Numerous Beneficiaries and The Center**

15.     The Center's leadership recently discovered that between 2009 and 2020 approximately $100 million of funds under The Center's control was paid out as a loan under a purported line of credit agreement. The funds utilized to make the fund this purported loan were taken from over 1,000 of The Center's beneficiaries and The Center itself. The Center's demands for the immediate repayment of these funds and for documents addressing the use of the funds have gone unanswered.

16.     Upon learning of the existence of this alleged loan transaction, The Center embarked on an internal investigation to ascertain all facts and circumstances surrounding the transfer of approximately $100 million from The Center. Through its investigation, The Center determined that the purported $100 million loan was made to the Boston Finance Group ("**BFG**"), a company controlled by The Center's founder, Leo Govoni ("**Govoni**"). BFG and Govoni appear to have undertaken a multi-year effort to access trust funds under The Center's management while

simultaneously ensuring beneficiaries did not receive proper disclosure related to these funds and failing to take any meaningful steps to repay the funds.

17.    The transfers were effectuated by the transactions most recently documented by an Amended Line of Credit Agreement with BFG as the obligor under the "loan" (the "**BFG Loan**"). Funds from the affected Trusts were used to fund the BFG Loan with each Trust being allocated a portion of the loan as an investment. The detailed trust accounting for some of the affected Trust Accounts may have reflected the Trust's exposure to the BFG Loan as an asset in the Trust Account, designated by the labels "Center Fixed Income IV" or "Pooled Fixed Income V". Based on the Debtor's initial investigation, it has determined that these "investments" regardless of nomenclature effectively have unknown value[3] and are completely illiquid.

18.    Additionally, many of the Trust Accounts appear to be compromised by exposure to an account titled Bank 01 (the "**Bank 01 Account**"). The Debtor's investigation of the Bank 01 Account is ongoing, but it appears that the Bank 01 Account does not have sufficient assets to back each affected Trust Account's allocation of the Bank 01 Account, resulting in a shortfall of funds. Each Trust Account's exposure to the Bank 01 Account results in the Trust Account being further compromised by a shortfall of funds. The Debtor believes the shortfall in the Bank 01 Account is related to the funding of the BFG Loan.

19.    The Debtor has determined that 1,570 of the Trust Accounts are compromised to some extent by the BFG Loan and/or the Bank 01 Account (the "**Compromised Trust Accounts**"). Many of the Compromised Trust Accounts have minimal remaining Liquid Assets for the Debtor to utilize to make ongoing distributions on account of the Beneficiaries of those

---

[3] The Debtor has made demand on BFG to produce information regarding the underlying investments. To date, the Debtor has not received any responsive documents from BFG.

Trust Accounts. For example, of the 1,570 Compromised Trust Accounts, 896 of those Trust Accounts have less than $500 in Liquid Assets that could be used to fund ongoing distributions.

20.    The remaining 470 Trust Accounts have no exposure to the BFG Loan and are completely invested in legitimate financial products (the "**Clean Trust Accounts**"), with their investment accounts being managed by institutional financial advisory firms such as Wells Fargo, Keybank, Fidelity, or Bank of America.

21.    Based on its investigation and the impact of the purported loan to BFG, The Center determined it was necessary to file a petition for relief under Chapter 11 of the Bankruptcy Code for three primary reasons. First, the bankruptcy filing provides The Center a means to provide all beneficiaries with notice of the transfer of $100 million to BFG, while simultaneously allowing The Center to pursue the recovery of these funds for the benefit of beneficiaries. Unfortunately, unless and until the Debtor recovers assets through its litigation efforts or other asset recoveries, the Debtor is unable to continue making distributions for the benefit of Beneficiaries of the Compromised Trust Accounts to the extent their Trust Accounts have no Liquid Assets. Although as discussed in the Trust Distribution Motion (as defined below), the Debtor will continue to make distributions on account of certain Beneficiaries, the Debtor would need to cease making Trust distributions for the benefit of Beneficiaries of a Compromised Trust Account if their Trust Account lacks Liquid Assets sufficient to fund such distributions. Second, the Chapter 11 filing will facilitate The Center's ongoing investigation into the transfer and misuse of its funds, and the funds of the SNTs it administers. Third, and finally, The Center aims through this Chapter 11 proceeding to preserve the going-concern value of its assets and to restructure its obligations for the benefit of Beneficiaries adversely impacted by the transfers.

4878-2714-6404, v. 3

### C. Debtor's Capital Structure, Assets, and Liabilities

22.　　The Debtor is a non-profit corporation and, therefore, does not have any shareholders. The Debtor has the following officers, who are also members of the Debtor's Board of Directors: Michelle Diebert (President); Laura Davis (Vice President); Carl Schroeder (Secretary).

23.　　The Debtor earns revenue through fees earned on assets maintained in the Trust Accounts. The Debtor's revenues for the calendar year ended 2023 were $5,931,472.42.

24.　　The Debtor's most significant assets consist of litigation claims and claims for repayment of the note payable from BFG. As discussed above, the Debtor asserts significant claims against Leo Giovani, BFG, and other affiliated entities, based on breach of contract, breach of fiduciary duty, and other claims.

25.　　The balance of the note payable from BFG is in excess of $105 million. The Debtor has cash on hand in the amount of approximately $4.6 million. The Debtor has accounts receivables of $32,000, prepaid expenses of $98,000, and other receivables of approximately $60,000. The Debtor also owns a piece of real property located in Maine, with a book value of approximately $763,000. The Debtor owns fixtures and equipment which are fully deprecated on its books and records. The Debtor's other assets consist of litigation claims with an unknown value.

26.　　The Debtor does not have any secured debts and the Debtor has no liability for priority claims other than amounts owed to current employees for prepetition wages. The Debtor's liabilities consist almost exclusively of unsecured amounts owed to Beneficiaries as a result of their exposure to the BFG Loan. The Debtor estimates the aggregate amount owed to Beneficiaries is approximately $105 million.

4878-2714-6404, v. 3

## III.    First Day Pleadings

27.    To minimize the adverse effects of the commencement of the Chapter 11 Case on the Debtor's ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtor's estate, the Debtor has filed the following First Day Pleadings:

- *Debtor's Emergency Motion for Approval of Trust Distribution Procedures* (Doc. No. 10)

- *Debtor's Emergency Motion to Authorize the Implementation of Procedures to Maintain and Protect Confidential and Personally Identifiable Information* (Doc. No. 14)

- *Debtor's Motion for Authorization to Pay Prepetition Wages and Salaries* (Doc. No. 8)

- *Debtor's Emergency Motion for Interim and Final Orders Granting (A) Authority to (I) Maintain Trust Bank Accounts and to Continue to Use Existing Business Forms and Checks for Trust Bank Accounts, and (II) Continue to Use Existing Trust Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines* (Doc. No. 18)

- *Debtor's Emergency Application for Authorization to Employ Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* (Doc. No. 20)

28.    I have reviewed each of the First Day Pleadings, including any exhibits thereto, and the statements and facts set forth in each of the First Day Pleadings are true and correct to the best of my knowledge, information, and belief. I hereby incorporate by reference each of the factual statements set forth in the First Day Pleadings. I believe that the relief requested in the First Day Pleadings is necessary to prevent irreparable harm and to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtor's stakeholders.

### A.    Emergency Motion for Approval of Trust Distribution Procedures (Doc. No. 10)

29.    Through the *Debtor's Emergency Motion for Approval of Trust Distribution Procedures* (Doc. No. 10) (the "**Trust Distribution Procedures Motion**"), the Debtor seeks entry of an order approving procedures governing its administration of distributions to beneficiaries of

the various special needs trusts it manages. The Debtor filed the Trust Distribution Procedures Motion to ensure that Beneficiaries who have sufficient Liquid Assets in their accounts can continue to receive the benefit of distributions from their trusts to pay for needed expenses. At the same time, however, certain trusts have been compromised by the transfer of funds to BFG, and after an initial investigation, the Debtor has determined that some of the Trust Accounts it administers have minimal remaining Liquid Assets that can be used to fund continued distributions. Through Trust Distribution Procedures Motion, the Debtor seeks approval to cease making distributions on Trust Accounts where there are insufficient Liquid Assets to fund such distributions, at least until the Debtor is able to recover funds to replenish these affected Beneficiaries' Trust Accounts.

30. By the Trust Distribution Procedures Motion, the Debtor seeks entry of an interim and a final order providing, *inter alia*, that (a) the Debtor is authorized to make distributions on account of Beneficiaries of Compromised Trust Accounts, to the extent that such Trust Accounts' legitimate investments can be liquidated to fund requests for distributions, but once such legitimate investments are exhausted, the Debtor would be authorized to cease making distributions on account of such Trust Beneficiaries; and (b) the Debtor is authorized to continue making distributions, in the ordinary course of business, on account of Beneficiaries of Clean Trust Accounts.

31. The Debtor understands that this will result in serious financial implications for the affected Beneficiaries. However, the Debtor believes this result is mandated by the Bankruptcy Code and will help ensure the Debtor will be able to continue operating and continue to earn income and pursue recovery of assets to eventually replenish, as much as possible, the affected Beneficiaries' Trust Accounts.

10

32.    First, the Bankruptcy Code would prohibit the Debtor using bankruptcy estate funds to fund payments on account of Beneficiaries of Compromised Trust Accounts once the Trust Accounts' Liquid Assets are depleted. Without any Liquid Assets to fund requests for payment, the Debtor would need to use its cash on hand—bankruptcy estate property—to make payments on account of these Beneficiaries. These payments, however, would amount to repayments of such Beneficiary's prepetition claim against the Debtor, which is prohibited under the Bankruptcy Code.

33.    Second, allowing the Debtor to make go-forward payments from bankruptcy estate funds for Beneficiaries of Compromised Trust Accounts without Liquid Assets would also run afoul of the Bankruptcy Code's equality of distribution principles. By making early distributions to certain Beneficiaries based solely on their requests for distributions, the Debtor would be favoring creditors based on the timing of their needs or requests for distributions and not based on the goal of equality of distribution.

34.    Third, the Debtor must ensure that it can continue to operate through this Chapter 11 case so that it can continue to service the Trusts, earn income that will be used to fund future distributions back to the Compromised Trust Accounts, and pursue the recovery of assets. If the Debtor's own cash dwindles due to ongoing requests for distributions by Beneficiaries of Compromised Trust Accounts without Liquid Assets, the Debtor may quickly become administratively insolvent and be unable to continue operating for the benefit of all creditors.

35.    The Debtor is mindful of the pain that Beneficiaries of Compromised Trust Accounts may suffer as a result of this decision, but this is a necessary step in the Debtor's goal of recovering assets and making future payments under a Chapter 11 plan to restore the affected Beneficiaries' Trust Accounts as much as possible. The Debtor will be aggressively pursuing all

avenues to sue parties responsible for the diversion of funds and recover assets as quickly as possible for Affected Beneficiaries.

36.     One of the Debtor's primary goals in this case will be to quickly recover assets and restore, to some minimum level, the Compromised Trust Accounts so that their basic expenses— over and above those provided for by governmental assistance—can be paid consistent with the Debtor's normal practices.

**B. Debtor's Emergency Motion to Authorize the Implementation of Procedures to Maintain and Protect Confidential and Personally Identifiable Information (Doc. No. 14).**

37.     Through the *Debtor's Emergency Motion to Authorize the Implementation of Procedures to Maintain and Protect Confidential and Personally Identifiable Information* (Doc. No. 14), the Debtor seeks to maintain as confidential and redact from any court filings the names and personally identifiable information of individual Beneficiaries, and authorizing the Claims and Noticing Agent (as defined herein) to withhold publication of claims filed by individual beneficiaries and to maintain any proofs of claims or attachments confidential and under seal.

38.     Nearly all of the Debtor's potential creditors in this case will be comprised of certain of the Beneficiaries with Compromised Trust Accounts. Based in part on the duty of confidentiality incident to its role as trustee of the various Trusts and in part on the sensitive nature of the Beneficiaries' circumstances, the Debtor believes that disclosure of the identity of the individual Beneficiaries and their personally identifiable information, such as address or other identifying information into the public record—which advertises the fact that the Beneficiary is a Beneficiary of a special needs or similar trust—could potentially have an adverse impact on the Beneficiary's right to privacy. Additionally, the information could jeopardize potentially confidential information as part of an underlying lawsuit and confidential settlement. As a result,

12

the Debtor requests procedures specific to noticing Beneficiaries and for maintaining under seal proofs of claim filed by Beneficiaries.

39.     The Debtor believes that cause exists to authorize the Debtor to redact or withhold form publication the personally identifiable information—including, without limitation, the names, home addresses, and email addresses—of any individual Beneficiary listed on, or appearing in, any document (a) made publicly available on the Debtor's case website, (b) filed with the Court, or (c) otherwise submitted to the Claims and Noticing Agent, including the creditors lists, the claims register maintained by the Claims and Noticing Agent, and the schedules to be filed by the Debtor. The Debtor maintains its files in part by the use of unique identifying account numbers for the Trust Accounts and Beneficiaries. Use of those account numbers, as opposed to the names and addresses of the Beneficiaries, will allow for the tracking of information in the schedules, creditors lists, and other filings, without risking harm to the Beneficiaries.

40.     Multiple factors demonstrate the need to protect the identities and privacy of the Beneficiaries, including but not limited to those who are minors. First, by the nature of the Debtor's role as trustee of special needs or similar trusts, the Beneficiaries of those Trusts are or are likely to be in need of protection from the public disclosure of their personal information, and the release of such information publicly could potentially jeopardize their safety or violate privacy protections. Second, the Debtor's role as trustee, and the attendant duty of confidentiality, militates against disclosure of personally identifiable information of the individual Beneficiaries as potentially being a breach of the duty of loyalty. Third, some of the underlying settlements require the Debtor to keep information confidential. Fourth, the information is likely to reflect medical or other information, either directly or by reference to other sources of information. Finally, some of the Beneficiaries are minors. Absent such relief, such information can be used to perpetrate identity

theft and phishing scams, to disclose the identities of individuals who have special needs, or to locate survivors of domestic violence, harassment, or stalking. And such disclosure may cause the Debtor to be in violation of its duty of confidentiality towards the Beneficiaries, as well as any applicable data privacy laws.

41.     The Debtor seeks authority to have the Claims and Noticing Agent undertake the mailing of the Notice of Commencement and the meeting of creditors to creditors, including the Beneficiaries, using the unredacted version of the list of creditors available to the Claims and Noticing Agent. The Debtor further proposes to provide an unredacted, under seal, version of the list of creditors, the claims register, and the schedules, and any other applicable filings redacted pursuant to the proposed Order to the Court, the U.S. Trustee, counsel to any official committee appointed in the Chapter 11 Case, and any other party designated by further order of the Court, as appropriate.

42.     Further, the Debtor will instruct the Claims and Noticing Agent to serve the Beneficiaries at their personal addresses on file with the Debtor and will ensure each individual receives the same notices in the Chapter 11 Case as all other creditors, without unnecessarily publicly disclosing the individuals' names and home addresses. Thus, in view of the foregoing and given there is minimal, if any, benefit to the public of publishing the names and home addresses of the individual Beneficiaries in the Chapter 11 Case, the Debtor submits that the relief requested is appropriate.

43.     With respect to the claims register and proofs of claim, the Debtor intends to file a motion requesting approval of procedures for the submission of claims and the use of a claim form. Pending entry of an order on such a motion, the Debtor requests that the Claims and Noticing Agent be authorized to (i) exclude from the publicly filed and available claims register any proofs

of claim filed by individual Beneficiaries to prevent public disclosure of any personal identifying information being uploaded to the public claims register, and (ii) to exclude from the publicly filed and available claims register any attachments to any proofs of claim filed by individual Beneficiaries. The Debtor believes, and is informed by the Claims and Noticing Agent, that redaction of proof of claims forms to redact personal identifying information could potentially cost tens of thousands of dollars in costs, not including the fees to verify that redactions were made appropriately.

44.      The Debtor proposes that the unredacted claim forms and the excluded attachments would be filed, under seal, and available to the Court, and accessible to the U.S. Trustee, counsel to any official committee appointed in the Chapter 11 Case, and any other party designated by further order of the Court, as appropriate.

45.      Although the Debtor is sensitive to the concerns that might arise from imposing potential impediments on certain creditors' ability to communicate and the public nature of bankruptcy court proceedings, measures can be implemented to facilitate any necessary communications or to address other concerns while maintaining a baseline of confidentiality and protection given the unique and sensitive nature of the Debtor's business.

**C. The Debtor's Motion for Authorization to Pay Prepetition Wages and Salaries (Doc. No. 8).**

46.      On the Petition Date, the Debtor had twenty-two employees (the "**Employees**"), which includes the Debtor's three officers (not including the CRO). The Debtor seeks authorization to pay all prepetition Employee related obligations including, but not limited to, wages, salaries, compensation, employee benefits, and reimbursable business expenses.

47.      The Employees are paid are paid every two weeks. The last payroll was paid on February 2, 2024, for the payroll period that ended on January 27, 2024. The Debtor's next payroll

will be paid on February 16, 2024. This payroll will include approximately $55,810.00 in prepetition wages for services rendered from January 28, 2024, through the Petition Date.

48.　　All the Employees which the Debtor is seeking to pay remain employed by the Debtor. None of the Employees which the Debtor seeks to pay are "affiliates" as defined in the Bankruptcy Code.

49.　　The prepetition payroll obligations to each of the Employees are under the priority cap priority claim of up to $15,150.00 for compensation earned in the one hundred eighty (180) day period preceding the Petition Date.

50.　　Retaining the Employees is critical to the successful operation and reorganization of the Debtor's business as the Debtor would not be able to replace these Employees without a significant disruption in its business and substantial delay in its reorganization effort. These Employees are vital to the Debtor's continued success.

51.　　Each of the Employees performed necessary and valuable services for the Debtor prior to the Petition Date and performed those services with the expectation that wage and wage-related commitments would be honored. The failure to honor its obligations to Employees is likely to lower morale and cause concern among the Employees regarding the Debtor's intentions to honor its ongoing obligations. The Debtor cannot afford to lose the support of its Employees at a time when the Debtor must operate more efficiently and meet more administrative burdens than before.

### D.  Trust Cash Management Motion (Doc. No. 18)

52.　　Through the *Debtor's Emergency Motion for Interim and Final Orders Granting (A) Authority to (I) Maintain Trust Bank Accounts and to Continue to Use Existing Business Forms and Checks for Trust Bank Accounts, and (II) Continue to Use Existing Trust Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines* (Doc. No. 18) (the "**Trust**

**Cash Management Motion**"), the Debtor seeks the entry of an interim order and a final order (a) authorizing (i) the continued use of the Debtor's existing Trust Bank Accounts (defined herein) and continued use of existing Business Forms (defined herein) and checks related to the Trust Bank Accounts, and (ii) the continued use of the existing cash management system related to the Trust Bank Accounts; (b) finding that the investment and deposit guidelines of section 345 of the Bankruptcy Code and the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees (revised 11/9/2021)* (the "**Guidelines**") promulgated by the Office of the United States Trustee are not applicable to Trust Bank Accounts; and (c) providing any additional relief required in order to effectuate the foregoing.

53.     The Debtor maintains two operating bank accounts (the "**Operating Accounts**"), held at American Momentum Bank. The Debtor maintains nine segregated bank accounts (each a "**Trust Bank Account**" and collectively, the "**Trust Bank Accounts**"), listed on Exhibit B to the Trust Cash Management Motion. Eight (8) of the Trust Bank Accounts are located at American Momentum Bank and one (1) Trust Bank Account is located at KeyBank. The sole purpose of the Trust Bank Accounts is to receive funds from investment accounts for the various Trusts. From these accounts, after receiving money from the applicable investment account, the Debtor then makes distributions for the benefit of Beneficiaries from the Trust Bank Accounts. The funds that flow into and out of the Trust Bank Accounts are not Debtor property, are not property of the bankruptcy estate, and typically only remain in the account for a few days.

54.     By the Trust Cash Management Motion, the Debtor requests authorization to keep the Trust Bank Accounts in place to avoid disruption in its core service of making trust distributions for the benefit the Beneficiaries. The Debtor will be opening debtor-in-possession

17

accounts to serve as the Debtor's operating accounts, but it is critical that the Debtor's existing Trust cash Management System remain in place.

55.     To require the Debtor to use new bank accounts would be disruptive to the Trust Beneficiaries' needs and would impair the Debtor's efforts to reorganize. Moreover, having to open new accounts as of the Petition Date would unnecessarily distract the Debtor's key accounting and financial personnel, whose efforts are more appropriately focused on assisting with the restructuring process. Furthermore, any delays or disruption in the payment of distributions for Trust Beneficiaries would erode confidence at this critical time.

56.     The Debtor also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Trust Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Trust Bank Accounts. In accordance with existing practices, the Debtor will maintain strict records of all receipts and disbursements from the Trust Bank Accounts during the pendency of this case.

57.     Considering the fact that the funds received into the Trust Bank Accounts are not estate property, the Debtor also requests clarification that the Guidelines do not apply to the extent they require the Debtor to make all disbursements by check. In particular, the Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the nature of the Debtor's services provided to the Trust Beneficiaries, the Debtor must conduct transactions from the Trust Bank Accounts by debit, wire, or ACH payments and other similar methods.

**E. Application for Authorization to Employ Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date (Doc. No. 20)**

58.    Through the *Debtor's Emergency Application for Authorization to Employ Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* (Doc. No. 20)**,** The Debtor seeks approval of the employment of Epiq Corporate Restructuring, LLC ("**Epiq**") as claims, noticing and solicitation agent (the "**Claims and Noticing Agent**"). The application seeks an order appointing Epiq as the Claims and Noticing Agent and authorizing Epiq to assume full responsibility for, among other things, the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtor's case.

59.    The Debtor has not yet filed its bankruptcy schedules, but it anticipates that approximately 1,500 creditors will need to receive notice throughout this Chapter 11 case. Upon considering the number of anticipated claimants, the nature of the claims, and the Debtor's business, the Debtor believes that appointment of a claims and noticing agent is necessary and in the best interests of the Debtor's estate and the Debtor's creditors.

60.    Epiq is eminently experienced in serving as claims and noticing agents in Chapter 11 cases of all sizes, including large Chapter 11 cases. The Debtor selected Epiq to serve as the Claims and Noticing Agent after obtaining and reviewing engagement proposals from at least two (2) other claims and noticing agents to ensure selection through a competitive process. Based on all engagement proposals obtained and reviewed, Epiq's rates are competitive and reasonable in light of Epiq's quality of services and expertise. The terms of retention, including Epiq's fees, are set forth in Epiq's Services Agreement attached to the Epiq Application.

61.    Appointing Epiq as Claims and Noticing Agent will expedite the distribution of notices and the processing of claims. Further, Epiq's appointment will relieve administrative burden from the clerk's office cause by processing what could be an overwhelming number of

19

claims. A description of the various services to be performed by Epiq is contained in the Epiq Application, and includes the maintenance of a dedicated website for case-related matters: https://dm.epiq11.com/case/centerforspecialneedstrustadministration/info

## IV.    Conclusion

62.    In sum, I believe that the relief sought in the First Day Pleadings: (a) is necessary to enable the Debtor to accomplish the goals of this Chapter 11 Case in an expedient fashion; and (b) best serves the Debtor's estate and the interests of its creditors.

**DECLARATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge and belief after diligent inquiry.

Executed on February 12, 2024.

By: _____
William A. Long, Jr.
Chief Restructuring Officer

4878-2714-6404, v. 3