**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                        Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                 Chapter 11

      Debtor.

_____/

**CHAPTER 11 TRUSTEE'S APPLICATION FOR AUTHORIZATION**
**TO EMPLOY LANDVEST INC. AS EXCLUSIVE BROKER**

<div style="border:1px solid black; padding:10px;">

NOTICE OF OPPORTUNITY
TO OBJECT AND REQUEST FOR HEARING

If you object to the relief requested in this paper you must file a response with the Clerk of the Court at the United States Bankruptcy Court, 801 North Florida Avenue, Suite 555, Tampa, FL 33602, within fourteen (14) days from the date of the attached proof of service, plus an additional three days if this paper was served on any party by U.S. Mail.

If you file and serve a response within the time permitted, the Court will either notify you of a hearing date or the Court will consider the response and grant or deny the relief requested in this paper without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, and the Court may grant or deny the relief requested without further notice or hearing.

**You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated if you do not timely file and serve a response.**

</div>

     Michael Goldberg, the Chapter 11 Trustee ("Chapter 11 Trustee"), by and through undersigned counsel, submit this Application (the "Application") to employ Landvest Inc. to market and sell certain real property, and in support thereof states as follows:

1.      On February 9, 2024, The Center for Special Needs Trust Administration, Inc. (the ("Center" or the "Debtor") filed a voluntary chapter 11 petition (Doc. 1).

2.      On March 21, 2024, the Court appointed Michael Goldberg as the chapter 11 Trustee (Doc. 109).

3.      The Chapter 11 Trustee has determined that it is in the best interest of the estate to sell the Maine Property, more particularly described in the survey annexed to the Listing Agreement (defined below), and that it requires the assistance of a real estate broker to market and sell the property.

4.      The Chapter 11 Trustee desires to employ LandVest Inc., an affiliate of Christie's International Real Estate, located at 36 Danforth Street, Portland, ME 04101, as its real estate broker (the "Broker").

5.      The services of the Broker have been selected because they have considerable experience in marketing real property of a type similar to the Maine Property and the Chapter 11 Trustee believes the firm is well qualified to represent the estate in the marketing of the Maine Property for sale.

6.      The Chapter 11 Trustee has entered into an Exclusive Right Agreement with the proposed Broker (the "Listing Agreement"), contingent upon Court approval and has agreed to a proposed commission of 6% of the contract purchase price of $1,750,000. A copy of the Listing Agreement is attached hereto as Exhibit A.

7.      This contract purchase price is based on the professional appraisal of the Maine Property, conducted on December 13, 2023 (the "Appraisal"). The Appraisal was meticulously performed by a certified appraiser, ensuring that the valuation reflects the current market

2

conditions and the Maine Property's intrinsic value. A copy of the Appraisal is attached hereto as Exhibit B.

8.      Although the Debtor contemplates a commission upon the sale of the Maine Property, it has been explained to the Broker that it will not receive any commission for the sale of the Maine Property until it is reviewed for reasonableness by this Court and approved by Court Order. In addition, it has been explained to the Broker that all contracts to sell the Property must be approved by this Court.

9.      To the Chapter 11 Trustee's knowledge, the Broker represents no interest adverse to the estate as supported by the Declaration of Real Estate Broker attached hereto as Exhibit C, and, except as otherwise disclosed therein, has no connection with the Debtor, creditors, or any other party in interest, the United States Trustee, or any person employed in the office of the United States Trustee.

10.     The Chapter 11 Trustee believes listing and selling the Maine Property pursuant to the Listing Agreement to be the most beneficial course of action for the Bankruptcy Estate and the course of action most likely to realize the true and proper value of the Maine Property. Based on the foregoing, the Chapter 11 Trustee respectfully requests the authority to employ Landvest as their Broker to market and sell the Maine Property pursuant to the Listing Agreement.

WHEREFORE, the Chapter 11 Trustee requests this Court enter an order substantially in the form attached hereto as Exhibit D (i) approving the Application, (ii) authority to employ Landvest Inc. pursuant to the terms of the Listing Agreement, and (iii) granting such other and further relief as the Court deems just and proper.

76698514

Respectfully submitted,

AKERMAN LLP

By: */s/ Steven R. Wirth*
    Steven R. Wirth
    Florida Bar No.: 170380
    Email: steven.wirth@akerman.com
    Raye C. Elliott
    Florida Bar No.: 18732
    Email: raye.elliott@akerman.com
    401 East Jackson Street, Suite 1700
    Tampa, Florida 33602
    Telephone: (813) 223-7333
    Facsimile: (813) 223-2837

    *Counsel for Chapter 11 Trustee, Michael Goldberg*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 25, 2024, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record. Additionally, Epiq Corporate Restructuring, LLC will cause a true and correct copy of the foregoing document to be served on all parties required to be served, including the Local Rule 2002-1 Parties in Interest List.

    */s/Steven R. Wirth*
    Steven R. Wirth

76698514

# Exhibit A

# EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT

AGENCY: **LandVest Inc.**

**COMPENSATION:**

In consideration of Agency's agreement to list and promote the sale of ( **X** all ☐ part of; If 'part of' see explanation or description attached hereto) Seller's property situated in municipality of _____**Newry**_____, County of _____**Oxford**_____, State of Maine, located at _____**off Poplar Brook Lane  *see attached survey**_____ and described in deed(s) recorded at said County Registry of Deeds in Book(s) ____**4241**____, Page(s) ____**271**____, the undersigned as Seller, hereby gives the Agency the exclusive right to sell or exchange said property at a price of $**1,750,000.00**_____, and on the terms herein stated, or at any other price or terms to which Seller may authorize or consent. If, during the term of this agreement, a Buyer is produced who is ready, willing and able to purchase at said price, or any other price or terms to which the Seller may agree, or if the property is sold or exchanged by anyone, including the Seller, then Seller agrees to pay Agency a commission of ____**6.0 - see Addendum**____% of contract price.

Agency has disclosed its policies regarding cooperation and compensation so as to inform Seller of any policy that would limit the participation of any other Agency including, without limitation, the following:

**BUYER'S AGENCY**

**X** Yes ☐ No     This Agency's policy is to cooperate with other agencies acting as Buyer's agents.

**X** Yes ☐ No     This Agency's policy is to share compensation with Buyer's agents.

If Yes, Agency's policy for this transaction is to offer compensation to Buyer's agents in the range of ____**zero**____% to ____**2.000**____% of the contract price.

**TRANSACTION BROKERS**

**X** Yes ☐ No     This Agency's policy is to cooperate with other agencies acting as transaction brokers.

**X** Yes ☐ No     This Agency's policy is to share compensation with transaction brokers.

If Yes, Agency's policy for this transaction is to offer compensation to transaction brokers in the range of ____**zero**____% to ____**2.000**____% of the contract price.

**DISCLOSURE OF AGENCY COMPENSATION POLICIES**

**X** Yes ☐ No     This Agency's policy is to compensate all other real estate brokerage agencies in the same manner. If no, Seller acknowledges this policy may limit the participation of other agencies in the marketplace.

☐ Yes **X** No     This Agency's policy on paying commissions to its affiliated licensees is to provide a greater commission for an in-house sale versus sales involving a cooperating real estate brokerage agency.

**TERM:**

This Agreement begins on _____**June 1, 2024**_____ and will expire on _____**June 1, 2025**_____ ("Expiration Date"). If at such expiration date Seller has placed the property under any type of contract and the transaction is still pending, the expiration date of this Agreement shall be extended until completion of that transaction by either closing/transfer of title or termination/expiration of the contract.

The commission as provided above shall be due if the property is sold, conveyed, exchanged, optioned or otherwise transferred within 6 months after the expiration of this Agreement to anyone with whom Agency has negotiated unless listed in good faith with another real estate brokerage agency. Negotiation shall include providing information about the property, showing the property, or presenting offers on the property. All rights under this paragraph shall expire on _____**December 1**_____, ____**2025**____ ("Carryover Date").

Seller acknowledges and/or agrees:

● A continuing duty between the signing of this listing agreement and the final closing to disclose to Agency all information about the property, adverse or otherwise, and understands that all such information shall be disclosed by Agency to Buyer.

● To hold Agency harmless for any claim which may result from the Seller's failure to disclose information about the property.

● To refer all inquiries to Agency.

● To convey property by _____**Quitclaim Deed With Covenant**_____ deed.

Page 1 of 3 Seller's Initials _____ _____ _____ _____

- To authorize a "For Sale" sign on the property.    [X] Yes   [ ] No
- To authorize the advertising of the property.    [X] Yes   [ ] No
- To authorize use of a key and/or a lock box on the property.    [X] Yes   [ ] No
- To authorize Agency to divulge the existence of offers on or interest in the property.    [X] Yes   [ ] No
- To authorize publication of property and applicable disclosure attachments in the MLS and use of information for marketing, appraisal and statistical purposes.    [X] Yes   [ ] No
- To authorize the Agency to use and make exterior and interior photographs and video of said property in promoting its sale.    [X] Yes   [ ] No
- To authorize inclusion of street address of the property on Internet display to the public.    [X] Yes   [ ] No
- To authorize inclusion of automated estimate of market value (AVM) on the property shown on virtual office websites.    [ ] Yes   [X] No
- To authorize inclusion of allowing comments or reviews about the listing on virtual office websites.    [ ] Yes   [X] No
- This property is monitored by audio and/or video surveillance equipment.    [ ] Yes   [X] No
- That Agency has discussed with Seller safeguarding of personal property and valuables located within the Property. Seller releases and indemnifies Agency and licensees against any liability which may occur due to damage or loss.
- Seller acknowledges that buyers and licensees may engage in activities such as, but not limited to, photography, videography, and videotelephony.
- That the State of Maine law requires Buyers of property owned by non-resident Sellers to withhold a prepayment of capital gains tax unless a  waiver has been obtained by Seller from the State of Maine Revenue Services.
- That the State of Maine law says that the owner of property as of April 1 is legally responsible to pay the property taxes even if the property is later sold and any tax lien filed for non-payment will be in the name of the owner as of April 1 which could have a negative effect on their credit rating.
- To seek legal, tax, and other professional advice as necessary in connection with sale of property.
- Receipt of a copy of this agreement.
- That Agency has informed Seller of his/her obligation to provide buyers with information developed by the Department of Health and Human  Services (Bureau of Health) regarding what homeowners should know about arsenic in private water supplies and arsenic in treated wood.
- That Agency has informed Seller of his/her disclosure and certification obligations regarding the presence of lead-based paint and lead-based paint hazards and a Buyer's right to conduct a risk assessment or inspection of the property to determine the presence of lead-based paint or lead-based paint hazards.
- Any property management services are only provided by Agency if agreed to by separate written agreement.
- If any earnest money is forfeited by a Buyer, it shall be distributed one half to Seller, and one half to Agency. In no event shall the Agency portion exceed the agreed upon commission set forth above.

**Seller agrees to hold Agency harmless from any loss or damage that might result from authorizations provided in the Agreement.**

FIXTURES: The Seller agrees that all fixtures, including but not limited to existing storm windows, screens, shades and/or blinds, shutters, curtain rods, built-in appliances, heating sources/systems including gas and/or kerosene-fired heaters and wood/pellet stoves, sump pump, electrical fixtures, hard-wired generators, landscaping, and _____ **NA** are included with the sale except for the following: __**NA**_____ _____ .

PERSONAL PROPERTY: The following items of personal property may be included with the sale at no additional cost, in "as is" condition with no warranties if specified in the Purchase & Sale Agreement: __**NA**_____ _____ _____ .

Other Conditions: __**SEE ADDENDUM #1**_____ _____ _____

Page 2 of 3 Seller's Initials _____  _____  _____  _____

Seller acknowledges receipt of a copy of the Residential Property Transaction Booklet ☐ Yes ☒ No

Agency and Seller agree that Agency shall represent Seller and that this Agreement creates an agency/client relationship as defined in the Real Estate Brokerage License Act.

Agency and Seller each agree that this property is to be offered without regard to race, color, religion, sex, physical or mental disability, familial status, ancestry, sexual orientation, gender identity, or national origin as defined in Maine state law or because the person sought and received an order of protection under Title 19-A, section 4007.

I hereby consent to receive fax or other electronic transmissions from Agency to fax number(s) and/or email address(es) provided herein.

This agreement may be signed on any number of identical counterparts with the same binding effect as if the signatures were on one instrument. Original or faxed or other electronically transmitted signatures are binding.

Pursuant to the Maine Uniform Electronic Transactions Act and Digital Signature Act, the parties authorize and agree to the use of electronic signatures as a method of signing/initialing this Agreement, including all addenda. The parties hereby agree that either party may sign electronically by utilizing an electronic signature service.

_____     _____
Seller **Center for Special Needs Trust Administration, Inc.**      Seller

_____     _____
Seller      Seller


SELLER(S) Mailing Address: _____

SELLER(S) Phone Number(s): _____

SELLER(S) E-mail Address: _____

SELLER(S) Fax Number(s): _____


Accepted by AGENCY on _____ (Date)
By: _____
Name: **Stephen Gauthier**
Its Authorized Signer

Page 3 of 3



**Maine Association of REALTORS®/Copyright © 2024.**
All Rights Reserved. Revised 2024.



# CYBER / WIRE FRAUD ADVISORY

Buyers and sellers need to exercise extreme caution when wiring funds in real estate transactions. Criminals/hackers target email accounts of real estate licensees as well as other parties involved in real estate transactions, including mortgage brokers, closing attorneys, and title agents. In many cases, they have been able to intercept emailed wire transfer instructions, obtain account information and, by altering some of the data, use emails to redirect the funds to a different account. These emails are convincing and sophisticated and may look like legitimate emails from parties in the transaction. You should look carefully at the entire email address as it may look legitimate but will contain some small change to fool you for example, joe@acme.com becomes joe@acrne.com a very hard distinction to pick up. If you believe you have received questionable or suspicious wire transfer instructions, immediately contact the title company/closing agent and your real estate professional.

### Do NOT Initiate the Electronic Transfer of Funds (Wires) Without Double Checking the Legitimacy of the Destination

**In every real estate transaction, Buyer and Seller are advised to:**

- **Never wire funds without personally speaking with the intended recipient of the wire to confirm the routing number and account number.**
- **Verify that the contact information for the wire transfer recipient is legitimate. Buyer and seller should each call using a phone number that has been independently obtained, not the phone number contained in the email containing the wiring instructions.**
- **Never share personal information such as social security numbers, bank account numbers and credit card numbers, unless it is through secured/encrypted email or personal delivery (or phone call) to the intended recipient.**
- **Take steps to secure the system you are using with your email account such as using strong passwords and secure WiFi and email using a domain name account (safer than using a public account such as aol or gmail).**

If you suspect that you have been victimized by wire fraud:

1) Contact the financial institution immediately and ask them to do a "swift recall".
2) Then call your local law enforcement immediately (town police department or county sheriff's office) to report the incident.
3) Then call the FBI immediately (24 hours or less) and let them know you are reporting the incident within 24 hours and file a complaint online at www.ic3.gov. Your chances of recovery are greater with less than 24-hour reporting.

To contact the FBI in Maine:

Augusta: 207-622-2902 -- Bangor: 207-947-6670 -- Portland: 207-774-9322

Even if you cannot undo the damage, file a complaint as specified above as this will help track the criminals.

### Again, Do Not Initiate Wires Without Double Checking the Legitimacy of the Destination

## ADDENDUM _____ 1 _____ TO LISTING AGREEMENT

Addendum to Listing Agreement dated _____ ,

between _____ **LandVest Inc.** _____ ("Agency")

and _____ **Center for Special Needs Trust Administration, Inc.** _____ ("Seller")

for property located at _____ **off Poplar Brook Lane  *see attached survey, Newry,** _____

The terms of the Listing Agreement are modified/supplemented as follows:

**1.) Seller agrees to compensate Shelly Everett, broker of Everett Realty Group 2.0% (two) if she brings a buyer who successfully buys the property (see BUYER'S AGENCY compensation).**

**2.) In the event that there is no BUYER BROKER involved, LandVest gross commission will be 4.0% (four)**

_____
Seller **Center for Special Needs Trust Administration, Inc.**      Date

_____
Seller      Date

_____
Seller      Date

_____
Seller      Date

AGENCY

By: _____
Name: **Stephen Gauthier**      Date
Its Authorized Signer



**Maine Association of REALTORS ®/Copyright © 2024.**
All Rights Reserved. Revised 2019.



# Exhibit B



FOREST INTEL

# RESTRICTED APPRAISAL REPORT

## Stowe Mountain Tract
## 3,364 Acres in Newry, Oxford County, Maine

*Prepared for:*
**The Center for Special Needs
Trust Administration, Inc.**

*Effective Date:*
**December 13, 2023**

*Date of Report:*
**January 23, 2024**

*Prepared by:*
**Daniel J. McConville
Forest Intel LLC
8 Foxglove Court
Yarmouth, ME 04096**



dmcconville36@gmail.com | 207.944.3726 |
8 Foxglove Court |Yarmouth, Maine 04096

January 23, 2024

Thomas Bales
The Center for Special Needs Trust Administration, Inc.
PO Box 17296
Clearwater, FL 33762

Re: Newry Stowe Mountain Appraisal

Dear Mr. Bales:

I am pleased to submit this appraisal of the Stowe Mountain Tract, consisting of 3,364 acres of conservation easement-encumbered timberland in Newry, Oxford County, Maine owned by The Center for Special Needs Trust Administration, Inc. (CSNT).

The purpose of the appraisal is to provide an estimate of the market value of all the rights, title, and interest in and to the subject property as of December 13, 2023, the inspection date. CSNT is Forest Intel's client and sole intended user of this report. CSNT is considering selling the property and requested this appraisal as part of their due diligence, including developing a supported sale price. The appraisal report will be used to assist CSNT with due diligence. It is not intended for any other use.

The estimated market value of the subject property, as of December 13, 2023, is:

<div align="center">

*** ONE MILLION SEVEN HUNDRED AND EIGHTY THOUSAND DOLLARS ***
*** $1,780,000 ***
($530 per Acre)
Range: $1.54 to $2.02 million

</div>

This is a Restricted Appraisal Report that complies with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice (USPAP). As such, it presents no discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's work file. The depth of discussion contained in this report is specific to the needs of the client and for the stated intended use. The appraiser is not responsible for unauthorized use of this report. The signed Certification is attached as Appendix B.

Sincerely yours,

Daniel J. McConville
ME Certified General Appraiser #CG2841
Forest intel LLC

## TABLE OF CONTENTS

LETTER OF TRANSMITTAL ................................................................................................i

TABLE OF CONTENTS.....................................................................................................ii

ASSUMPTIONS AND LIMITING CONDITIONS ........................................................... iii

REPORT.............................................................................................................................1

    Identification of the Property ..........................................................................1

    Client, Intended Users, and Intended Use......................................................2

    Important Dates ...............................................................................................2

    Value Appraised ..............................................................................................2

    Scope of Work .................................................................................................2

    Extraordinary Assumptions ............................................................................3

    Hypothetical Conditions .................................................................................3

    Existing Use ....................................................................................................3

    Highest and Best Use ......................................................................................3

    Definition of Market Value .............................................................................3

    Appraisal Standards ........................................................................................4

    Valuation Premises .........................................................................................4

    Analysis...........................................................................................................5

    Final Conclusion ...........................................................................................10

    Exposure Period ............................................................................................10

### TABLES AND FIGURES

Table 1. Gross Timber Volume and Value...........................................................5

Table 2. Sales Comparison Approach Summary ................................................. 8

Table 3. Sales Comparison Approach Reconciliation.........................................10

### APPENDIX

Appendix A.    Property Maps

Appendix B.    Certification

Appendix C.    Appraiser Qualifications

Appendix D.    Conservation Easement

## ASSUMPTIONS AND LIMITING CONDITIONS

1. This appraisal is documented in a Restricted Appraisal Report that complies with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice (USPAP). As such, it presents little or no discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's work file. The depth of discussion contained in this report is specific to the needs of the client and for the stated intended use. The appraiser is not responsible for unauthorized use of this report.

2. This Restricted Appraisal Report estimates the market value of all rights, title, and interest in and to the subject property as of the effective date of December 13, 2023, the date of the property inspection. After the effective date a significant storm caused flooding on the subject property damaging bridges and interior roads. The appraiser did not inspect the property after the damage occurred. As instructed by the client, this appraisal estimates the market value of the subject property as of the effective date and thus prior to the storm. The client understands that the market value of the subject property was likely negatively impacted by the damages to the infrastructure caused by the storm and therefore understands that the market value of the subject property is likely less at the date of this report than what is presented in this Restricted Appraisal Report.

3. Unless specified otherwise, this appraisal assumes that the subject property is free of liens and encumbrances, in responsible ownership, and under competent management, with free and clear title. The appraiser assumes no responsibility for matters legal in nature and infers no opinion of title.

4. The appraiser has taken legal descriptions and dimensions from sources thought to be authoritative, but neither assumes nor suggests responsibility for either. The appraiser has not surveyed the property. Maps, drawings, and pictures presented in this report are intended merely to assist the reader.

5. This report may not be used by any party other than the *client* and *intended users*, as so identified in this report, without the prior written consent of the appraiser. No portion of this report or addendum material may be photocopied and/or distributed to a third party without the prior written consent of the appraiser. This limitation to copying and distributing the report is not intended to constrain the government in its obligations to comply with Freedom of Information Act.

6. Possession of all or any part of this report, or a copy thereof, does not confer the right of publication. Neither all nor any part of this report may be conveyed to the public through advertising, public relations, news releases, sales brochures, or other media without the written consent and approval of the appraiser.

7. This report may not be used for any purpose other than the purpose for which it was prepared. Its use is restricted to consideration of its entire contents.

8. The preparation of this report shall not obligate the appraiser to testify or appear in court unless prior arrangements have been made with the appraiser.

9. Unless specified otherwise, the appraiser has not considered the existence of potentially hazardous material on the property used in the construction or maintenance of improvements, if any, or the existence of toxic wastes. The appraiser is not qualified to detect such substances. It is assumed that the property is free of hazardous waste as

that term is defined under both federal and state statutes. The appraiser has not been provided with an environmental study, nor has the appraiser undertaken any environmental study. The reader is urged to consult experts in this field if appropriate.

10. The appraiser has not undertaken a soils analysis in conjunction with this study. Development activity undertaken should be based on soils tests conducted by a licensed site evaluator.

11. The Uniform Standards of Professional Appraisal Practice defines an **extraordinary assumption** as "an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions or conclusions." Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis." **I make no extraordinary assumptions in this appraisal.**

12. The Uniform Standards of Professional Appraisal Practice (2020-2021 ed.) defines a **hypothetical condition** as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." **No hypothetical conditions were used in this appraisal.**

13. Opinions regarding zoning and other land use regulations rendered by state and local officials are not binding on the state and local agencies; although they may be used in this report to provide a reasonable analysis of uses to which the property may legally be put.

14. Neither Forest Intel LLC, nor the appraiser is liable for any consequential or special damages arising from any error in the conduct or presentation of this review. Any liability on the part of the appraiser or Forest Intel LLC is limited to the amount of fees collected for work conducted by the appraiser or appraiser's firm in connection with the appraisal review.

# REPORT

### IDENTIFICATION OF THE PROPERTY

This is an appraisal of all the rights, title, and interest in and to 3,364 acres of forested land held by The Center for Special Needs Trust Administration, Inc. (CSNT) subject to a working-forest conservation easement (CE) held by the State of Maine. The property is identified for property tax purposes by the Town of Newry as Map R-8, Lot 10.

CSNT purchased the property from Les Bois Carthage, Inc. on December 17, 2007, for $3,000,000 recorded in Oxford County Registry of Deeds, Book 4241, Page 271. On December 11, 2009, CSNT conveyed the CE to the State of Maine, recorded in Oxford County Registry of Deeds, Book 4537, Page 193. The sale price of the CE was reportedly $1.57 million ($458 per acre), but I was not able to confirm the sale price with the grantor or grantee.

The property is in the northwest corner of the Town of Newry, abutting the Grafton Township line in the north and the Riley Township line to the west. It is legally and physically accessible by way of an access easement across a private road known as Poplar Brook Lane that extends westerly from Maine State Route 26. Exterior and interior access is challenged by Bear River, brooks and streams. Poplar Brook Lane crosses Bear River near the Route 26 intersection via a privately owned and maintained bridge. A second bridge on Poplar Brook Lane crosses Poplar Brook before reaching the subject property. This bridge was poorly constructed using old tires and needs to be replaced. It's my understanding that the subject landowner is responsible for maintaining this bridge. After the bridge, Poplar Brook Road extends onto and into the subject property. The road is in good condition to the subject property line. Poplar Brook Lane continues in a westerly direction parallel with Poplar Brook, eventually extending onto the subject. The Poplar Brook Road crosses Poplar Brook again where there's a newer bridge with good concrete abutments and steel. The runners on the bridge are rotted and need to be replaced. Interior access is sufficient for timber harvesting, although road maintenance is required prior to future timber harvesting.

The property is encumbered by a CE that divides the property into two "use" areas; the 747-acre "Natural Area," in which timber harvesting is prohibited, and the 2,617-acre "Timber Management Area" in which timber harvesting is permitted but is not required. Timber harvesting must be "designed and implemented to ensure a continuing, renewable, and long-term harvest of forest products…in accordance with a Forest Management Plan." The plan must be submitted to the CE holder annually, but it is not subject to the holder's approval. The landowner (i.e. the grantor of the CE) granted the CE Holder with a perpetual right to allow and manage public access. However, the landowner can charge fees for access

deemed reasonable to cover infrastructure costs. A copy of the CE is included in the Appendix.

## CLIENT, INTENDED USERS, AND INTENDED USE

CSNT is Forest Intel LLC's client and sole intended user of this report. I understand that CSNT is considering selling the subject property and will use this appraisal as part of its due diligence. It is not intended for any other use.

## IMPORTANT DATES

The effective date of appraisal is December 13, 2023. The appraisal analysis and the report were completed on January 23, 2024.

## VALUE APPRAISED

This is an appraisal of all the rights, title, and interest in and to 3,364 acres of forested land held by The Center for Special Needs Trust Administration, Inc. (CSNT) subject to a working-forest conservation easement (CE) held by the State of Maine.

## SCOPE OF WORK

For this appraisal, I conducted the following tasks:

- Reviewed and analyzed property data provided by CNST as well as publicly available data;
- Interviewed market participants and other sources concerning current market conditions;
- Reviewed pertinent land use regulations;
- Reviewed files and contacted appropriate persons to identify and verify relevant market data (especially comparable sales data);
- Considered all approaches to value using the sales comparison approach only to arrive at a value conclusion for the subject; and
- Prepared this Restricted Appraisal Report.

## EXTRAORDINARY ASSUMPTIONS

The Uniform Standards of Professional Appraisal Practice defines an **extraordinary assumption** as "an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions or conclusions." Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis." **I make no extraordinary assumptions in this appraisal.**

## HYPOTHETICAL CONDITIONS

USPAP defines a **hypothetical condition** as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." **I do not use any hypothetical conditions in this appraisal.**

## EXISTING USE

Commercial timber production and passive recreation.

## HIGHEST AND BEST USE

Commercial timber production and passive recreation.

## DEFINITION OF MARKET VALUE

*"The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*

- *Buyer and seller are typically motivated;*

- *Both parties are well informed or well advised, and acting in what they consider their best interests;*

- *A reasonable time is allowed for exposure in the open market;*

- *Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."*

(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)"

## APPRAISAL STANDARDS

The appraisal process and resulting restricted report were performed in accordance with USPAP. This report presents little or no discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's work file. The depth of discussion contained in this report is specific to the needs of the client and for the stated intended use.

## VALUATION PREMISES

Appraisal technique seeks to duplicate the process, conscious or unconscious, by which the typical buyer of the property would arrive at the price to be paid. That is, in appraising property, the appraiser must put himself in the shoes of the typical buyer. What process would this prospective purchaser use to arrive at the price to be paid?  It is also important to consider the willing seller's viewpoint.

Appraisal theory holds that market value can be estimated in three ways: by the income capitalization approach, the sales comparison approach, and the cost approach. The sales comparison approach was used to estimate the market value of the subject property. Neither the cost nor income approaches were used because I do not believe they would lead to a more credible estimate of value.

## ANALYSIS

### Gross Timber Volume and Value

The subject property was cruised by Prentiss & Carlisle in December 2023. The merchantable timber volume estimate totaled 47,420 cords, or 18.1 cords per forested acre[1] and 14.1 cords per gross acre (Table 1). Hardwood products make up 64.5% of the merchantable volume and softwood products comprise 35.5%.

I developed stumpage value estimates using conversion return analysis, which is how most buyers estimate stumpage values to estimate values at the effective appraisal date. The rates were developed based on the location of the property relative to the most logical markets. Table 1 shows the estimated gross timber volume and gross timber value (GTV) of $2.36 million or $702 per gross acre. Hardwood sawtimber accounts for $1.41 million or 59.7% of GTV.

### Table 1. Gross Timber Volume and Value

|  |  | Acres | Cds/Ac | GTV/Ac |  |
|---|---|---|---|---|---|
|  | Productive: | 2,617 | 18.1 | $902 |  |
|  | Gross: | 3,364 | 14.1 | $702 |  |

| Product | Volume | Percent of Total Volume[1] | Unit Rate[2] | Gross Retail Timber Value[3] | | | |
|---|---|---|---|---|---|---|---|
|  |  |  |  | Total Value | Percent | per total acre | per forest acre |
| *Pulpwood:* | *Cords* |  |  |  |  |  |  |
| Mixed Hardwood | 22,705 | 47.9% | $24.00 | $544,920 | 23.1% | $161.99 | $208.22 |
| Spruce-Fir | 3,235 | 6.8% | $1.00 | $3,235 | 0.1% | $0.96 | $1.24 |
| Pine | 214 | 0.5% | $1.00 | $214 | 0.0% | $0.06 | $0.08 |
| Hemlock | 6,482 | 13.7% | $1.00 | $6,482 | 0.3% | $1.93 | $2.48 |
| *Pulpwood Totals* | *32,636* | *68.8%* | *$17.00* | *$554,851* | *23.5%* | *$164.95* | *$212.02* |
| *Sawtimber:* | *MBF* |  |  |  |  |  |  |
| *Softwood* |  |  |  |  |  |  |  |
| Spruce | 1,339 | 6.8% | $190.00 | $254,410 | 10.8% | $75.63 | $97.21 |
| Fir | 130 | 0.7% | $140.00 | $18,200 | 0.8% | $5.41 | $6.95 |
| Hemlock | 1,664 | 7.0% | $75.00 | $124,800 | 5.3% | $37.10 | $47.69 |
| *Total Softwood ST* | *3,133* | *14.5%* | *$126.85* | *$397,410* | *16.8%* | *$118.14* | *$151.86* |
| *Hardwood* |  |  |  |  |  |  |  |
| Y Birch | 1,082 | 4.0% | $330.00 | $357,107 | 15.1% | $106.16 | $136.46 |
| Hd Maple | 1,174 | 2.9% | $400.00 | $469,504 | 19.9% | $139.58 | $179.41 |
| Sf Maple | 115 | 0.5% | $265.00 | $30,475 | 1.3% | $9.06 | $11.65 |
| W Ash | 332 | 0.6% | $250.00 | $83,061 | 3.5% | $24.69 | $31.74 |
| Aspen | 169 | 0.8% | $240.00 | $40,560 | 1.7% | $12.06 | $15.50 |
| Boltwood | 211 | 0.9% | $285.00 | $60,104 | 2.5% | $17.87 | $22.97 |
| Hardwood Pallet | 1,533 | 6.9% | $240.00 | $367,920 | 15.6% | $109.38 | $140.59 |
| *Total Hardwood ST* | *4,616* | *16.6%* | *$305.18* | *$1,408,730* | *59.7%* | *$418.79* | *$538.30* |
| **Subtotal ST** | **7,749** | **31.2%** | **$233.08** | **$1,806,140** | **76.5%** | **$536.93** | **$690.16** |
| *Summary:* |  |  |  |  |  |  |  |
| Total softwood | 16,831 | 35.5% | $24.20 | $407,341 | 17.3% | $121.10 | $155.65 |
| Total hardwood | 30,589 | 64.5% | $63.87 | $1,953,650 | 82.7% | $580.78 | $746.52 |
| **GRAND TOTAL** | **47,420** | **100.0%** | **$49.79** | **$2,360,991** | **100.0%** | **$701.88** | **$902.17** |

[1] Timber volume estimates come from 12/11/2023 timber cruse. [2] Price data developed from Forest Intel conversion return analysis, which was based on surveys. [3] Undiscounted for illiquid timber and the time value of money.

---

[1] The forested acreage is equal to all area except for the 746 acres identified as the Natural Area. The forested acreage includes some inoperable area, wetlands, roads, and other non-forested area.

**Sales Comparison Approach**

Appraisers use the sales comparison approach to estimate market value by comparing the subject with similar, recently sold properties in the same or similar competing areas. Analyzing the degree of comparability between properties involves judgments as to their similarity with respect to such factors as GTV, location, zoning, and utility.

The sale prices of the most comparable properties tend to set the value range in which the subject will fall. Further analysis of the comparable data entails an adjustment process which effectively "normalizes" the sales by accounting for specific differences between each sale and the subject. Each sale provides an independent indication of what the buyer of that sale would pay for the subject property. I then reconcile these estimates into a value conclusion.

**Important Features of the Subject**

The subject is a CE-encumbered timberland property with average timber stocking. It's located in an area where timberland management is prevalent and where good markets exist to buy most timber products. There are a limited number of CE-encumbered sales from which to analyze, with most timberland sales being unencumbered properties. Legal access is by deeded right-of-way but the physical access along the ROW and within the property is challenged by waterways and steep terrain. In order to harvest and deliver forest products, the landowner must maintain the roads and bridges within and adjacent to the property, which is challenging to do on the subject.

**Sales Comparison Approach**

I identified seven sales as comparable to the subject property; each of which is encumbered by a CE. The sales are in similarly rural areas but span a wide geographic distance from western Maine to the New York Adirondacks.

Timberland markets for unencumbered properties have changed significantly over the past few years with values increasing by over 30% percent since the first quarter of 2020.[2] Markets for CE-encumbered properties have been more stable, and when normalized for timber markets have increased by about 10% since Q1 2020. Due to the dynamic market, I avoided using sales that closed prior to 2021, only selecting sales that closed after the onset of the pandemic when the real estate market began its significant appreciation. The seven sales closed between February 2021 and May 2023. Sales ranged from 2,353 acres to 7,211 acres, with a mean and median of 5,063 and 4,944 acres, respectively, thereby bracketing

---

[2] Based on analysis of rural land sales in the MLS database, less than 1,000 acres with little timber value and no significant water frontage.

the subject in terms of size but skewing larger. GTV ranged from $514 to $1,410 with mean and median values of $885 and $855 or skewing larger than the subject ($702/acre).

For the class of buyer that would compete for the subject property, these transactions represent the best available evidence of market value. Summary details of each of these transactions are shown in Table 2 and retained in the appraiser's files. Forest Intel has verified transaction details with buyer, seller, and/or agent. Table 3 summarizes the reconciliation analysis.

Initial quantitative adjustments were made for three variables (interest conveyed, sale conditions, and market conditions), resulting in an adjusted value per acre ranging from $401 to $579 per acre, averaging $887 per acre. No adjustments were made for interest conveyed or sale conditions. The market conditions adjustment was computed using regression analysis of 21 CE-encumbered sales that closed in Maine, New Hampshire, Vermont, and New York since January 2019.

Next, I adjusted for GTV and lease income. The GTV adjustment was computed as the subject GTV minus the sale GTV, multiplied by 55%. The multiplier was developed using regression analysis and implies that for every one dollar increase in GTV, sale price increases by 55%. Two sales had annual lease income amounting to $4.34 and $1.62 per acre per year. I capitalized the lease income using a cap rate of 6% resulting in adjustments of -$72.30 per acre for Sale 8254 and -$26.97 per acre for Sale 8138. After adjusting for GTV and lease value the ales ranged from $459 to $600 per acre with mean and median values of $529 and $504 per acre, respectively.

Next, I compared the sales to the subject for six qualitative characteristics (CE terms, amenities, access, topography, land use regulation, and location). I refer to these as *qualitative* because while these factors clearly influence value, I do not have the data to develop a quantitative adjustment for each, such as with a paired sale analysis or regression analysis. Each sale was rated as inferior (▲), similar (=), or superior (▼) to the subject for each qualitative characteristic. The "▼" and "▲" symbols indicate the direction of an adjustment. For example, a "▲" adjustment indicates the sale is "inferior" to the subject for that attribute and should be adjusted upward. It's worth noting that the easements limit development reducing the effect of the amenities and zoning on value, and the lease adjustment already adjusts for differences in amenity value for two sales. For those reasons, I made no adjustments amenities and only adjusted for zoning as it relates to timber harvesting regulations.

## Table 2. Sales Comparison Approach Summary

| ITEM | SUBJECT | 8254 | 8224 | 8202 | 8191 | 8223 | 8138 | 8261 | MEAN |
|---|---|---|---|---|---|---|---|---|---|
| Grantor | | TCF | TCF | VLT | VLT | TCF | Phillips | Draper | |
| Grantee | | CRT | US For. Inv. | Timber Rings | Seidman | Success Forest | One Hackmatack | Dillon | |
| Location | Newry, ME | Clifton & Colton, NY | Campton & Sandwich, NH | Elmore & Worcester, VT | Worcester, VT | Success, NH | U Cup. & L Cup. & Davistown, ME | Moxie Gore, ME | |
| Date of Sale | 12/13/2023 | 5/31/2023 | 9/14/2022 | 6/15/2022 | 1/13/2022 | 9/23/2021 | 6/30/2021 | 2/23/2021 | |
| H&BU | For. Mgmt | Tbr & Rec. | Tbr & Rec. | Tbr & Rec. | Tbr & Rec. | Tbr & Rec. | Tbr & Rec. | Tbr & Rec. | MEAN |
| Sale Price | | $4,400,000 | $4,000,000 | $3,070,000 | $1,895,000 | $3,625,000 | $2,700,000 | $1,200,000 | $2,984,286 |
| Acres | 3,364 | 7,211 | 5,441 | 3,568 | 2,353 | 8,741 | 4,944 | 3,183 | 5,063 |
| Cords/Acre | 14.1 | 21.7 | 19.0 | 39.8 | 32.4 | 15.4 | 16.7 | 19.1 | 23.5 |
| GTV/Ac | $702 | $855 | $981 | $1,410 | $1,175 | $593 | $668 | $514 | $885 |
| SP:GTV Ratio | | 71% | 75% | 61% | 69% | 70% | 82% | 73% | 72% |
| Price/Acre | | $610 | $735 | $860 | $805 | $415 | $546 | $377 | $621 |
| Int. conveyed | CE Encumbered Fee | 99.5% CE Enc. Fee | CE Enc. Fee | CE Enc. Fee | CE Enc. Fee | CE Enc. Fee | CE Enc. Fee | w ME | |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | |
| Adjustment | | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Sale cond. | Normal | Normal | Normal | Normal | Normal | Normal | Normal | Normal | |
| Comparison | | Similar | Similar | Similar | Similar | Similar | Similar | Similar | |
| Adjustment | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Mkt cond. | Current | 6 months Inferior | 15 months Inferior | 18 months Inferior | 23 months Inferior | 27 months Inferior | 29 months Inferior | 34 months Inferior | |
| Comparison | N/A | | | | | | | | MEAN |
| Adjustment | | 1.0% | 2.5% | 3.1% | 3.7% | 5.0% | 5.7% | 6.4% | |
| Adj. SP/ac | | $615 | $754 | $887 | $835 | $436 | $577 | $401 | $644 |
| GTV/Ac. | $702 | $855 | $981 | $1,410 | $1,175 | $593 | $668 | $514 | |
| Comparison Adjustment | | Superior -$84.22 | Superior -$153.67 | Superior -$389.47 | Superior -$260.22 | Inferior $59.94 | Inferior $18.50 | Inferior $103.33 | MEAN -$101 |
| Adj. SP/ac | | $531 | $600 | $498 | $575 | $495 | $596 | $504 | $543 |
| Lease Income | $0.00 | $4.34 | $0.00 | $0.00 | $0.00 | $0.00 | $1.62 | $0.00 | |
| Comparison Adjustment | | Superior -$72.30 | Similar $0.00 | Similar $0.00 | Similar $0.00 | Similar $0.00 | Superior -$26.97 | Similar $0.00 | MEAN |
| Adj. SP/ac | | $459 | $600 | $498 | $575 | $495 | $569 | $504 | $529 |
| CE Terms | No dev, no subdiv, mgmt plan review, public use | No dev, no subdiv, mgmt plan w/ holder approval, limited public access | No dev, mgmt plan req. but min. restrictions, no subdiv, cannot restrict pub access | CE requires sustainable forestry, allows pedestrian pub access, no subdiv, allows 3 prim. 800 SF camps | CE requires sustainable forestry, allows pedestrian pub access, no subdiv, allows 3 prim. 800 SF camps | No dev, stringent mgmt plan req. w/ annual review, harv restrictions on 1,514 ac, no subdiv, cannot restrict pub access | No dev, mgmt plan req. but min. restrictions, can create 1 more lot, can restrict pub access | No dev, no subdiv, min harv restrictions., can restrict pub access | |
| Comparison Adjustment | | Similar = | Similar = | Similar = | Similar = | Slightly Infer. ▲ | Similar = | Slightly Super. ▼ | |
| Amenities | Mnt views; river and stream frontage | Encompasses 15-ac pond Dillon Pond; streams; 18 hunting camps; leased | Mnt views; Beebe R frontage | Mnt views; sugar potential | Mnt views; sugar potential | Mnt and pond views | Mnt views, pond frontage; sev'l lease lots ~$8k/yr | Minimal | |
| Comparison Adjustment | | Similar = | Similar = | Similar = | Similar = | Similar = | Similar = | Similar = | |
| Access | Fair: ROW from public road; fair interior | Excellent: Exc. pub rd frontage, good internal access | Good: Class VI rds, fair int. access | Fair: some pub. rd. & ROW, fair int. | Fair: some pub. rd. & ROW, fair int. | Fair: ROW, good interior | Good: ROW, good interior | Fair: ROW, good interior | |
| Comparison Adjustment | | Somewhat Super. ▼▼ | Slightly Super. ▼ | = | = | Similar = | Slightly Super. ▼ | Slightly Super. ▼ | |
| Topography | Mountainous to hilly, min. wetlands | Rolling; 18.3% wetlands | Hilly; min. wetlands | Hilly to mountainous | Hilly to mountainous | Hilly, 10.6% wetlands; minor | Rolling; 1.9% wetlands | Flat, 3.6% wetlands | |
| Comparison Adjustment | | Somewhat Infer. ▲▲ | Slightly Super. ▼ | = | Similar = | Similar = | Slightly Super. ▼ | Slightly Super. ▼ | |
| Zoning | Local, minimal | APA 96% Res. Mgmt 4% Rur Use | Local, minimal | Local, minimal | Local, minimal | Local, minimal | LUPC, 6.8% P-GP/P-SL2, 1.9% P-WL1&2 | LUPC, 7.9% P-FW | |
| Comparison Adjustment | | Similar = | Similar = | Similar = | Similar = | Similar = | Slightly Infer. ▲ | Slightly Infer. ▲ | |
| Location | Rural western ME | NW AP | Rural C NH | Rural N-C VT | Rural N-C VT | Remote N NH | Remote | NW ME | |
| Comparison Adjustment | | Slightly Infer. ▲ | Similar = | Similar = | Similar = | Similar = | Similar = | Slightly Infer. ▲ | |
| Unit basis: Adjustment | | Slightly Infer. ▲ | Somewhat Super. ▼▼ | = | Similar = | Slightly Infer. ▲ | Slightly Super. ▼ | Similar = | MEAN |
| Adj Vol/Ac | | $459 | $600 | $498 | $575 | $495 | $569 | $504 | $529 |
| Total Value | | $1,543,449 | $2,018,926 | $1,674,389 | $1,934,295 | $1,666,145 | $1,912,570 | $1,696,587 | $1,778,052 |

| | Low | Best Estimate | High |
|---|---|---|---|
| SCA Estimate: | $1,540,000 | $1,680,000 | $2,020,000 |
| Per acre: | $459 | $500 | $600 |

▼ Sale is superior to subject and price should be adjusted downward; ▲ Sale is inferior to subject and price should be adjusted upward; = Sale is about equal to the subject.
NOTE: Order of magnitude is "Slightly, Somewhat, Significantly."

Sales were further differentiated using the preceding adverbs, in order of magnitude, "slightly," "somewhat," and "significantly," assigning one, two, three symbols depending on the preceding adverb. In the final analysis, I considered the net effect of the adjustments to develop an overall rating for each sale. For example, if a sale was rated as "somewhat superior" to the subject, the conclusion implies that the market value of the subject ought to be somewhat less than that sale's adjusted sale price.

Table 3 summarizes the reconciliation process. Two sales were rated as "slightly inferior," two as "similar," one sale as "somewhat superior," and one as "slightly superior." Thus, the sales did a good job of bracketing the subject for the qualitative factors. The "slightly inferior" sales imply that the market value of the subject is "slightly more than" $459 per acre (Sale 8254) or slightly more than $495 per acre (Sale 8223); the "similar" sales imply the subject is "about equal to" $498 per acre (Sale 8202) or $575 per acre (Sale 8191); the "somewhat superior" sale implies the subject is "somewhat less than" $600 per acre (Sale 8224); and the "slightly superior" sale implies the subject is "slightly less than" $569 per acre (Sale 8138).

The logic is somewhat gray because Sale 8191 implies that the subject is "about equal to" $570 per acre, while Sale 8138 implies the subject is "slightly less than" to $569 per acre. Moreover, Sales 8202 and 8191 are both rated as similar, although they vary from $498 to $575 per acre. However, the range in the adjusted sale prices reflects typical variance in the marketplace, as buyer and seller motivation vary from deal to deal. Moreover, intangible differences between the sales and subject also contribute to variance. This is why it's important to analyze several sales as well as to use good judgement when reconciling the results of the analysis.

The "similar" sales average $536 per acre, which is one indication of value. The average of the first "slightly inferior" sale (8254) and the "slightly superior" sale (8138) is $514 per acre, and another indication of value, and the average of the second "slightly inferior" sale (8223) and the slightly superior sale (8138) is $532 per acre. The three pairs suggest values of $514, $536, and $532 per acre. After careful analysis and consideration of the relative comparability of each sale, I conclude a value of $530 per acre, or 1.78 million, with a range of $459 to $600 per acre. The range is computed as the low and high adjusted sale prices.

**Table 3. Sales Comparison Approach Reconciliation**

| Sale# | Comparison | Rating | Adjusted Value/Ac. | Adjusted Value | | Implication | Adj. Value |
|-------|-----------|--------|-------------------|----------------|---|-------------|------------|
| *Newry Stowe Mnt. Tract, as of:* | | | *December 13, 2023* | | | | |
| 8254 | Slightly Infer. | ▲ | $459 | $1,543,449 | | *Subject is slightly greater than:* | *$1,540,000* |
| 8224 | Somewhat Super. | ▼▼ | $600 | $2,018,926 | | *Subject is somewhat less than:* | *$2,020,000* |
| 8202 | Similar | = | $498 | $1,674,389 | | *Subject is about equal to:* | *$1,670,000* |
| 8191 | Similar | = | $575 | $1,934,295 | | *Subject is about equal to:* | *$1,930,000* |
| 8223 | Slightly Infer. | ▲ | $495 | $1,666,145 | | *Subject is slightly greater than:* | *$1,670,000* |
| 8138 | Slightly Super. | ▼ | $569 | $1,912,570 | | *Subject is slightly less than:* | *$1,910,000* |
| 8261 | Similar | = | $504 | $1,696,587 | 0% | *Subject is about equal to:* | *$1,700,000* |

|  | $/Acre | Total |
|---|--------|-------|
| Arithmetic mean, all sales: | $533 | $1,790,000 |
| Mean value of "similar" sales: | $536 | $1,800,000 |
| **Best estimate:** | **$530** | **$1,780,000** |
| Low estimate from Sale 8254: | $459 | $1,540,000 |
| High estimate from Sale 8224: | $600 | $2,020,000 |
| Range as % of best estimate: | | 27% |

## FINAL CONCLUSION

I relied exclusively on the sales comparison approach to estimate the market value of the subject property. I did not use the income or cost approaches. The income and cost approaches are not appropriate for vacant parcels without a regular income stream and with little chance of a large residential subdivision.

The sales comparison approach produces a market value estimate of $530 per acre, or $1.78 million, with a plausible range from $459 to $600 per acre.

Therefore, the market value of the subject property as of December 13, 2023, based solely on the sales comparison approach and subject to the assumptions and limiting conditions stated herein is:

<div align="center">

*** ONE MILLION SEVEN HUNDRED AND EIGHTY THOUSAND DOLLARS ***
*** $1,780,000 ***
($530 per Acre)
Range: $1.54 to $2.02 million

</div>

## EXPOSURE PERIOD

3 to 6 months.

*Appendix A*
*Property Maps*

Subject Location Map



Subject Aerial Map



Subject Topography Map



*Appendix B
Certification*

## CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct;

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and my personal, unbiased professional analyses, opinions, and conclusions;

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved;

- I have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment;

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment;

- My engagement in this assignment was not contingent upon developing or reporting predetermined results;

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal;

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice;

- I did inspected representative portions of the subject property for this appraisal assignment on December 13, 2023.

- No one provided significant real property appraisal assistance to the person signing this certification.

_____        _____
Daniel J. McConville                              January 23, 2024
                                                               Date

*Appendix C*
*Appraiser Qualifications*

## APPRAISER QUALIFICATIONS

**DANIEL J. McCONVILLE**

**SENIOR RESOURCE CONSULTANT/APPRAISER**

Daniel McConville started the consulting firm Forest Intel in 2023. His project work combines appraisal projects, timber valuation, due diligence, management consulting, and economic studies. Mr. McConville is a licensed professional forester and a licensed certified general appraiser. He has been appraising properties since 2005 in the US, Canada, Latin America, and Africa focusing on investment-grade timberland but including woodlots, waterfront parcels, agriculture, mineral and industrial properties. Mr. McConville has appraised properties throughout North, Central and South America and Africa for a variety of forest types. His experience includes appraising spruce-fir, pine, and northern hardwoods in the northeast US and eastern Canadian provinces; pine plantations and bottomland hardwood in the US Southeast; natural hardwoods in the Appalachian region; and pine, eucalyptus, gmelina and teak in Central and South America and Africa.

Mr. McConville has completed numerous economic studies, including feasibility/resource studies to project supply, demand and pricing for clients seeking to build or buy or expand existing plants that use forest resources, including sawmills, pulp/paper mills, pellet plants and biomass facilities. This work includes developing cost models along the fiber supply chain and forecasting supply, demand and pricing into the future.

Prior to starting Forest Intel, Mr. McConville worked at Sewall for ten years and at Prentiss & Carlisle for seven years. While at both firms, he provided appraisals, valuation services including analysis for trades, acquisitions and dispositions of timberlands, and feasibility studies for existing and proposed industrial plants. In addition to appraisals and valuation work, Mr. McConville assisted with the management of more than 1.3 million acres of timberland, including forest-level planning, highest and best use determination, development of silviculture guidelines, and documentation for FSC "Green" certification while working at Prentiss & Carlisle. Mr. McConville has published widely and has given presentations nationally and internationally on subjects dealing with silviculture and forest stand-level financial analysis.

**Education**

B.A., History, Middlebury College, 1991
Post-Baccalaureate, Forest Management, University of Washington, 1992-1994
M.S., Forestry, University of Maine, 1998

**Professional Affiliations & Licenses**

Licensed & Certified General Appraiser, Maine and New York
Licensed Professional Forester, Maine
Former Faculty Associate, School of Forest Resources, University of Maine

**Relevant Experience**

Feb. 2023 – Present: Owner of Forest Intel LLC, a consulting company specializing in valuation work of timberland and rural land properties.

2012 – Feb. 2023: Sewall Old Town, Maine
*Senior Consultant/Appraiser:* Completed appraisals and due diligence studies for properties in North and Latin America and Africa and resource studies

2005-2012: Prentiss & Carlisle Company, Bangor, Maine
*Project Forester/Appraiser:* Completed various appraisals, feasibility studies, acquisition and disposition analysis, and provided forest management planning services

2000-2005: Cooperative Forestry Research Unit, University of Maine, Orono, Maine
*Research and Communications Coordinator*: Managed all aspects of applied research in silviculture and forest management and the communications program for all research activities

1998-2000: Joseph W. Jones Research Center, Newton, Georgia
*Research Associate:* Completed several applied research projects related to improving forest management technology

1995-1998: School of Forest Resources, University of Maine
*Research Assistant*: Silviculture and growth and yield analysis
*Teaching Assistant*: Silviculture

*Appendix D*
*Conservation Easement*

## CONSERVATION EASEMENT

**I.    PROJECT NAME:** Stowe Mountain, Newry, Oxford County, Maine

**II.    WORDS OF CONVEYANCE**

**THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.,** a Florida non-profit corporation with a mailing address of 4912 Creekside Drive, Clearwater, FL 33760, (hereinafter referred to as the "GRANTOR" which word shall include, unless the context clearly indicates otherwise, the above-named Grantor, jointly and severally, its personal representatives, heirs and assigns, its successors and assigns and any successors in interest to the Protected Property, and its executors, administrators and personal representatives), for full consideration paid and not as a gift, HEREBY GRANTS to the **STATE OF MAINE**, acting by and through its Department of Conservation, Bureau of Parks and Lands, a governmental entity having a mailing address of 22 State House Station, Augusta, Maine 04333 (hereinafter referred to as the "Holder", which word shall, unless the context clearly indicated otherwise, include Holder's successors and assigns):

with QUITCLAIM COVENANT in perpetuity, the following described Conservation Easement on real estate in the Town of Newry, County of  Oxford , and State of Maine, hereinafter referred to as the PROTECTED PROPERTY, and more particularly described in Exhibit A, and depicted on Exhibit B, both attached hereto and made a part hereof by reference, such grant to be exclusively for conservation purposes as set forth herein, and a right of way for vehicular access to the Protected Property as necessary or appropriate to exercise the Holder's  rights of monitoring, inspection and enforcement hereunder, over any and all rights-of-way and roads owned by Grantor or over which Grantor has or shall have rights of access to the Protected Property to the extent allowed under and subject to the terms of any such right of way, as more particularly described in Exhibit A**,** and shown on Exhibit B, provided, however, that this easement for a right of way shall not be deemed to be a part of the Protected Property subject to the terms and conditions set forth herein.

**III.    PURPOSE**

The State of Maine has purchased this Conservation Easement to forever conserve the Protected Property for the following purposes:

To protect in perpetuity the Protected Property's significant recreational, wildlife and ecological values for public benefit;

To allow the continued management of the Protected Property as a working forest and to ensure that, so long as the Protected Property is managed as a working forest, it will be managed for a continuing, renewable and long term source of forest products important to the economy of the State;

To protect rare and endangered species habitat, rare and exemplary natural communities and other significant wildlife values (including, without limitation, fisheries habitats and deer yards) and the natural, scenic, educational, scientific, recreational, historical and archaeological features of the Protected Property;

To conserve water quality, wetlands and riparian values of the Protected Property; and to maintain the fertility and quality of its soil;

To assure the sustained, natural capacity of the Protected Property and its soils to support healthy and vigorous forest growth and allow, but not require, commercial forest management. If undertaken, commercial forest management must be designed and implemented to assure a continuing, renewable and long-term source of forest products, maintain a healthy and biologically diverse forest that supports a full range of native flora and fauna, and limit adverse aesthetic and ecological impacts, particularly in riparian areas, high elevation areas and public vistas; and

To assure the availability of the Protected Property for traditional non-intensive outdoor recreation by the general public in accordance with applicable laws and regulations and the terms of this easement.

Grantor and Holder intend that this Conservation Easement will confine the use of the Protected Property to activities that are consistent with the purposes of this Conservation Easement.

## IV.    RECITALS

WHEREAS, Grantor is the sole owner of the Protected Property, which consists of approximately 3,364 acres of substantially natural and undeveloped forested land with streams, steep sloping uplands, alpine and subalpine habitat, hardwood, softwood and mixed wood forests, which property has been and continues to be managed for the long term economic benefit of its owners, including but not limited to management for production of forest products (hereinafter "Working Forest"); and

WHEREAS, the Protected Property is prominently visible from and provides scenic enjoyment to the general public from Route 26, a State designated Scenic Byway, and from area hiking trails, including the Appalachian Trail and the Grafton Loop Trail; and

WHEREAS, the Protected Property includes two significant tributaries to the Bear River, Simmons Brook and Wight Brook, with steep gradients and extensive cascading falls and pools; and,

WHEREAS the Protected Property contains an exemplary natural community, the Crowberry-bilberry Summit Bald Community, documented by the Maine Natural Areas Program along the ridge of Sunday River Whitecap; and,

WHEREAS the Protected Property encompasses a wide diversity of habitat due largely to the extensive variation in topography and elevation, and development of the Protected Property in excess of that allowed in this Conservation Easement would have an adverse effect on the ecology of the area; and

WHEREAS, the Protected Property is a predominately forested land area of significant breadth and diversity, with outstanding natural resources, including large tracts of undeveloped forests of high quality, productive soils, diverse wildlife and plant habitat, mountains, elevated ridges, streams, and unique natural features; and

WHEREAS, the Protected Property contains historically permissive popular recreational areas important to the people of the State of Maine, including portions of the Grafton Loop Trail and ITS snowmobile trail #82, and preservation of the opportunity for continued public access and traditional non-intensive outdoor recreation on the Protected Property by the general public, as defined herein, consistent with the preservation and protection of the other conservation values of

the Property and preservation of the opportunity for the continued management of the Protected Property as a Working Forest, is in the public interest; and

WHEREAS, Grantor and Holder agree that the use the Protected Property for commercial forest management under the terms of this Conservation Easement, consistent with the protection and preservation of rare and endangered species and rare and exemplary natural communities, significant wildlife values, special natural, historical or archaeological features, areas of high public value, and other conservation values identified herein are consistent with the goals of this Conservation Easement; and

WHEREAS, Grantor and Holder agree that opportunity for the continued management of the Protected Property as a working forest, in a manner that protects rare and endangered species and rare and exemplary natural communities and conserves significant wildlife values, special natural, historical or archaeological features, and areas of high public values, is consistent with the goals of this Conservation Easement; and

WHEREAS, Grantor and Holder agree that the opportunity for the continued management of the Protected Property as a Working Forest will confer the following public benefits: (a) provide a continuing, renewable and long-term source of forest products; (b) provide for long-term management of the forest in accordance with best management practices to prevent erosion, sedimentation and other degradation of soil and water resources; (c) maintain a natural resource base for a forest-based economy and corresponding employment opportunities; and (d) support further investment in local businesses and community services that depend directly upon, or provide ancillary services to, a forest-based economy and forest product industry; and

WHEREAS, the Grantor and Holder agree that the permanent protection of the Protected Property for conservation and traditional non-intensive outdoor recreation by the general public, while permitting its use for commercial forestry consistent with the protection of those values, will make a lasting contribution to the State of Maine; and

WHEREAS, in order to describe the present condition of the Protected Property and its natural and scenic resources so as to be able to monitor properly future uses of the Property and assure compliance with the terms hereof, Holder and Grantor have prepared an inventory of the Protected Property's relevant features and conditions (the "Baseline Documentation" hereinafter so called), which documentation is incorporated herein by reference, and the original of which is on file at the offices of the Holder and consists of descriptions, maps, and other documentation that the parties agree provide, collectively, the parties' efforts to assemble an accurate representation of the Protected Property as reasonably known to them as of the date of this grant, and is intended to serve as an objective, although not exclusive, information baseline for monitoring compliance with the terms of this Easement; and

WHEREAS, the Bureau of Parks and Lands of the State of Maine Department of Conservation is authorized to acquire land and interests in land, with the consent of the Commissioner of the Department of Conservation, pursuant to M.R.S.A. Title 12, Section 1850, subsection 1, for public reserved lands, and

WHEREAS, this Conservation Easement has been purchased for full fair market value in part with funds from Land for Maine's Future Fund, established under **Title 5 Maine Revised Statutes Annotated, Chapter 353, Section 6200**, and pursuant to the terms of **P.L. 1999 c. 514, Sec. A-6**, to acquire lands or conservation easements and other interests in land of statewide significance that: a) Contain recreation lands, prime physical features of the Maine landscape, areas of special

scenic beauty, farmland or open space, undeveloped shorelines, wetlands, fragile mountain areas, or lands with other conservation or recreation values; b)  Provide habitat for plant or animal species or natural communities considered rare, threatened or endangered in the State; or c) Provide access to recreation opportunities or to the above mentioned natural resources; and

WHEREAS, this Conservation Easement has been acquired, in part, with federal funds from the Forest Legacy Program in accordance with the provisions of Title XII of the Food, Agriculture, Conservation and Trade Act of 1990 (16 U.S.C. §2103c), as amended, which was enacted to protect environmentally important forest areas threatened by conversion to non-forest uses and for promoting forest land protection and other conservation opportunities.

## V.      INCORPORATION OF PURPOSES & RECITALS

THEREFORE, in consideration of the foregoing recitals and purposes the Grantor and Holder have established this Conservation Easement on, over and across the Protected Property consisting of the following terms, covenants, restrictions and affirmative rights granted to Holder, which shall run with and bind the Protected Property in perpetuity.

## VI.      RESTRICTIONS AND RESERVED RIGHTS

The Protected Property shall be used only for conservation, traditional non-intensive outdoor recreation by the general public, operation as a working forest and for such other uses by Grantor consistent with the purposes of this Conservation Easement not otherwise precluded under the terms of this Conservation Easement.  The Grantor specifically reserves all right, title and interest in and to the Protected Property not inconsistent with the terms, conditions and purposes of this Conservation Easement, subject to the affirmative rights granted to Holder herein. Without limiting the generality of the foregoing, the following restrictions and other terms shall be applicable with respect to the Protected Property:

## 1.      LAND USE.

A.      No residential, industrial, or commercial development, quarrying, mining, mineral development, energy generation installations, alteration of watercourses and water bodies, or building development activities are permitted on the Protected Property, except incidental to commercial forestry activities allowed herein and as otherwise expressly permitted herein, including but not limited to those structures as permitted under Section 3 below.

B.      Without limiting the generality of the foregoing and except as otherwise expressly permitted herein, residential housing units, docks, piers, campgrounds, condominiums, trailer parks, mobile homes, high-intensity lighting, motels or hotels, commercial advertising, billboards, towers, power generation, including wind power generation, or transmission facilities, antennas or equipment for telecommunications and/or radar, and use of the Protected Property as an aircraft landing site except in an emergency, all are specifically prohibited on the Protected Property.

C.      Discharge of waste water into surface or ground waters on or about the Protected Property is prohibited.  It is forbidden to dispose of or store rubbish, garbage, building debris, unserviceable vehicles and equipment or parts thereof, hazardous or other waste, hazardous or toxic substance, or other unsightly or offensive waste material on the Protected Property, except that organic matter, compost and logging debris may be used, stored or disposed of in a manner not detrimental to the conservation values of the Protected Property, and other waste generated by or

substances used in connection with permitted uses on the Protected Property, including fuel and other hazardous or toxic substances used in the ordinary course in connection with Forest Management Activities, may be stored temporarily in appropriate containment for removal at reasonable intervals, all in accordance with applicable state, local and federal laws and regulations.

D.    For the purposes of land uses permitted under the terms of this Conservation Easement, the Protected Property will be considered as 2 land use areas: the Grafton Loop Trail Buffer Area and the Forest Management Area, as generally depicted as the "Natural Area" and the "Timber Management Area", respectively, on Exhibit B, all attached hereto and made a part hereof by reference.

**2.    SUBDIVISION.**

A.    The Protected Property shall remain in its current configuration as an entirety without division, partition, subdivision or other legal or *de facto* creation of lots or parcels in separate ownership (but excluding any mortgage of the Protected Property in its entirety). Grantor may enter into boundary line agreements to resolve bona fide boundary line disputes with the prior written consent of Holder which shall not be unreasonably withheld, and further provided that the total acreage of land protected under this Conservation Easement shall not materially be reduced thereby without court order. Any real property received by Grantor in exchange for such conveyance shall automatically become subject to this Easement; any real property conveyed by Grantor in exchange for such conveyance shall be automatically released from the operation of this Easement, subject to obtaining court order, if applicable.

B.    Notwithstanding the foregoing, any portion of the Protected Property may be conveyed to Holder or to another entity that meets the requirements set forth in Section 11, for permanent conservation ownership by such a qualified entity, subject to the terms of this Conservation Easement.

C.    All rights to develop or use the Property that are expressly prohibited by or inconsistent with this Easement are extinguished, and can not be used to transfer development rights to other land, or to permit increased development or natural resource use or removal on other land, or to achieve other regulatory mitigation credits for fiber, discharge of pollutants, or other similar accommodation on land not subject to this Conservation Easement.

**3.    STRUCTURES.**

As of the date of this grant, there are no structures on the Protected Property other than as reflected in the Baseline Documentation.

No additional structures of any kind, temporary or permanent, may be located on the Protected Property, except that Grantor reserves the following rights:

A.    Minor Structures.  Grantor reserves the right to install, maintain, repair and replace minor, small scale structures to enhance the opportunity for traditional non-intensive outdoor recreation by the general public, and as necessary for the management of such recreation not detrimental to the conservation values of the Protected Property, including but not limited to the following:  trail markers; small unlighted informational and interpretive signs; trail improvements such as steps, bog bridges, water bars, footbridges, platforms, and railings; primitive campsites facilities; temporary tents for camping; tent platforms; registration boxes; wildlife observation stations; study markers and grids; gates, barriers or low fences to control unauthorized use, prevent

access by motor vehicles, or protect fragile areas and areas under active management or study, provided that all such minor structures must be designed and located to blend with the natural surroundings and complement the natural and scenic features of the landscape. Grantor also reserves the right to install and maintain the following public recreation management structures and facilities to be located in the Forest Management Area only**:** picnic facilities; portable or composting toilets or outhouses necessary to serve camping and/or day use areas; unpaved parking areas; registration and information kiosks; potable water facilities; and, temporary tents for periodic events. The areas of land on which such public recreational management structures and facilities are located shall not exceed twenty (20) acres in the aggregate.

B.      Forestry Improvements.  Grantor reserves the right to install, maintain, repair and replace minor or temporary structures necessary or appropriate to accomplish its forest management activities on the Forest Management Area, said activities as defined in Section 7.A, hereafter "Forestry Improvements", including but not limited to portable privies, temporary equipment sheds, temporary sawmills, gates, barriers, fences, fresh water systems, boundary markers, provided that they **(1)** are designed and located in a manner that minimizes, to the extent reasonably practicable, the impact on the scenic and substantially undeveloped character of the Protected Property when viewed from public vantage points along State Route 26, **(2)** are set back at least 250 feet, measured horizontally, from any wetlands, watercourses or the existing ITS snowmobile trail #82, and **(3)** are not located within the Grafton Loop Trail Buffer Area. The Grantor also reserves the right to install bridges, drainage and support structures for winter roads, skid roads and permanent roads permitted in Section 4, permitted Surface Alterations, that may be necessary to accomplish its Forest Management Activities on the Protected Property.  When Forestry Improvements cease to be used, as evidenced by the cessation of their use and their lack of maintenance for a period of ten (10) consecutive years, and such cessation of use and lack of maintenance results in an unsafe condition, a danger to human health, or a threat to the environment ("adverse conditions"), then any such adverse conditions shall either be repaired or remedied by Grantor or shall be removed by Grantor and, if removed, the site of such structures, improvements and utilities shall be allowed to return to a natural condition and the Grantor shall remove any utilities, cap any wells or septic systems, and remove or burn and bury any decaying structures at the Grantor's cost and expense.

## 4.      SURFACE ALTERATIONS.

As of the date of this grant, there are no surface alterations on the Protected Property except for  unpaved trails, skid trails, unpaved woods roads and timber landing areas, one gravel pit, stump dumps, and erosion control systems, all of which are to be described in the Baseline Documentation.

No additional filling, dumping, excavation or other alteration may be made to the surface or subsurface of the Protected Property or to its surface or ground waters, or wetlands; except that the Grantor reserves the following rights on the Forest Management Area, provided that in every case the disturbed surrounding area must be restored as soon as reasonably possible to a state consistent with the conservation values to be protected by this Conservation Easement:

A.      Grantor reserves the right to maintain, repair and replace the existing surface alterations described above in this Section 4, and the right to alter the surface to the minimum extent necessary to exercise the rights reserved in Sections 3 and 5 herein;

B.      Grantor reserves the right to establish and maintain, repair and replace additional woods roads provided for in the Forest Management Plan required in Section 5.A, and to install

erosion control devices, and establish timber landing areas, temporary winter woods road and skid trails, all subject to any applicable design and location requirements and compliance with Best Management Practices for such activities and the other requirements of this easement.

C.    Except where otherwise prohibited or restricted by this Easement, Grantor reserves the right to excavate and use, in accordance with applicable provisions of the Forest Management Plan, gravel and rock found within the Protected Property exclusively for construction and maintenance of woods roads, timber landings and trails permitted on the Protected Property and the access road within the right of way benefiting the 12.8 acre parcel reserved by Grantor in Exhibit A hereto and on other, adjoining land owned by Grantor; provided that the exposed mineral surface of any such gravel or borrow pit (i) shall be limited to not more than **2** acre(s) of exposed mineral surface at any time, and shall be located sufficiently distant to protect wetlands, water bodies and fragile habitat from erosion or disturbance, (ii) shall be located in such a manner as to minimize, to the extent reasonably practicable, the impact on the scenic character of the Protected Property, (iii) shall be located outside of the Grafton Loop Trail Buffer Area except as allowed in Section 5(f)(ii) below, and (iv) shall be regraded and restored to a natural vegetated condition and appearance similar to its original condition within a reasonable time after cessation of use.

D.    Grantor reserves the right, subject to prior written notice to Holder in accordance with the terms of Section 8, to permit limited excavation of the surface of the Protected Property for ecological, education, scientific research, or archeological investigation conducted under then current generally accepted professional standards and without adverse impact to the conservation values protected by this easement.

E.    Grantor reserves the right, after notice in writing to Holder in accordance with the terms of Section 8, to establish and maintain additional unpaved trails for use by the general public, provided that they are located and designed in a manner to prevent soil erosion and prevent damage to fragile plant communities and wildlife habitat.

## 5.    FOREST MANAGEMENT.

As of the date of this grant, the Protected Property is in a substantially natural, predominantly forested condition as documented in the Baseline Documentation.

Grantor reserves the right to manage vegetation on the Forest Management Area, subject to applicable laws and regulations, in a manner that assures the continuing and sustained ability of the Protected Property and its soils to support healthy and vigorous forest growth and allows for, but does not require, commercial forest management. If undertaken, commercial forest management must be designed and implemented to ensure a continuing, renewable and long-term harvest of forest products, consistent with the forestry principles of paragraph C of this section and with the use of the Protected Property by the general public for traditional non-intensive outdoor recreation, subject to the following conditions:

A.    Grantor reserves the right to manage vegetation for Commercial Forestry, as defined herein, and for the control and prevention of fire and disease, eradication of invasive species, wildlife habitat improvement, and general forest health, in accordance with a Forest Management Plan (hereafter the "Forest  Management Plan,") designed to ensure, if commercial forest management is undertaken, the utilization of silviculturally sound forestry methods that: 1) allow for a continuing, renewable and long term source of forest products; 2) assure the sustained ability of the Protected Property and its soils to support healthy and vigorous forest growth and allow for a continuing, renewable and long-term harvest of forest products; 3) are not inconsistent

with the purposes, recitals and other terms of this Conservation Easement; 4) protect the Grafton Loop Trail Buffer Area depicted on Exhibit B attached hereto and made a part hereof by reference; and 5) comply with then-current Best Management Practices for timber harvesting operations as set forth by the Maine Forest Service or its successor agency, or other standard for soil and water protection approved in advance and in writing by Holder, which approval will not be unreasonably withheld, conditioned or delayed.

B.        Grantor reserves the right to manage vegetation by cutting, pruning and planting without the requirement of a Forest Management Plan, as necessary to exercise the reserved rights at Sections 3 and 4, and to accommodate traditional non-intensive outdoor recreation by the general public allowed by this Conservation Easement, including the removal of vegetation for safety purposes, for the creation of scenic vistas and views from trails, public roadways, campsites, overlooks, and other public vantage points; provided that no new openings or clearings in the forest greater than 1 acre are permitted for such purposes without the prior written consent of Holder, which consent shall not be unreasonably withheld, conditioned or delayed. The incidental sale of vegetation cut or removed from the Protected Property in the exercise of Grantor's non-commercial vegetation management rights shall not be deemed Commercial Forestry.

C.        All forestry activities shall be consistent with the Purposes of this Easement and the Forestry Principles set forth below:

(i)        assure the sustained ability of the Protected Property and its soils to support healthy and biologically diverse forest and allow for a continuing, renewable and long-term source of forest products;

(ii)       protection of wildlife habitat and unique natural areas reflected in the Baseline Documentation;

(iii)      preservation of traditional, non-intensive outdoor recreational activities;

(iv)      protection of scenic character as viewed from public vantage points as provided herein;

(v)       maintenance or improvement of the diversity and health of the forest and the productive capacity of the soil; and

(vi)      preservation of wetlands, water quality and riparian areas by avoidance of erosion, siltation or other degradation of water.

D.        Forest management plan; term; review; contents.

(i)        Ten year management plan:  All commercial forest management activities, except preliminary timber cruising and resource evaluation and except as otherwise provided herein, shall be conducted in accordance with a written Forest Management Plan. After submission to the Holder, the Forest Management Plan shall be adopted by the Grantor, which shall operate within the constraints of the Forest Management Plan in accordance with the terms of this Easement.  The Forest Management Plan shall be prepared prior to any harvesting or treatment activities, and shall be reviewed and updated at least every ten years, by one or more professional foresters licensed in the State of Maine, following submission to Holder as provided hereinafter.

(ii)    Holder review:  The Forest Management Plan shall be provided to Holder prior to conducting any timber harvesting activities. Holder shall review the Forest Management Plan for consistency with the purpose and terms of this Conservation Easement, but is not required to approve the Forest Management Plan.  If the Grantor is not certified pursuant to Section 5.C.(i) and the Holder finds that any portion of the Forest Management Plan is inconsistent with the terms of this Conservation Easement or that resulting Forest Management Activities could result in a violation of this Conservation Easement, the Holder may, but is not required to, shall provide written comments to the Grantor identifying and explaining such inconsistencies or disagreements that may result in a violation of the Easement.   Grantor acknowledges that the actual activities and outcomes on the Protected Property will determine compliance with this Conservation Easement whether or not Holder has commented upon the Forest Management Plan. Holder's failure to provide comments does not constitute a waiver of the terms of this Conservation Easement.

(iii)    Grantor shall provide Holder with a written annual report ("Annual Report") describing Grantors' proposed plan during the coming year for Forest Management Activities and other activities on the Protected Property permitted hereunder. In the annual report, Grantor shall accurately describe the forestry and other activities on the Protected Property during the preceding year including information on proposed harvest volumes for the coming year and the preceding year's actual harvest volume.  Grantor shall also describe in the report the location, silvicultural objectives, and estimated timing of all forestry activities planned for the coming year.   In the report, Grantor shall also demonstrate the consistency of such completed and anticipated forestry activities with the Forest Management Plan prepared under this Easement. Grantor shall provide Holder with reasonable opportunity to meet with Grantor and its supervising licensed professional forester at least annually to review the annual report.

(iv)    Third party certification:  Holder may approve independent, third-party certification programs, which approval will be based upon Holder's assessment of the qualifications, experience, audit standards and procedures of that agent to evaluate the consistency of the Grantor's Forest Management Plan with the terms of this Easement. If the Protected Property is certified as being operated in a sustainable manner or other relevant certification standard under that third-party certification program so approved by the Holder, and if the Grantor's Forest Management Plan and performance under the plan is reviewed and approved as being consistent with the terms of this Easement by such third party as part of the certification process, such plan shall be deemed to be in compliance with all of the provisions of this Section 5 and the terms, purposes and recitals of this Conservation Easement, and may, but need not be, reviewed by the Holder.  The third party certification process qualifying under this paragraph, including Holder's approval of the certification program, shall be effective for a period of up to five years or such other time as mutually agreed upon by the Grantor and the Holder. The Holder retains the right to review the Forest Management Plan and shall have the right to review all documents prepared by the third-party responsible for the certification. Grantor acknowledges that the purpose of the Forest Management Plan is to guide forest management activities in compliance herewith, and that the actual activities and outcomes on the Protected Property will determine compliance with this Conservation Easement.

(v)    Timber harvesting shall be supervised by a licensed professional forester and conducted under written contracts with operators satisfactory to that supervisory

forester, which contract shall specify relevant requirements for compliance with this Conservation Easement.

(vi)    The Forest Management Plan shall specify activities and practices proposed to achieve compliance with the Forestry Principles set forth hereinabove, and shall also include and comply with at a minimum the following:

(a)    the Grantor's long-term Forest Management Plan for management of the Protected Property, and a general description of proposed actions to protect forest health and maintain timber productivity in a manner to assure compliance with the terms, purposes and recitals of this Easement and the Principles set forth above;

(b)    identification of the natural and physical features of the Protected Property at the time of the Forest Management Plan, and current harvest areas, including forest type, current stocking levels, age, quality, health, relevant stand history, and existing access routes; wetlands and water bodies; location of roads, trails, campsites and other areas used by the public; location of special plant or wildlife habitat;

(c)    information, by species group, on timber harvest levels during the ten year period of the preceding Forest Management Plan (none is required for submission of the initial Forest Management Plan);

(d)    a projection of timber growth and harvest, by species group, over the period of the Forest Management Plan and, at least twenty years beyond the term of the Forest Management Plan, utilizing current scientific methods, and a description of the relationship between projected harvests and the requirements of this Conservation Easement showing that the Protected Property will be managed to allow for a continuing, renewable and long-term source of forest products;

(e)    a description of Grantor's actions to protect and manage soil productivity and water quality, including reclamation and reforestation practices to be employed upon completion of harvesting operations to ensure soil stabilization, as may be required for compliance of forest management activities with then currently available best management practices  or comparable standards agreed to by Grantor and Holder;

(f)    a description of the foreseeable situations in which chemical application will be recommended, including the type, amount, method of application, and recommended limitations to protect water quality, recreational values, and wildlife habitat;

(g)    a specific description of harvesting techniques and treatments to be employed to avoid adverse impact to the specific conservation values identified in the Principles at Section 5.C and 5.D hereinabove;

(h)    a description of how Forest Management Activities will be conducted to (1) manage for fish and wildlife resources, (2) protect known site-specific occurrences of animal and plant species that are listed by state or federal agencies as endangered, threatened or of "special concern" for such time period as

such species are so listed, and (3) meet the requirements of state and federal law regarding threatened and endangered species;

(i)     a description of how Forest Management Activities will be conducted to protect and manage the Protected Property's recreational resources and scenic resources (such as limiting the size, shape, and orientation of forest openings so that they do not draw undue attention); and

(j)     map information sufficient to support the above requirements.

As of the date of this Easement, Grantor has provided to Holder its Forest Management Plan prepared January, 2009, by James Chapman and Daniel J. Earley, which plan has been accepted and approved by Holder.

E.     Commercial Forest Management is prohibited in the Grafton Loop Trail Buffer Area except as necessary to cross the Buffer Area in one location at the southerly end of the Protected Property (the "crossing location") to access the Forest Management Area. The crossing location is generally depicted on Exhibit B and consists of a corridor fifty (50) feet in width. Grantor reserves the right to construct, use and maintain within the crossing location a road for Commercial Forest Management and other purposes consistent with the terms of this Conservation Easement; the traveled surface of such road shall not exceed thirty-five (35) feet in width.  Construction, use and maintenance of the road shall be subject to compliance with Best Management Practices for such activities and the other requirements of this Conservation Easement. Grantor further reserves unto itself the right to relocate all or any portion of said crossing location within the Grafton Loop Trail Buffer Area provided that any portion of the crossing location so relocated shall lie below 900' in elevation, with the prior written approval of Holder, which approval shall not unreasonably be withheld.

F.     Grantor reserves the following rights within the Grafton Loop Trail Buffer Area:

(i)     The right to maintain and use the existing landing area consisting of one half acre in the general location depicted on Exhibit B hereto, for the purpose of landing and storing forest products; and

(ii)     The right to maintain and use the existing gravel pit and adjacent land not to exceed in the aggregate twenty thousand (20,000) square feet in the general location depicted on Exhibit B hereto, for those purposes and in accordance with the provisions of Section 4 (c) above.

G.     Access to Records of Grantor:

Holder shall have access to records in the possession of the Grantor to the extent reasonably necessary to perform monitoring and enforcement responsibilities as set forth in this Conservation Easement. The Parties recognize that the identity of the Holder may change, and that governmental agencies serving as Holder are subject to applicable public records laws. The intent of the Parties, as further set forth below, is that governmental agencies serving as Holder shall maintain such records consistent with applicable public records laws including, to the extent applicable, any provisions within such laws that may protect from disclosure records containing proprietary information or trade secrets.

Grantor shall promptly make available to Holder upon request copies of any records reasonably necessary to perform monitoring or enforcement responsibilities under this

Conservation Easement. To the extent Grantor concludes in good faith that such records contain proprietary information or trade secrets, Grantor may either: (1) redact such proprietary information or trade secrets within said records, so long as the redacted information is not reasonably necessary for monitoring and enforcement and Grantor further provides a written explanation of the nature of the redacted information in sufficient detail to allow Holder to assess their need for the redacted information; or (2) submit the requested records in unredacted form clearly marked as "claimed confidential." Holder shall consider any information Grantor may provide in support of a claim of confidentiality in determining whether (1) such records are reasonably necessary to perform monitoring and enforcement responsibilities, and (2) such records are properly subject to disclosure or entitled to protection from disclosure under applicable public records laws, including Maine's Freedom of Access Law, 1 M.R.S.A. § 401 *et seq*. ("FOAA") and successors thereto. Except to the extent required by law or court order, in the event that Holder determines that records subject to a claim of confidentiality by Grantor are subject to disclosure pursuant to FOAA or other applicable law, Holder shall, prior to disclosing such records pursuant to a FOAA request or otherwise, provide Grantor with written notice and a reasonable opportunity to obtain a court order barring disclosure. Holder's handling of Grantor's records, including those submitted under a claim of confidentiality, shall be consistent with and governed by applicable law, including FOAA, and nothing herein may be construed as creating any inconsistent obligation.

Records obtained by the Attorney General in connection with the enforcement of this Conservation Easement shall be governed by 33 M.R.S. § 478(4), and successors thereto, and any other applicable provision of law.

## 6.    PUBLIC ACCESS.

A.    Grantor hereby grants to the Holder the perpetual right to allow and manage public pedestrian access to and use of the Protected Property for traditional non-intensive outdoor recreation by the general public, as provided herein.  To this end, Grantor agrees to take no action to prohibit or discourage such access to the Protected Property nor to inhibit traditional non-intensive outdoor recreation by the general public**.**  Grantor further grants to Holder the right to allow and manage public snowmobile access over ITS snowmobile trail #82 on the Protected Property in accordance with the terms set forth herein and to allow and manage, within the Grafton Loop Trail Buffer Area, primitive non-commercial camping in accordance with the terms set forth herein.

B.    The parties recognize that public access and recreational uses of the Protected Property may lead to certain significant and ongoing costs to the Grantor, including but not limited to a) the cost of removal of litter and similar unauthorized material, b) in the event Maine's Landowner Liability statute, 14 M.R.S.A. 159-A, is subsequently amended in a manner that increases Grantor's potential exposure to liability from recreational uses of the Protected Property authorized by this Easement, the actual cost of insurance necessary to cover such increase, and c) the costs of establishment, repair and maintenance by Grantor of recreational improvements, such as roads, trails, and facilities ("improvement costs").  In recognition thereof, Grantor may charge the public fees for pedestrian access on and across and use of the Protected Property  (1) only to the extent necessary to reimburse Grantor for the actual cost of removal of litter or similar unauthorized materials left by the public on the Protected Property,  (2) in the event that Maine's Landowner Liability statute, 14 M.R.S.A. 159-A, is subsequently amended in a manner that increases Grantor's potential exposure to liability from recreational uses of the Protected Property authorized by this Easement, only to the extent necessary to cover the cost of insurance necessary to obtain insurance that would restore Grantor's liability protection to that

which existed pursuant to 14 M.R.S.A . 159-A as of the date this Easement is recorded, and (3) only to the extent necessary to reimburse Grantor for actual improvement costs provided such fees do not unreasonably restrict pedestrian access on and across the Protected Property.  Any plan to impose such fees must be submitted to Holder 30 days in advance of implementation for Holder's approval.

C.      Grantor further agrees to take no action to discourage or prohibit access to the Forest Management Area by motor vehicle on abutting public roads, and/or on rights of way owned by Grantor to the Forest Management Area or to which Grantor has assignable access rights identified in Exhibit A, except as permitted in subparagraph D and except as may be prohibited by the terms of any such rights of way owned by Grantor, further subject however to the Grantor's right to impose rules, regulations, and restrictions as set forth in subparagraph D below.  Nothing contained in this Easement shall obligate Grantor to maintain any roadways providing access to, on or over the Protected Property, and all such use shall be at the sole risk of the users. Rules, regulations and fees established by Grantor as contemplated by any provision of this Conservation Easement shall not be deemed a violation of this paragraph or an assumption of any obligation to maintain such roadways on the Protected Property.

D.      Consistent with the provisions of P.L. 1999, c. 514, sec. A-6, other applicable law and the provisions of this Conservation Easement, and in order to exercise Grantor's Reserved Rights, manage the Protected Property, and protect the Conservation Values of the Protected Property, Grantor reserves the right to make reasonable rules and regulations with respect to night use; camping; loud activities; open fires; access by domesticated animals or pets; harvesting of trees or non-timber forest products, or any use that may interfere with or be harmful to any person, whether or not the same arise out of Traditional Non-intensive Outdoor Recreation permitted by this Easement.  Grantor reserves the right to limit or prohibit motorized or mechanized access by the public on and across the Property and to limit, on a temporary basis, non-motorized access by the public to portions of the Protected Property if Grantor, in its reasonable discretion, determines (i) that such access would damage the Conservation Values to be protected by this Easement, (ii) would conflict with active Forest Management Activities, (iii) that a hazardous condition exists; or (iv) if motorized or mechanized access would damage roads and trails due to seasonal conditions. Grantor shall have no obligation to limit such access and if Grantor chooses to limit motorized or mechanized access, no advance notice shall be required. Such reserved right of Grantor to limit pedestrian access may be exercised only following 30 days' prior notice to Holder and an opportunity to comment, except in an emergency in which notice to Holder shall be as soon thereafter as possible.  Grantor also has the right to restrict access by the public on and over the roads on the Protected Property during periods of water-saturated soils to prevent road damage.  Holder and Grantor may agree in writing to restrict pedestrian access and use of the Protected Property by the general public for other purposes, but only to the extent and for the duration necessary to assure safety, to permit necessary maintenance, or to preserve important scenic, ecological, or other Conservation Values of the Protected Property.

E.      Nothing in this Conservation Easement shall be interpreted as an assumption of responsibility by, or basis for liability on the part of, Grantor for any injury to person or damage to property or loss of life that may be sustained by any person as a result of any entry on or use of the Protected Property.  Grantor specifically retains all the protections provided under Maine law to owners of land, including, the protections contained in 14 M.R.S.A. § 159-A.

Nothing in this Conservation Easement shall be construed to:

(i)     Grant any rights in the Protected Property, including without limitation any rights by adverse possession, to any individual.  Except as otherwise provided by law, this Conservation Easement may be enforced only by Holder and Grantor.

(ii)    Preclude Grantor's right to grant additional access on, over or across the Forest Management Area only for Traditional, Non-intensive, Outdoor Recreation by the general public and for motorized or mechanized use by the general public, provided that such use does not conflict with the Purposes of this Easement or the Conservation Values of the Protected Property to be protected thereby.

## 7.     DEFINITIONS.

A.      "Commercial Forest Management" and "Commercial Forestry" are defined as the planting, growing, cultivation, stocking, and cutting of trees and other forest products, and includes timber cruising, resource evaluation, herbicide, pesticide and fertilizer application, timber stand improvement, pruning, mechanical and conventional timber harvesting and other forest harvesting, forest products transportation, natural and artificial regeneration of forest stands, maple sugaring, other substantially similar and associated activities, and the construction, creation, use and maintenance of woods roads, skid trails and winter haul roads, turnouts, timber landings and crossings of flowing waters for such purposes, all as consistent with the terms of this Conservation Easement.

B.      "Grantor" as used in this easement shall mean the owner in fee simple of the Protected Property and shall include, unless the context clearly indicates otherwise, the within-named Grantor, its successors and assigns and any successors in interest to the Protected Property.  The term "Holder" as used in this easement shall, unless the context clearly indicates otherwise, include the Holder's successors and assigns.

C.      "Traditional, non-intensive outdoor recreation" is defined as dispersed, non-commercial, non-exclusive public recreational activities that do not generally rely on buildings or spectator facilities. Such uses include hunting, fishing, trapping, hiking, nature observation, picnicking, cross country skiing, snow-shoeing, bicycling, horseback riding, swimming, and outdoor education and nature study, including scientific and archeological research and observation, and enjoyment of open space; provided however, that snowmobiles on trails designated by the Grantor for this purpose shall be permitted in connection with such uses and in accordance with reasonable rules and regulations of Grantor. Use of all terrain vehicles, motorcycles and other motorized two-wheel vehicles is expressly not included in this definition.  The incidental use of the Protected Property by the general public supported by paid guides or outfitters shall not be deemed commercial use.  Establishment of approved permits and access fees for use of permitted campsites and other permitted recreational facilities shall not be deemed exclusive use.

D.      "Wetland" means any area saturated or inundated by water at a frequency or for a duration sufficient to support, and which under normal circumstances does support, a prevalence of wetland vegetation typically adapted for life in saturated soils.  The "upland edge" of a wetland is the boundary between upland and wetland, and not the edge of open water.

## 8.     NOTICES.

A.      Any notices to Holder required in this Conservation Easement shall be sent by registered or certified mail, or other courier providing reliable proof of delivery, to the following person and address or such other person or address as may be hereafter specified by notice in

writing to: HOLDER: Commissioner, Maine Department of Conservation, 22 State House Station, Augusta, ME 04333.   All other communication shall be made by reasonable means under the circumstances.  Such notices to Holder or requests for Holder consent, required or contemplated hereunder, must include, at a minimum, sufficient information to enable Holder to determine whether proposed plans are consistent with the terms of this Conservation Easement and the purposes hereof.

      B.     Any notices to Grantor required by this Conservation Easement shall be sent by registered or certified mail, or other courier providing reliable proof of delivery, to the Grantor's designee at the following address, or to such other person or address as may be hereafter specified by notice in writing to GRANTOR: General Counsel, The Center for Special Needs Trust Administration, Inc., 4912 Creekside Drive, Clearwater, FL 33760. All other communication shall be made by reasonable means under the circumstances. Such notices to Grantor or requests for Grantor consent, required or contemplated hereunder, must include, at a minimum, sufficient information to enable Grantor to determine whether proposed plans are consistent with the terms of this Conservation Easement and the purposes hereof.

      C.     In the event that the Protected Property is owned by a trust, business entity, or any common or jointly held ownership, the Grantor entity or the common or joint owners shall designate an agent to be responsible for the granting of approvals of Grantor and the receipt of notices on behalf of Grantor hereunder.  In the event that no single owner or agent is so designated, the approval of or notice to, any executive officer of the business entity, or any one common or joint owner, shall be deemed the approval of or notice to all.

      D.     Any approval or consent required to be given by Holder of actions proposed by Grantor shall be given in writing within twenty (20) days of receipt of notice or request by Grantor. Such approval or consent shall not be unreasonably withheld, conditioned or delayed, except as specifically permitted hereunder.  In the absence of any written response from Holder within that time period, Holder shall be deemed to have denied any such submission, request or activity set forth in said notice. In the event Holder denies consent, Holder must provide Grantor with written basis for denial within twenty (20) days.

## 9.     COSTS AND LIABILITIES.

      A.     Grantor shall pay and discharge when due all property taxes and assessments imposed upon the Protected Property and any uses thereof, and, subject to Section 12(G) below, to avoid the imposition of any liens that may materially impact Holder's rights hereunder. Grantor shall keep the Protected Property free of any liens or encumbrances, including without limitation those arising out of any work performed for, materials furnished to or obligations incurred by Grantor, but specifically not including any liens or encumbrances arising from the Holder's or Holder's assignees, employees or agents exercise of or actions under this Easement for which Holder shall be responsible and liable.

      B.     Grantor acknowledges that Holder has no possessory rights in the Protected Property, nor any responsibility or right to control, maintain, or keep up the Protected Property, other than as set forth herein. Grantor shall retain all responsibilities and shall bear all costs and liabilities of any kind related to the ownership, operation, upkeep and maintenance of the Protected Property, except for costs and liabilities proximately caused by the negligent act or misconduct of Holder, its assignees, employees or agents.  Grantor shall indemnify, defend and hold Holder harmless from and against any and all liabilities, costs, damages, or expenses of any kind that Holder may suffer or incur as a result of or arising out of the activities of Grantor or any

other person other than the Holder or Holder's assignees, employees or agents on the Protected Property.

C.      Grantor shall have responsibility, and the Holder shall have no responsibility whatsoever (except for costs and liabilities proximately caused by the negligent act or misconduct of Holder, its assignees, employees or agents for which Holder shall remain liable), for the operation of the Property, the monitoring of hazardous and other conditions thereon. Notwithstanding any other provision of this Easement to the contrary, the parties do not intend and this Easement shall not be construed such that: (1) it creates in the Holder the obligations or liabilities of an "owner" or "operator" as those words are defined and used in the environmental laws, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 United States Code, Sections 9601 et seq.) or any successor or related law; (2) it creates in the Holder obligations or liabilities of a person described in 42 United States Code Section 9607(a)(3) or any successor or related law; or (3) the Holder has any control over the Grantor's ability to investigate and remediate any hazardous materials associated with the Property. The term "environmental laws" includes, without limitation, any federal, state, local, or administrative agency statute, regulation, rule, ordinance, order or requirement relating to environmental conditions or hazardous substances.

## 10.      HOLDER'S AFFIRMATIVE RIGHTS.

A.      At a reasonable time and in a reasonable manner that is consistent with the conservation purposes hereunder, Holder has the right to enter the Protected Property, including over roads owned by Grantor or rights of way to the extent allowed under and subject to the terms of any such right of way or other access ways available to Grantor for access to the Protected Property for inspection and monitoring purposes and for enforcement of the terms of this easement.

B.      Holder has the right to enforce this Conservation Easement by proceedings at law and in equity, including without limitation the right to require the restoration of the Protected Property to a condition that existed prior to any injury or damage and receive damages for irremediable harm due to violation hereof. In the event that Holder becomes aware of a violation or threatened violation of the terms of this Easement, Holder shall give written notice to Grantor and request that Grantor take corrective action sufficient to cure the violation or prevent the threatened violation, and Grantor shall be entitled to a reasonable opportunity to cure except where emergency circumstances or prevention of a threatened breach of this Conservation Easement require more immediate enforcement action. Wherever in this Conservation Easement Grantor is afforded or retains a right to provide a plan or otherwise express an intention to take an action (regardless of whether Holder has any right to approve Grantor's action, plan or statement of intention), nothing in this Easement shall be construed to impair Holder's right to seek injunctive or other relief as necessary to enforce the terms of this Easement against a violation or threatened violation hereof. Grantor is not responsible for and Holder may not bring an enforcement action against Grantor for injury to or change in the Protected Property resulting from natural causes or environmental catastrophe beyond Grantor's control, such as fire, flood, storm, and earth movement, or from any prudent action taken by Grantor under emergency conditions to prevent, abate, or mitigate significant injury to the Protected Property resulting from such causes or from actions of the public or of third parties other than those who enter the Protected Property with the permission or invitation of Grantor or pursuant to a contractual relationship with Grantor. Nothing herein shall be construed to limit the right of Holder and/or Grantor to seek damages or other compensation from such third parties. If a Court (or other decision maker

chosen by mutual consent of the parties) determines that that Holder is a prevailing party in any action affecting this Conservation Easement, Grantor will reimburse Holder for any reasonable costs of enforcement, including court costs, reasonable attorney's fees, and any other payments ordered by such Court or decision maker.

C.      It is Grantor's obligation to locate and keep the boundaries of the Protected Property and any Land Use Areas identified in Section 1, clearly marked on the ground before undertaking any actions that are restricted by this Conservation Easement in the vicinity of such boundary.

D.      Holder has the right, after consultation with Grantor, to install and maintain small unlighted signs visible from public vantage points, to identify Holder and inform the public and abutting property owners that the Protected Property is under the protection of this grant.

E.      On the Protected Property, Holder has the right to allow, maintain and manage public use of ITS snowmobile trail #82 ("the Trails"). On the Grafton Loop Trail Buffer Area, Holder has the right to allow, maintain and manage public use on Trails and to construct, maintain and manage up to 2 non-commercial primitive campsites or, with the prior written approval of Grantor, more than 2 campsites, subject to any rules and regulations of Grantor as allowed hereunder. The right to construct campsites on the Grafton Loop Trail Buffer Area shall include the right to construct up to 2 outhouses appurtenant to each campsite. Holder may assign some or all of these responsibilities to qualified organizations upon notice to Grantor. The Trails and campsites (which term shall include any outhouses appurtenant thereto) shall be maintained in an environmentally-sound manner. Holder agrees to maintain the Trails and campsites as needed to ensure that they are safe and suitable for public use and do not pose a threat to the environment. Holder agrees to oversee use of the Trails and campsites and to cooperate with the landowner to prevent and rectify any inappropriate or excessive use. The right to conduct maintenance activities includes the selective clearing of trees and other vegetation to provide an open trail and provide scenic views, construct water bars, stone steps, bog bridges, erosion control measures, and cairns, erect barriers to prevent unauthorized use by motor vehicles, and paint marks on trees to identify the location of the Trails and campsites. Holder shall have the right to harvest and remove materials, including trees and rock, within the Grafton Loop Trail Buffer Area to the extent necessary for trail and campsite construction, in accordance with applicable laws, rules and regulations governing the same and the terms of this Easement.

F.      Holder may relocate trails within the Grafton Loop Trail Buffer Area. Holder may also establish one new trail within the southeasterly portion of the Grafton Loop Trail Buffer Area and extending into and across the Forest Management Area in the approximate location depicted on Exhibit B attached hereto. Said new trail shall be for the purpose of access to the Grafton Loop Trail Buffer Area across that portion of the Forest Management Area depicted on Exhibit B. Any portion of the existing trail in the Grafton Loop Trail Buffer Area that is located southeasterly of the new trail shall be deemed abandoned and Holder shall take appropriate measures to preclude further use of such portion, including but not limited to placement of signage, barriers or vegetation. Holder shall obtain the prior approval of Grantor to the proposed location of the new trail within the Forest Management Area, such approval to not be unreasonably withheld, conditioned or delayed. Holder shall have the right to construct, maintain and manage any such relocated trails and new trail. Grantor shall have the right to conduct Commercial Forest Management Activities in the Forest Management Area along the new trail without any buffer, setback or other restrictions. Grantor and Holder may relocate any portion of the southeasterly portion of the Grafton Loop Trail Buffer Area to a location that encompasses the new trail, such relocation to be in a location and on such other terms as are mutually acceptable to Grantor and Holder.

G.    The Holder may, but is not required to, notify Grantor in the event that Holder believes that Grantor's activities or planned activities may constitute or could lead to a violation of the terms of this Easement, provided that no act or failure to act by or on behalf of the Holder may be construed to constitute an approval, waiver or estoppel in connection with Holder's rights to enforce the terms of this Easement.

**11.    CONSERVATION EASEMENT REQUIREMENTS UNDER FEDERAL LAWS AND REGULATIONS.**

A.    Conservation Purposes.  This Conservation Easement is established exclusively for conservation purposes consistent with the provisions of the Internal Revenue Code, as amended (hereinafter referred to as the "Code") at Title 26, U.S.C.A., Section 170(h)(1)-(6) and Sections 2031(c), 2055, and 2522, and under Treasury Regulations at Title 26 C.F.R. §1.170A-14 *et seq.*, as amended.

B.    Qualified Donee.  The Holder is qualified to hold conservation easements pursuant to Title 33, Maine Revised Statutes Annotated, Section 476(2)(A) and under Internal Revenue Code Section 170(h)3, to wit: a governmental entity with the commitment to preserve the conservation values of the Protected Property.

C.    Assignment Limitation.  The burden of the Easement created hereby shall run with the Property and shall be enforceable against all future owners and tenants in perpetuity; the benefits of this Easement shall not be appurtenant to any particular parcel of land, but shall be in gross and assignable or transferable only to a governmental entity, consistent with the Forest Legacy Program (16 USC Section 2103c). Any such assignee or transferee shall have the like power of assignment or transfer.  Any assignment or transfer of responsibility for the Easement shall be in recordable form and shall be recorded in the Oxford County Registry of Deeds.

D.    Proceeds Clause. The parties agree that the grant of this Conservation Easement creates a property right vesting immediately in Holder.  At the time of this grant, Holder's property right has a fair market value equal to the amount by which the fair market appraisal value of the Protected Property unrestricted by this Conservation Easement is reduced by the terms and conditions imposed by this Conservation Easement.  The parties further agree that the future value of Holder's property right in the Protected Property may increase to a greater extent than the future value of Grantor's property right.

In the event that this Conservation Easement is extinguished or reduced by judicial decree, eminent domain or other legal authority for which action the parties are entitled to receive compensation, the parties agree that notwithstanding any other valuation process proposed to calculate compensation due to the parties by the entity accomplishing the extinguishment or reduction, Holder shall be entitled to that portion of the proceeds of such sale, exchange or conversion equal to the amount by which the fair market appraisal value of the Protected Property unrestricted by this Conservation Easement is reduced by the terms and conditions imposed by this Conservation Easement as of the date of such extinguishment or reduction.

Whenever all or part of the Protected Property is taken in the exercise of eminent domain so as to abrogate the restrictions imposed by this Conservation Easement, the parties shall join in appropriate actions at the time of such taking to recover the full value of the taking and all incidental or direct damages resulting from the taking.  All proceeds shall be divided in accordance with the proportionate value of Grantor's and Holder's interests as specified in this

Subsection. Holder's share of proceeds will not include value attributable to authorized improvements made and paid for by Grantor after the date of this grant except as to improvements made by or at the expense of Holder.

In the event any interest acquired with federal funds made available through the aforesaid Forest Legacy Program is ever sold, exchanged, or otherwise disposed of, the Holder shall reimburse the United States for the market value of such interest at the time of disposal, provided that the Secretary of Agriculture may exercise discretion to consent to such sale, exchange or disposition upon the Holder's tender or other equal valued consideration acceptable to the Secretary.

## 12.    GENERAL PROVISIONS.

A.    Applicable Law.    This Conservation Easement is created pursuant to the Uniform Conservation Easement Act at Title 33, Maine Revised Statutes Annotated, Sections 476 through 479-B, inclusive, as amended, and shall be construed in accordance with the laws of the State of Maine.

B.    Interpretation.    If uncertainty should arise in the interpretation of this Conservation Easement, judgment should be made in favor of accomplishing the conservation purposes of this grant.  Nothing in this Conservation Easement should be construed to permit any activity otherwise prohibited by existing or future laws and regulations imposed by any federal, state, or local government or governmental agency having jurisdiction over the Protected Property, nor to prohibit the imposition of further land use restrictions by the agreement of the parties, or by operation of law.

C.    Non Waiver.    The failure or delay of the Holder, for any reason whatsoever, to discover a violation or initiate an action to enforce this Conservation Easement shall not constitute laches or a waiver or estoppel of its rights to do so at a later time.

D.    Compliance.    A person's obligation hereunder as Grantor, or successor owner of the Protected Property, will cease, if and when such person or entity ceases to have any present, partial, contingent, collateral or future ownership interest in the Protected Property, but only to the extent that the Protected Property is then in compliance herewith.  Responsibility of owners for breaches of this Conservation Easement that occur prior to transfer of title will survive such transfer; provided that the new owner shall also be responsible for bringing the Property into compliance unless Holder releases the new owner.  At Grantor's cost, Holder will provide certificates to Grantor or to third parties, indicating the extent to which, to Holder's knowledge after due inquiry, there is compliance of the Protected Property with the terms of this grant. Such inquiry and delivery of such certificates shall be within a reasonable time after Grantor's prior written request.

E.    Severability.    If any provision of this Conservation Easement or the application of any provision to a particular person or circumstance is found to be invalid, the remainder of this Conservation Easement and the application of such provision to any other person or in any other circumstance, shall remain valid.

F.    Amendment and Discretionary Consents.    Grantor and Holder acknowledge that, in view of the perpetual nature of this Conservation Easement, they are unable to foresee all potential future land uses, future technologies and future evolution of the land and other natural resources, and other future occurrences affecting the Purposes of this Easement.  Holder therefore may determine whether (a) proposed uses or proposed improvements not contemplated by or addressed in this Easement or (b) alterations in existing uses or structures, are consistent with the

Purposes of this Easement.  Any legally permissible amendment hereto, and any discretionary consent by Holder contemplated by this Conservation Easement, may be granted only if the Holder has determined in its reasonable discretion, that the proposed use furthers or is not inconsistent with the purposes of this Conservation Easement, substantially conforms to the intent of this grant, meets any applicable conditions expressly stated herein, and does not materially increase the adverse impact of expressly permitted actions under this Conservation Easement on the conservation values of the Protected Property.  Holder has no right or power to consent to any use that would result in building development on the Protected Property other than that which is expressly allowed herein, or that would be inconsistent with the Purposes of this Conservation Easement or limit the term or terminate this Conservation Easement, or that would impair the qualification of this Conservation Easement or the status of the Holder under any applicable laws, including Title 33 M.R.S.A. Section 476 et seq., and/or Section 170(h) or 501(c)(3) of the Internal Revenue Code, or successor provisions thereof.

G.    Liens Subordinated.    Grantor represents that as of the date of this grant there are no liens or mortgages outstanding against the Protected Property, except any listed in Exhibit A and are subordinated to all of Holder's rights under this Conservation Easement.  Grantor has the right to use the Protected Property as collateral to secure the repayment of debt, provided that any lien or other rights granted for such purpose are subordinate to all of Holder's rights under this Conservation Easement. Under no circumstances may Holder's rights be extinguished or otherwise affected by the recording, foreclosure or any other action taken concerning any lien or other interest in the Property.

H.    Grantor's right to further conservation actions.  Subject to the provisions of P.L. 1999, c.514, sec. A-6, nothing contained in this Easement shall be construed to limit the Grantor's rights to take additional conservation actions to protect the resources and conservation values of the Protected Property, provided such actions are not inconsistent with the terms, conditions and purposes of this easement. This instrument and the Baseline Documentation set forth the entire agreement of the parties with respect to the Conservation Easement and supercede all prior discussions, negotiations, understandings, or agreements relating to the Conservation Easement, all of which are merged herein. Nothing contained herein will result in a forfeiture of this Conservation Easement or reversion to Grantor of any rights extinguished or conveyed hereby. Nothing contained herein is intended to or shall result in a forfeiture or reversion of Grantor's fee title in any respect.

I.    Rights and immunities.  Grantor and Holder each reserve and claim all of the rights and immunities against liability to the fullest extent of the law under Title 14 M.R.S.A., Section 159-A, et seq. as amended and any successor provisions thereof (Maine Recreational Use Statute), and Title 14 M.R.S.A. Section 8101, et seq. as amended and any successor provisions thereof, (Maine Tort Claims Act), and under any other applicable provision of law.

J.    Standing to Enforce.  Only the State of Maine and Grantor may bring an action to enforce this grant, and nothing herein should be construed to grant any other individual or entity or the public standing to bring an action hereunder, nor to grant any rights in the Protected Property to any individual or entity or the public by adverse possession or otherwise, provided that nothing in this Easement shall affect any public rights in or to the Property acquired by common law, adverse possession, prescription or other law, independently of this grant.

K.    Reasonable Control of Access.  Grantor reserves the right to reasonably control, by posting and other means, any use not specifically granted to the Holder herein, that may unreasonably interfere with the proper exercise of Grantor's reserved rights. Grantor may exercise

this right following reasonable, prior notice to Holder and an opportunity to comment, except in an emergency, in which case notice to Holder shall be as soon thereafter as possible.  As part of this right, Grantor may temporarily restrict public access on areas of the Protected Property for safety purposes during active timber harvesting or other permitted management activities that may pose a hazard to recreational users.  Grantor may temporarily restrict public access on areas of the Protected Property to prevent degradation of the roads during periods of water-saturated soils. Holder and Grantor may agree in writing to restrict access and use of the Protected Property by the general public for other purposes, but only to the extent and for the duration necessary to assure safety, to permit necessary maintenance, or to preserve important scenic, ecological, and other conservation values of the Protected Property.

L.    Additional Grant of Access Rights Not Limited.  Nothing in this Easement should be construed to preclude Grantor's right to grant additional public access on, over or across the Protected Property, for traditional, non-intensive, outdoor recreation by the general public, provided that such use does not conflict with the conservation values of the Protected Property or the public recreational uses provided for herein.

M.    Holder's ability to exercise rights.  The parties acknowledge that the ability of the Holder to exercise the rights or carry out the duties of the Holder hereunder, including, without limitation, the operation and maintenance of any recreational improvements on the Protected Property, are subject to the availability of moneys appropriated or otherwise available to the Holder and designated for such purposes.

N.    Costs, Legal Requirements and Liabilities.  The Grantor retains all responsibilities and shall bear all costs and liabilities of any kind related to the Grantor's ownership, operation, upkeep, and maintenance of the Protected Property.  The Grantor remains solely responsible for obtaining any applicable governmental permits and approvals for any activity or use by Grantor permitted by this Easement and for undertaking any such activity or use in accordance with all applicable federal, state and local laws, regulations and requirements. The Holder shall maintain adequate liability insurance coverage, in an amount not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate for its activities in administration of this Easement. From time to time, the Grantor may update these minimum amounts to account for inflation or claims history, but no such update shall be made within the five years of the grant of this Easement or within five years of any prior update.  The State of Maine agrees to include this Easement, and the rights granted hereunder, with the other lands and activities covered under the State of Maine's self-insurance and risk management programs, to the limits prescribed by law.  Grantor acknowledges and agrees that such inclusion shall be deemed to meet the requirements of this section. Notwithstanding anything to the contrary herein, no Holder other than the State of Maine shall be entitled to self insure without the prior written approval of Grantor, in Grantor's sole discretion.

O.    Dispute Resolution:  If the parties disagree as to the consistency of any proposed use or activity with the Purposes and terms of this Easement and the parties are unable to resolve such disagreement through unassisted consultations between themselves, either party may refer the dispute to mediation by request made in writing upon the other. Within ten business days of the receipt of such a request, the parties shall select a single trained and impartial mediator. Mediation shall then proceed in accordance with the following guidelines:

(i)    The purpose of the mediation is to (i) promote discussion between the parties, (ii) assist the parties to develop and exchange pertinent information concerning the issues in dispute; and (iii) assist the parties to develop proposals which enable them to

arrive at a mutually acceptable resolution of the controversy. The mediation is not intended to result in any express or *de facto* modification or amendment of this Easement or to limit either party's right to enforce this Easement in accordance with the terms hereof.

> (ii)   The parties agree they will participate in the mediation process in good faith and expeditiously.

> (iii)   All information presented to the mediator shall be subject to applicable confidentiality provisions set forth at Section 5(G) above and shall be disclosed to the mediator only with the consent of the parties. No statements made or documents prepared for mediation sessions shall be disclosed in any subsequent proceeding except as contemplated in Section 5(G) above or construed as an admission of a party.

> (iv)   Neither party shall be obligated to continue the mediation process beyond a period of ninety days from the date of receipt of the initial request or if the mediator concludes that there is no reasonable likelihood that continuing mediation will result in a mutually agreeable resolution of the dispute.

> (v)   The costs of the mediator shall be borne equally by Grantor and Holder; the parties shall bear their own expenses, including attorney's fees.

Notwithstanding the foregoing, mediation shall not be required a) if the parties are unable to agree in good faith upon a mediator within the aforesaid ten day period, or) if either party reasonably believes that such proposed use or activity will cause irreparable or significant damage to the Protected Property.

P.   Notwithstanding anything in this Easement to the contrary, and without acknowledging the validity of any such claims or rights that may exist now or in the future, this Easement shall not impair any prescriptive or other right in the Property that may have been acquired by the public or the Holder prior to the date of this Easement or that may be acquired after the date of this Easement, or any other right the public or the Holder may have to use or access the Property pursuant to law.

## VII.   HABENDUM AND SIGNATURES

TO HAVE AND TO HOLD the said Conservation Easement unto the said Holder and its successors and assigns forever.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Grantor, The Center for Special Needs Trust Administration, Inc., has caused these presents to be signed and sealed in its corporate name by Ted William Dunbar, its President, hereunto duly authorized, this ___ day of December, 2009.

**THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.**

_____    By:_____
Witness                                     Name: Ted William Dunbar
                                            Title: President

**VIII.    ACKNOWLEDGEMENT**

STATE OF FLORIDA
COUNTY OF                              , ss.                              December __, 2009

Personally appeared the above-named Ted William Dunbar, in his capacity as President of Grantor, and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said corporation.

Before me,    _____
              Notary Public

              _____
              Typed or printed name of notary
              My commission expires:

**IX.    HOLDER ACCEPTANCE.**

Pursuant to M.R.S.A. Title _____, Section _____,, _____, Commissioner of the Department of _____ , hereby gives consent to acquisition by the STATE OF MAINE, Department of _____ of the above and foregoing Conservation Easement. Executed this _____ day of _____ 200 ___ .

| Signed Sealed & Delivered | **STATE OF MAINE** |
|---|---|
| **in the Presence of:** | *Department of* |

_____          _____
Witness                                                              by:

                                                                          its Commissioner

STATE OF MAINE
COUNTY OF KENNEBEC, ss.                                                    Date:

Personally appeared the above-named _____ , Commissioner of the Maine Department of _____ , and acknowledged acceptance of the above and foregoing Conservation Easement as her/his free act and deed in said capacity, and the free act and deed of the STATE OF MAINE.

Before me, _____
                      Notary Public/ Attorney at Law

                      _____
                      Please Print or Type Name

## X.    ATTACHMENTS TO CONSERVATION EASEMENT

### EXHIBIT A
### Legal Description of the Protected Property

The Protected Property is bounded and described as follows:

Being that portion of the premises bounded and described in the deed from IP Timberlands Operating Company, Ltd. dated March 31, 1994, recorded in Book 2110, Page 324 of the Oxford County Registry of Deeds, as amended by corrective deed recorded in Book 2154, Page 56, as lies in the town of Newry, Maine, the descriptions therein being incorporated herein by reference. Subject to the same conditions, restrictions, easements and matters set forth in said deeds. Being further bounded and described as follows:

A certain parcel, of land in Newry, Oxford County, State of Maine, being the easterly portion of the so-called "Harris Tract" and sometimes called the "Lewiston Steam Mill Tract", more particularly described as follows:

Between Sunday River and Bear River in said Newry, there is a ridge of mountains running across said tract parallel or nearly so with said rivers, dividing said tract into two unequal parts, the part lying between said mountain ridge and Bear River being supposed to be the smaller part, and it is all of Grantor's right, title and interest in said smaller part which is hereby conveyed, said parcel hereby conveyed extending from the Easterly line of said tract westward to the highlands which divide the waters flowing into the Bear River from those flowing into the Sunday River; bounded to the east by Lot Seven in each of Ranges 12, 13, 14, 15 and 16 in the Town of Newry; to the south by land now or formerly of one John B. Murry; to the west by land formerly of International Paper Company, now of Sunday River Skiway Corporation; and to the north by the Newry-Grafton municipality line.

Being the same premises conveyed by Lewiston Steam Mill Co. to William Frye by deed recorded at Book 187 Page 228; and further being the parcel designated "Lewiston Steam Mill Tract-3520 Ac.", on a map, entitled Plan of Land Owned by American Realty Company and Umbagog Paper Company in Newry, Maine, Oxford County, E. McCourt Macy, Eng., July 1923, recorded with the Oxford County Registry of Deeds as Plan No. 28990, which see for further reference.

Excepting the following described parcel of land, conveyed by Umbagog Paper Company to Merton and Clara Kilgore by deed dated March 22, 1921, recorded at Book 348 Page 528: Beginning at a stone post, supposed to be at or near the original southeast corner of the Town of Grafton and north-east corner of Newry in the west line of what was formerly Andover West Surplus; thence north 83° 45' west, in the old line between Grafton and Newry one hundred and seventy-two (172) rods, more or less, to a birch tree marked "Kilgore, I.P. Co. 1921"; thence south 47° 30' east two hundred and sixty-nine rods eighteen links (269-18), more or less to a white maple tree marked "Kilgore, I.P. Co. 1921", standing in the original west line of Andover West Surplus, now part of Newry; thence north 10° west, in said original line, one hundred and sixty-six (166) rods, more or less, to the corner begun at.

Consisting of 86 acres, more or less, and being the same premises shown on a plan by E McCourt Macy, Engineer, said plan being appended to the instrument recorded at Book 348 Page 528.

Further excepting and reserving from the Protected Property the parcel described in the deed from John Hancock Mutual Life Insurance Company to Donald Gray and Sylvia Gray dated August 18, 1994 and recorded in Book 2156, Page 218.

Further excepting and reserving from the Protected Property the property described in Exhibit A-1 attached hereto and made a part hereof.

The Protected Property is conveyed with the benefit of two (2) nonexclusive rights of way, to be used in common with Grantor, its successors and assigns, excepted and reserved therein as appurtenant easements to the land described in Book 2110, Page 324 and Book 2154, Page 56 of the Oxford County Registry of Deeds.

The Protected Property is further conveyed with the benefit of that certain nonexclusive right of way, to be used in common with Grantor, its successors and assigns, described in the agreement from Donald Gray and Sylvia Gray to John Hancock Mutual Life Insurance Company dated August 18, 1984, and recorded in Book 2154, Page 108, subject to the terms and conditions therein.

EXHIBIT A-1

Excepting and reserving from the Protected Property the following:

A certain lot or parcel of land in said Newry bounded and described as follows: Commencing at a point in the thread of Poplar Brook, approximately 1800 feet westerly of Route 26, witnessed by a 5/8" x 6" rebar with plastic cap marked "PLS 351" lying S26°31'07"E, 46 feet distant; Thence N26°31'23"W for 507.10 feet to the point of beginning; Thence S85°39'55"W along land of the Center for Special Needs Administration Inc. for 948.86 feet to an iron pin; Thence N39°33'47"W along land of said Center for 223.43 feet to a point; Thence N33°17'11"W along land of said Center for 277.87 feet to a point; Thence N39°49'46"W along land of said Center for 154.78 feet to an iron pin; Thence N85°48'33"E along land of said Center for 1078.22 feet to an iron pin; Thence S26°31'23"E along land of Rosemary Antonucci for 592.86 feet to the point of beginning.

All courses of this description are referenced to Maine-West State Plane, NAD83.

Meaning and intending to describe a parcel of land containing 12.82 acres as shown on a plat prepared by York Land Services, LLC dated March 30, 2009 titled, "Stowe Mountain, Surveyed for The Trust for Public Land, Property of The Center for Special Needs Administration, Inc., Newry Township, Maine", to be recorded at Oxford County Registry of Deeds.

The above described parcel is conveyed together with the following:

    a. two (2) nonexclusive rights of way, to be used in common with Holder, its successors and assigns, excepted and reserved therein as appurtenant easements to the land described in Book 2110, Page 324 and Book 2154, Page 56 of the Oxford County Registry of Deeds; and
    b. that certain nonexclusive right of way, to be used in common with Holder, its successors and assigns, described in the agreement from Donald Gray and Sylvia Gray to John Hancock Mutual Life Insurance Company dated August 18, 1984, and recorded in Book 2154, Page 108, subject to the terms and conditions therein

Further excepting and reserving from the Protected Property and the above described parcel is conveyed with the benefit of an appurtenant perpetual easement for a right of way for all purposes, including utility services, over the existing woods road extending from the northwesterly corner of the land now or formerly of John and Sylvia Gray depicted on the survey referred to above in a westerly, northerly and easterly direction to the above described parcel.

Said reserved easement is thirty (30) feet in width, the centerline of which is coextensive with the centerline of the existing woods road. Grantor may improve, maintain, repair and replace the existing woods road at its own cost and expense.  Prior to undertaking any improvements, maintenance, repair or replacement of such road, Grantor shall a) provide Holder with notification, reasonable for the circumstances, and b) obtain and/or file any applicable required federal, state or local governmental approvals, permits or authorizations.

Grantor and Holder shall have the right, upon mutual written agreement, to relocate all or any portion of the existing woods road thereon to another location on the Protected Property. In the event of any such relocation, the easement shall be deemed relocated to a location, the centerline of which is coextensive with the centerline of the existing woods road.

# Exhibit C

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

THE CENTER FOR SPECIAL NEEDS            Case No. 8:24-bk-00676-RCT
TRUST ADMINISTRATION, INC.,


      Debtor.                                    Chapter 11

_____/

## DECLARATION OF STEPHEN GAUTHIER

     I, Stephen Gauthier of LandVest Inc., hereby declare under penalty of perjury pursuant to the provisions of 28 U.S.C. § 1746 that the following is true, accurate, and correct to the best of my knowledge, information and belief:

     1.    I am a Senior Project Manager of LandVest Inc and a real estate broker licensed by the State of Maine.

     2.    I submit this Declaration in support of the *Chapter 11 Trustee's Application for Authorization to Employ LandVest Inc. as Exclusive Broker* (the "Application"), to market and sell the Maine Property, as more fully described in the Application.

     3.    I am authorized to make this Declaration on behalf of LandVest Inc. in accordance with Bankruptcy Rule 2014 and Local Rule 2016-1.

     4.    To the best of my knowledge, neither I nor LandVest Inc. represent or hold any interest adverse to the Chapter 11 Trustee or to the Debtor's estate, its creditors or other parties in interest, and we are disinterested persons within the meaning of 11 U.S.C. § 101(14) as required by 11 U.S.C. § 327(a).

     5.    LandVest Inc. has not accepted any fee to represent the Chapter 11 Trustee and the proposed real estate commission is contingent upon review by the Court for reasonableness.

I further understand that LandVest Inc. may not accept any fees or compensation in this matter without first receiving Court approval by court order.

6.      Neither I nor any member of LandVest Inc. has any connection with the Chapter 11 Trustee, or the Debtor, its creditors, or any other party in interest in this case, the Chapter 11 Trustee's attorneys, the United States Trustee, or any other person employed in the office of the United States Trustee.

7.      LandVest Inc. is not in control of the Debtor and is not a relative of a director, officer, or person in control of the Debtor, including the Chapter 11 Trustee.

8.      LandVest Inc. does not presently represent a creditor or beneficiary of the Debtor, lessor, lessee, party to an executory contract of the Debtor, or any person otherwise adverse or potentially adverse to the Debtor or the estate, on any matter, whether such representation is related or unrelated to the Debtor or the estate.

9.      I have reviewed the Application and to the best of my knowledge, information, and belief, the facts set forth therein are true, accurate, and correct.

By: _____
(Signature)

Stephen Gauthier
_____
(Print Name)

Dated: June ___, 2024

6/25/2024

2

# Exhibit D

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                                 Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                          Chapter 11

      Debtor.
_____/

**ORDER GRANTING CHAPTER 11 TRUSTEE'S APPLICATION FOR**
**AUTHORIZATION TO EMPLOY LANDVEST INC. AS EXCLUSIVE BROKER**

This case came on for consideration without a hearing, on the Chapter 11 Trustee's Application to employ Landvest Inc. ("Landvest") as their real estate broker to market and sell the Maine Property (Doc. ___) (the "Application")[1].  Upon review of the Application and no objections having been filed to the Application after expiration of the negative notice period, it is

**ORDERED**:

    1.       The Application is **APPROVED**.

    2.       The Chapter 11 Trustee is authorized to employ Landvest Inc. as the exclusive real estate broker for this estate on the terms outlined in the Application.

---

[1] Defined terms from the Application are incorporated by reference herein.

76698513;

3.    The reasonableness of compensation will be determined later in accordance with

11 U.S.C § 330.


Steven R. Wirth, Esq. is directed to serve a copy of this order on interested parties who do not
receive service by CM/ECF and file a proof of service within three days of entry of this order.

76698513;