**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                    Case No. 8:24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                    Chapter 11

　　　　Debtor.

_____/

**CHAPTER 11 TRUSTEE'S REPLY TO CHAMBERLIN CLASS PLAINTIFFS'**
**OBJECTION AND AMERICAN MOMENTUM BANK'S OBJECTION TO CHAPTER**
**11 TRUSTEE'S MOTION TO ENFORCE AUTOMATIC STAY**

Michael Goldberg, the Chapter 11 Trustee ("Chapter 11 Trustee"), by and through
undersigned counsel, submits this reply to the Chamberlin Class Plaintiffs' Objection in Response
to Chapter 11 Trustee's Motion to Enforce Automatic Stay (ECF 252) and American Momentum
Bank's Limited Objection to Chapter 11 Trustee's Motion to Enforce Automatic Stay (ECF 210)
(together, the "Objections"), and respectfully requests that the Court enter an order overruling the
Objections and granting his Motion to Enforce the Automatic Stay (ECF 195) (the "Stay
Motion").[1] In support, the Chapter 11 Trustee states:

<u>**INTRODUCTION**</u>

As a Chapter 11 Trustee, Mr. Goldberg has been appointed by the Court, pursuant to the
Bankruptcy Code and upon the recommendation of the United States Trustee, to marshal assets of
the bankruptcy estate and pursue litigation claims. In order to do that, he needs an opportunity to
investigate those assets and claims; and he is entitled to do his work free of interference from
creditors, and without disparate, competing litigation over the same claims.

---

[1] As a preliminary matter, the only motions pending before the Court is the Chapter 11 Trustee's Stay Motion. No
motions for relief from the automatic stay have been filed, nor has anyone sought a declaratory judgment regarding
the nature of the putative class action claims.

The Class Plaintiffs and their counsel may not like the bankruptcy process (indeed, without it, their fledgling class action has the potential to be lucrative for them, at the cost of other creditors and non-class members) but their personal preference, and the vehemence with which they attack the Chapter 11 Trustee, do not entitle them to evade it. In their objection, the Class Plaintiffs say that the Chapter 11 Trustee is "us[ing] the Bankruptcy Code as a shield for the thieving Debtor and a sword against the disabled SNT beneficiaries who are victims of its crimes," but that demonstrates a fundamental misunderstanding of the role of a Chapter 11 Trustee. Mr. Goldberg's role is to pursue litigation claims for all creditors, not just the Class Plaintiffs; and that's what they don't like, but that's the way the Bankruptcy Code and case law are written.

The Chamberlin Class Action should be stayed because the claims being pursued are property of the estate. After all, the Class Plaintiffs are seeking to recover the same $100,000,000 that the Chapter 11 Trustee is seeking to recover. More specifically, it is undisputed that: the Debtor was the Trustee of a "pooled trust" with hundreds (if not thousands) of "Trust sub-accounts;" the Class Plaintiffs were beneficiaries of those pooled "Trust sub-accounts;" and the Debtor lent funds from the "pooled trust" to Boston Finance Group, LLC ("BFG") (a defendant in the Chamberlin Class Action). In his own adversary proceeding no. 8:24-ap-0139-RCT, the Chapter 11 Trustee is pursuing recovery of those funds, pursuant to the loan documents, to augment the bankruptcy estate. And in the Chamberlin Class Action, the Class Plaintiffs are pursuing *the same money* on theories of negligence and fraudulent transfer, among others. The Class Plaintiffs argue that they should be able to recover that money themselves, outside of the bankruptcy estate. But if they were able to do that, it would violate the priority scheme in the Bankruptcy Code, harm other creditors and beneficiaries, and run afoul of the Declaration of Trust that created their interests in the first place. Tellingly, the Class Plaintiffs have completely ignored

the Declaration of Trust which provides, *for the beneficiaries' own protection*, that the beneficiaries have no claim to the trust corpus or income except as authorized by the Trustee.

<u>BACKGROUND</u>

1.      At all times material, the Debtor was the Trustee of a "pooled trust," and many, if not all, of the Class Plaintiffs (including Mr. Chamberlin himself) were beneficiaries of the pooled trust, via certain "Trust sub-accounts" established for them. The pooled trust is governed by a "Reformed Declaration of Trust," a true and correct copy of which is attached to this Reply as ***Exhibit 1***.

2.      The Declaration of Trust states, "Beneficiaries Have No Claim on Trust Assets" and "none of the Beneficiaries have any right or entitlement to the Trust corpus or income, except as the Trustee elects to disburse the same in its sole, complete, absolute, and unfettered discretion." *See* Exhibit 1, ¶ 3.1.

3.      As detailed in the Stay Motion, after this Chapter 11 bankruptcy case was filed, certain beneficiaries filed two class action complaints (collectively, the "<u>Class Actions</u>") in the United States District Court for the Middle District of Florida, against BFG and various third parties, alleging several counts that, at bottom, seek nothing more than the return of the proceeds of the loan *due to the Debtor* from BFG and its guarantor, Leo Govoni ("<u>Govoni</u>").

4.      One of these class actions, *Chamberlin v. Boston Finance Group, LLC*, No. 8:24-cv-00438-SDM-AEM  (the "<u>Chamberlin Class Action</u>"), was filed against defendants BFG, Boston Asset Management, Inc., Govoni, John W. Staunton, Jonathan Golden, Prospect Funding Holdings, LLC, Prospect Funding Partners, LLC, Prospect Funding Holdings (NY) III, LLC, and American Momentum Bank ("<u>AMB</u>"). Although they have not sought relief from the automatic stay, and despite the fact that they are seeking to recover the same funds as the Chapter 11 Trustee in this bankruptcy case, the Class Plaintiffs have continued to litigate the Chamberlin Class Action. Thus,

the Stay Motion seeks an order enforcing the automatic stay with respect to the Chamberlin Class

Action and the second class action described in the Stay Motion.[2]

5.      AMB has filed a "Limited Objection" to the Stay Motion, seeking permission to argue

a motion to dismiss the Chamberlin Class Action. To its credit, AMB has said that the relief sought

in the Stay Motion is "reasonable, warranted, and should be granted." *See, e.g.,* AMB's Reply, ¶ 18.

Without commenting on the merits of AMB's motion to dismiss, and in the interests of fairness and

judicial economy, the Chapter 11 Trustee requests that the Court stay the Chamberlin Class Action

*immediately*, and prior to the District Court ruling on AMB's motion to dismiss.

6.      KapilaMukamal, LLP has been hired as forensic accountants in this case. *See* ECF

138. In that role, KapilaMukamal is working on reconciling trust ledgers and bank records and

*attempting* to trace the missing funds, through the "pooled trust" and "Trust sub-accounts," but the

records cover a span of 16 years, from 2008 through 2024, with approximately 6,800 trusts impacted,

and over 2.6 million transactions.[3] And preliminary findings indicate that trust funds were so

extensively comingled that it will likely be extremely difficult to do any meaningful tracing analysis.

A declaration of Kevin McCoy of KapilaMukamal is attached to this Reply as ***Exhibit 2***.

## ARGUMENT

The Chamberlin Class Action should be stayed for at least three reasons. First, no matter how

the Court looks at the issues, the Class Plaintiffs are pursuing estate claims. Second, the Chamberlin

Class Action – which competes with the Chapter 11 Trustee's efforts – is interfering with orderly

---

[2] The plaintiffs in the second class action do not oppose the Stay Motion.

[3] In connection with this effort, the Chapter 11 Trustee has served numerous subpoenas on a number of banks and brokerage companies to obtain decades' worth of bank account records. *See, e.g.,* ECF 187. Last month, American Momentum Bank produced over 70,000 documents. Another institution, Fidelity Brokerage Services, LLC, has produced over 13,000 pages of records so far, but it has not produced records for the individual Trust accounts held at Fidelity. Given the volume of documents and trusts or pooled "sub-accounts" at issue, KapilaMukamal's work will take substantial time; but even with this partial picture, it seems clear that the commingling was pervasive.

and effective administration of the estate. And, third, if the Chamberlin Class Action is not stayed and the Class Plaintiffs are successful, it would harm other creditors and beneficiaries who are not able to participate in the Chamberlin Class Action.

## I. The Class Plaintiffs Are Pursuing Estate Claims.

The Class Plaintiffs contend the automatic stay is not applicable to their lawsuit because the "SNT Funds" (read: "Special Needs Trust Funds") and proceeds were never property of the bankruptcy estate and therefore the claims to recover the "SNT Funds" and proceeds cannot be property of the estate. Pl. Obj. at 8-15. But this is legally and factually incorrect.

### a. The Declaration of Trust.

First, the Class Plaintiffs completely ignore the Declaration of Trust, which says, "Beneficiaries Have No Claim on Trust Assets" and "none of the Beneficiaries have any right or entitlement to the Trust corpus or income, except as the Trustee elects to disburse the same in its sole, complete, absolute, and unfettered discretion." Exhibit 1, ¶ 3.1. Thus, under the plain language of the trust document, the "Trust corpus" (which is at the heart of the Chamberlin Class Action) is clearly property of the estate because it is something that the Debtor has a "legal or equitable interest" in. *See* 11 U.S.C. § 541(a)(1). Indeed, according to the operative document, the Debtor is the only one who has an interest in these funds (because the beneficiaries do not).

In the Court's section 541 analysis, contracts like the Declaration of Trust matter. In *In re Tri-State Financial, LLC*, for example, a group of investors argued that certain funds were not estate property because they had passed through the debtor, as a conduit for an investment in an affiliate. 526 B.R. 311, 326 (Bankr. D. Neb. 2015). The evidence supported this argument, but the investors made a fatal mistake: prior to the petition date, they executed a general release of the debtor, giving up "any and all claims… related to each and every business dealing" of the debtor.

*See id.* at 330. In light of that contractual language, the court ruled that they had no claim based on their "trust" theory. *See id.* at 331. The result should be the same here: in light of the trust language saying "Beneficiaries Have No Claim on Trust Assets," the funds at issue – and litigation to recover them – is clearly estate property.

The Class Plaintiffs cite to *E.F. Hutton & Co. v. Hadley,* 901 F.2d 979, 985 (11th Cir. 1990) and say "because debtor's misappropriation of its customers' funds injured customers, not debtor, claims against third party who assisted misappropriation belonged to customers and bankruptcy trustee lacked standing to bring them." *See* Objection, p. 16. But that does not tell the entire story, because it ignores the rest of the Court's opinion. In *Hutton,* the debtor had sold securities to certain customers, pre-petition, and wanted to sue third-parties for claims related to those securities, but the securities were fully purchased and paid-for prior to the petition date. *See id.* at 986. Ultimately, the Eleventh Circuit held that the trustee lacked standing to pursue those claims because the debtor "failed to show any possessory interest whatsoever in these securities [] when this lawsuit was filed." *See id.* In the instant case, however, the evidence (including, specifically, the Declaration of Trust) clearly shows the opposite: the funds at issue (and, later, the right to enforce the loan documents) were in the possession and custody of the Debtor at all times prior to the Petition Date and, moreover, the Class Plaintiffs had "No Claim on Trust Assets." *See* Ex. 1, ¶ 3.1. As a result, the *Hutton* holding actually confirms the Chapter 11 Trustee's standing in this case.

### b. The Trustee's Power to Prosecute Claims Necessitates Staying the Class Action Over the Same Claims.

The Class Plaintiffs also ignore Florida trust law on the relevant issues. According to Fla. Stat. § 736.0816(23), the trustee has the power to "[p]rosecute or defend, including appeals, an action, claim, or judicial proceeding in any jurisdiction to protect trust property or the trustee in the performance of the trustee's duties." And, under Fla. Stat. § 736.0811, "[a] trustee shall take

reasonable steps to enforce claims of the trust and to defend claims against the trust." So, in this case, where the Chapter 11 Trustee has stepped into the shoes of the Debtor / Trustee, the authority to pursue claims against third-parties has passed to him.[4]

### c. Choses in action belong to the estate, regardless of the source of funds.

Similarly, the Class Plaintiffs want the Court to ignore the loan (and the Debtor's contractual right to recover the money lent) and focus on the source of the funds prior to their being lent out. But that loan was made before the petition was filed; and the automatic stay under section 362 broadly applies to all property of the estate as of the commencement of the case. Without question, "property of the estate" includes choses or causes of action, like the Debtor's right to enforce the loan documents. *In re Alipour*, 252 B.R. 230, 233 (Bankr. M.D. Fla. 2000) ("This definition is very broad, and includes causes of action belonging to the debtor at the commencement of the case."); *Matter of Educators Group Health Tr.*, 25 F.3d 1281, 1283 (5th Cir. 1994); *In re Ryder*, 73 BR 116, 117 (Bankr. S.D. Fla. 1987) ("Case law clearly establishes that choses in action which accrue to the Debtor pre-petition, are property of the Debtor's estate.") (citing *Miller v. Shallowford Community Hospital, Inc.,* 767 F.2d 1556 (11th Cir. 1985)); *see also Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 428 (1972) (trustee has standing to assert and pursue any claims that the debtor had prior to filing the petition). The source of the funds does not change this analysis.

---

[4] In their objection, the Class Plaintiffs cite inapposite case law, including a case involving PACA trusts, the assets of which are *statutorily* exempt from the bankruptcy estate. *See, e.g., C.H. Robinson Co. v. Tr. Co. Bank, N.A.,* 952 F.2d 1311, 1315 n.3 (11th Cir. 1992) (Objection, p. 9). But that case law can largely be ignored by the Court, because *this* case does not involve PACA trusts. Contrary to the cases cited by Class Plaintiffs, the Chapter 11 Trustee has exclusive standing under the Declaration of Trust, Florida law and the loan documents to seek recovery of the loan proceeds (regardless of how those claims are characterized), which are indisputably property of the bankruptcy estate.

### d.   The Chamberlin Class Action Claims Are "Derivative," Not Direct.

In their objection, the Class Plaintiffs erroneously conclude that the automatic stay is not applicable to their claims because non-debtors are suing non-debtors, but that analysis is too simplistic. In the bankruptcy context, a debtor-in-possession (or a chapter 11 trustee) has standing to bring "derivative" claims to redress injuries to the company that indirectly harm the creditors. *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 584 (5th Cir. 2008), ("If the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate and only the bankruptcy trustee has standing to pursue the claim for the estate so that all creditors will share in any recovery."); *Matter of Buccaneer Res., L.L.C.*, 912 F.3d 291, 293-294 (5th Cir. 2019) ("To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate.").

In this case, one need look no further than the Class Plaintiffs' Amended Complaint itself to see that their claims are "derivative" of harm to the Debtor. They allege that BFG and others misappropriated trust funds for their own personal gain, and the Debtor allowed it to happen, violating the trust bestowed on the Debtor. *See* Chamberlin Class Action, Doc. 33, at ¶ 62 ("over a ten-year span, the Center allowed over $100,000,000.00 million in SNT assets to be siphoned and misappropriated from SNT accounts… in violation of the exceptional trust and confidence they had placed in and the duties owed by the Center and its officers, directors, founders, and agents"). Clearly, those funds were taken *from the Debtor*[5] and given to BFG – and we know, from the preliminary analysis of KapilaMukamal, that the Debtor had been commingling those funds with operating accounts – so, clearly, the Debtor was harmed because it had less money on the petition date than it otherwise would have. The Class Plaintiffs, on the other hand, did not suffer

---

[5] Plus, according to the Declaration of Trust, the Debtor was the only entity with any legal claim to those funds.

77182428;1

any particularized harm, because *all* of the trust beneficiaries, and the Debtor's creditors, suffered when the Debtor lost the comingled money in its control. *See, e.g., In re Madoff*, 848 F.Supp.2d 469 (S.D.N.Y. 2012) (holding that claims were derivative because the alleged wrongful acts had harmed every investor in firm in same way and for same reason, every customer could have brought similar claims, and plaintiffs could not articulate any *particularized* harm or acts specifically directed at them).

In many ways, this is a classic derivative claim. *In re Lothian Oil, Inc.*, for example, when third parties lured a debtor into transferring oil and gas assets to them, they eliminated the creditors' hopes of recovering a portion of the value of those assets. 531 F. App'x 428, 439 (5th Cir. 2013). The creditors' injury (reduced bankruptcy recovery) was derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties. *Id.* at 439–40.

### e. Commingling Trust Funds.

Finally, the Class Plaintiffs argue that the funds they are seeking are not property of the bankruptcy estate because they are "trust" funds under section 541(d). Even if the Court were to ignore the plain language of the Declaration of Trust discussed above, the argument still fails due to extensive commingling. According to the preliminary findings of KapilaMukamal, all of the trust funds were commingled with other funds, such that it is extremely difficult, if not impossible, to trace funds back to the "Trust sub-accounts." *See* Exhibit 2, ¶¶ 10-11, 13-15. As a result, all of the funds should be deemed to be property of the estate, with trust beneficiaries being treated as creditors. *See Matter of Felton's Foodway, Inc.*, 49 B.R. 106 (Bankr. M.D. Fla. 1985) (trust funds commingled with debtor's funds must be traced, and only funds that can be traced are not property of the estate); *In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135 (Bankr. D. Del. 2010) (debtor deposited pooled investment funds into its operating account and made disbursements to

77182428;1

the investors from the operating account and even though debtor kept records of what investors were owed, all funds were kept in the operating account and investors could not trace funds using lowest intermediate balance test). In response to this, the Class Plaintiffs might argue for a *constructive* trust, but that would be similarly futile in the face of so much commingling. *See Bank of Alex Brown v. Goldberg (In re Goldberg)*, 158 B.R. 188, 195-96 (Bankr. E.D. Cal. 1993) ("Commingling trust funds with personal funds generally renders the [constructive] trust unenforceable against the commingled funds or property acquired from the commingled funds."). And, in any event, the "[t]he remedy of a [constructive trust] is 'an extraordinary one' subject to the discretion of the court and traditional equitable defenses." *Joseph v. Chanin*, 940 So. 2d 483, 487 (Fla. 4th DCA 2006). Moreover, a constructive trust is not warranted because the Chapter 11 Trustee can do the work of marshalling assets and distributing them fairly, to creditors and beneficiaries alike.

## II.    The Chamberlin Class Action is Interfering With <u>Orderly and Effective Administration of the Estate.</u>

The Chamberlin Class Action – which competes with the Chapter 11 Trustee's efforts because the Class Plaintiffs are pursuing the same funds – is interfering with orderly and effective administration of the estate in several ways. First, and perhaps most obvious, the Class Plaintiffs' vehement opposition to the Stay Motion causes the estate to incur substantial administrative fees that it would not otherwise incur. In addition, the Chapter 11 Trustee and KapilaMukamal need time to gather, reconcile, and analyze the relevant trust and bank records. Allowing the Class Plaintiffs' litigation to continue will only create additional costs and confusion, and could potentially prejudice the Chapter 11 Trustee's claims going forward; especially when there is no legitimate reason for the Chamberlin Class Action to proceed at the same time as the Chapter 11 Trustee's adversary proceeding.

**III.     If the Chamberlin Class Action is not Stayed and the Class Plaintiffs Are Successful, it Would Harm Other Creditors and Beneficiaries <u>Who Are Not Able to Participate in the Chamberlin Class Action.</u>**

The aim of the Class Plaintiffs' complaint is the same in every single count: they are trying to recover the approximately $100 million that was loaned by the Debtor to BFG and guaranteed by Govoni. In Count I, they allege conversion of these funds. In Counts II – VI, they allege that the loan itself was a breach of fiduciary duty. In Counts VII – IX, they allege that the loan was an act of negligence against them. In Count X, they want to claw back the loan as a fraudulent transfer. In Counts XI and XIII, they allege the loan unjustly enriched BFG and others. And in Count XIII, they are seeking to hold all of the defendants responsible for each other's conduct in making the loan. Every single count is an attempt to recover the loan proceeds for themselves.

The goal of any bankruptcy – and the duty of any Chapter 11 Trustee – is to marshal assets and fairly distribute them to creditors. In this case, that includes the sub-account beneficiaries. The loan is clearly an asset of the estate, and the Chapter 11 Trustee is well on his way to holding the borrower and guarantor responsible for the loan. In fact, the defendants in that adversary have admitted liability and the parties have already met in person to discuss a potential settlement. Once the Chapter 11 Trustee recovers as much as he can from those defendants and other targets of liability for the same funds, he will be in the best position to treat all creditors and interested parties fairly, according to the Bankruptcy Code. If, however, the Court were to allow the Class Plaintiffs to recover those funds directly, then they would jump in front of other creditors who played by the rules. Counsel for the Class Plaintiffs would also seek a contingency fee that would further harm the trust beneficiaries by effectively depleting the sums due under the promissory note by as much as 33%. For these reasons and more, the so-called "Class Plaintiffs" must be stopped.

77182428;1

## CONCLUSION

WHEREFORE, the Chapter 11 Trustee respectfully requests that the Court grant the Stay

Motion – enforcing the automatic stay against the Class Actions to allow the Chapter 11 Trustee

to efficiently and effectively manage, settle, or prosecute the Chapter 11 Trustee's rights, claims

and interests arising from the breach of the loan documents – and providing for such other and

further relief as to the Court deems just.

Respectfully submitted,

AKERMAN LLP

By: */s/ Steven R. Wirth*
    Steven R. Wirth
    Florida Bar No.: 170380
    Email: steven.wirth@akerman.com
    Raye C. Elliott
    Florida Bar No.:  18732
    Email:  raye.elliott@akerman.com
    401 East Jackson Street, Suite 1700
    Tampa, Florida 33602
    Telephone: (813) 223-7333
    Facsimile: (813) 223-2837

    *Counsel for Chapter 11 Trustee, Michael Goldberg*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 10, 2024, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record.

*/s/Steven R. Wirth*

# Exhibit 1

# REFORMED DECLARATION OF TRUST
## OF
### THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.

WHEREAS, THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC., a 501(c)(3) Non-Profit Corporation organized under the laws of the State of Florida (the "Center"), established The Florida Pooled Trust under a Master Declaration of Trust dated March 10, 2001 (the "Master Declaration"); and

WHEREAS, the Master Declaration specifically reserved authority in paragraph 1.5 to amend The Florida Pooled Trust from time to time so as to effectuate its purposes and intent and/or so that it would conform with any statutes, rules, or regulations that are approved by any governing body or agency relating to 42 U.S.C. § 1396p or related statutes, including state statutes and regulations that are consistent with the provisions and purposes of the Omnibus Budget Reconciliation Act of 1993, amending 42 U.S.C. § 1396p; and

WHEREAS, the Center amended and restated the Master Declaration on October 22, 2009, on December 5, 2014, November 4, 2015, and again on April 5, 2016 (the "Restated Master Declaration"); and,

WHEREAS, the Restated Master Declaration also created and reserved specific authority in paragraphs 1.5 and 9.5 for the Center to reform or amend The Florida Pooled Trust within its discretion without notice so as to effectuate its purposes and intent and/or so that it would conform with any changes and/or interpretations of statutes, rules, or regulations relating to 42 U.S.C. §1396p or related statutes, including but not limited to state statutes and regulations that are consistent with the provisions and purposes of the Omnibus Budget Reconciliation Act of 1993, amending 42 U.S.C. § 1396p; and,

WHEREAS, the Center has determined within its discretion that reforming the Restated Master Declaration will effectuate its purposes and intent due to certain policy clarifications recently made by the Social Security Administration regarding Pooled Trusts and Special Needs Trusts;

NOW THEREFORE, the Center for Special Needs Trust Administration, Inc. hereby exercises its authority to reform and amend The Florida Pooled Trust and restates therefore the reformed Master Trust in its entirety below, with such reformation to be effective prospectively and retroactively immediately upon its execution on this _10th_ day of July, 2018.

## ARTICLE 1
### ESTABLISHMENT OF TRUST

1.1    <u>Trust is Established.</u>    The Trustee incorporates the recitals above and hereby establishes a pooled trust, for the sole benefit of the Beneficiaries hereunder, pursuant to 42 U.S.C.

§1396p (d)(4)(C), amended August 10, 1993 by the Omnibus Budget Reconciliation Act of 1993, and pursuant to the Social Security Policy Operation Manual (POMS) SI 01120.203, *Exceptions to Counting Trusts Established on or after 1/1/00*, and all related POMS, all of which are used by the Social Security Administration for the purpose of determining Supplemental Security Income eligibility and the availability of trust assets.

    1.2    <u>Name of Trust.</u>  The name of the Trust established under this Declaration is The Florida Pooled Trust (the "Trust").

    1.3    <u>Initial Funding of Trust.</u>  The Trustee has assigned, conveyed, transferred, and delivered a lump sum payment of One Hundred Dollars and No Cents ($100.00) to the Trust. The Trust estate shall consist of this initial contribution and any additional contributions in cash or property made to the Trust estate at any time by any Grantor in accordance with the provisions below in Article 4, Grantor Contributions.

    1.4    <u>Irrevocability.</u>  This Declaration of Trust and the Trust created hereunder shall be irrevocable.

    1.5    <u>Reformations and Amendments to Trust.</u>  Notwithstanding the irrevocability of this Declaration of Trust and the Trust created hereunder, as set forth in paragraph 1.4 above, this Declaration and the Trust created hereunder may be reformed and/or amended from time to time to effectuate its purposes and intent. The Trustee may also, but is not required to, reform and/or amend this Declaration and the Trust created hereunder so that it conforms with any statutes, rules, or regulations that are approved by any governing body or agency relating to 42 U.S.C. § 1396p or related statutes, including state statutes and regulations that are consistent with the provisions and purposes of the Omnibus Budget Reconciliation Act of 1993, amending 42 U.S.C. § 1396p. Any reformations and/or amendments hereunder may be made prospectively or retroactively at the Trustee's discretion and shall not require advance or subsequent notice to Beneficiaries. Under no circumstances, however, shall the Trustee amend any provision that would: (i) render a previously made irrevocable contribution revocable; (ii) allow for early termination of a Trust sub-account; (iii) cause the Trust to fail to comply with any of the provisions of 42 U.S.C. § 1396p, related statutes, and/or related regulations and POMS; or, (iv) abandon or otherwise abrogate the basic purposes or objectives of the Trust.

**ARTICLE 2**
**DEFINITIONS**

    2.1    "Beneficiary" means a disabled person, as defined in § 1614 (a)(3) of the Social Security Act (42 U.S.C. § 1382c(a)(3)), who qualifies under 42 U.S.C. § 1396p, and who a Grantor shall specify as the sole beneficiary under any one of the particular Trust sub-accounts created under and within this Trust by such Grantor.

    2.2    "Co-Trustee", if any, means an entity selected by the Trustee and designated as such to assist with the management, administration, allocation, and disbursement of Trust assets and property. Provided, however, that the Trustee is strictly limited to selecting and designating only those entities that are 501(c)(3) non-profit associations that have been granted tax exempt status by

the Internal Revenue Service. Under no circumstances shall the Trustee designate any entity as Co-Trustee that is not a 501(c)(3) non-profit associations, nor shall the Trustee otherwise fail to retain sufficient authority and control over the pooled trust to meet the criteria in Section 1917(d)(4)(C) of the Social Security Act and 42 U.S.C. §1396p(d)(4)(C) and as further described in SI 0120.225 of the POMS.

2.3    "Government assistance" means all insurance, services, benefits, medical assistance paid under a State plan, financial assistance, and any other assistance of any kind that may be provided by any county, state, or federal agency to, or on behalf of, a Beneficiary. Such assistance includes, but is not limited to, the Supplemental Security Income program (SSI), the Old Age Survivor and Disability Insurance Program (OASDI), the Supplemental Security Disability Income program (SSDI), Title XVIII of the Social Security Act (Medicare), Title XIX of the Social Security Act (Medicaid), and Section 8 of the United States Housing Act of 1937 (42 U.S.C. 1437f), together with any similar, additional, or successor public programs.

2.4    "Grantor" means a parent, grandparent, or legal guardian of a Beneficiary, a Beneficiary himself or herself, a court, or any person or entity acting pursuant to an order by a court, who contributes money and/or property to the Trust. Grantor shall also include, when applicable, any person or entity that contributes his, her, or its own property to the Trust for the sole benefit of a Beneficiary, whether by gift, will, contract, or agreement.

2.5    "Joinder agreement" means the individual written agreement between the Trustee and a Grantor by which the Grantor establishes an individual Trust sub-account for the sole benefit of a Beneficiary.

2.6    "Legal representative" or "representative" means a legal guardian, conservator, agent acting under an appropriate power of attorney, trustee, representative payee, or any other agent, fiduciary, or representative of a Beneficiary that has either been selected by: the Beneficiary; a court of competent jurisdiction; a governmental or quasi-governmental agency; or, the Trustee within its sole discretion.

2.7    "Non-support payments" means payments made by the Trustee for supplemental needs or supplemental care.

2.8    "Sole benefit" means that the Trust and/or a Trust sub-account may not benefit anyone but the Beneficiary for whom a Trust sub-account is established, whether at the time the sub-account is established or at any time for the remainder of the Beneficiary's life as described in SI 01120.201F.1., et seq., of the POMS. Consistent with paragraph 9.4 below, the term shall also include and automatically incorporate any special or modified definition of sole benefit as may be included in, or interpreted by, the governing Medicaid rules of the State where a Beneficiary may reside at the time of, or subsequent to, establishing a sub-account.

2.9    "State plan" means the plan that each State is required to submit for approval to the Centers for Medicare and Medicaid Services as a condition to receiving federal appropriations for the State's medical assistance programs (Medicaid) as provided pursuant to Sec. 1902(a) of the Social Security Act and 42 U.S.C. §1396a.

2.10  "Supplemental care" and "supplemental needs" may be used conjunctively, interchangeably, or separately as the context requires, and the terms shall always mean care that is not provided, or needs that are not met, by any private assistance or government assistance that may be available to a Beneficiary.

2.11  "Trustee" means The Center For Special Needs Trust Administration, Inc., or its successor or successors, and in all cases shall mean the 501(c)(3) non-profit association granted tax exempt status by the Internal Revenue Service that has assumed responsibility for carrying out the duties and responsibilities of the Trust.

2.12  "Trust sub-account" means that portion of the entire Trust estate that is established and managed solely for the individual and sole benefit of a Beneficiary.

## ARTICLE 3
### SPENDTHRIFT PROVISIONS

3.1  <u>Beneficiaries Have No Claim on Trust Assets.</u>  This Trust shall not be reduced in value by creditors of any of the Beneficiaries.  The public and private assistance benefits of the Beneficiaries should not be terminated or made unavailable to them because of this Trust or the assets held in any Trust sub-account for their benefit.  This is not a support trust, and assets held in this Trust and the sub-accounts of this Trust are not intended for the primary support of the Beneficiaries and shall only be used for their supplemental care and/or supplemental needs.  The Grantor and Trustee do not owe any obligation of support to any of the Beneficiaries, and none of the Beneficiaries have any right of entitlement to the Trust corpus or income, except as the Trustee elects to disburse the same in its sole, complete, absolute, and unfettered discretion.  The Trustee may act unreasonably in exercising its discretion, and the judgment of any other person or entity shall not be substituted for the judgment of the Trustee.

3.2  <u>Trust Assets Not Subject to Creditors of the Beneficiaries.</u>  The restrictions on transfers of the Beneficiaries' interests hereunder shall apply to both voluntary and involuntary transfers.  No part of this Trust, or any Trust sub-account, neither principal nor income, shall be subject to anticipation or assignment by any of the Beneficiaries, nor shall it be subject to attachment or control by any public or private creditor of any of the Beneficiaries.  No part of this Trust, or any Trust sub-account, neither principal nor income, may be taken by any legal or equitable process by any voluntary or involuntary creditor, including those who have provided support and maintenance for a Beneficiary.  Under no circumstances may any Beneficiary or representative of a Beneficiary compel a distribution from the Trust sub-account maintained for that Beneficiary or from any other part of the Trust estate.

## ARTICLE 4
### GRANTOR INTENT, CONTRIBUTIONS, AND IRREVOCABLILTY

4.1  <u>Grantor's Intent to Establish a Supplemental Fund.</u>  In making contributions to the Trust, it shall not be the intention of any Grantor to displace any public and/or private financial assistance that may otherwise be available to any Beneficiary.  It shall therefor be the specific intention of all Grantors to establish a supplemental fund pursuant to 42 U.S.C. §1396p and to limit

the Trustee's disbursements to, or on behalf of, a Beneficiary to that respective Beneficiary's supplemental care and supplemental needs only.

4.2     Effect of Grantor's Contribution.    Specifically subject and subordinate to Article 3 above, and to the Trustee's sole and absolute discretion in making distributions, the effect of a Grantor's contribution to the Trust as it applies to any one particular Beneficiary is such that total distributions made on behalf of a Beneficiary shall not exceed an amount equal to the total of all contributions made to such Beneficiary's Trust sub-account, plus any undistributed income.

4.3     Future Transfer of Property.    Property, or interests in property, may be designated for future transfer by a Grantor as a contribution to the Trust. Examples of contributions designated for future transfer include, but are not limited to, a life insurance policy on the Grantor's life in which the Trust is designated as a beneficiary, or the Trust being named as a beneficiary of any future interest in property, such as that which might pass by way of a Grantor's Last Will and Testament.

4.4     Irrevocability of Joinder Agreements.    Subject to approval by the Trustee, this Trust shall be effective as to any particular Beneficiary upon contribution of property and/or money ("Property") to the Trust and execution of a Joinder Agreement by a Grantor. Upon approval by the Trustee, and delivery of Property that is acceptable to the Trustee, the following provisions apply:

a)     the Trust shall be irrevocable as to such Grantor and Beneficiary;

b)     the contributed Property shall not be refundable to the Grantor of such Property;

c)     the designation of the respective Beneficiary may not be revoked or changed; and,

d)     the Trust may not be terminated early and shall not be construed to contain a provision that would allow for early termination.

4.5     Certain Common Law Principles Inoperable.    The common law principles of the Rule in Shelly's Case and the Doctrine of Worthier Title shall not operate to make any Trust sub-account revocable, which would be contrary to the clear intent of the Trust and contrary to the intent as expressed by each Grantor to establish an irrevocable trust, the same common law principles having been specifically abolished by Florida Statute, Sections 689.17 and 689.175, respectively. Moreover, no Trust sub-account shall be deemed revocable under the general trust principle that a trust is revocable where a grantor is also the sole beneficiary because it can be revoked unilaterally without the joinder of residual beneficiaries. While all Trust sub-accounts shall be established for the sole benefit of the Beneficiaries as required within the meaning of the Social Security Administration POMS, SI 01120.201F. and SI 01120.203D.5., no Grantor/Beneficiary shall be the sole beneficiary such that a Trust sub-account can be terminated unilaterally due to the interest that 42 U.S.C. §1396p(d)(4)(C)(iv) creates in the Trust and in the State(s). The Trustee and all States where a Beneficiary has received government assistance therefore have standing to challenge any attempt by a Grantor, a Beneficiary, or any other party to revoke an irrevocable Joinder Agreement, and no action to revoke a Trust sub-account unilaterally can be successful because it would require notice to the State(s) and to the Trustee as well as joining them to the action.

4.6    <u>Residual Beneficiary Designated to Ensure Irrevocability.</u>  Each Grantor who executes, or has previously executed, a Joinder Agreement hereby designates The Center for Special Needs Trust Administration, Inc. as a residual beneficiary to receive the sum of Twenty-Five Dollars ($25.00) upon the death of the Beneficiary for whom each such Trust sub-account is established or has been established.  While this disposition is and shall be the clear and unambiguous expression of each existing and prospective Grantor's wishes, the Trustee and each Grantor further acknowledge and direct that such disposition is subject to, and does not alter in any respect, the retention and reimbursement provisions found in each Joinder Agreement and also found in Article 6 below of this Declaration of Trust.  In designating the residual beneficiary hereunder, each Grantor is also acting to prevent an agency regulation from nullifying a Federal statute, and to avoid the unreasonable and detrimental result of applying two conflicting policies that require a trust to have a residual beneficiary while simultaneously requiring a sole beneficiary.  As the Social Security Administration seeks to explain through SI 01120.200D.3. of the POMS, "[S]ome States follow the general principle of trust law that if a grantor is also the sole beneficiary of a trust, the trust is revocable regardless of language in the trust to the contrary."  In applying this POMS Section to Pooled Trusts, the Social Security Administration has determined certain Pooled Trusts to be revocable despite the fact that Section 1917(d)(4)(C) of the Social Security Act; 42 U.S.C. §1396p(d)(4)(C); all relevant sections of the POMS; and, all relevant sections of all State Medicaid regulations require individuals who establish Pooled Trust sub-accounts to be the sole beneficiaries of their respective Trust sub-accounts and also to fund their respective Trust sub-accounts with their assets alone.

## ARTICLE 5
## DISTRIBUTIONS DURING THE BENEFICIARY'S LIFETIME

Subject to the Trustee's sole and absolute discretion, distributions from any of the individual Trust sub-accounts shall be made in accord with the provisions of this Article 5 during the lifetime of a Beneficiary.  No Beneficiary, spouse, or representative of a Beneficiary shall have the right to revoke or terminate the Trust or respective Trust sub-account and then use the funds to meet his or her food or shelter needs.  Likewise, no Beneficiary, spouse, or representative of a Beneficiary shall have the right to direct the use of his or her trust principal for his or her support and maintenance.

5.1    <u>Distributions Within Discretion of Trustee.</u>  The Trustee shall pay or apply for the supplemental care or supplemental needs of each Beneficiary, such amounts from the principal or income, or both, of the Trust sub-account maintained for such Beneficiary, up to the whole thereof, as the Trustee, in its sole and absolute discretion, may from time to time deem necessary or advisable.  The Trustee shall possess and exercise the authority to allocate all distributions between principal and income as it determines in its sole and absolute discretion.  Any income not distributed from a Trust sub-account shall be added to the principal of that Trust sub-account.

5.2    <u>Distributions Not to Replace Assistance.</u>  Distributions from this Trust should not be made to, or for the benefit of, a Beneficiary if the effect of such distribution would be to replace, or to disqualify a Beneficiary from receiving, government assistance.  The Trust corpus and income is specifically not available to any Beneficiary except to the extent of distributions made by the Trustee for the benefit of a Beneficiary.  No distributions should be made by the Trustee to, or for the benefit of, a Beneficiary in excess of resource and income limitations of any public benefit program to which the Beneficiary is entitled and/or is seeking to become entitled.  The Trustee may

consider the future needs of a Beneficiary when making distributions or when considering requests for distributions but shall not be required to do so. The Trustee should refuse any request for payments from this Trust for services that any public or private agency has the obligation to provide to Beneficiaries who otherwise qualify for such assistance.

5.3    <u>Non-exclusive Examples of Appropriate Distributions.</u>    The following examples illustrate the types of non-support payments that are within the discretion of the Trustee to make from this Trust for the sole benefit of a Beneficiary. Such examples include:

a)    payments to a third party that result in the receipt of goods or services by the Beneficiary;

b)    payment of third party travel expenses which are necessary in order for the Beneficiary to obtain medical treatment; and

c)    payment of third party travel expenses to visit a Beneficiary who resides in an institution, nursing home, or other long-term care facility, such as group homes and assisted living facilities, or other supported living arrangements in which a non-family member or entity is being paid to provide or oversee the living arrangements of the Beneficiary. The travel must be for the purpose of ensuring the safety and/or medical well-being of the Beneficiary.

5.4    <u>Acquisition and Maintenance of Real Estate.</u> The Trustee is authorized, in its sole and absolute discretion, to acquire and maintain an interest in residential real estate for occupancy by a Beneficiary. In exercising its authority hereunder, the Trustee may title any such residential real estate as the Trustee determines, in its sole and absolute discretion, to be in the best interest and sole benefit of such Beneficiary provided that it meet the Trust's sole benefit requirement and thereby preserves the Beneficiary's eligibility for public assistance. In the event the Trust comes to own any interest in such realty, the Trustee may permit such Beneficiary to occupy or use such property without charge and in such manner as, in the opinion of the Trustee, best serves the Beneficiary's special needs, without the necessity of turning such property into cash or gaining an income therefrom. The Trustee is also authorized to continue holding any such real property without the necessity of turning such property into cash or gaining an income therefrom in the event a Beneficiary no longer continues to reside therein.

5.5    <u>Maintenance Costs and Rent.</u> The Trustee is further authorized, in its sole and absolute discretion, and without regard to how any such residential real estate may be specifically titled, to pay out of the income or principal of the Trust any taxes, insurance, and maintenance expenses needed to keep the residential or replacement property in suitable repair, or any portion thereof. The Trustee may also collect rent from other occupants of the property, but shall not be obligated to do so. In exercising the powers herein, the Trustee shall continue to fulfill its primary duty of taking into consideration the intent and purpose of this Trust and the duty to administer the Trust for the sole benefit of the Beneficiary. All of these powers may be exercised for the benefit of such Beneficiary, even if the Beneficiary is residing with a family member or members.

5.6    <u>Limitation on Authority.</u> Without regard to the provisions of paragraphs 5.4 and 5.5

above, the Trustee shall be required to title any interest in residential real estate in the name of a Beneficiary's Trust sub-account whenever and wherever such titling is required pursuant to the administrative rules and regulations of the State where such a Beneficiary resides. Likewise, the Trustee shall be required to collect pro-rata contributions of rent and other associated costs from any other occupants of the property whenever and wherever such pro-rata contributions are required by the administrative rules and regulation of the State where such a Beneficiary resides.

5.7   Trustee's Duty Regarding Government Assistance Programs.   In providing for the Beneficiary's special needs, and/or in making determinations regarding disbursements and/or distributions for the benefit of the Beneficiary's special needs, the Trustee shall always consider the government assistance for which the Beneficiary is currently eligible, or for which the Beneficiary may be attempting to become currently eligible, and the Trustee shall make no disbursements and/or distributions that would cause the Beneficiary to be or become ineligible for such government assistance.  Distributions that the Trustee may or may not have made in the past because of less restrictive government assistance programs, more restrictive government assistance programs, or government assistance programs that the Beneficiary did not apply for, qualify for, and/or receive, shall not serve to provide a pattern of any sort that establishes a duty or discretion in the Trustee to continue making such distributions, to continue refusing such distributions, or to make or to refuse such distributions in the future as the individual case may be.  The Trustee shall have no discretion in this regard, and it shall be an absolute duty of the Trustee to follow the directions herein.

5.8   Distributions for Purchases Resulting in Titling or Registration.   For any distribution that results in a purchase requiring titling or registration, such as for real property or a vehicle, the Trustee shall make certain the title, deed, or registration is in the name of the Beneficiary or the Trust sub-account of the Beneficiary as required by SI 01120.201F.3.a. of the POMS.  If the Beneficiary is living in a State that does not permit titling or registration in such form, the Trustee shall cause the ownership of any such real property or vehicle to be titled or registered in such manner as is permitted or required by the Medicaid Agency in the State were the Beneficiary resides, provided however, that in all cases the purchase shall still be for the sole benefit of the Beneficiary.

## ARTICLE 6
## DISTRIBUTIONS AT A BENEFICIARY'S DEATH

6.1   No Distributions.   Upon the death of a Beneficiary, any amounts that remain in that Beneficiary's Trust sub-account shall be administered according to the provisions of this Article 6 so as to conform with all of the requirements of 42 U.S.C. §1396p and/or related statutes, including state statutes and regulations that are consistent with the provisions and purposes of the Omnibus Budget Reconciliation Act of 1993, amending 42 U.S.C. § 1396p and pertaining to reimbursement to the States for medical assistance provided under a State plan on behalf of the individual Beneficiary.

6.2   Remaining Trust Property.   To the extent that any such remaining property is not retained by the Trust consistent with 42 U.S.C. §1396p(d)(4)(C), such property shall be distributed to the State where the Beneficiary resided at the time of death and also to all such other States where the Beneficiary received medical assistance under a State plan up to the full amount provided by each of the States.  At the time such a distribution may be made, the Trustee shall reimburse each State

based on its pro-rata share of the total amount of medical assistance paid by all of the States on behalf of the Beneficiary if the remaining Trust estate is insufficient to fully reimburse all of the States. This provision is intended to meet the requirements of 42 U.S.C. § 1396p(d)(4)(C), as amended by OBRA '93, and all related rules, regulations, and POMS. As such, the State and/or States where the Beneficiary received medical assistance under a State plan shall be the first payee(s) hereunder and shall have priority over payment of all other debts and administrative expenses with no limitation as to any State(s) or any particular period of time.

6.3    Specifically Prohibited Expenses. The Trustee shall not: 1) pay taxes due from the estate of a Beneficiary other than those arising from inclusion of the Trust in the estate; 2) pay inheritance taxes due for residual beneficiaries; 3) make payment of debts owed to third parties; 4) pay for funeral expenses; and/or, 5) make any payments to residual beneficiaries.

## ARTICLE 7
### ADMINISTRATIVE PROVISIONS RELATING TO TRUST SUB-ACCOUNTS

7.1    Establishment and Maintenance of Trust Sub-accounts. A separate Trust sub-account shall be established and maintained for the sole benefit of each Beneficiary, but the Trust shall pool these sub-accounts for investment and management purposes. The Trustee, or the Trustee's authorized agents, shall maintain records for each Trust sub-account in the name of, and showing the contributed property for, each Beneficiary.

7.2    Taxes. In establishing the Trust, it is the Trustee's intent that each Beneficiary's Trust sub-account preserve the option of being treated as a Grantor Trust for purposes of determining the Beneficiaries' tax liability. For the sole purpose of determining such tax liability and having each of the Beneficiaries' Trust sub-accounts treated as a Grantor Trust, the Trustee may apply trust income to the payment of premiums on policies of insurance on the life of each Grantor, from the Trust sub-account of each respective Beneficiary, without the approval or consent of any adverse party within the meaning of Section 672(a) of the Internal Revenue Code. For purposes of this paragraph 7.2, "Grantor" means the Beneficiary whose funds are used to fund and establish an individual Trust sub-account. Moreover, "trust corpus" shall have the same meaning as "Trust sub-account" used elsewhere throughout this Declaration of Trust. Last, nothing in this paragraph 7.2 shall in any way affect or modify the intent and/or purpose of the Trust or any of the provisions found in this Declaration of Trust.

7.3    Reports to the Beneficiaries. The Trustee shall report at least annually to each Beneficiary or to such Beneficiary's legal representative, and such report shall be a reasonably understandable accounting that begins from the date of the last accounting, or from the date on which the Trustee became accountable in the case of a first accounting, and which otherwise meets all other statutory reporting requirements for trustees both as to substance and as to standard fiduciary form. All reports and/or accountings provided hereunder shall be conclusively deemed to be accepted by the Beneficiary or the Beneficiary's representative if the Trustee does not receive an objection within sixty (60) days of having provided the report and/or accounting. For purposes of calculating sixty (60) days hereunder, the date of having provided the report and/or accounting shall be the date such report is mailed by the Trustee to the Beneficiary or to the Beneficiary's representative. To be effective, any such objection to the Trustee's report shall be mailed to the Trustee's normal place of

business by certified mail, return receipt requested.

7.4 <u>Pre-Need Services.</u> The Trustee is encouraged and specifically authorized, but not required, to make distributions for irrevocable burial and funeral services prior to the death of a Beneficiary. Because such services are highly personal and cannot be easily planned without the request or cooperation of a Beneficiary or family member, the Trustee is further authorized within its discretion to take whatever measures it deems reasonable and prudent to ensure that such services are provided to Beneficiaries in the event that a Beneficiary or representative fails to cooperate. Provided, however, that any such measures taken by the Trustee shall be irrevocable and shall also be for the sole benefit of such a Beneficiary. As strictly prohibited by 6.3 above, the Trustee shall not make any distribution for burial or funeral services after the death of a Beneficiary.

7.5 <u>Periodic Payments.</u> In the event that any Trust sub-account is named as the payee of irrevocable periodic payments from a qualified assignment pursuant to Section 130 of the Internal Revenue Code, the Trustee shall have no duty to seek out or otherwise obtain any remaining guaranteed payments upon the Beneficiary's death if the parties to the qualified assignment have named residual beneficiaries other than the Trust.

## ARTICLE 8
### TRUSTEE PROVISIONS

8.1 <u>Trustee Powers.</u> In addition to all necessary powers to acquire and convey real property, the Trustee shall have the powers enumerated under this Article in addition to all other powers granted to Trustees by law. Notwithstanding any contrary provision herein, the Trustee shall not exercise any power in a manner that is inconsistent with a Beneficiary's right to the beneficial enjoyment of the Trust property in accordance with general principles relating to the law of trusts or that is inconsistent with the purpose and intent of this Trust and the individual Trust sub-accounts.

8.2 <u>Trustee May Seek Advice.</u> The Trustee may, in performing its duties under this Trust, seek the advice and assistance of any person or entity it deems to be appropriate, including, but not limited to, any federal, state, and/or local agencies that are established to assist people with disabilities. Any associated costs that affect the Trust as a whole may be apportioned on a pro rata basis to all Trust sub-accounts, but any associated costs that affect individual sub-accounts shall only be charged against the Trust sub-account about which the Trustee seeks such advice or assistance.

8.3 <u>Designation of Co-Trustee.</u> Specifically subject to the limitations and restrictions of only selecting from among 501(c)(3) non-profit associations as more fully described in paragraph 2.2 above, the Trustee may designate a Co-Trustee, or Co-Trustees, as it may deem, in its sole and absolute discretion, to be necessary or advisable as to any matter and/or matters.

8.4 <u>Appointment and Delegation.</u> The Trustee may engage, appoint, retain, and pay agents, advocates, trust protectors, money managers, and/or advisors as it determines in its sole and absolute discretion to be necessary for the proper discharge of its duties hereunder without liability for the acts of any such persons and/or entities, provided such persons and/or entities are selected and retained with reasonable care. Provided, however, that in employing any persons or for-profit entities as described herein, the Trustee shall maintain ultimate managerial control over the pooled

trust at all times, and such persons and for-profit entities shall always be and remain subordinate to the Trustee, which is a 501(c)(3) non-profit Trustee granted tax exempt status by the Internal Revenue Service as required by Section 1917(d)(4)(C) of the Social Security Act and 42 U.S.C. §1396p(d)(4)(C) and as further described in SI 0120.225 of the POMS.

8.5    Trustee Identification of Programs.    The Trustee may, but is not required, to assist in identifying private or governmental programs that may be of legal, social, financial, developmental, or other assistance to Beneficiaries, or to create programs when such programs do not exist. In no event, however, shall the Trustee be liable in any way to any Beneficiary for failure to identify programs or resources that may be available to such Beneficiary or to create programs when such programs do not exist.

8.6    Scope of Trustee's Power.    Except as may be otherwise provided in this Declaration, and for so long as the Trustee is prudent in administering the Trust, the Trustee may serve without bond and shall exercise all powers under any and all Federal and State laws that may exist and be applicable to trusts, in effect on or after the execution of Joinder Agreements by the Grantors. Should bond be necessary for any reason whatsoever, such bond shall be a proper expense of the Trust or the Trust sub-account requiring such bond.

8.7    Trustee's Discretion to Accept Beneficiaries.    If the Social Security Administration or any authorized government agency has not yet made a determination that the Beneficiary is a person with a disability, the Trustee is authorized to accept such Beneficiary within its discretion upon its reasonable and informal determination that the Beneficiary is a person with a disability as defined in 42 U.S.C. § 1382c (a)(3) by virtue of the Beneficiary having established a Sub-account.

8.8    Trustee to Receive Full Consideration for Trust Assets.    No authority described in this Declaration, or available to trustees pursuant to applicable law, shall be construed to enable the Trustee to purchase, exchange, or otherwise deal with or dispose of the assets of any Trust sub-account for less than an adequate or full consideration in money or money's worth, or to enable any person to borrow the assets of any Trust sub-account, directly or indirectly, without adequate interest or security.

8.9    Trustee Compensation.    The Trustee shall be entitled to receive annual compensation for its services hereunder in accordance with its published fee schedule in effect when the services are performed. All such compensation shall be charged directly to each Trust sub-account, recorded as a disbursement from the Trust sub-account, and reflected on the annual report provided to the Beneficiary. Costs and expenses shall be charged in accordance with the Trustee's published fee schedule in effect when the costs or expenses are incurred.

8.10    Trustee Resignation; Successor Trustees.    The Trustee may resign upon written notice to the Beneficiaries, or representatives, at the time of the Trustee's resignation. Upon any such resignation, the Trustee shall comply with the requirements of paragraph 2.2 above by designating another 501(c)(3) non-profit association granted tax exempt status by the Internal Revenue Service as successor Trustee, which shall assume its duties under this Declaration without any liability for the acts or omissions of any predecessor Trustee. The provisions of this paragraph 8.10 shall also control if the Trustee ceases to exist, is dissolved, or can no longer serve as Trustee

for any other reason. In conjunction with the actions described in this paragraph 8.10, a final accounting shall be made by the Trustee to the Beneficiaries, or representatives, if any. However, in the event of a name change and/or a merger with another 501(c)(3) non-profit corporation, such successor Trustee shall immediately and automatically assume its duties hereunder without the need or obligation to provide notice or an accounting.

8.11    Indemnification of Trustee.    The Trustee and each of its Co-trustees, if any, agents and employees, including the heirs, successors, assigns, and personal representatives of its agents, are hereby indemnified by the Trust and the Trust property against all claims, liabilities, fines, or penalties, and against all costs and expenses, including attorney's fees and disbursements and the cost of reasonable settlements, imposed upon, asserted against or reasonably incurred thereby in connection with or arising out of any claim, demand, action, suit, or proceeding in which he, she, or it may be involved by reason of being or having been a Trustee or affiliated with a Trustee as set forth above, whether or not he, she, or it shall have continued to serve as such at the time of incurring such claims, liabilities, fines, penalties, costs, or expenses or at the time of being subjected to the same. However, the Trustee and each of its Co-trustees, agents and employees, including the heirs, successors, assigns, and personal representatives of its agents, shall not be indemnified with respect to matters as to which he, she, or it shall be finally determined to have been guilty of willful misconduct in the performance of any duty by a court of competent jurisdiction. This right of indemnification shall not be exclusive of, or prejudicial to, other rights to which the Trustee and each of its Co-trustees, agents and employees, including the heirs, successors, assigns, and personal representatives of its agents, may be entitled as a matter of law or otherwise.

## ARTICLE 9
### GENERAL PROVISIONS

9.1    No Requirement to Furnish Bond.    Neither the Trustee, nor any Co-trustees, if any, shall be required to furnish bond for the faithful performance of any duties created under this Declaration. If bond is required by any law or court of competent jurisdiction, no surety shall be required on such bond, and such bond shall be a proper expense of the Trust or the Trust sub-account for which bond is required as the case may be.

9.2    Trust to Be Free From Court Supervision.    The Trust established under this Declaration shall be administered free from the active supervision of any court. However, the Trustee may initiate proceedings asking a court to review and settle interim or final accounts, and to seek judicial instructions or judicial determinations regarding any other matter, in any court having jurisdiction of matters relating to the construction and administration of trusts with venue to be determined by the Trustee within its sole discretion. Alternatively, to avoid the time, costs, and fees normally associated with court proceedings, the Trustee may enter into non-judicial agreements with Beneficiaries, their family members, their representatives, or any other interested party.

9.3    Governing Law.    This Trust shall be governed exclusively by, and interpreted exclusively in accordance with, the laws of the United States and the State of Florida.

9.4    Governing Medicaid Rules.    Notwithstanding paragraph 9.3 above, each Trust sub-account shall also be governed by the particular State Medicaid rules of the State where a Beneficiary

resides without regard to whether such rules are implemented by statute, administrative code, or agency manuals. Such governing Medicaid rules shall apply immediately and automatically by virtue of a Beneficiary moving to, or living in, a particular State. Consistent with paragraph 2.9 in particular and Article 5 more generally, the Trustee shall modify the administration of the Trust sub-account accordingly as may be necessary to comply with such governing Medicaid rules. Likewise, any particular language required to be included in the Trust sub-account shall be automatically incorporated herein with no requirement for the Trustee to take any formal or informal action. The Trustee may execute and incorporate a statement formally acknowledging that such a Trust sub-account is governed by the Medicaid rules of such a Beneficiary's State of residence, but such a formal acknowledgment is not a necessary pre-condition to the automatic applicability of such rules. However, to the extent that any Federal agency or State Medicaid agency requires some particular language to be included in the Trust sub-account agreement, the Trustee shall execute a reformation or confirming amendment demonstrating that such language has been incorporated into the Beneficiary's Joinder Agreement at the time of execution and that such language controls.

9.5    Procedural Provisions.    Any conforming and/or effectuating reformations or amendments that might be made pursuant to paragraphs 1.5 or 9.4 above, may be made unilaterally by the Trustee without notice to any party and/or Beneficiary and may be made effective retroactively or prospectively as the Trustee deems most appropriate in its sole discretion. As the Trustee elects in its discretion to be the most timely, effective, and/or practical, any reformations or amendments hereunder may be effectuated by restating this Trust directly, by an additional addendum or reformation thereto, or through the terms of the individual Joinder Agreement(s) as used in the particular State(s) in question without effecting the operation of the Trust in any other State(s).

9.6    Rules of Construction.    By executing a Joinder Agreement and establishing a Trust sub-account, it shall be the intent of the Trustee and each Grantor to meet and comply fully with 42 U.S.C. §1396p(d)(4)(C) and all such enabling legislation, regulations, and rules such as, but not limited to POMS SI 01120.201; POMS SI 01120.201; and, all related Medicaid rules and regulations. As such, this Trust and the Joinder Agreement shall be construed as broadly as possible to meet this purpose and objective. In the event that any Joinder Agreement and this Master Trust are ever deemed to contain ambiguities or conflicts that would otherwise defeat its purpose or open it to interpretations that would render it non-compliant and make a Beneficiary ineligible for government assistance, the documents shall be read together and any such provisions of either document that clarify or resolve such ambiguities or conflicts in favor of a Beneficiary shall be given priority and effect so as to achieve compliance and eligibility for the Beneficiary. In the event that it becomes impossible to resolve any ambiguities or conflicts by reading the Joinder Agreement and the Trust together and construing them broadly, then the terms of this Master Trust shall control and be given precedence. In this regard, the Master Trust shall control and be given precedence over all existing Joinder Agreements executed before the date of this reformed and restated Master Trust as well as all Joinder Agreements executed after the date of this reformed and restated Master Trust.

9.7    Severability and Section Headings.    Any provision of this Declaration that is adjudged invalid or unenforceable under the laws of any place where the terms of the Declaration are to be performed, or are sought to be enforced, shall be deemed inoperative without invalidating such provision elsewhere or any of the other provisions of this Declaration or without invalidating such provision in any other place where the terms of the Declaration are to be performed. Section

headings are for purposes of convenience only and shall have no bearing on the interpretation of any provision of this Declaration of Trust.

     9.8    <u>Benefits Savings Clause</u>.  Any provision of this Declaration, the Trust created hereunder, or any Joinder Agreement that may disqualify any Beneficiary for government assistance, or reduce such assistance, shall be automatically, ab initio, reformed, amended, limited or void, as required to avoid any such disqualification.  This provision is included herein, despite the contrary policy expressed by the Social Security Administration in SI 01120.227, so that the Trust provides a firm basis for bringing any matter before a State Court as may be advisable or necessary for a reformation.

     IN WITNESS WHEREOF, the undersigned hereby subscribes to the above Reformed Declaration of Trust on the date and year first written above.

WITNESSES:

THE CENTER FOR SPECIAL NEEDS TRUST
ADMINISTRATION, INC.

By: _____

_____
Printed Name

_____
_Todd J. Belisle_
Printed Name

_____
_Megan Palmer_
Printed Name

Its:     President

STATE OF FLORIDA     ))
COUNTY OF PINELLAS     ))

     The foregoing Declaration was acknowledged before me this _10th_ day of July, 2018, by Todd J. Belisle, who is:

[ X ] personally known to me; or,

[   ] who has produced _____ as identification.

_____
Notary

VICKI L. DUFFEY
MY COMMISSION # FF 131045
EXPIRES: August 12, 2018
Bonded Thru Notary Public Underwriters

# Exhibit 2

THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.
CASE NO. 8:24-bk-00676-RCT
UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

## <u>DECLARATION OF KEVIN MCCOY</u>

1.      My name is Kevin McCoy.  I am over the age of 18, am competent to furnish this declaration, and do so based on my personal knowledge of the statements made herein.

2.      I am a partner at KapilaMukamal, LLP ("KM"), which specializes in insolvency, turnaround, forensic and investigative consulting, expert witness, and litigation support services.

3.      My areas of expertise include forensic accounting and investigation, financial transactions litigation, complex commercial litigation, and insolvency advising.

4.      I have worked with fiduciaries in conjunction with the Federal Bureau of Investigation (FBI), Securities and Exchange Commission (SEC), the Federal Trade Commission (FTC), and the United States Attorney's Office.

5.      I am a Certified Public Accountant (CPA), Certified Fraud Examiner (CFE), and a Certified Insolvency and Restructuring Advisor (CIRA), affiliated with the Association of Insolvency and Restructuring Advisors (AIRA). I am also affiliated with the National Association of Federal Equity Receivers (NAFER), Association of Certified Fraud Examiners (ACFE), and the Florida Institute of Certified Public Accountants (FICPA).

6.      On April 3, 2024, KM's retention as Forensic Accountants to Michael Goldberg, the Chapter 11 Trustee ("Trustee") for the Center for Special Needs Trust, Inc. (the "Debtor" or "Center") was approved by the Bankruptcy Court, retroactively to March 21, 2024 [DE 138].

7.      Since that date, I, along with other members of the KM team, have assisted the Trustee and his counsel with a forensic analysis of the accounting records, financial records and the bank and brokerage account records for the Debtor and the Special Need Trusts ("Trusts")

1

THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.
CASE NO. 8:24-bk-00676-RCT
UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

administered by the Debtor. KM's investigation is in its early stages and remains on-going at present. The following paragraphs are KM's preliminary findings and are subject to change based on additional information reviewed and analyzed during the investigation.

8.      The are currently over 2,000 Trusts administered by the Debtor, including approximately 1,270 individual Trusts that are combined into pooled accounts ("Pooled Trust") and approximately 750 individual Trusts ("Individual Trusts").[1] During the period from 2008 through June 2024 (the "Relevant Period"), there were as many as 6,900 Trusts administered by the Debtor and in excess of 2.6 million transactions.[2]

### ***Pooled Trusts***

9.      It's my understanding that a Pooled Trust is established for an individual with a disability for the benefit of that individual and generally managed by nonprofit organizations that combine the funds of many beneficiaries to:

- Provide more efficient administrative and management services, and

- Comply with various federal and state regulatory compliance allowing a beneficiary to maintain their Medicaid or Social Security benefits.

10.     The Center currently maintains five separate bank or brokerage accounts that contain certain Pooled Trust funds. The funds in these five accounts are combined and commingled amongst hundreds of beneficiaries to manage and maintain the Trusts' investments and fund and pay expenses.

---

[1] The amount and the identity of the Trusts as Pooled or Individual is based on the Trust Ledger accounting records maintained by the Debtor.
[2] Trust ledgers maintained by the Debtor within the Navision accounting platform.

THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.
CASE NO. 8:24-bk-00676-RCT
UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

### *Individual Trusts*

11.     Additionally, it is my understating that the Center maintains a Trust operating account ("Trust Operating Account") that combines and commingles funds from the Individual Trusts. The Trust Operating Account:

- Receives new Individual Trust funds (a portion of which are occasionally disbursed to a specific brokerage account for the Individual Trusts) [3];

- Obtains funds directly from an Individual Trust's brokerage account; and

- Maintains Trust funds to pay Individual Trust expenses.

12.     The Trust Operating Account is two dedicated bank accounts at American Momentum Bank ("AMB"). [4] The AMB Trust Operating Accounts have been active since as early as 2008 and during the Relevant Period. There are a significant number of transactions in both quantity and amounts that flow through the AMB Trust Operating Account.  For example, the following reflects a sample of the transactional activity that occurred on monthly basis in the ZBA - Trust Operating Account (as provided for in monthly bank statements):

- August 2020:

  i.   71 pages of activity, including 439 pages of check copies

  ii.  $2.8 million in Deposits, $2.8 million in Checks/Debits

- April 2021:

  i.   71 pages of activity, including 436 pages of check copies

---

[3] In some cases, a Trust may not have a brokerage account and all their funds are maintained in the Trust Operating Account.

[4] One account was the operating account that maintained a balance, and the other account was a zero-balance account ("ZBA") or disbursement account that issued the checks and payments for Trust expenses and maintained a zero ($0) balance.  Post-petition, a new Trust Operating Account was opened at another financial institution.

        ii.  $3.8 million in Deposits, $3.8 million in Checks/Debits

- July 2022:

    i.  66 pages of activity, including 387 pages of check copies

    ii. $3.4 million in Deposits, $3.4 million in Checks/Debits

- January 2023:

    i.  58 pages of activity, including 347 pages of check copies

    ii. $2.1 million in Deposits, $2.2 million in Checks/Debits

- October 2023:

    i.  46 pages of activity, including 225 pages of check copies

    ii. $3.5 million in Deposits, $3.5 million in checks/debits

13. It's also my understanding that the Center maintains two bank accounts that manage both Individual and Pooled Trusts funds that are combined and commingled for the purposes of funding beneficiaries' pre-paid credit cards.[5]

### *Conclusion*

14. In summary, the Trust funds were maintained and commingled in numerous different bank and brokerage accounts during the Relevant Period.

15. KM's investigation is still in its early stages and the analysis above is preliminary. There are a significant number of bank and brokerage accounts that existed during the Relevant period for over 6,900 Trusts and KM is coordinating with the Trustee and his counsel on the investigation efforts which remain on-going.

---

[5] The Debtor is in the process of closing one of the bank accounts used to fund the pre-paid credit cards.

THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.
CASE NO. 8:24-bk-00676-RCT
UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 10, 2024

By: _____

Kevin McCoy, CPA, CIRA, CFE

5