## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                    Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                  Chapter 11

     Debtor.

_____/

### OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S SUPPLEMENTAL
### MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE AUTOMATIC STAY
(Doc. No. 195)

The Official Committee of Unsecured Creditors (the "**Committee**"), by counsel and

pursuant to 11 U.S.C. §§ 105(a) and 362, files this Supplemental Memorandum in Support of

Motion to Enforce Automatic Stay (Doc. No. 195)("**Motion**"), and states as follows:

### Preliminary Statement

The Chamberlin Class Plaintiffs' arguments misunderstand the sole question pending

before this Court: Does the Chamberlin Class Action's operative Amended Complaint, as it

currently exists, violate the automatic stay?  If the answer is yes, the Court should grant the Motion

to Enforce the Stay.

What is also important, and notable in light of prior Court arguments on this issue, are the

matters that are *not* pending.  Specifically, there is no motion by the Chamberlin Class Plaintiffs

requesting stay relief or asserting cause to lift the stay to proceed with the Chamberlin Class

Action, and there is no adversary proceeding to determine what is property of this bankruptcy

estate.

Rather than address if there is a stay violation in the Amended Complaint, the Chamberlin

Class Plaintiffs suggest the Motion is an opportunity for this Court to make final factual and legal

determinations as to which parties may ever bring certain claims against third parties. Delving into such analysis now, through legal disputes between fiduciary representatives with nearly identical constituencies, is wasteful and reckless—as it forces fiduciary representatives to fight amongst themselves, potentially losing claims before testing those claims against the actual defendants whose conduct is at issue.

If, instead, the Court focuses solely on the action to enforce the stay before it, the resolution becomes more straightforward. The Motion should be granted because the Complaint[1] in the Chamberlin Class Action violates the automatic stay.

First, the automatic stay is violated because the Chamberlin Class Action argues that the $100 million loan held by this estate (which may result in a rapid judgment for the benefit of this estate's creditor victims) is a "sham" that the "Center had no intention of enforcing," because the note was "no more than pieces of paper meant to farcically substantiate the impermissible transfers," and that the "so-called loans [] were never legitimate."[2] These allegations illegitimizing the largest asset of the estate permeate the Complaint's background and are incorporated into the individual counts.

The Complaint also attacks the conduct of the Debtor,,and the claims against named defendants are derived in large part from their actions as officers, directors, and "agents" of the Debtor. Collectively, the allegations throughout the Complaint violate Sections 362(a)(1) & (3), as they are functionally claims against the Debtor and its assets[3] or allegations of the Debtor's wrongdoing.

---

[1] Case No. 24-cv-438- Doc. No. 41, as amended. The focus of the Supplement is on the Chamberlain Class Action, as parties for the Orris Class Action have not sought to be heard on this issue.
[2] All quotations in this Summary of Argument are more fully quoted and cited in the body of this Reply *infra*.
[3] Including the $100 million loan on which the Chapter 11 Trustee has already sued and essentially received concessions of the indebtedness and default.

The Complaint also (a) asserts derivative claims of this estate and for which the Chapter 11 Trustee has made an insurance claim, and (b) seeks to exercise control over an asset of this estate by having another Court deem the alleged "sham Loans" invalid to support the remainder of their claims.

Despite these stay-violating allegations and, therefore, factual and legal findings sought by the Complaint, the Chamberlin Class Action Plaintiffs make several arguments that certain of the claims "belong" to them alone.  This misses the point for two key reasons: (1) the Chamberlin Class Action Plaintiff's position is reliant upon its alleged facts being proven true while there is still great uncertainty regarding the underlying facts; and (2) as stated above, the allegations and findings sought are directly adverse to the Debtor and its assets even if the claims "belong" to those plaintiffs.  Yet, no relief from the automatic stay has been sought to bring the claims, as drafted (or further amended) notwithstanding the stay violating approach in the current Complaint.

To determine whether claims "belong" to the Chamberlin Class Action Plaintiffs, the Court would need to hold a trial and assess the decades old financial records and facts to determine whether each Complaint allegation was accurate and led to the legal consequence the Chamberlin Class Action Plaintiffs assert.[4]  A trial among fiduciaries for the victim creditors would be a waste; rather, such litigation should be organized by those fiduciaries against the defendants that have perpetrated the wrongdoing.

---

[4] In this regard, the Chapter 11 Trustee's Reply brief (Doc. No. 290), in crafting a rebuttal to the Chamberlin Class Action Plaintiffs, may also frame this very complex, not yet fully developed, factual record in terms of absolutes regarding ownership of certain claims and consequences of the not yet understood manner in which monies were moved from beneficiaries to various bad actors.  At this stage, only those bad actors know what really occurred and the Committee urges all possible beneficiary representatives to be more cautious with statements that might harm possible claims of either this bankruptcy estate or the Chamberlin Class Action.

In this procedural posture, and in light of the allegations included in the Complaint, the Court's resolution of the Motion to Enforce Stay is simpler than the Chamberlin Class Action Plaintiffs suggest. The Complaint violates the stay, which is in place and should be enforced.

If the Chamberlin Class Action Plaintiffs believe they can advance amended claims without violating the stay, they should do so and ask this Court for relief if they feel it is necessary.

It is not appropriate to seek the expansive rulings and declaratory judgments requested of this Court in response to another party's more straightforward Motion to Enforce Stay.

### Background

1.      On February 9, 2024, the Center for Special Needs Trust Administration, Inc. ("**Debtor**" or "**Center**") filed a voluntary chapter 11 petition (Doc. No. 1) ("**Petition Date**"). The Center was an administrator of special needs trusts across the country prior to filing bankruptcy.[5]

2.      Each Beneficiary of the Center has its own trust account or sub-trust account (a "**SNT Account**") reflecting the specific assets in the respective Beneficiary's special needs trust ("**SNT**"), or in the case of a pooled SNT, the specific assets allocated to the Beneficiary's sub-trust account.  Some of the Beneficiaries were invested in a loan allegedly made by the Center to Boston Financial Group ("**BFG**").

3.      Prepetition, it was discovered that over $100,000,000 was missing from beneficiaries' accounts.  Exactly how, when, and where is not yet known by the Chapter 11 Trustee or the Chamber Class Action Plaintiffs, though it is apparent some portion was purported to be a loan (or series of loans) made from the Debtor to BFG (the "**Loan**").

---

[5] On March 4, 2024, the United States Trustee filed its *Notice of Appointment of Official Unsecured Creditors Committee* (Doc. No. 75) thereby giving notice of the appointment of the Committee. [5]On March 21, 2024, the Court appointed Michael Goldberg as the chapter 11 Trustee ("**Trustee**") (Doc. No. 109).

4.      Post-petition case, certain of the beneficiaries of the Center filed two class action complaints (collectively, the "**Class Actions**")[6] in the United States District Court for the Middle District of Florida against the Center's former owner, Leo Govoni,[7] BFG, and various other related third parties, including former officers, directors, and "agents" of the Debtor, alleging counts which seek recovery of funds misappropriated by and through the Center.

5.      The Trustee filed a Motion to Enforce Automatic Stay (Doc. No. 195) seeking to stay the Class Actions.

6.      On April 25, 2024, the Trustee filed a cause of action against Govoni and BFG alleging, in part, breach of contract of the $100,000,000 Loan.  *See* Adversary Proceeding No. 24-ap-00139. On June 7, 2024, defendants Govoni and BFG filed their Answers (without affirmative defenses) conceding liability owed under the Loan and recognizing default of the Loan.  *See* Adversary Proceeding at Doc. No.  7 (¶ 81), Doc. No. 10 (¶81).

7.      Problematically, as noted by the Trustee, the allegations in the Class Actions derive from and arise through the initial harm caused by the Debtor in misappropriating the Beneficiaries' funds in the form of the Loan.  The Chamberlin Class Action highlights this issue throughout. It explicitly alleges *the Debtor*, owed and violated fiduciary duties to the Chamberlin Class Action Plaintiffs and that those plaintiffs "rel[ied] on the Center to adhere to its fiduciary duties of care, loyalty, and prudence" that "The Center … breached [those] duties of care, loyalty, and prudence." Complaint, at ¶ 58.

---

[6] See 8:24-CV-438-SDM *Chamberlin et al v. Boston Finance Group, LLC et al* ("**Chamberlin Class Action**"), and 8:24-CV-874-SDM *Orris v. Govoni, et al.* ("**Orris Class Action**").
[7] BFG, the Center, and many other entities are owned or controlled by Leo Govoni ("**Govoni**"), John Staunton ("**Staunton**") or Jonathan Golden ("**Golden**").

8.       The Complaint explicitly takes positions that undermine the claims of the bankruptcy estate concerning the Loan, including explicitly alleging:

  a.   The Center also claims it has no records that its Board of Directors or any other party approved the BFG Loan.  *Id*. at ¶ 72.

  b.   *The Center* had no intention of enforcing the loan and the Loan documentation was *no more than pieces of paper meant to farcically substantiate the impermissible transfers. Id*. at ¶ 74.

  c.   The *sham* Loan documents.  *Id*. at ¶ 75.

  d.   Any suggestion that the Loan was a legitimate loan that went bad is an *outright preposterous position. The so-called loans were never legitimate.  Id.* at ¶ 79.

  e.   "the *sham* BFG Loan".  *Id.* at ¶ 169.[8]

9.       The Complaint is also replete with allegations that *the Debtor* acted "in violation of the exceptional trust and confidence [Beneficiaries] had placed in and the duties *owed by the [Debtor] Center* and *its* officers, directors, founders, and agents." (emphasis added). *Id*. at 62.  The Complaint focus is on the Debtor, alleging "The Center now blames everyone but itself and its current directors for the massive, unmitigated misappropriation of SNT assets." *Id*. at 86. Additional allegations against the Debtor include:

  a.   As an initial means to convert trust funds, *the Center* converted Beneficiaries' interests in individual and irrevocable SNTs to pooled SNTs, without receiving court approval.  *Id.* at ¶ 55.

  b.   Beneficiaries rely *on the Center* to fulfill its fiduciary obligations. *Id.* at 58-59.

  c.   *The Center* allowed over $100 million in SNT assets to be siphoned and misappropriated in violation of the exceptional trust and confidence they had placed in the duties owed by *the Center*. *Id*. at ¶ 62.

  d.   The Center entered into the $100,000,000 revolving line of credit, Staunton signed as the Center's managing member. *Id*. at ¶ 73.

---

[8] Emphasis added throughout with respect to citations to the Complaint.

    e.   Loan amendments were signed by Todd Belisle on *behalf of the Center*. Id. at ⁋ 76.

    f.   Staunton was paid millions of dollars *by the Center. Id.* at ⁋⁋ 53, 68.

    g.   *The Center's* bankruptcy filing reports [*the Center*] owes beneficiaries in excess of $105,000,000. *Id*. at ⁋ 78.

    h.   *The Center* gave zero notice to the SNT Beneficiaries of the existence of *the Center's* loans to BFG or BFG's defaults. *Id*. at ⁋ 84.

    i.   *The Center* owes the Beneficiaries over $100,000,000. Id. at ⁋⁋ 80, 84.

    j.   *The Center* paid FTAS over $4.6 million. *Id*. at ⁋ 92.

    k.   Checks and electronic deposits were sent to American Momentum Bank ("**AMB**") to fund the Beneficiaries' SNTs, *for which the Center served as trustee* and paid a monthly fee to AMB. *Id.* at ⁋ 120.

    l.   When the bank account at AMB was opened, the bank was aware Govoni was an individual with control over the Center. *Id*. at ⁋ 137 – 141.

    m.   At all relevant times, Govoni owned and had responsibility to *control, manage, and direct BFG and through BFG,* its subsidiaries Prospect Funding and Prospect Finance. *Id*. at ⁋ 139.

    n.   The assets of the SNTs were commingled *with the Center's assets*. *Id*. at ⁋ 161.

    o.   The primary defendants "Govoni and Staunton were the Center's founders and substantial contributors and exerted oversight and control over the Center." *Id*. at ⁋ 204.

10.    Additional allegations further highlight the misappropriation of funds and wrongdoing *perpetrated by and through the Center,* giving rise to causes of action indirectly against the Debtor with respect to the misappropriated Loan:

    a.   The *Center* was obligated to keep SNT assets segregated. *Id.* at ⁋ 192.

    b.   Each Beneficiary's share of the pooled trust distributions was traceable and identifiable through the *Center's* uniformly applied treasury management system with American Momentum. *Id.* at ⁋ 194.

c. BFG, Govoni, Staunton, and Golden wrongfully transferred the funds from the SNT accounts to BFG's [account] for the purported BFG Loan. *Id.* at ¶ 199.

d. Govoni and Staunton were the Center's founders and substantial contributors and exerted oversight and control over the Center and the SNTs under its administration. *Id.* at ¶ 204.

e. Beneficiaries … reposed trust in Govoni, Staunton, Golden, and BAM to exercise their superior expertise in the handling and investing SNT funds. *Id.* at ¶ 208.

f. As the fiduciaries entrusted to handle and invest SNT assets [on behalf of the Center], these Defendants owed Plaintiffs and Class Members the fiduciary duties to administer and invest the SNTs prudently and reasonably. *Id.* at ¶ 211.

g. At all relevant times, FTAS*, the Center's "agent*," owed fiduciary duties to Plaintiffs and Class Members and their SNT assets. *Id.* at ¶ 221.

h. FTAS [received] over $4,600,000.00 from the Center in a five-year period. *Id.* at ¶ 231.

i. AMB as the Center's *agent* owed fiduciary duties to Plaintiffs and Class Members to safeguard the SNT assets in its custody. *Id.* at ¶ 242.

j. Plaintiffs and Class Members reposed trust and confidence in the Center to exercise its superior expertise in serving as trustee and administering SNT property. *Id.* at ¶ 259.

k. Plaintiffs and Class Members entrusted the management and investment of SNT assets to BAM, as the Center's agent and the SNTs' and Plaintiffs' and Class Members' investment manager and fiduciary. *Id.* at ¶ 260.

l. As the SNTs' investment manager and the Center's agent, BAM owed Plaintiffs and Class Members the fiduciary duties to administer, manage, and invest SNT property prudently and reasonably. *Id.* at ¶ 265.

m. The Center and BAM further breached their duties of care, loyalty, and prudence owed to Plaintiffs and Class Members by allowing and/or causing over $100,000,000 to be transferred to BFG from the SNT accounts with no beneficial or legitimate investment purpose. *Id.* at ¶ 270.

n. At all relevant times, American Momentum Bank knew that the Center and BAM would be in breach of their duties of care, prudence, and good faith

by allowing and/or causing SNT accounts to be almost completely depleted through transfers to BFG. *Id.* at ¶ 292.

o. Defendants Govoni, Staunton, and Golden, as founders, agents, service providers, and substantial contributors of and to the Center, owed Plaintiffs and Class Members as SNT Beneficiaries the duty to act reasonable with respect to the SNT assets they handled. *Id.* at ¶ 303.

p. At all relevant times, numerous red flags related to the pooled SNT accounts and the BFG account at American Momentum Bank clearly evidenced that SNT account funds were being mishandled and misappropriated by the SNTs' fiduciary, including without limitation the following: a. The Center failed to segregate SNT funds and commingled them with funds in the Center's operating and/or master accounts at American Momentum Bank. *Id.* at ¶ 320.

q. At all relevant times, Defendant FTAS, as an agent to the Center and an accounting service provider for Plaintiffs' and Class Members' SNTs, owed Plaintiffs and Class Members the duty to act reasonable with respect to the SNT assets it handled. *Id.* at ¶ 331.

r. On a continuing basis from 2011 through 2020, BFG transferred Prospect Funding approximately $14,000,000 in funds misappropriated and converted from Plaintiffs' and Class Members' pooled SNT accounts (stated without knowledge of the source of the funds). *Id.* at ¶ 346.

s. BFG acquired the SNT assets through inequitable means in that BFG concealed the transfers to BFG and obtained the money from the pooled SNT accounts (stated without knowledge of the source of the funds). *Id.* at ¶ 369.

t. Prospect Funding and Prospect Finance acquired the SNT assets through inequitable means in that BFG, Prospect Funding, and Prospect Finance concealed the transfers to BFG and the subsequent transfers to Prospect Funding and Prospect Finance, and obtained the money for those transfers from the pooled SNT accounts (stated without knowledge of the source of the funds). *Id.* at ¶ 379.

u. Upon information and belief, Govoni, Golden, and Staunton used the funds wrongfully transferred from the SNT accounts to BFG's for their own personal benefit and expenses and those of commonly controlled entities, including to capitalize their fraudulent lending scheme and/or by transferring said funds to BHC for subsequent use by its other subsidiaries under their control. *Id.* at ¶ 397.

     v.   Govoni, Golden, and Staunton used a corporate structure wherein companies associated with BFG, BHC, and Prospect under these Defendants' common control were organized as legally distinct entities for the additional improper purpose of concealing and obfuscating the self-dealing, nefarious transactions including the $100,000,000 in improper transfers from the pooled SNT accounts. *Id.* at ¶ 403.

11.    The consistent themes throughout the Complaint are (1) the Loan is invalid and (2) the Center's conduct is the hub of the activity by which the Loan was made and the funds were misappropriated, while the bad actors were acting in their capacity as officers, directors, and agents of the Debtor.

**I.**    **The Class Action Complaint Violates the Automatic Stay**

12.    Section 11 U.S.C. § 362(a)(1) provides that a petition operates as a stay applicable to the "commencement or continuation…of an action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

13.    Section § 362(a)(3) provides additional protection and stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

14.    The Complaint against third parties alleges that the estate's largest known asset, recovery of the $100,00,000 Loan, is a sham therefore is not property of the estate.  The applicability of § 362 is particularly appropriate here, where an action against a putative third-party risks potential prejudice to the debtor's estate. *See In re Klarchek*, 508 B.R. 386, 397 (Bankr. N.D. Ill. 2014) (noting "even where such a collateral argument may be unavailing, the estate cannot simply be a bystander in such an action and risk prejudice…[the] real party in interest context also implicates the sections of § 362(a)(3).").  Courts have applied § 362(a)(1) to prevent enterprising litigants from initiating litigation in "transparent attempt[s] to end run the automatic stay" where

"the allegations in the complaint were actually against the debtor." *In re Jefferson County, Al.*, 491 B.R. 277, 286 (Bankr. N.D. Al. 2013).

15.     Section 11 U.S.C. § 362(a)(3) also applies to actions against non-debtors. *See In re Jefferson County, Al.*, 491 B.R. 277, 295 (Bankr. D. Al. 2013) (noting "§ 362(a)(3) is not limited to actions against the debtor").  The provision "prohibits affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed." *City of Chicago, Illinoi v. Fulton*, 592 U.S. 154, 158 (2021).  Section 362(a)(3) prohibits acts against a non-debtor third party that would change this "status quo." *See In re Klarchek*, 508 B.R. 386, 397 (Bankr. N.D. Ill. 2014) (applying § 362(a)(3) where "there is no question that the driving force behind timing and content of the [d]issolution [p]roceeding was to thwart the [c]hapter 7 [t]rustee's investigation and possible claims."); *See Also In re Jefferson County, Al.*, 491 B.R. at 295 ("courts have applied the (a)(3) stay to non-debtor actions that have an adverse impact on the property of the estate."); *See Also In re Kaiser Aluminum Corporation, Inc.*, 315 B.R. 655, 658 (Dist. Del. 2004) ("The protection of the automatic stay extends to any action or proceeding against an interest of the Debtor.  The scope of this protection is not determined solely by whom a party chose to name in the proceeding, but rather by who is the party with a real interest in the litigation.").

16.     Here, both § 362(a)(1) and (a)(3) apply and demonstrate the Chamberlain Class Action violates the automatic stay through its direct and indirect allegations that the Center orchestrated with others to misappropriate over $100 million in Beneficiary assets.

## II.     Determination of Stay Relief on Various Class Action Complaint Counts is not Procedurally Proper

17.     Notwithstanding the stay violations on their face, the Chamberlin Class Action Plaintiffs argue this Court should determine which claims belong to them and can be carved out and pursued.  But, it is not the place of this Court to chop up or propose edits to the Complaint or

chart a path for the Chamberlin Class Action to proceed when the only motion before the Court is to enforce the stay, which has been violated.

18.     At the Court's last hearing on this topic, the Committee all but begged class counsel to file a stay relief motion to tee up its requests properly before the Court if it wanted to address its own counts one-by-one or how it may proceed in light of the existing stay violations.  Class Counsel did not take any such action and therefore cannot continue to ask the Court or the other parties which counts are the bankruptcy estates, and which counts the Chamberlin Class Action Plaintiffs can advance.  Problematically, however, it's not that simple, nor is such a request ripe for adjudication. Litigating now, without determining the underlying facts, fails to advance recovery from the *actual* defendants who are labile to the Beneficiaries in this case.[9]

19.     At this procedural stage, the Court also does not have before it an adversary proceeding complaint requesting a declaratory judgment to determine whether any particular cause of action is estate property or otherwise non-violative of the automatic stay.  The Court only has before it a motion to enforce the automatic stay and determine, in connection with that motion, whether the Complaint violates the automatic stay.  The answer is resoundingly yes.

20.     A determination at this stage, before the forensic accountant finishes his work, is unnecessarily risky and puts the proverbial cart before the horse, to the detriment of the beneficiaries for whom we all work.  The Class Action claims are complicated (and perhaps compromised) by the nature in which the 'bad acts' occurred. For example, SNT funds were not just misappropriated from 2009 to 2012 when the Loan was made. *Id*. at 73-75. The misappropriation, perhaps as a cover up, was ongoing for at least a decade.

---

[9] It is curious why the potential Chamberlin Class Action Plaintiffs believe their constituent group would be benefitted by arguing the Chapter 11 Trustee, who is tasked with recovering assets for their benefit, does not have claims against similar defendants, including to collect proceeds transferred as part of the Loan.  In this regard, the Chamberlin Class Action Plaintiffs seem to be creating a conflict with their fellow class members and maximizing all possible recoveries.

21.     Thus, some potential Chamberlin Class Action class members may be creditors of other class members as a result of the Center's continued efforts to conceal the Loan and misappropriation.  These issues will take time to sort out and should not be rushed.  But, this issue highlights the looseness of the Chamberlin Class Action Plaintiff's position.  As a gating issue, there must actually be a "class."

22.     While the Complaint asserts in support of its class certification that "every … Class member[] was exposed to virtually identical conduct," that may not be accurate.  Compliant at ‖ 183.  Specifically, while many trusts had their funds diverted to the Loan over a decade ago, the many trusts created in the last five years that are short funds appear to have had their trust funds transferred to other potential class members' trust accounts.  If the forensic investigation proves that is what did occur, there is not typicality among the class members and they may in fact be in conflict with claims against each other.

23.     As with other factual assertions of the Chamberlin Class Action Plaintiffs, the Court would need a fully developed evidentiary record and trial to make the findings they request concerning who are the sole parties who can bring various claims.

24.     Yet, the only requested relief the Court can grant is to enforce the automatic stay in total, or not.  Given the Class Counsel's position that the estate's largest asset does not exist, the Court should enforce the automatic stay and prevent further challenges to that asset in any other court.

### III.     Other Beneficiary Assets May Be Jeopardized

25.     Class Counsel's claims not only jeopardize the $100 million Loan, but they put additional assets at risk.  The estate holds over $5 million in director and officer liability insurance claims.  The Class Counsel's allegations of fraud, without coordinating with the Trustee or the

Committee, put these assets at risk of loss. A hasty and rushed adjudication of who owns what claims for the purposes of getting attorneys paid is not in the best interest of the beneficiaries.

26.     Most importantly for the Committee, the beneficiaries need a coordinated approach that maximizes recovery of funds at the last expense and litigation possible. The Trustee already has filed a cause of action to recover the alleged Loan, and Default has been admitted.  Concerning director and officer insurance, the Committee understands that the Chapter 11 Trustee either has asserted a claim under the policy or intends to do so.

27.     Other causes of action claimed in the Class Actions are in their nascent stage and no one would be harmed if they are not determined until a later date.  For instance, whether funds recovered on account of the Loan should be held by the Chapter 11 Trustee in a form of constructive trust, solely for the beneficiaries, is a distribution question that can be answered if and when money is recovered.  To fight over this nuance now, and delay recovery efforts at the expense of the beneficiaries, is not justified.

**IV.     Judicial Settlement Conference**

28.     To the extent the Court believes it must adjudicate, now, whether each count in the Complaint is property of the estate, the Committee urges the Court to consider compelling the parties to attend a judicial settlement conference before litigating among themselves rather than recovering funds for the benefit of the estate.

**WHEREFORE**, for the reasons set forth above, the Committee respectfully requests the Court grant the Motion, and for all other relief the Court finds just and proper.

Dated: July 12, 2024.

/s/ Megan W. Murray
Megan W. Murray
Florida Bar Number 0093922
Scott A. Underwood

Florida Bar Number 730041
Daniel E. Etlinger
Florida Bar Number 0077420
Underwood Murray, P.A.
100 N. Tampa St., Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401 / Fax: (813) 553-5345
Email: mmurray@underwoodmurray.com
          sunderwood@underwoodmurray.com
          detlinger@underwoodmurray.com
*Counsel to the Committee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing, that was filed with the Clerk of Court, has been furnished electronically to those parties registered to receive service via CM/ECF, including the United States Trustee, the Trustee, and Debtor's counsel, counsel for the Class Actions, on June 12, 2024.

/s/ Megan W. Murray
Megan W. Murray