ORDERED.

Dated: August 05, 2024

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

The Centers for Special Needs
Trust Administration, Inc.,

        Debtor.
_____/

Case No. 8:24-bk-00676-RCT

Chapter 11

**ORDER (I) GRANTING CHAPTER 11 TRUSTEE'S MOTION TO
ENFORCE AUTOMATIC STAY; AND (II) DENYING AS MOOT AMERICAN
MOMENTUM BANK'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

This case came before the Court at a hearing on July 23, 2024, on two motions: (1) the Chapter 11 Trustee's Motion to Enforce Automatic Stay (Doc. 195) and related filings (Docs. 210, 252, 290, 297, 299); and (2) American Momentum Bank's ("AMB") Motion for Relief from the Automatic Stay (Doc. 291) and related filings (Docs. 302, 305, 306). As explained below, the Court grants the Trustee's motion and denies as moot AMB's motion.

**I.  Background**

Debtor The Centers for Special Needs Trust Administration, Inc. served as the trustee or co-trustee of numerous special needs trusts, including both individual, stand-alone trusts and pooled trusts (collectively, "SNTs") for over 2,000 beneficiaries who suffer from various levels of disability (the "Beneficiaries"). Debtor's primary duty as trustee of the SNTs is to manage

the SNTs, maintain records for assets managed by third-party investment managers, respond to requests for distributions from Beneficiaries, and make distributions in a manner that ensures that the applicable beneficiary meets the income and asset thresholds to qualify for certain critical public assistance benefits, such as Medicaid, Social Security, and Supplemental Security Income.

Of the more than 2,000 SNTs administered by Debtor, 1,270 SNTs are combined into pooled accounts ("Pooled Trusts") and approximately 750 SNTs are individual trusts. Each Beneficiary has its own trust account or sub-trust account ("SNT Account") that reflects the specific assets allocated to the respective Beneficiary's SNT (collectively, "SNT Funds").

The Pooled Trusts are governed by a Master Declaration of Trust, dated March 10, 2001, which was amended and restated four times, before it was reformed and amended, effective prospectively and retroactively immediately upon its execution on July 10, 2018 ("Reformed Trust Declaration").[1] The Reformed Trust Declaration provides that the Trust is irrevocable, and, although separate sub-accounts are established and maintained for each Beneficiary, "the Trust shall pool these sub-accounts for investment and management purposes."[2] The Trust is structured somewhat ambiguously to protect the right of the Beneficiaries to receive public assistance.[3]

Before filing a Chapter 11 petition, Debtor's leadership discovered that Debtor had loaned approximately $100 million to a third-party, Boston Financial Group ("BFG") (the "BFG Loan"). BFG is a company controlled by Debtor's founder, Leo Govoni ("Govoni").

---

[1] Doc. 290, p. 14-27.
[2] Doc. 290, p. 22, ¶ 7.1.
[3] For example, while paragraph 1.1 of the Reformed Trust Declaration states that the pooled trust is established for the sole benefit of the trust beneficiaries, paragraph 3.1 states that "none of the Beneficiaries have any right of entitlement to the Trust corpus or income, except as the Trustee elects to disburse the same in its sole, complete, absolute, and unfettered discretion." (Doc. 290, p. 14, 17).

2

The BFG Loan is evidenced by multiple revolving line of credit loan agreements between BFG and Debtor, a security agreement giving Debtor a security interest in all of BFG's real and personal property, promissory notes by BFG made in favor of Debtor for $100 million, and a personal guaranty executed by Govoni (collectively, the "Loan Documents"). The Loan Documents were executed by Govoni, on behalf of BFG, and by Todd Belisle, on behalf of Debtor. The Beneficiaries are not parties to the Loan Documents. The BFG Loan matured on January 1, 2017 and is in default.[4]

Debtor filed for bankruptcy under Chapter 11 on February 9, 2024. On March 4, 2024, the Office of United States Trustee appointed an Official Committee of Creditors.[5] By Order dated March 11, 2024, this Court directed the appointment of a Chapter 11 Trustee.[6] And, on March 21, 2024, the Court approved the U.S. Trustee's selection of Michael Goldberg as the Chapter 11 Trustee.[7]

### The Trustee's Adversary Proceeding

On April 25, 2024, the Chapter 11 Trustee filed an adversary proceeding against BFG and Govoni for breach of the Loan Documents, for turnover of property of the estate, and for an accounting, seeking to recover the outstanding amount due under the BFG Loan of not less than $142,283,314 (the "Adversary Proceeding").[8]

The Chapter 11 Trustee's Complaint (filed just over a month after his appointment) makes the following allegations.[9] Govoni, a purported financial and investment advisor, founded Debtor in 2000 and served on its Board of Directors until his resignation in 2008 or

---

[4] Adv. Proc. No. 8:24-ap-00139-RCT, Doc. 10, ¶ 81.
[5] Docs. 75, 76. By Order dated March 18, 2024, the Court approved the Committee's application to employ bankruptcy counsel (Doc. 99).
[6] Doc. 93.
[7] Doc. 109.
[8] Adv. Proc. No. 8:24-ap-00139-RCT.
[9] AP Doc. 1.

2009. However, despite resigning, Govoni continued to exert control over Debtor's operations, finances, human resources, and information technology.

After Govoni resigned, between 2009 and 2020, Debtor made numerous transfers from SNT Funds to BFG totaling $100 million. It started on June 1, 2009, by Debtor and BFG entering into a $2.5 million line of credit loan agreement. In connection with the 2009 loan, BFG executed a promissory note for $2.5 million and a security agreement that granted Debtor a security interest in all BFG's real and personal property.

Then, on December 1, 2009, Debtor and BFG entered into an amended line of credit loan agreement, which increased the credit line to $15 million (along with a $15 million promissory note). The line of credit was increased three more times: (1) on March 15, 2010, it was increased to $30 million (and BFG executed a $30 million promissory note); (2) on March 15, 2011, it was increased to $50 million (and BFG executed a $50 million promissory note and an amended promissory note that changed the interest rate); and (3) on January 1, 2012, it was increased to $100 million (and BFG executed a $100 million promissory note). In connection with the 2012 amendment to the loan, Govoni executed a personal guaranty for the $100 promissory note.

The 2012 promissory note matured on January 1, 2017, and BFG had only made a few payments on the loan, both before and after it matured (with the last payment being made on October 27, 2023). On September 8, 2023, Debtor sent BFG a demand for payment for all amounts due. As of April 23, 2024, Debtor was owed $100 million in principal and $42,283,314 in interest.

The Chapter 11 Trustee filed a motion for summary judgment as to liability for the BFG Loan in the Adversary Proceeding. Specifically, he seeks summary judgment on Count I (breach of the promissory notes by BFG) and Count II (Govoni's breach of his personal

guaranty). At a pretrial status conference on July 23, 2024, the Chapter 11 Trustee stated that he was expecting to submit an agreed order granting the motion.

### **The Class Actions**

After Debtor's Chapter 11 petition was filed, two separate class actions were filed on behalf of the Beneficiaries in the United States District Court for the Middle District of Florida (collectively, the "Class Actions"). The Class Action Plaintiffs did not seek relief from the automatic stay prior to filing either Class Action.

The first class action was filed on February 19, 2024, by Beneficiary Clark Chamberlin, a disabled minor child, by and through his parents and co-guardians, Todd Chamberlin and Kelli Chamberlin, and on behalf of all other similarly situated Beneficiaries against defendants BFG; Boston Asset Management, Inc.; Govoni; John W. Staunton, Esq. ("Staunton"); Jonathan Golden; Prospect Funding Holdings, LLC; Prospect Funding Partners, LLC; Prospect Funding Holdings (NY) III, LLC; AMB; Boston Holding Company, LLC; and FTAS alleging thirteen different counts (the "Chamberlin Class Action").[10]

The second class action was filed on April 9, 2024, by T.L, a disabled adult by and through Shawnta Orris, his guardian ad litem, individually and on behalf of all others similarly situated against defendants Govoni, Staunton, Todd Belisle, Richard Shonter, Caitlin Janicki, Tracey Gregory, Michelle Diebert, Laura Davis, Carl Schroeder, and BFG alleging four different counts (the "Orris Class Action").[11]

No class has been certified in either action.

---

[10] *Chamberlin v. Boston Finance Group, LLC*, No. 8:24-cv-00438-SDM-AEM (M.D. Fla. filed Feb. 19, 2024).
[11] *Orris v. Govoni*, No. 8:24-cv-00874-CEH-AEP (M.D. Fla. filed Apr. 9, 2024).

5

## II. Trustee's Motion to Enforce the Stay

By his Motion to Enforce the Stay, the Chapter 11 Trustee seeks to enforce the automatic stay against both Class Actions on grounds that the claims made in the Class Actions are based on the same harm and misconduct caused by BFG's breach and default of the $100 million secured loan by Debtor to BFG and that the Class Actions seek recovery of the same funds owed to Debtor under the Loan Documents. The Trustee further maintains that Debtor's former directors and officers ("D&O") owed a fiduciary duty to Debtor, and as such, the claims raised in the Class Actions, including claims against any D&O policies, belong to the bankruptcy estate. The Orris Class Action Plaintiffs do not oppose the Chapter 11 Trustee's Motion to Enforce the Stay, and the Official Committee of Unsecured Creditors supports the Trustee's motion.[12] However, the Chamberlin Class Action Plaintiffs oppose the Trustee's motion.[13]

At the heart of the Trustee's Motion is the creation of a bankruptcy estate and the automatic stay that arises to protect to protect the estate. The bankruptcy estate is created to facilitate a centralized administration of all assets of a debtor and all claims against the debtor:

> The purpose of bankruptcy law is to address the collective-action problem that a bankruptcy poses. When a company's liabilities exceed its ability to pay creditors, every creditor has an incentive to maximize its own recovery before other creditors deplete the pot. Without a mandatory collective system, the creditors would race to the courthouse to recover first. One or a few successful creditors could then recover substantial funds, deplete the assets, and . . . leav[e] other creditors with nothing.[14]

---

[12] Doc. 297.
[13] Docs. 252, 299.
[14] *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2090 (2024) (Kavanaugh, J., dissenting) (internal citations omitted); *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 390 (2023) (stating that "the Bankruptcy Code offers debtors a fresh start by discharging and restructuring their debts in an 'orderly and centralized' fashion").

In this way, "[t]he bankruptcy system works to preserve a bankrupt company's limited assets and to then fairly and equitably distribute those assets among the creditors."[15]

Here, the Beneficiaries have substantial claims against Debtor. Debtor's former D&Os have been ousted by Court Order. In their place, the Court has appointed an independent Chapter 11 Trustee, who is charged with winding down Debtor's operations, liquidating the assets of the bankruptcy estate, and paying the Beneficiaries' claims as soon as possible. The Court has also approved the appointment of a Creditors' Committee, who is charged with protecting the rights of all Beneficiaries.[16]

The tool that effects this centralization anticipated by the Bankruptcy Code is the automatic stay, as set forth in 11 U.S.C. § 362.[17] The stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[18]

Section 541(a)(1) provides that property of the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case wherever located and by whomever held.[19] Property of the estate also includes any cause of action that a debtor has at the commencement of the case.[20]

To determine if the Chamberlin Class Action violates the automatic stay, a review of the allegations set forth in the Chamberlin Amended Class Action Complaint ("CCC")[21] is required. The CCC asserts thirteen claims against the following defendants: (1) BFG – the

---

[15] *Purdue Pharma*, 144 S. Ct. at 2088 (Kavanaugh, J., dissenting).
[16] In this Chapter 11 case, unlike other commercial cases, there are no significant creditors other than the Beneficiaries.
[17] *See S.E.C. v. Miller*, 808 F.3d 623, 630 (2d Cir. 2015) (citations omitted).
[18] 11 U.S.C. § 362(a)(3).
[19] *See In re Dorand*, 95 F.4th 1355, 1363 (11th Cir. 2024).
[20] *See In re Icarus Holding*, LLC, 391 F.3d 1315, 1319 (11th Cir. 2004) (citations omitted).
[21] Case No. 8:24-cv-00438-SDM-AEP (M.D. Fla. filed Feb. 19, 2024) (Doc. 41).

company to which Debtor loaned $100 million; (2) Boston Asset Management, Inc. ("BAM") – the company that provided investment management and marketing services for the SNT Funds that were invested via the BFG Loan;[22] (3) Prospect Funding Holdings, LLC; Prospect Funding Partners, LLC; and Prospect Funding Holdings (NY) III, LLC (collectively, "Prospect") – companies that received funds from BFG that BFG received from the BFG Loan; BFG has owned the membership interests in Prospect;[23] (4) AMB – the bank where Debtor held the SNT Funds in eight different accounts;[24] (5) Boston Holding Company, LLC ("BHC") – an entity allegedly used by Govoni, Golden, and Staunton to defraud Beneficiaries whose SNT Funds were misappropriated;[25] (6) FTAS – an entity controlled by Govoni, Staunton, and Golden that was Debtor's accounting firm that prepared SNT annual accountings for Beneficiaries, which purported to show the receipts, disbursements, and inventory of their SNTs, but which did not disclose the BFG Loan and BFG's failure to repay it;[26] (7) Govoni – he served as BFG's and BHC's managing member and BAM's director and president, and he controlled these entities' operations and affairs alongside Golden and Staunton; he also co-founded Debtor with Staunton; he also controlled Prospect's operations and affairs;[27] (8) Staunton – he is an attorney and has been a principal of and/or owned membership interests in BFG and stock in BAM and controlled those entities' operations and affairs alongside Govoni and Golden; he also co-founded Debtor with Govoni; he also controlled Prospect's operations and affairs;[28] and (9) Golden – he is an attorney and has been a beneficial owner of BFG, BHC,

---

[22] CCC, ¶ 89.
[23] CCC, ¶ 29, 99, 102, 105, 396.
[24] CCC, ¶ 119.
[25] CCC, ¶ 398, 400.
[26] CCC, ¶ 88, 92, 136.
[27] CCC, ¶ 20, 30.
[28] CCC, ¶ 22, 30, 64.

and BAM and controlled these entities' operations and affairs alongside Govoni and Staunton; he also controlled Prospect's operations and affairs.[29]

The Chamberlin Class Action Plaintiffs allege that: (1) BAM took over from Debtor essentially all duties related to SNT assets, including investing and managing SNT assets and that this led to at least $100 million being misappropriated from SNT Accounts to fund the BFG Loan;[30] (2) the SNT Funds were maintained in (and were transferred to BFG from) pooled SNT accounts held at AMB;[31] (3) Debtor also maintained two operating accounts at AMB;[32] (4) Debtor failed to segregate SNT Funds and commingled them with the funds in its operating and/or master-general deposit accounts at AMB;[33] and (5) BFG transferred some of the funds that it received via the BFG Loan to Prospect.[34] Based on these allegations, the Chamberlin Class Action Plaintiffs assert claims of conversion, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligence, unjust enrichment, and conversion against the defendants.

However, at its core, the Chamberlin Class Action Plaintiffs' claims arise from Debtor funding a $100 million loan to BFG with SNT Funds, and BFG's subsequent breach and default of the BFG Loan. Thus, the Chamberlin Class Action Plaintiffs seek recovery of the same funds owed to Debtor under the Loan Documents, *i.e.*, the $100 million in principal amount loaned by Debtor to BFG. And yet, the legal claims based on the Loan Documents are property of the bankruptcy estate and are to be administered by the Chapter 11 Trustee.

---

[29] CCC, ¶ 21, 30, 64.
[30] CCC, ¶ 78, 90.
[31] CCC, ¶ 95.
[32] CCC, ¶ 121.
[33] CCC, ¶ 293a, 320a.
[34] CCC, ¶116.

At this point in the case, the Chapter 11 Trustee is still investigating the best way to recover on the BFG Loan. His first step has been to bring the Adversary Proceeding and to move for summary judgment on the Loan Documents. Although the Chapter 11 Trustee has not sued all the parties who are defendants in the Class Actions, at some point, the Chapter 11 Trustee may choose to do so on behalf of the estate for the benefit of all Beneficiaries. The timing and order of pursuing those claims is up to the Chapter 11 Trustee. Those claims, as well as claims against any D&O policies, may be pursued by the Trustee after further investigation or after a final determination that the moneys are not recoverable from the parties to the Loan Documents. That process in this Chapter 11 case has just begun, and any such claims on behalf of the bankruptcy estate most certainly have not been abandoned by the Chapter 11 Trustee.

The Chapter 11 Trustee has adopted a measured strategy designed to minimize litigation costs and to preserve potential insurance claims in order to increase the money that eventually will go to pay the claims of the Beneficiaries. The Chamberlain Class Action has interfered with and jeopardized the Trustee's work and the administration of this Chapter 11 case by attempting to exercise control over the recovery of the BFG Loan proceeds.

The Chamberlin Class Action Plaintiffs attempt to argue that, because they are trying to recover funds contributed by the Beneficiaries that were to be held in trust for them by Debtor, 11 U.S.C. § 541(b)(1)[35] provides that the funds that they are seeking to recover are not property of the bankruptcy estate, and the Trustee lacks standing to pursue claims to recover property that does not belong to the bankruptcy estate. They make this argument without specifying

---

[35] Section 541(b)(1) provides that "[p]roperty of the estate does not include . . . any power that the debtor may exercise solely for the benefit of an entity other than the debtor." Therefore, if a debtor holds property in trust for someone else, that property does not become property of the debtor's bankruptcy estate. *See Peachtree Special Risk Brokers, LLC v. Kartzman (In re Rocco Co., Inc.)*, No. 10-18799 (DHS), Adv. No. 12-1269 (DHS), 2014 WL 7404566, at *4 (D.N.J. Dec. 29, 2014).

10

whether the funds invested in the BFG Loan came from pooled or individual trusts. At this point, the Court cannot accept their argument.

The Chapter 11 Trustee's forensic accounting firm, KapilaMukamal, LLP ("KM Firm"), which has just begun the hard work of sorting out Debtor's business and SNT administration, has preliminarily observed that the funds were comingled and will take great effort to determine the source or sources of funds for the BFG Loan. The KM Firm has initially concluded that between the period of 2008 through June 2024: (1) there were as many as 6,900 SNTs administered by Debtor and in excess of 2.6 million transactions within the trust ledgers; and (2) during this time, the SNT Funds were maintained and commingled in numerous different bank and brokerage accounts.[36] Indeed, the Chamberlin Class Action Plaintiffs specifically allege in their CCC that Debtor failed to segregate SNT Funds and commingled them with the funds in its operating and/or master-general deposit accounts at AMB.[37]

Comingled funds generally constitute property of the bankruptcy estate unless and until they can be traced.[38] As a result, the Chapter 11 Trustee has standing to recover the commingled funds; this would seem to be particularly true for the pooled trust assets. Sometime in the future, if ever, it may be possible to trace the SNT Funds, but today, comingling is not seriously disputed.

Next, the Chamberlin Class Action Plaintiffs argue that, because Debtor "stole" the SNT Funds that it lent to BFG, the SNT Funds were never property of the bankruptcy estate, and only they (the Chamberlin Class Action Plaintiffs) are the proper party to recover their stolen SNT Funds. But the Chamberlain Class Action Plaintiffs must acknowledge that the SNT Funds were voluntarily given to Debtor to invest, administer, pay out when appropriate and

---

[36] Doc. 290, p. 30, ¶ 8 & p. 32, ¶ 14.
[37] CCC, ¶ 293a, 320a.
[38] *See Rocco,* 2014 WL 7404566, at *4-6.

hold for the benefit of the Beneficiaries. So, what the CCC really alleges is that Debtor breached its fiduciary duty to the Beneficiaries by making an improper loan to an insider, and that the measure of damages is in large part the amount represented by the BFG Loan. In this respect, the claims against the defendants in the CCC are so intertwined with the claims that the Beneficiaries have against Debtor that they are effectively claims against Debtor. As such, the determination of the claims in the CCC will impact the administration of this bankruptcy, whether through collateral estoppel, indemnification, or otherwise.

At oral argument, the Chamberlin Class Action Plaintiffs acknowledged that only Debtor has standing to bring an action under the BFG Loan Documents for the $100 million promissory note and whatever interest may be due thereupon. Thus, pivoting somewhat from their allegations in the CCC, the Chamberlin Class Action Plaintiffs argue that they have asserted individualized damages that go beyond the $100 million-plus that the Chapter 11 Trustee seeks to recover in the Adversary Proceeding. The Court does not disagree.

Individualized tort claims, or other direct claims, for emotional, special, or even punitive damages certainly may exist in favor of a specific Beneficiary, or even a group of similarly situated Beneficiaries against some or all of the defendants named in the CCC.[39] Nothing that happens in this Chapter 11 case will release any such claims without the consent of the Beneficiaries.[40] But the CCC, in substance, does not assert claims independent of the BFG Loan. Instead, the CCC seeks to recover the same funds (albeit through different claims against

---

[39] In addition to individualized tort claims, it was suggested at oral argument that some of the more recent Beneficiaries (who were left holding the bag when Debtor filed bankruptcy) may even be at odds with earlier Beneficiaries, whose accounts may have been replenished with new money deposited in the Pooled Trusts. The bottom line is that, at this stage of the Chapter 11 Trustee's investigation, no one knows what Debtor's records ultimately will reveal or whether any SNT Funds can be traced.

[40] *See Purdue Pharma*, 144 S. Ct. at 2084 (stating "that a bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors").

additional defendants) as the Chapter 11 Trustee seeks to recover.[41] Moreover, the CCC seeks to recover those funds by impugning the validity of the Loan Documents, as the CCC's claims are necessarily based on the premise that the BFG Loan and the Loan Documents are a sham.

The Chamberlin Class Action Plaintiffs also do not allege in the CCC that they dealt directly with any of the defendants named in their CCC. Instead, they allege a scheme—which, at its heart, includes the BFG Loan—by which the same people (Govoni, Golden, and Staunton) controlled (or exerted control over) Debtor (which held the SNT Funds), the recipients of the SNT Funds (BFG and Prospect), and the entities that facilitated the scheme (BHC, BAM, and FTAS).[42] As such, the Chamberlin Class Action Plaintiffs' claims not only seek the same recovery as, but they are derived from, the Trustee's claim for breach of the Loan Documents.[43] Consequently, any claims by the Beneficiaries for recovery of the BFG Loan proceeds (as articulated in the CCC) are arguably characterized as claims against Debtor, which violates the automatic stay.[44]

Accordingly, the Court agrees with the Trustee and concludes that the Class Actions, as currently pled, violate the automatic stay. Therefore, the Court grants the Chapter 11 Trustee's Motion to Enforce Automatic Stay (Doc. 195).

---

[41] *Securities Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011) (stating that the "[p]laintiffs cannot convincingly contend that their causes of action, no matter what form they take, are independent of their claims against the [bankruptcy] estate, and they are therefore bound by the automatic stay").

[42] The Chamberlin Class Action Plaintiffs also allege that AMB was another entity that facilitated the scheme, but they do not allege that Govoni, Golden, and Staunton controlled AMB.

[43] Stated differently, each alleged harm in the CCC is derived from and is a continuation of the initial harm—the direct loss due to the breach of the Loan Documents. Each count in the CCC is interconnected to the same alleged harm, and thus, all the subsequent harm and injury caused by the breach of the Loan Documents are legal claims that belong to the bankruptcy estate, which the Chapter 11 Trustee has the exclusive standing to pursue.

[44] *See Madoff*, 443 B.R. at 314 (stating that "[w]hether sounding in bankruptcy, state law or common law, and whether purporting to recover fraudulent transfers or tort damages, the Third Party Actions seek to recover potential estate assets to redress harms common to all victims of Madoff's massive Ponzi scheme that, consistent with the purposes of the automatic stay, belong exclusively to the Trustee").

### III. AMB's Motion for Relief from Stay

AMB filed a motion for relief from the stay to allow the district court rule on its pending motion to dismiss in the Chamberlin Class Action. AMB's motion to dismiss is based on the premise that, unlike Debtor, the Chamberlin Class Action Plaintiffs "are *not* AMB customers."[45] However, because the Court finds that the Class Actions violate the automatic stay, they are void *ab initio*.[46] As a result, the Court must deny as moot AMB's Motion for Relief from the Automatic Stay (Doc. 291).

### IV. Conclusion

Based on the above, it is **ORDERED**:

(1)     The Chapter 11 Trustee's Motion to Enforce Automatic Stay (Doc. 195) is **GRANTED**.

(2)     Because the Orris Class Action and Chamberlin Class Action violate the automatic stay, they are void *ab initio.*

(3)     AMB's Motion for Relief from the Automatic Stay (Doc. 291) is **DENIED AS MOOT**.

Attorney Steven Wirth is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of its entry.

---

[45] Doc. 291, p. 3, ¶ 5.
[46] In the Eleventh Circuit, actions in violation of the automatic stay are void *ab initio*. *See Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982) (citations omitted).