**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                            Case No. 8:24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                        Chapter 11

     Debtor.
_____/

**CHAPTER 11 TRUSTEE'S AGREED EMERGENCY MOTION TO APPROVE**
**ESCROW OF SALE PROCEEDS OF 737 MAIN STREET LLC**

Michael Goldberg, the Chapter 11 Trustee ("Chapter 11 Trustee"), by and through
undersigned counsel, files this emergency motion (the "Motion") requesting entry of an order
approving the escrow of certain sale proceeds from the sale of real property owned by 737 Main
Street, LLC ("737 Main") pursuant to 11 U.S.C. § 105. In support of this Motion, the Chapter 11
Trustee states the following:

**Background**

1.      On February 9, 2024, The Center for Special Needs Trust Administration, Inc. (the
("Center" or the "Debtor") filed a voluntary chapter 11 petition (Doc. 1).

2.      On March 8, 2024, the U.S. Trustee filed an Expedited Motion for Order Directing
the United States Trustee to Appoint a Chapter 11 Trustee by Agreement of the Debtor (Doc. 88).
The Court granted the U.S. Trustee's Motion by Order dated March 11, 2024 (Doc. 93).

3.      On March 21, 2024, the Court entered its Order Approving Appointment of Chapter
11 Trustee, appointing Michael Goldberg as Chapter 11 Trustee (Doc. 109).

4.      The Debtor is a 501(c)(3) non-profit Florida corporation that administers pooled
trusts and special needs trusts. The Debtor is the trustee or co-trustee of numerous special needs

trusts, including both stand-alone trusts and pooled trusts (the "Trusts") for approximately 2,000 beneficiaries who suffer from various levels of disability (the "Beneficiaries"). The Debtor's primary service as trustee of the Trusts is to manage the Trusts, maintain records for assets managed by third-party investment managers, respond to request for distributions from Beneficiaries, and make distributions in a manner that still ensures that the applicable beneficiary meets the income and asset thresholds to qualify for certain public assistance benefits, such as Medicaid, Social Security, or Supplemental Security Income. The Debtor's services help to ensure that Beneficiaries maintain their qualification for these critical public assistance benefits.

5.      The Debtor was initially established by Leo Govoni, who served on the Debtor's Board of Directors until he resigned in 2008 or early to mid-2009. However following his resignation, Govoni allegedly continued to control and exert his influence over the Debtor's operation and finances through a web of corporate entities.

6.      The Chapter 11 Trustee alleges that Boston Finance Group, LLC ("BFG") received numerous transfers of funds from the Debtor totaling well over $100 million between 2009 and 2020. The funds utilized to make these transfers were allegedly taken from over 1,000 Trusts managed by the Debtor and the transfers were documented as a purported loan from the Debtor to BFG.

7.      On April 25, 2024, the Chapter 11 Trustee filed an adversary complaint against Govoni and BFG for recovery of the "loan" which was designated Adversary Proceeding Number 8:24-ap-00139-RCT (the "Adversary Proceeding"). On August 20, 2024, the Court entered an Agreed Order Granting Plaintiff's Motion for Partial Summary Judgment holding that BFG and Govoni are liable to the Debtor for amounts due under the documents for the purported loan with a reservation of jurisdiction to determine the amount due to the Debtor.   A motion for summary

judgment on the determination of damages in an amount not less than $154,170,786.50 is pending before the Court (Adv. Doc. 23).

8.     Govoni owns interests in many other companies that also allegedly received transfers from the Debtor over the years, including but not limited to Boston Holding Company, LLC ("BHC").  In addition, Govoni maintains an interest in Fiduciary Tax & Accounting Services LLC ("FTAS"), which performed tax and accounting services for the Debtor and certain other clients. FTAS is indirectly owned by entities owned or otherwise controlled by Govoni and John Witeck.

9.     Witeck is the record owner of an 81% interest in 737 Main and BHC a 19% interest.

10.    737 Main owns real property located at 737 Main Street, Safety Harbor, Florida 34695 (the "Property"). On September 23, 2024, 737 Main entered into a Commercial Contract to sell the Real Property to Rachel Wilson ("Wilson") for the purchase price of $3,250,000.00. A copy of the Commercial Contract is attached hereto as **Exhibit A**. Wilson formed a limited liability company for purposes of purchasing the Property which is known as Nakatomi Plaza, LLC ("Nakatomi"). Wilson intends to assign the Commercial Contract to Nakatomi.

11.    After payment of a mortgage encumbering the Property in favor of Hancock Whitney Bank and closing costs, 737 Main will receive net sales proceeds of approximately $1,887,818.85, subject to any final changes to 737 Main's closing costs (the "Sales Proceeds"). A copy of the draft closing statement for the sale of the Property is attached hereto as **Exhibit B**.

12.    The appraised value of the Property is $3,150,000, $100,000 less than the proposed purchase price.  A copy of the appraisal of the Property dated November 15, 2024 is attached hereto as **Exhibit C**.  Other than owing the restaurant that is the current tenant of 737 Main, Wilson has no ownership or other interest in 737 Main, or connections with Govoni, Witeck or any entity owned or controlled by them.  The members of Nakatomi are Wilson, Richard Wilson, Frank Fine, Mitchell

78863620

Mortenson, and Jenna Bell with each owning a 20% interest in Nakatomi. Declarations from each member of Nakatomi attesting that they do not have any connection to 737 Main, Govoni, BFG, BHC, or any other company related to Govoni are being executed and will be filed with the Court upon execution. Such declarations will be executed prior to the closing of the sale of the Property.

13.     The Chapter 11 Trustee believes that the acquisition of the Property may have been funded, in whole or in part, using funds that were held and/or owned by the Debtor.  The Chapter 11 Trustee further asserts a constructive trust on the Property which arose by operation of law on the date of the acquisition of the Property, to the extent such Property was acquired with funds wrongfully obtained from the Debtor.  Witeck disputes that the capital contributions he made to fund the acquisition of the Property came from estate funds and further disputes that his share of the Sale Proceeds are subject to a constructive trust or lien in favor of the bankruptcy estate.  However, given that the Chapter 11 Trustee has clouded title in the official records of the Property, the parties have agreed to an escrow of the Sales Proceeds until the parties either agree on the ownership of the Sales Proceeds or this Court determines ownership.

14.     Closing for the sale of the Property is scheduled for tomorrow, November 21, 2024. Accordingly, the Chapter 11 Trustee requests that the Court enter an order approving the escrow of the Sales Proceeds by the Chapter 11 Trustee's counsel, Akerman LLP, in its interest bearing trust account. In the event an order on this motion is not entered prior to closing, the Sales Proceeds will be held in escrow by the attorney closing the sale of the Property, David R. Phillips, Esq. and the law firm of Phillips, Hayden & Labee, LLP and then, upon entry of an order granting this motion, the Sales Proceeds will be transferred to Akerman LLP's trust account.

78863620

15.     The Chapter 11 Trustee also requests authorization to execute a release of the Notice of Entry of Order Granting Summary Judgment as to Liability which was recorded  in the public records of Pinellas County and created a cloud on the title to the Property.

16.     Pursuant to § 105 of the Bankrtupcy Code which authorizes the Court to "issue any order, process, or judgment that tis necessary or appropriate to carry out the provisions of" the Bankruptcy Code, the Chapter 11 Trustee requests that the Court enter an order substantially in the form attached as **Exhibit D** approving the deposit of the Sales Proceeds in escrow, pending a determination of the ownership of the Sales Proceeds.

17.     Witeck, as the manager and member of 737 Main, has consented to the relief requested in this Motion.[1]

WHEREFORE, Michael Goldberg, Chapter 11 Trustee, respectfully requests that the Court approve the deposit of the Sales Proceeds in escrow and for such other relief as the Court deems just.

Dated: November 20, 2024

Respectfully submitted,

AKERMAN LLP

By: */s/ Steven R. Wirth*
    Steven R. Wirth
    Florida Bar No.: 170380
    Email: steven.wirth@akerman.com
    Raye C. Elliott
    Florida Bar No.:  18732
    Email:  raye.elliott@akerman.com
    401 East Jackson Street, Suite 1700
    Tampa, Florida 33602
    Telephone: (813) 223-7333

---

[1] As a courtesy, counsel for the Chapter 11 Trustee circulated a copy of this Motion to counsel for Govoni and asked for his consent as a minority member of 737 Main, but received no response from his counsel. Nevertheless, the Chapter 11 Trustee does not believe Govoni's consent is necessary as the managing member of 737 Main, Witeck, has provided the requisite consent.

5

Facsimile: (813) 223-2837

*Counsel for Chapter 11 Trustee, Michael Goldberg*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 20, 2024, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record. Additionally, Epiq Corporate Restructuring, LLC will cause a true and correct copy of the foregoing document to be served on the Local Rule 1007-2 Parties in Interest List and will file a certificate or affidavit of service with the Court.

*/s/Steven R. Wirth*
Steven R. Wirth

78863620

# Exhibit A

## Commercial Contract

1. **1. PARTIES AND PROPERTY:** _____ RACHEL WILSON _____ **("Buyer")**

2. agrees to buy and _____ 737 MAIN STREET LLC _____ **("Seller")**

3. agrees to sell the property at:

4. Street Address: _____ 737 MAIN ST, SAFETY HARBOR, FL 34695 _____

5. _____ (full city block between 7th Ave N & 8th Ave N on Main Street) _____

6. Legal Description: **WEST GREEN SPRINGS BLK 27, LOTS 6 THRU 10 LESS ST & LOT 11**

7. _____

8. and the following Personal Property: _____

9. _____

10. (all collectively referred to as the "Property") on the terms and conditions set forth below.

11. **2. PURCHASE PRICE:**      $ **3,250,000.00**

12.    **(a)** Deposit held in escrow by: _____ Phillips, Hayden, Labbee, LLP _____    $ 10,000.00

13.      **("Escrow Agent")** (checks are subject to actual and final collection)

14.    Escrow Agent's address: _____ 19321 US Hwy 19, Ste 301Clearwater, FL 33764 _____ Phone: 727-300-1399

15.    **(b)** Additional deposit to be made to Escrow Agent

16.    ☐ within ____ days (3 days, if left blank) after completion of Due Diligence Period or

17.    ☐ within ____ days after Effective Date    $ _____

18.    **(c)** Additional deposit to be made to Escrow Agent

19.    ☐ within ____ days (3 days, if left blank) after completion of Due Diligence Period or

20.    ☐ within ____ days after Effective Date    $ _____

21.    **(d)** Total financing (see Paragraph 5) _____    $ **90%**

22.    **(e)** Other _____    $ _____

23.    **(f)** All deposits will be credited to the purchase price at closing.

24.    Balance to close, subject to adjustments and prorations, to be paid

25.    via wire transfer.    $ **BALANCE**

26. For the purposes of this paragraph, "completion" means the end of the Due Diligence Period or upon delivery of

27. Buyer's written notice of acceptability.

28. **3. TIME FOR ACCEPTANCE; EFFECTIVE DATE; COMPUTATION OF TIME:** Unless this offer is signed by **Seller**

29. and **Buyer** and an executed copy delivered to all parties on or before _____ September 18th, 2024 _____ , this offer

30. will be withdrawn and the **Buyer's** deposit, if any, will be returned. The time for acceptance of any counter offer will be

31. 3 days from the date the counter offer is delivered. **The "Effective Date" of this Contract is the date on which the**

32. **last one of the Seller and Buyer has signed or initialed and delivered this offer or the final counter offer** or

33. _____ September 18th, 2024 _____ . Calendar days will be used when computing time periods, except time periods of 5

34. days or less. Time periods of 5 days or less will be computed without including Saturday, Sunday, or national legal

35. holidays. Any time period ending on a Saturday, Sunday, or national legal holiday will extend until 5:00 p.m. of the next

36. business day. **Time is of the essence in this Contract.**

37. **4. CLOSING DATE AND LOCATION:**

38.    **(a) Closing Date:** This transaction will be closed on _____ or before November 19th, 2024 _____ (Closing Date), unless

39.    specifically extended by other provisions of this Contract. The Closing Date will prevail over all other time periods

40.    including, but not limited to, Financing and Due Diligence periods. In the event insurance underwriting is suspended

Buyer ( ____ ) ( ____ ) and Seller ( ____ ) ( ____ ) acknowledge receipt of a copy of this page, which is Page 1 of 8 Pages.

41  on Closing Date and **Buyer** is unable to obtain property insurance, **Buyer** may postpone closing up to 5 days after
42  the insurance underwriting suspension is lifted.

43      **(b) Location:** Closing will take place in _____ County, Florida. (If left blank, closing will take place in the
44  county where the property is located.) Closing may be conducted by mail or electronic means.

45  **5. THIRD PARTY FINANCING:**
46  **BUYER'S OBLIGATION:** On or before ___5___ days (5 days if left blank) after Effective Date, **Buyer** will apply for third
47  party financing in an amount not to exceed _____% of the purchase price or $_____, with a fixed
48  interest rate not to exceed __7.5__% per year with an initial variable interest rate not to exceed ___0___%, with points or
49  commitment or loan fees not to exceed ___0___% of the principal amount, for a term of __30__ years, and amortized
50  over ___30___ years, with additional terms as follows:
51  _____.
52  **Buyer** will timely provide any and all credit, employment, financial and other information reasonably required by any
53  lender. **Buyer** will use good faith and reasonable diligence to (i) obtain Loan Approval within _____ days (45 days if left
54  blank) from Effective Date (Loan Approval Date), (ii) satisfy terms and conditions of the Loan Approval, and (iii) close
55  the loan. **Buyer** will keep **Seller** and Broker fully informed about loan application status and authorizes the mortgage
56  broker and lender to disclose all such information to **Seller** and Broker. **Buyer** will notify **Seller** immediately upon
57  obtaining financing or being rejected by a lender. **CANCELLATION:** If **Buyer**, after using good faith and reasonable
58  diligence, fails to obtain Loan Approval by Loan Approval Date, **Buyer** may within _____ days (3 days if left blank)
59  deliver written notice to **Seller** stating **Buyer** either waives this financing contingency or cancels this Contract.
60  If **Buyer** does neither, then **Seller** may cancel this Contract by delivering written notice to **Buyer** at any time thereafter.
61  Unless this financing contingency has been waived, this Contract shall remain subject to the satisfaction, by closing, of
62  those conditions of Loan Approval related to the Property. **DEPOSIT(S) (for purposes of Paragraph 5 only):** If **Buyer**
63  has used good faith and reasonable diligence but does not obtain Loan Approval by Loan Approval Date and
64  thereafter either party elects to cancel this Contract as set forth above or the lender fails or refuses to close on or
65  before the Closing Date without fault on **Buyer's** part, the Deposit(s) shall be returned to **Buyer**, whereupon both
66  parties will be released from all further obligations under this Contract, except for obligations stated herein as surviving
67  the termination of this Contract. If neither party elects to terminate this Contract as set forth above or **Buyer** fails to use
68  good faith or reasonable diligence as set forth above, **Seller** will be entitled to retain the Deposit(s) if the transaction
69  does not close. For purposes of this Contract, "Loan Approval" means a statement by the lender setting forth the terms
70  and conditions upon which the lender is willing to make a particular mortgage loan to a particular buyer. Neither a pre-
71  approval letter nor a prequalification letter shall be deemed a Loan Approval for purposes of this Contract.

72  **6. TITLE: Seller** has the legal capacity to and will convey marketable title to the Property by [X] statutory warranty
73  deed [ ] special warranty deed [ ] other _____, free of liens, easements and
74  encumbrances of record or known to **Seller**, but subject to property taxes for the year of closing; covenants,
75  restrictions and public utility easements of record; existing zoning and governmental regulations; and (list any other
76  matters to which title will be subject) _____
77  _____;
78  provided there exists at closing no violation of the foregoing and none of them prevents **Buyer's** intended use of the
79  Property as _____.

80      **(a) Evidence of Title:** The party who pays the premium for the title insurance policy will select the closing agent
81  and pay for the title search and closing services. **Seller** will, at (check one) [X] **Seller's** [ ] **Buyer's** expense and
82  within __30__ days after Effective Date or at least _____ days before Closing Date deliver to **Buyer** (check one)
83  [X] (i) a title insurance commitment by a Florida licensed title insurer setting forth those matters to be discharged by
84  **Seller** at or before Closing and, upon **Buyer** recording the deed, an owner's policy in the amount of the purchase
85  price for fee simple title subject only to exceptions stated above. If **Buyer** is paying for the evidence of title and
86  **Seller** has an owner's policy, **Seller** will deliver a copy to **Buyer** within 15 days after Effective Date. [ ] (ii) an
87  abstract of title, prepared or brought current by an existing abstract firm or certified as correct by an existing firm.
88  However, if such an abstract is not available to **Seller**, then a prior owner's title policy acceptable to the proposed
89  insurer as a base for reissuance of coverage may be used. The prior policy will include copies of all policy
90  exceptions and an update in a format acceptable to **Buyer** from the policy effective date and certified to **Buyer** or

**Buyer** (_____) (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 2 of 8 Pages.

CC-5xx   Rev. 8/24                                                                ©2024 Florida Realtors®
Serial#: 002707-400172-5897466

91    **Buyer's** closing agent together with copies of all documents recited in the prior policy and in the update. If such
92    an abstract or prior policy is not available to **Seller** then (i.) above will be the evidence of title.

93    **(b) Title Examination: Buyer** will, within 15 days from receipt of the evidence of title deliver written notice to **Seller**
94    of title defects. Title will be deemed acceptable to **Buyer** if (1) **Buyer** fails to deliver proper notice of defects or (2)
95    **Buyer** delivers proper written notice and **Seller** cures the defects within _____ days from receipt of the notice
96    ("Curative Period"). Seller shall use good faith efforts to cure the defects. If the defects are cured within the
97    Curative Period, closing will occur on the latter of 10 days after receipt by Buyer of notice of such curing or the
98    scheduled Closing Date. **Seller** may elect not to cure defects if **Seller** reasonably believes any defect cannot be
99    cured within the Curative Period. If the defects are not cured within the Curative Period, **Buyer** will have 10 days
100    from receipt of notice of **Seller's** inability to cure the defects to elect whether to terminate this Contract or accept
101    title subject to existing defects and close the transaction without reduction in purchase price.

102    **(c) Survey:** (check applicable provisions below)
103    ☒ **Seller** will, within __10__ days from Effective Date, deliver to **Buyer** copies of prior surveys,
104    plans, specifications, and engineering documents, if any, and the following documents relevant to this
105    transaction:
106    _____,
107    prepared for **Seller** or in **Seller's** possession, which show all currently existing structures. In the event this
108    transaction does not close, all documents provided by **Seller** will be returned to **Seller** within 10 days from the
109    date this Contract is terminated.

110    ☐ **Buyer** will, at ☐ **Seller's** ☐ **Buyer's** expense and within the time period allowed to deliver and examine
111    title evidence, obtain a current certified survey of the Property from a registered surveyor. If the survey reveals
112    encroachments on the Property or that the improvements encroach on the lands of another, ☐ **Buyer** will
113    accept the Property with existing encroachments ☐ such encroachments will constitute a title defect to be
114    cured within the Curative Period.

115    **(d) Ingress and Egress: Seller** warrants that the Property presently has ingress and egress.

116    **7. PROPERTY CONDITION: Seller** will deliver the Property to **Buyer** at the time agreed in its present "as is" condition,
117    ordinary wear and tear excepted, and will maintain the landscaping and grounds in a comparable condition. **Seller**
118    makes no warranties other than marketability of title. In the event that the condition of the Property has materially
119    changed since the expiration of the Due Diligence Period, **Buyer** may elect to terminate the Contract and receive a
120    refund of any and all deposits paid, plus interest, if applicable, or require Seller to return the Property to the required
121    condition existing as of the end of Due Diligence period, the cost of which is not to exceed $_____ (1.5% of
122    the purchase price, if left blank). By accepting the Property "as is", **Buyer** waives all claims against **Seller** for any
123    defects in the Property. (Check **(a)** or **(b)**)

124    ☐ **(a) As Is: Buyer** has inspected the Property or waives any right to inspect and accepts the Property in its "as is"
125    condition.

126    ☒ **(b) Due Diligence Period: Buyer** will, at **Buyer's** expense and within __15__ days from Effective Date ("Due
127    Diligence Period"), determine whether the Property is suitable, in **Buyer's** sole and absolute discretion. During the
128    term of this Contract, **Buyer** may conduct any tests, analyses, surveys and investigations ("Inspections") which
129    **Buyer** deems necessary to determine to **Buyer's** satisfaction the Property's engineering, architectural,
130    environmental properties; zoning and zoning restrictions; flood zone designation and restrictions; subdivision
131    regulations; soil and grade; availability of access to public roads, water, and other utilities; consistency with local,
132    state and regional growth management and comprehensive land use plans; availability of permits, government
133    approvals and licenses; compliance with American with Disabilities Act; absence of asbestos, soil and ground
134    water contamination; and other inspections that **Buyer** deems appropriate. **Buyer** will deliver written notice to
135    **Seller** prior to the expiration of the Due Diligence Period of **Buyer's** determination of whether or not the Property
136    is acceptable. **Buyer's** failure to comply with this notice requirement will constitute acceptance of the Property in
137    its present "as is" condition. **Seller** grants to **Buyer**, its agents, contractors and assigns, the right to enter the
138    Property at any time during the term of this Contract for the purpose of conducting Inspections, upon reasonable
139    notice, at a mutually agreed upon time; provided, however, that **Buyer**, its agents, contractors and assigns enter
140    the Property and conduct Inspections at their own risk. **Buyer** will indemnify and hold **Seller** harmless from
141    losses, damages, costs, claims and expenses of any nature, including attorneys' fees at all levels, and from
142    liability to any person, arising from the conduct of any and all inspections or any work authorized by **Buyer**. **Buyer**
143    will not engage in any activity that could result in a mechanic's lien being filed against the Property without
144    **Seller's** prior written consent. In the event this transaction does not close, (1) **Buyer** will repair all damages to the

**Buyer** (_____/_____) and **Seller** (_____/_____) acknowledge receipt of a copy of this page, which is Page 3 of 8 Pages.

145    Property resulting from the Inspections and return the Property to the condition it was in prior to conduct of the
146    Inspections, and (2) **Buyer** will, at **Buyer's** expense release to **Seller** all reports and other work generated as a
147    result of the Inspections. Should **Buyer** deliver timely notice that the Property is not acceptable, **Seller** agrees that
148    **Buyer's** deposit will be immediately returned to **Buyer** and the Contract terminated.

149    **(c) Walk-through Inspection: Buyer** may, on the day prior to closing or any other time mutually agreeable to the
150    parties, conduct a final "walk-through" inspection of the Property to determine compliance with this paragraph and
151    to ensure that all Property is on the premises.

152    **8. OPERATION OF PROPERTY DURING CONTRACT PERIOD: Seller** will continue to operate the Property and any
153    business conducted on the Property in the manner operated prior to Contract and will take no action that would
154    adversely impact the Property after closing, as to tenants, lenders or business, if any. Any changes, such as renting
155    vacant space, that materially affect the Property or **Buyer's** intended use of the Property will be permitted [X] only with
156    **Buyer's** consent ☐ without **Buyer's** consent.

157    **9. CLOSING PROCEDURE:** Unless otherwise agreed or stated herein, closing procedure shall be in accordance with
158    the norms where the Property is located.
159    **(a) Possession and Occupancy: Seller** will deliver possession and occupancy of the Property to **Buyer** at
160    closing. **Seller** will provide keys, remote controls, and any security/access codes necessary to operate all locks,
161    mailboxes, and security systems.

162    **(b) Costs: Buyer** will pay **Buyer's** attorneys' fees, taxes and recording fees on notes, mortgages and financing
163    statements and recording fees for the deed. **Seller** will pay **Seller's** attorneys' fees, taxes on the deed and
164    recording fees for documents needed to cure title defects. If **Seller** is obligated to discharge any encumbrance at or
165    prior to closing and fails to do so, **Buyer** may use purchase proceeds to satisfy the encumbrances.

166    **(c) Documents: Seller** will provide the deed; bill of sale; mechanic's lien affidavit; originals of those assignable
167    service and maintenance contracts that will be assumed by **Buyer** after the Closing Date and letters to each
168    service contractor from **Seller** advising each of them of the sale of the Property and, if applicable, the transfer of its
169    contract, and any assignable warranties or guarantees received or held by **Seller** from any manufacturer,
170    contractor, subcontractor, or material supplier in connection with the Property; current copies of the condominium
171    documents, if applicable; assignments of leases, updated rent roll; tenant and lender estoppels letters (if
172    applicable); tenant subordination, non-disturbance and attornment agreements (SNDAs) required by the **Buyer** or
173    **Buyer's** lender; assignments of permits and licenses; corrective instruments; and letters notifying tenants of the
174    change in ownership/rental agent. If any tenant refuses to execute an estoppels letter, **Seller**, if requested by the
175    **Buyer** in writing, will certify that information regarding the tenant's lease is correct. If **Seller** is an entity, **Seller** will
176    deliver a resolution of its governing authority authorizing the sale and delivery of the deed and certification by the
177    appropriate party certifying the resolution and setting forth facts showing the conveyance conforms to the
178    requirements of local law. **Seller** will transfer security deposits to **Buyer**. **Buyer** will provide the closing statement,
179    mortgages and notes, security agreements, and financing statements.

180    **(d) Taxes and Prorations:** Real estate taxes, personal property taxes on any tangible personal property, bond
181    payments assumed by **Buyer**, interest, rents (based on actual collected rents), association dues, insurance
182    premiums acceptable to **Buyer**, and operating expenses will be prorated through the day before closing. If the
183    amount of taxes for the current year cannot be ascertained, rates for the previous year will be used with due
184    allowance being made for improvements and exemptions. Any tax proration based on an estimate will, at request
185    of either party, be readjusted upon receipt of current year's tax bill; this provision will survive closing.

186    **(e) Special Assessment Liens:** Certified, confirmed, and ratified special assessment liens as of the Closing Date
187    will be paid by **Seller**. If a certified, confirmed, and ratified special assessment is payable in installments, **Seller** will
188    pay all installments due and payable on or before the Closing Date, with any installment for any period extending
189    beyond the Closing Date prorated, and **Buyer** will assume all installments that become due and payable after the
190    Closing Date. **Buyer** will be responsible for all assessments of any kind which become due and owing after Closing
191    Date, unless an improvement is substantially completed as of Closing Date. If an improvement is substantially
192    completed as of the Closing Date but has not resulted in a lien before closing, **Seller** will pay the amount of the last
193    estimate of the assessment. This subsection applies to special assessment liens imposed by a public body and
194    does not apply to condominium association special assessments.

195    **(f) Foreign Investment in Real Property Tax Act (FIRPTA):** If **Seller** is a "foreign person" as defined by FIRPTA,
196    **Seller** and **Buyer** agree to comply with Section 1445 of the Internal Revenue Code. **Seller** and **Buyer** will
197    complete, execute, and deliver as directed any instrument, affidavit, or statement reasonably necessary to comply

**Buyer** (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 4 of 8 Pages.

198  with the FIRPTA requirements, including delivery of their respective federal taxpayer identification numbers or
199  Social Security Numbers to the closing agent. If **Buyer** does not pay sufficient cash at closing to meet the
200  withholding requirement, **Seller** will deliver to **Buyer** at closing the additional cash necessary to satisfy the
201  requirement.

202  **10. ESCROW AGENT: Seller** and **Buyer** authorize Escrow Agent or Closing Agent (collectively "Agent") to receive,
203  deposit, and hold funds and other property in escrow and, subject to collection, disburse them in accordance with the
204  terms of this Contract. The parties agree that Agent will not be liable to any person for misdelivery of escrowed items to
205  **Seller** or **Buyer**, unless the misdelivery is due to Agent's willful breach of this Contract or gross negligence. If Agent
206  has doubt as to Agent's duties or obligations under this Contract, Agent may, at Agent's option, (a) hold the escrowed
207  items until the parties mutually agree to its disbursement or until a court of competent jurisdiction or arbitrator
208  determines the rights of the parties or (b) deposit the escrowed items with the clerk of the court having jurisdiction over
209  the matter and file an action in interpleader. Upon notifying the parties of such action, Agent will be released from all
210  liability except for the duty to account for items previously delivered out of escrow. If Agent is a licensed real estate
211  broker, Agent will comply with Chapter 475, Florida Statutes. In any suit in which Agent interpleads the escrowed items
212  or is made a party because of acting as Agent hereunder, Agent will recover reasonable attorney's fees and costs
213  incurred, with these amounts to be paid from and out of the escrowed items and charged and awarded as court costs
214  in favor of the prevailing party.

215  **11. CURE PERIOD:** Prior to any claim for default being made, a party will have an opportunity to cure any alleged
216  default. If a party fails to comply with any provision of this Contract, the other party will deliver written notice to the non-
217  complying party specifying the non-compliance. The non-complying party will have _____ days (5 days if left blank) after
218  delivery of such notice to cure the non-compliance. Notice and cure shall not apply to failure to close.

219  **12. FORCE MAJEURE**: **Buyer** or **Seller** shall not be required to perform any obligation under this Contract or be liable
220  to each other for damages so long as performance or non-performance of the obligation, or the availability of services,
221  insurance, or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force Majeure.
222  "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God, unusual
223  transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent effort, the
224  non-performing party is unable in whole or in part to prevent or overcome. All time periods, including Closing Date, will
225  be extended a reasonable time up to 7 days after the Force Majeure no longer prevents performance under this
226  Contract, provided, however, if such Force Majeure continues to prevent performance under this Contract more than
227  30 days beyond Closing Date, then either party may terminate this Contract by delivering written notice to the other
228  and the Deposit shall be refunded to **Buyer**, thereby releasing **Buyer** and **Seller** from all further obligations under this Contract.

229  **13. RETURN OF DEPOSIT:** Unless otherwise specified in the Contract, in the event any condition of this Contract is
230  not met and **Buyer** has timely given any required notice regarding the condition having not been met, **Buyer's** deposit
231  will be returned in accordance with applicable Florida Laws and regulations.

232  **14. DEFAULT:**
233  **(a)** In the event the sale is not closed due to any default or failure on the part of **Seller** other than failure to make
234  the title marketable after diligent effort, **Buyer** may elect to receive return of Buyer's deposit without thereby
235  waiving any action for damages resulting from Seller's breach and may seek to recover such damages or seek
236  specific performance. If Buyer elects a deposit refund, Seller may be liable to Broker for the full amount of the
237  brokerage fee.
238  **(b)** In the event the sale is not closed due to any default or failure on the part of **Buyer**, **Seller** may either (1)
239  retain all deposit(s) paid or agreed to be paid by **Buyer** as agreed upon liquidated damages, consideration for the
240  execution of this Contract, and in full settlement of any claims, upon which this Contract will terminate or (2) seek
241  specific performance. If **Buyer** fails to timely place a deposit as required by this Contract, **Seller** may either (1)
242  terminate the Contract and seek the remedy outlined in this subparagraph or (2) proceed with the Contract without
243  waiving any remedy for **Buyer's** default.

244  **15. ATTORNEY'S FEES AND COSTS:** In any claim or controversy arising out of or relating to this Contract, the
245  prevailing party, which for purposes of this provision will include **Buyer**, **Seller** and Broker, will be awarded reasonable
246  attorneys' fees, costs, and expenses.

247  **16. NOTICES:** All notices will be in writing and may be delivered by mail, overnight courier, personal delivery, or
248  electronic means. Parties agree to send all notices to addresses specified on the signature page(s). Any notice,
249  document, or item given by or delivered to an attorney or real estate licensee (including a transaction broker)
250  representing a party will be as effective as if given by or delivered to that party.

**Buyer** (_____) (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 5 of 8 Pages.

**17. DISCLOSURES:**

   **(a) Commercial Real Estate Sales Commission Lien Act:** The Florida Commercial Real Estate Sales Commission Lien Act provides that a broker has a lien upon the owner's net proceeds from the sale of commercial real estate for any commission earned by the broker under a brokerage agreement. The lien upon the owner's net proceeds is a lien upon personal property which attaches to the owner's net proceeds and does not attach to any interest in real property. This lien right cannot be waived before the commission is earned.

   **(b) Special Assessment Liens Imposed by Public Body:** The Property may be subject to unpaid special assessment lien(s) imposed by a public body. (A public body includes a Community Development District.) Such liens, if any, shall be paid as set forth in Paragraph 9(e).

   **(c) Radon Gas:** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

   **(d) Energy-Efficiency Rating Information: Buyer** acknowledges receipt of the information brochure required by Section 553.996, Florida Statutes.

**18. RISK OF LOSS:**

   **(a)** If, after the Effective Date and before closing, the Property is damaged by fire or other casualty, **Seller** will bear the risk of loss and **Buyer** may cancel this Contract without liability and the deposit(s) will be returned to **Buyer**. Alternatively, **Buyer** will have the option of purchasing the Property at the agreed upon purchase price and **Seller** will credit the deductible, if any and transfer to **Buyer** at closing any insurance proceeds, or **Seller's** claim to any insurance proceeds payable for the damage. **Seller** will cooperate with and assist **Buyer** in collecting any such proceeds. **Seller** shall not settle any insurance claim for damage caused by casualty without the consent of the **Buyer**.

   **(b)** If, after the Effective Date and before closing, any part of the Property is taken in condemnation or under the right of eminent domain, or proceedings for such taking will be pending or threatened, **Buyer** may cancel this Contract without liability and the deposit(s) will be returned to **Buyer**. Alternatively, **Buyer** will have the option of purchasing what is left of the Property at the agreed upon purchase price and **Seller** will transfer to the **Buyer** at closing the proceeds of any award, or **Seller's** claim to any award payable for the taking. **Seller** will cooperate with and assist **Buyer** in collecting any such award.

**19. ASSIGNABILITY; PERSONS BOUND:** This Contract may be assigned to a related entity, and otherwise ☐ is not assignable ☒ is assignable. If this Contract may be assigned, **Buyer** shall deliver a copy of the assignment agreement to the **Seller** at least 5 days prior to Closing. The terms **"Buyer, " "Seller"** and "Broker" may be singular or plural. This Contract is binding upon **Buyer, Seller** and their heirs, personal representatives, successors and assigns (if assignment is permitted).

**20. MISCELLANEOUS:** The terms of this Contract constitute the entire agreement between **Buyer** and **Seller**. Modifications of this Contract will not be binding unless in writing, signed and delivered by the party to be bound. Signatures, initials, documents referenced in this Contract, counterparts and written modifications communicated electronically or on paper will be acceptable for all purposes, including delivery, and will be binding. Handwritten or typewritten terms inserted in or attached to this Contract prevail over preprinted terms. If any provision of this Contract is or becomes invalid or unenforceable, all remaining provisions will continue to be fully effective. This Contract will be construed under Florida law and will not be recorded in any public records.

**21. BROKERS:** Neither **Seller** nor **Buyer** has used the services of, or for any other reason owes compensation to, a licensed real estate Broker other than:

**(a) Seller's Broker:** ___N/A_____ ,

                           (Company Name)                         (Licensee)

                           (Address, Telephone, Fax, E-mail)

who ☐ is a single agent ☐ is a transaction broker ☐ has no brokerage relationship and who will be compensated by ☐ **Seller** ☐ **Buyer** ☐ both parties pursuant to ☐ a listing agreement ☐ other (specify) _____
_____

**(b) Buyer's Broker:** ___N/A_____ ,

                           (Company Name)                         (Licensee)

                           (Address, Telephone, Fax, E-mail)

**Buyer** (_ _KW_ _) (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 6 of 8 Pages.

CC-5xx    Rev. 8/24                                             ©2024 Florida Realtors®

Serial#: 002707-400172-5897466

302   who ☐ is a single agent ☐ is a transaction broker ☐ has no brokerage relationship and who will be compensated by
303   ☐ **Seller's Broker** ☐ **Seller** ☐ **Buyer** ☐ both parties pursuant to ☐ other (specify)
304

305   (collectively referred to as "Broker") in connection with any act relating to the Property, including but not limited to
306   inquiries, introductions, consultations, and negotiations resulting in this transaction. **Seller** and **Buyer** agree to
307   indemnify and hold Broker harmless from and against losses, damages, costs and expenses of any kind, including
308   reasonable attorneys' fees at all levels, and from liability to any person, arising from (1) compensation claimed which is
309   inconsistent with the representation in this Paragraph, (2) enforcement action to collect a brokerage fee pursuant to
310   Paragraph 10, (3) any duty accepted by Broker at the request of **Seller** or **Buyer**, which is beyond the scope of
311   services regulated by Chapter 475, Florida Statutes, as amended, or (4) recommendations of or services provided and
312   expenses incurred by any third party whom Broker refers, recommends, or retains for or on behalf of **Seller** or **Buyer**.

313   **22. OPTIONAL CLAUSES:** (Check if any of the following clauses are applicable and are attached as an addendum to
314   this Contract):
315   ☐ (A) Arbitration                 ☐ (E) Seller Warranty            ☐ (I) Existing Mortgage
316   ☐ (B) Section 1031 Exchange        ☐ (F) Coastal Construction Control Li ☐ (J) Buyer's Attorney Approval
317   ☐ (C) Property Inspection and Repair   ☐ (G) Flood Area Hazard Zone     ☐ (K) Seller's Attorney Approval
318   ☐ (D) Seller Representations         ☐ (H) Seller Financing            ☐ Other _____

319   **23. ADDITIONAL TERMS:**
320   _____
321   _____
322   _____
323   _____
324   _____
325   _____
326   _____
327   _____
328   _____
329   _____

330   **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
331   **ADVICE OF AN ATTORNEY PRIOR TO SIGNING. BROKER ADVISES BUYER AND SELLER TO VERIFY ALL**
332   **FACTS AND REPRESENTATIONS THAT ARE IMPORTANT TO THEM AND TO CONSULT AN APPROPRIATE**
333   **PROFESSIONAL FOR LEGAL ADVICE (FOR EXAMPLE, INTERPRETING CONTRACTS, DETERMINING THE**
334   **EFFECT OF LAWS ON THE PROPERTY AND TRANSACTION, STATUS OF TITLE, FOREIGN INVESTOR**
335   **REPORTING REQUIREMENTS, ETC.) AND FOR TAX, PROPERTY CONDITION, ENVIRONMENTAL AND OTHER**
336   **ADVICE. BUYER ACKNOWLEDGES THAT BROKER DOES NOT OCCUPY THE PROPERTY AND THAT ALL**
337   **REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) BY BROKER ARE BASED ON SELLER**
338   **REPRESENTATIONS OR PUBLIC RECORDS UNLESS BROKER INDICATES PERSONAL VERIFICATION OF**
339   **THE REPRESENTATION. BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
340   **GOVERNMENTAL AGENCIES FOR VERIFICATION OF THE PROPERTY CONDITION, SQUARE FOOTAGE AND**
341   **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE.**

**Buyer** (_____) (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 7 of 8 Pages.

CC-5xx   Rev. 8/24                                          ©2024 Florida Realtors®
Serial#: 002707-400172-5897466



342 Each person signing this Contract on behalf of a party that is a business entity represents and warrants to the other
343 party that such signatory has full power and authority to enter into and perform this Contract in accordance with its
344 terms and each person executing this Contract and other documents on behalf of such party has been duly authorized
345 to do so.

346 **ATTENTION: SELLER AND BUYER**

347 **CONVEYANCES TO FOREIGN BUYERS**: Part III of Chapter 692, Sections 692.201 - 692.205, Florida Statutes, 2023
348 (the "Act"), in part, limits and regulates the sale, purchase and ownership of certain Florida properties by certain buyers
349 who are associated with a "foreign country of concern", namely: the People's Republic of China, the Russian
350 Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the
351 Venezuelan regime of Nicolás Maduro, or the Syrian Arab Republic. **It is a crime to buy or knowingly sell property**
352 **in violation of the Act.**

353 **At time of purchase, Buyer must provide a signed Affidavit which complies with the requirements of the Act.**
354 Seller and Buyer are advised to seek legal counsel regarding their respective obligations and liabilities under the Act.

355 _____   Date: _9/10/24_____
(Signature of Buyer

356   Rachel Wilson                              Tax ID No.: _____
(Typed or Printed Name of Buyer)

357 Title: _CEO_____           Telephone: _212-203-2449___

358 _____   Date: _____
(Signature of Buyer

359 _____   Tax ID No.: _____
(Typed or Printed Name of Buyer)

360 Title: _____               Telephone: _____

361 Buyer's Address for purpose of notice _102 Park St Safety Harbor, FL 34695___

362 Facsimile: _____            Email: _Rachel@Gigglewaters.com___

363 _____   Date: _09/23/2024_____
(Signature of Seller)

364   John L Witeck                            Tax ID No.: _____
(Typed or Printed Name of Seller)

365 Title: _Managing Partner_____     Telephone: _____

366 _____   Date: _____
(Signature of Seller)

367 _____   Tax ID No.: _____
(Typed or Printed Name of Seller)

368 Title: _____               Telephone: _____

369 Seller's Address for purpose of notice: _____

370 Facsimile: _____            Email: _____

Florida REALTORS® makes no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as REALTOR®. REALTOR® is a registered collective membership mark which may be used only by real estate licensees who are members of the NATIONAL ASSOCIATION OF REALTORS® and who subscribe to its Code of Ethics. The copyright laws of United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means including facsimile or computerized forms.

**Buyer** (_____) (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 8 of 8 Pages.

CC-5xx   Rev. 8/24                                                              ©2024 Florida Realtors®
Serial#: 002707-400172-5897466

Form
Simplicity

# Exhibit B

## COMBINED CLOSING STATEMENT

| | |
|---|---|
| **SELLER:** | **737 MAIN STREET LLC, a Florida limited liability company** |
| **BUYER:** | **NAKATOMI PLAZA, LLC, a Florida limited liability company** |
| **PROPERTY:** | **737 Main Street, Safety Harbor, Pinellas County, FL** |
| **CLOSING DATE:** | **November 18, 2024** |
| **FILE NO.:** | **10403-0001** |
| **CLOSING AGENT:** | **PHILLIPS, HAYDEN & LABBEE, LLP** |

| | | |
|---|---|---:|
| **PURCHASE PRICE:** | | $ 3,250,000.00 |
| <u>LESS</u> Earnest Money Deposit | | $ (10,000.00) |
| <u>PLUS</u> Credit to Seller for 2024 Real Estate Taxes | | $ 3,684.20 |
| **BALANCE OF PURCHASE PRICE DUE FROM BUYER:** | | $ 3,243,684.20 |
| | | |
| **LOAN FUNDING SUMMARY:** | | |
| **Loan Amount - First Priority Loan** | | $ 1,654,000.00 |
| **Loan Amount - Second Priority Loan** | | $ 1,323,200.00 |
| **TOTAL GROSS LOAN PROCEEDS ADVANCED AT CLOSING:** | | $ 2,977,200.00 |

**SELLER'S CLOSING COSTS:**

| | | |
|---|---:|---|
| Loan Payoff - Loan No. 00033101322054 *(Hancock Whitney Bank)* | $ 1,302,391.81 | |
| Documentary Stamps - Deed *(Clerk of Courts)* | $ 22,750.00 | |
| Recording - Deed (2 pages) *(Clerk of Courts)* | $ 23.25 | |
| Recording - LLC Affidavit (3 pages) *(Clerk of Courts)* | $ 31.75 | |
| Title Search Fee *(Chicago Title)* | $ 250.00 | |
| Premium - Owner's Policy *(Chicago Title)* | $ 8,560.00 | |
| 2024 Real Estate Taxes *(Pinellas County Tax Collector)* | $ 31,358.54 | |
| Municipal Lien Search *(Real Res)* | $ - | |
| Escrow and Settlement Fee *(Phillips, Hayden & Labbee, LLP)* | $ 500.00 | |
| Bankruptcy Judgment Escrow *(Akerman LLP)* | $ - | |
| **SUBTOTAL** | **$ 1,365,865.35** | |

**BUYER'S LOAN FEES:**

| | | |
|---|---|---:|
| Flood Determination Fee - First Loan *(Valley National Bank)* | | $ 25.00 |
| Flood Determination Fee - Second Loan *(Valley National Bank)* | | $ 25.00 |
| Tax Service Fee - First Loan *(Valley National Bank)* | | $ 74.00 |
| Tax Service Fee - Second Loan *(Valley National Bank)* | | $ 74.00 |
| Loan Processing Fee - First Loan *(Valley National Bank)* | | $ 125.00 |
| Loan Processing Fee - Second Loan *(Valley National Bank)* | | $ 125.00 |
| UCC Monitoring Fee - First Loan *(Valley National Bank)* | | $ 100.00 |
| UCC Monitoring Fee - Second Loan *(Valley National Bank)* | | $ 100.00 |
| Appraisal Fees *(Valley National Bank)* | P.O.C. | $ - |
| Environmental Fees *(Valley National Bank)* | | $ 425.00 |
| Payoff of Loan No. 402437800 *(Valley National Bank)* | | $ - |
| Interim Loan Fee - Second Loan *(Valley National Bank)* | | $ 16,540.00 |
| | **SUBTOTAL** | **$ 17,613.00** |

**BUYER'S CLOSING COSTS:**

| | |
|---|---:|
| Documentary Stamps - First Mortgage *(Clerk of Courts)* | $ 5,789.00 |
| Documentary Stamps - Second Mortgage *(Clerk of Courts)* | $ 4,631.20 |
| Documentary Stamps - Second Loan Increase *(Clerk of Courts)* | $ 114.80 |
| Intangible Tax - First Mortgage *(Clerk of Courts)* | $ 3,308.00 |

| | | |
|---|---|---:|
| **Intangible Tax - Second Mortgage** *(Clerk of Courts)* | $ | 2,646.40 |
| **Intangible Tax - Second Loan Increase** *(Clerk of Courts)* | $ | 65.60 |
| **Recording - First Mortgage (17 pages)** *(Clerk of Courts)* | $ | 150.75 |
| **Recording - Assignment of Leases (7 pages)** *(Clerk of Courts)* | $ | 65.75 |
| **Recording - Second Mortgage (19 pages)** *(Clerk of Courts)* | $ | 167.75 |
| **Recording - Assignment of Leases (7 pages)** *(Clerk of Courts)* | $ | 65.75 |
| **Recording - Notice of Commencement (4 pages)** *(Clerk of Courts)* | $ | 40.25 |
| **Recording - Assignment of Note and Mortgage (3 pages)** *(Clerk of Courts)* | $ | 125.25 |
| **Recording - SBA Assignment of Mortgage (3 pages)** *(Clerk of Courts)* | $ | 31.75 |
| **Recording - SBA Conditional Assignment (4 pages)** *(Clerk of Courts)* | $ | 40.25 |
| **Recording - SBA Conditional Assignment (4 pages)** *(Clerk of Courts)* | $ | 40.25 |
| **Recording - SBA Notice of Limitation (3 pages)** *(Clerk of Courts)* | $ | 31.75 |
| **Recording - Third Party Lender Agreement (10 pages)** *(Clerk of Courts)* | $ | 91.25 |
| **Recording - LLC Affidavit (3 pages)** *(Clerk of Courts)* | $ | 31.75 |
| **Premium - Loan Policy - First Loan** *(Chicago Title)* | $ | 350.00 |
| **Premium - Loan Policy - Second Loan** *(Chicago Title)* | $ | 350.00 |
| **Endorsements - Owner's Policy** *(Chicago Title)* | $ | 1,240.00 |
| **Endorsements - Loan Policy - First Loan** *(Chicago Title)* | $ | - |
| **Endorsement - Loan Policy - Second Loan** *(Chicago Title)* | $ | 1,405.00 |
| **Escrow and Settlement Fee** *(Phillips, Hayden & Labbee, LLP)* | $ | 500.00 |
| **Attorney's Fees and Costs** *(Sanders Law Group, P.A.)* | $ | 5,950.00 |
| **SUBTOTAL** | $ | 27,232.50 |

| | | |
|---|---|---:|
| **BALANCE DUE FROM BUYER TO SELLER:** | $ | 3,243,684.20 |
| <u>PLUS</u> **BUYER'S TOTAL CLOING COSTS** | $ | 27,232.50 |
| <u>LESS</u> **LENDER'S NET LOAN PROCEEDS** | $ | (2,959,587.00) |
| **TOTAL DUE FROM BUYER AT CLOSING:** | $ | 311,329.70 |
| <u>PLUS</u> **EARNEST MONEY DEPOSIT** | $ | 10,000.00 |
| <u>LESS</u> **SELLER'S TOTAL CLOSING COSTS** | $ | (1,365,865.35) |
| **TOTAL DUE TO SELLER AT CLOSING:** | $ | 1,887,818.85 |

**[SIGNATURE PAGE FOLLOWS]**

**SELLER'S SIGNATURE PAGE**

Seller hereby acknowledges the receipt of a copy of this Closing Statement and ratifies the deductions and disbursements of the amounts set forth hereinabove.  Seller hereby aknowledges that, to the best of its knowledge, the credits, expenses and disbursements herein set forth are accurate and correct.  In the event there are any errors or omissions contained herein, Seller agrees to promptly make the necessary adjustments and to promptly pay any sums due and owing pursuant to such adjustments upon written demand therefor.  Seller acknowledges that Phillips, Hayden & Labbee, LLP, as closing agent for Chicago Title Insurance Company, will handle the closing of the transaction represented herein, and that no disbursements will be made until sufficient funds have been credited to its trust account.

**SELLER**:

**737 MAIN STREET LLC,**
**a Florida limited liability company**

**By:**_____
        **John Witeck, its Manager**

**BUYER'S SIGNATURE PAGE**

Buyer hereby acknowledges the receipt of a copy of this Closing Statement and ratifies the deductions and disbursements of the amounts set forth hereinabove.  Buyer hereby aknowledges that, to the best of its knowledge, the credits, expenses and disbursements herein set forth are accurate and correct.  In the event there are any errors or omissions contained herein, Buyer agrees to promptly make the necessary adjustments and to promptly pay any sums due and owing pursuant to such adjustments upon written demand therefor.  Buyer acknowledges that Phillips, Hayden & Labbee, LLP, as closing agent for Chicago Title Insurance Company, will handle the closing of the transaction represented herein, and that no disbursements will be made until sufficient funds have been credited to its trust account.

<u>**BUYER**</u>:

**NAKATOMI PLAZA, LLC,**
**a Florida limited liability company**

**By:**_____
    **Rachel Wilson, its Manager**

**By:**_____
    **Mitchell Mortenson, its Manager**

4

**JOINDER OF CLOSING AGENT**

The foregoing Closing Statement is a true and correct statement of the funds to be received and disbursed by the Closing Agent in the subject transaction.

<u>CLOSING AGENT</u>:

**PHILLIPS, HAYDEN & LABBEE, LLP**

By:_____
          **David R. Phillips, its Partner**

**TAX PRORATION CALCULATION**

**Pinellas County Real Estate Taxes**

| | | | | |
|---|---|---|---|---|
| Parcel ID No. 03-29-16-96498-027-0080 | | | $ 31,358.54 | |
| Per Diem - 2024 Tax Bill (4% discount) | | | $ 85.68 | |

| | Days | | | |
|---|---|---|---|---|
| Seller's Portion (1/1/24 - 11/17/24) | 323 | $ 27,674.34 | | Seller's Tax Proration |
| Buyer's Portion (11/18/24 - 12/31/24) | 43 | **$ 3,684.20** | | **Buyer's Tax Proration** |

# Exhibit C

CBRE Valuation & Advisory Services

# Appraisal Report

**SAFETY HARBOR RETAIL CENTER**

737 Main Street

Safety Harbor, Florida  34695

Prepared for: Valley National Bank

Date of Report: November 15, 2024

CBRE File No.: CB24US090965-1

Client Reference No.: 32894

cbre.com/valuation

CBRE Valuation & Advisory Services



111 West Oak Avenue, Suite 100
Tampa, FL 33602

T (813) 868-8008

www.cbre.com/valuation

Date of Report: November 15, 2024

Ms. Leslie McKeon, MAI
Senior Staff Appraiser - FL Team Leader
VALLEY NATIONAL BANK
180 Fountain Parkway
Saint Petersburg, Florida 33716

And

U.S. Small Business Administration (SBA) and Florida Business Development Corporation (FBDC)

RE:      Appraisal of: Safety Harbor Retail Center
         737 Main Street
         Safety Harbor, Pinellas County, Florida 34695
         CBRE File No.: CB24US090965-1
         Client Reference No.: 32894

Dear Ms. Mckeon:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property. Our analysis is presented in the following Appraisal Report.

The subject is a 7,753-square foot mixed-use retail/office property located at 737 Main Street in Safety Harbor, Florida. The improvements were constructed in 1963 and have been extensively renovated since 2018 and are situated on a 0.94-acre site. The subject tenants are considered local in nature. The subject is currently 100% physically occupied, however, two units are owner-occupied.

The subject is currently under contract to the Rachel Wilson for a total consideration of $3,250,000. The buyer is the owner of Gigglewaters Restaurant who leases 3,018 square feet of the first floor of the subject. Upon closing the buyer will assume the two current owner-occupied units totaling 3,527 square feet. Therefore, 6,545 square feet or 84.4% of the property will be owner-occupied upon closing.

Of the 0.94 acres of the total site, 0.24 acres have been deemed surplus land. This land is primarily rectangular in shape and is located on the western portion of the property with frontage along Main Street and Western Avenue. Given the subject's high-density zoning with limited setback and restrictions, the surplus land is sufficient to support a variety of retail/commercial uses. We have included a separate value of this surplus land in our analysis. The balance of the parent site containing 0.70-acres is considered the support site for the existing improvements.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

CBRE Valuation & Advisory Services

## MARKET VALUE CONCLUSION

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | October 31, 2024 | $2,700,000 |
| As Is - Surplus Land | Fee Simple Estate | October 31, 2024 | $450,000 |
| Compiled by CBRE | | | |

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report.  No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

CBRE Valuation & Advisory Services

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.


Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES


Hoyd K "Trey" Starling III
Vice President
Cert Gen RZ 2485
Phone:     813-868-8013
Email:      Trey.Starling@CBRE.com


Kristin B. Repp, MAI
Managing Director - Florida
Cert Gen RZ 2454
Phone:     305-381-6408
Email:      Kristin.Repp@CBRE.com


Justin M. Watts
Senior Valuation Analyst
Trainee Appraiser RI 24479
Phone:     813-273-8457
Email:      Justin.Watts@CBRE.com

# Certification

**We certify to the best of our knowledge and belief:**

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. Hoyd K. Trey Starling III, and Justin Watts have appraised only and Kristin B. Repp, MAI has not not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice.

9. Hoyd K. Trey Starling III and Justin Watts have made a personal inspection of the property that is the subject of this report. Kristin B. Repp, MAI has not made a personal inspection of the property that is the subject of this report.

10. No one provided significant real property appraisal assistance to the persons signing this certification.

11. Justin Watts, State-Registered Trainee Appraiser RI24479, under the direct supervision of Hoyd K. "Trey" Starling III a State-Certified General Real Estate Appraiser RZ2485, made a significant professional contribution to this appraisal, consisting of conducting research on the subject, competitive markets, comparable data and completion of valuation work. In total, these acts comprise 12 hours.

12. Hoyd K. Trey Starling III, the supervisory appraiser of a registered appraiser trainee who contributed to the development or communication of this appraisal, hereby accepts full and complete responsibility for any work performed by the registered appraiser trainee named in this report as if it were my own work.

13. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

14. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

15. As of the date of this report, Kristin B. Repp, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

16. As of the date of this report, Hoyd K. Trey Starling III has completed the Standards and Ethics Education Requirements for Practicing Affiliates of the Appraisal Institute.

17.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the State of Florida.

_____

Hoyd K. "Trey" Starling, III
Cert Gen RZ2485

_____

Kristin B. Repp, MAI
Cert Gen RZ 2454

_____

Justin M. Watts
Trainee Appraiser RI 24479

# Subject Photographs



**Aerial View**



View of Subject Exterior



View of Subject Exterior



View of Subject Exterior



View of Subject Exterior



View of Subject Excess Land



View of Subject Retail Space



View of Subject Retail Space



View of Subject Office Space



View of Subject Office Space



View of Subject Office Space



View East along Main Street



View West along Main Street

# Executive Summary

| | | |
|---|---|---|
| **Property Name** | Safety Harbor Retail Center | |
| **Location** | 737 Main Street | |
| | Safety Harbor, Pinellas County, FL 34695 | |
| **Parcel Number(s)** | 03-29-16-96498-027-0080 | |
| **Client** | Valley National Bank | |
| **Client Reference Number** | 32894 | |
| **Highest and Best Use** | | |
| As If Vacant | Retail | |
| As Improved | Retail | |
| **Property Rights Appraised** | Leased Fee and Fee | |
| | Simple Interest | |
| **Date of Inspection** | October 31, 2024 | |
| **Estimated Exposure Time** | 6 - 12 Months | |
| **Estimated Marketing Time** | 6 - 12 Months | |
| **Gross Land Area** | 0.94 AC | 40,791 SF |
| **Support Site Land Area** | 0.70 AC | 30,337 SF |
| **Excess Land Area** | 0.24 AC | 10,454 SF |
| **Zoning** | MSM, Main Street Marketplace | |
| **Improvements** | | **Comments** |
| Property Type | Retail | (Freestanding Retail) |
| Number of Buildings | 1 | |
| Number of Stories | 2 | |
| Gross Leasable Area | 7,753 SF | |
| Year Built / Renovated | 1963 / 2019 | |
| Effective Age | 15 Years | |
| Remaining Economic Life | 30 Years | |
| Condition | Average | |
| **Buyer Profile** | Investor-Local | |
| **Financial Indicators** | | |
| Current Occupancy | 100.0% | |
| Stabilized Occupancy | 95.0% | |
| Stabilized Credit Loss | 1.0% | |
| Overall Capitalization Rate | 6.50% | |

| Pro Forma | Total | Per SF |
|---|---|---|
| Effective Gross Income | $269,238 | $34.73 |
| Operating Expenses | $92,544 | $11.94 |
| Expense Ratio | 34.37% | |
| Net Operating Income | $176,695 | $22.79 |
| **VALUATION** | *Total* | *Per SF* |
| Surplus Land Value | $450,000 | $43.05 |
| Sales Comparison Approach | $2,450,000 | $316.01 |
| Income Capitalization Approach | $2,700,000 | $348.25 |
| Insurable Value | $1,340,000 | $172.84 |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value** |
| As Is | Leased Fee Interest | October 31, 2024 | $2,700,000 |
| As Is - Surplus Land | Fee Simple Estate | October 31, 2024 | $450,000 |

Compiled by CBRE

## Strengths, Weaknesses, Opportunities and Threats (SWOT)

### Strengths/ Opportunities

- The subject is well located in downtown Safety Harbor.
- The subject has above average demographics with an average household income within a three-mile radius of $110,195.
- The subject was recently renovated.

### Weaknesses/ Threats

- The subject has a shorter average remaining lease term of less than three years.
- Commercial real estate market conditions have deteriorated at the macro level. The significant recent increase in the cost of capital and reduced volume of transaction activity is impacting price discovery and creating an increase in uncertainty. Increasing interest rates and subdued economic growth will continue to weigh on commercial real estate fundamentals and investment transaction volumes. This creates a higher degree of uncertainty in general, though the impacts may vary by market and asset class/type.

## Market Volatility

We draw your attention to a combination of inflationary pressures (leading to higher interest rates) and recent failures/stress in banking systems which have significantly increased the potential for constrained credit markets, negative capital value movements and enhanced volatility in property markets over the short-to-medium term.

Experience has shown that consumer and investor behavior can quickly change during periods of such heightened volatility. Lending or investment decisions should reflect this heightened level of volatility and the potential for deteriorating market conditions.

It is important to note that the conclusions set out in this report are valid as of the valuation date only. Where appropriate, we recommend that the valuation is closely monitored, as we continue to track how markets respond to evolving events.

## Extraordinary Assumptions

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have valued the property under the extraordinary assumption that upon closing the buyer will occupy the currently owner-occupied space and will therefore owner occupy three of the suites totaling 6,545 square feet or 84.4% of the property.
- Although requested, we were not provided a detailed operating history or budget for the subject property. The subject leases are structed where the tenant reimburses for electric and utilities in addition to a base year stop reimbursement for property taxes and insurance. We have also estimated the operating expenses, and reimbursement amounts as these were also not provided. We assume this information is accurate and correct.
- Use of this assumption may affect assignment results.

## Hypothetical Conditions

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

---

[1] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

[2] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

## Ownership and Property History

| OWNERSHIP SUMMARY | |
| --- | --- |
| **Item** | **Current** |
| **Current Ownership** | |
| Owner: | 737 MAIN STREET LLC |
| Seller: | CANDIA MAIN STREET LLC |
| Purchase Price: | $1,850,000 |
| Transaction Date: | November 6, 2018 |
| Sale in Last 3 Years?: | No |
| Legal Reference: | 20328 / 0041 |
| County/Locality Name: | Pinellas |
| Buyer/Seller Relationship Type: | Arm's length and reasonable |
| At / Above / Below Market: | At Market |
| **Pending Sale** | |
| Under Contract: | Yes |
| Buyer: | Rachel Wilson |
| Contract Price: | $3,250,000 |
| Contract Date: | September 23, 2024 |
| Arm's Length: | Yes |
| At / Above / Below Market: | Above Market |
| Compiled by CBRE | |

The subject is currently under contract to the Rachel Wilson for a total consideration of $3,250,000. The buyer is the owner of Gigglewaters Restaurant who leases 3,018 square feet of the first floor of the subject. Based on discussions with the buyer, this is an off-market transaction and the approached the current owner with the offer. Based on our concluded market value herein, the purchase price appears to be slightly above market, however, is considered reasonable given the buyer is motivated to expand within the property.

## Exposure/Marketing Time

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and
- the opinions of market participants.

The following table presents the information derived from these sources.

## EXPOSURE/MARKETING TIME DATA

| Investment Type | Exposure/Mktg. (Months) | | |
|---|---|---|---|
| | Range | | Average |
| Comparable Sales Data | 0.0 | - n/a | n/a |
| *PwC Net Lease* | | | |
| National Data | 3.0 | - 18.0 | 8.5 |
| Local Market Professionals | 6.0 | - 12.0 | 9.0 |
| **CBRE Exposure Time Estimate** | **6 - 12 Months** | | |
| **CBRE Marketing Period Estimate** | **6 - 12 Months** | | |
| Various Sources Compiled by CBRE | | | |

# Table of Contents

Certification ................................................................................................................................... i

Subject Photographs .................................................................................................................. iii

Executive Summary .................................................................................................................... vi

Table of Contents ....................................................................................................................... xi

Scope of Work ............................................................................................................................. 1

Area Analysis .............................................................................................................................. 5

Neighborhood Analysis .............................................................................................................. 7

Site Analysis .............................................................................................................................. 10

Improvements Analysis ............................................................................................................ 14

Zoning ........................................................................................................................................ 18

Tax Assessment Data ............................................................................................................... 20

Market Analysis ......................................................................................................................... 21

Highest and Best Use ............................................................................................................... 31

Insurable Replacement Cost ................................................................................................... 32

Surplus Land Value ................................................................................................................... 34

Sales Comparison Approach .................................................................................................... 36

Income Capitalization Approach .............................................................................................. 42

Reconciliation of Value ............................................................................................................. 51

Assumptions and Limiting Conditions ..................................................................................... 52

**ADDENDA**
Land Sale Data Sheets
Improved Sale Data Sheets
Rent Comparable Data Sheets
Legal Description
Client Contract Information
Qualifications

# Scope of Work

This Appraisal Report is intended to comply with the real property appraisal development and reporting requirements set forth under Standards Rule 1 and 2 of USPAP.  The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered, and analysis is applied.

## Intended Use Of Report

The report will be used for loan underwriting and credit decisions.

## Client

The client is Valley National Bank,

## Intended User Of Report

This appraisal is to be used by Valley National Bank U.S. Small Business Administration (SBA) and Florida Business Development Corporation (FBDC). Valley National Bank, its affiliates other lenders including prospective, current and future loan participants involved or considering involvement in a participation, syndication, or co-lending scenario and their respective successors and/or assigns (collectively, "Intended Users") are intended users of the appraisal. Further, the appraiser agrees to cooperate in answering questions by any parties in connection with any participation or syndication. No entity other than Valley National Bank and other Intended Users may use or rely on the information, opinions and conclusions contained in the appraisal. The appraisal may be disclosed without reliance to the Borrower, or other parties at the discretion of Valley National Bank.

> Intended users are those who an appraiser intends will use the appraisal or review report. In other words, appraisers acknowledge at the outset of the assignment that they are developing their expert opinions for the use of the intended users they identify. Although the client provides information about the parties who may be intended users, ultimately it is the appraiser who decides who they are. This is an important point to be clear about: The client does not tell the appraiser who the intended users will be. Rather, the client tells the appraiser who the client needs the report to be speaking to, and given that information, the appraiser identifies the intended user or users. It is important to identify intended users because an appraiser's primary responsibility regarding the use of the report's opinions and conclusions is to those users. Intended users are those parties to whom an appraiser is responsible for communicating the findings in a clear and understandable manner. They are the audience. [3]

## Reliance Language

Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied. Parties or entities other than Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct

---

[3] Appraisal Institute, *The Appraisal of Real Estate, 15th ed.* (Chicago: Appraisal Institute, 2020), 40.

dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith.

## Purpose of the Appraisal

The purpose of this appraisal is to develop an opinion of the market value of the subject property.

## Definition of Value

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## Interest Appraised

The value estimated represents the Leased Fee Interest and Fee Simple Estate as defined below:

*Leased Fee Interest* - The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [5]

## Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- legal description

## Extent to Which the Property is Inspected

Justin Watts and Hoyd K. "Trey" Starling, III inspected the interior and exterior of the subject, as well as its surrounding environs on the effective date of appraisal. This inspection was considered adequate and is the basis for our findings.

---

[4] 12 CFR, Part 34, Subpart C-Appraisals, 34.42(h).

[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 105.

## Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- demographics
- income and expense data
- comparable data

## Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. The steps required to complete each approach are discussed in the methodology section.

## Statement of Competency

The appraisers have the appropriate knowledge, education and experience to complete this assignment competently.

### Data Resources Utilized in the Analysis

| DATA SOURCES | |
|---|---|
| Item: | Source(s): |
| **Site Data** | |
| Size | Pinellas County Property Appraiser |
| **Improved Data** | |
| Building Area | Rent Roll, Pinellas County Property Appraiser |
| No. Bldgs. | Inspection |
| Parking Spaces | Inspection |
| Year Built/Developed | Pinellas County Property Appraiser, owner |
| **Economic Data** | |
| Deferred Maintenance: | N/A |
| Income Data: | Rent Roll, market data |
| Expense Data: | Market Data |
| Compiled by CBRE | |

The operating history for the subject was requested on several occasions and as of the writing of this report, this information has not been provided and we have relied up market data in our analysis of the subject property.

## Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

### Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the

highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, among others, or economic units of comparison such as gross rent multiplier.  Adjustments are applied to the physical units of comparison derived from the comparable sale.  The unit of comparison chosen for the subject is then used to yield a total value.  Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

## Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities.  This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future.  Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time.  The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

## Methodology Applicable to the Subject

In valuing the subject, only the sales comparison and income capitalization approaches are applicable and have been used. Given the subject's age, level of depreciation and market position, the cost approach would not produce a meaningful value indicator. For these reasons, coupled with the fact that prospective buyers do not base or place weight on the cost approach as a basis for determining market value, there is limited application of this approach. At the request of the client, we have also included the insurable value.

# Area Analysis



The subject is located in the Tampa-St. Petersburg-Clearwater, FL Metropolitan Statistical Area. Key information about the area is provided in the following tables.

## POPULATION

The area has a population of 3,356,667 and a median age of 43, with the largest population group in the 60-69 age range and the smallest population in 80+ age range.



Population has increased by 573,424 since 2020, reflecting an annual increase of 4.8%. Population is projected to increase by an additional 149,699 by 2029, reflecting 0.9% annual population growth.

Source: ESRI, downloaded on Nov, 5 2024



## INCOME

The area features an average household income of $106,305 and a median household income of $73,773. Over the next five years, median household income is expected to increase by 20.9%, or $3,090 per annum.



## EDUCATION

A total of 36.5% of individuals over the age of 24 have a college degree, with 23.4% holding a bachelor's degree and 13.0% holding a graduate degree.



## EMPLOYMENT



The area includes a total of 1,664,842 employees and has a 3.8% unemployment rate. The top three industries within the area are Health Care/Social Assistance, Retail Trade and Prof/Scientific/Tech Services, which represent a combined total of 36% of the population.

Source: ESRI, downloaded on Nov, 5 2024; BLS.gov dated Jul, 1 2024 (preliminary)

In summary, the area is forecasted to experience an increase in population and an increase in household income.

# Neighborhood Analysis



## Location

| NEIGHBORHOOD CHARACTERISTICS | |
|---|---|
| Location: | Suburban |
| Built-Up: | 25% - 75% |
| Life Cycle Stage | Growth |
| Change in Present Land Use: | Not Likely |
| | |
| Neighborhood Boundaries | |
| North: | FL-580 |
| South: | Gulf to Bay Boulevard |
| East: | Old Tampa Bay |
| West: | US Highway 19 |
| Source: CBRE | |

## NEIGHBORHOOD HOUSING TRENDS

| | | | |
|---|---|---|---|
| Property Values: | Stable | Owner Occupied %: | 67.1% |
| Demand/Supply: | In Balance | | |
| Marketing Time: | 3 - 6 Months | | |

| | Range with Fewest | Range with Most | Median Value |
|---|---|---|---|
| Housing Prices: | $1,000,000 - $1,499,999 | $400,000 - $499,999 | $459,042 |
| Year Built: | 1939 or Earlier | 1970-1979 | 1981 |

Multiple Sources Compiled by CBRE

## NEIGHBORHOOD LAND USE

### Present Land Use %

| | | | |
|---|---|---|---|
| Single Unit Residential: | 30% | Industrial: | 10% |
| Multi-Housing: | 10% | Agricultural: | 0% |
| Commercial: | 40% | Other: | 10% |

### Commercial Land Use Patterns

| | |
|---|---|
| Primary Commercial Thoroughfares: | Main Street, US Highway 19, Gulf to Bay Boulevard |
| Major Commercial Developments: | Various retail/commercial uses along Main Street |

Source:  CBRE

## Demographics

Selected neighborhood demographics in 1-, 3- and 5-mile radius from the subject are shown in the following table:

## SELECTED NEIGHBORHOOD DEMOGRAPHICS

| 737 Main Street<br>Safety Harbor, FL 34695 | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Tampa-St.<br>Petersburg- |
|---|---|---|---|---|
| **Population** | | | | |
| 2029 Total Population | 6,631 | 54,724 | 169,747 | 3,506,366 |
| 2024 Total Population | 6,717 | 54,542 | 170,710 | 3,356,667 |
| 2010 Total Population | 6,433 | 52,599 | 156,538 | 2,783,243 |
| 2000 Total Population | 6,791 | 55,691 | 155,946 | 2,395,991 |
| *Annual Growth 2024 - 2029* | *-0.26%* | *0.07%* | *-0.11%* | *0.88%* |
| *Annual Growth 2010 - 2024* | *1.09%* | *0.91%* | *2.19%* | *4.79%* |
| *Annual Growth 2000 - 2010* | *-0.54%* | *-0.57%* | *0.04%* | *1.51%* |
| **Households** | | | | |
| 2029 Total Households | 2,952 | 26,237 | 79,638 | 1,453,429 |
| 2024 Total Households | 2,948 | 25,710 | 78,958 | 1,384,869 |
| 2010 Total Households | 2,805 | 24,087 | 72,219 | 1,151,263 |
| 2000 Total Households | 2,903 | 25,029 | 70,795 | 1,009,315 |
| *Annual Growth 2024 - 2029* | *0.03%* | *0.41%* | *0.17%* | *0.97%* |
| *Annual Growth 2010 - 2024* | *1.25%* | *1.64%* | *2.26%* | *4.73%* |
| *Annual Growth 2000 - 2010* | *-0.34%* | *-0.38%* | *0.20%* | *1.32%* |
| **Income** | | | | |
| 2024 Median Household Income | $107,340 | $73,685 | $71,794 | $73,773 |
| 2024 Average Household Income | $140,293 | $110,195 | $103,724 | $106,305 |
| 2024 Per Capita Income | $62,416 | $51,836 | $47,931 | $43,929 |
| 2024 Pop 25+ College Graduates | 2,496 | 17,960 | 50,123 | 891,217 |
| Age 25+ Percent College Graduates - 2024 | 47.9% | 42.2% | 37.5% | 36.5% |

Source: ESRI

## Conclusion

As shown above, population growth within the neighborhood has been moderately increasing over the past twenty years. The neighborhood currently has a middle to upper middle-income demographic profile with a 2024 average household income of $110,195 in a three-mile radius. The outlook for the neighborhood is for relatively stable performance with moderate increases in population and household formation expected over the next five years. As a result, the demand for existing and proposed developments is expected to be good. Overall, the outlook for this neighborhood is average to good with continued slow but steady growth expected.

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

---

## SITE SUMMARY AND ANALYSIS

**Physical Description**

| | | |
|---|---|---|
| Gross Site Area | 0.94 Acres | 40,791 Sq. Ft. |
| Net Site Area | 0.70 Acres | 30,337 Sq. Ft. |
| Excess Land Area | 0.24 Acres | 10,454 Sq. Ft. |
| Primary Road Frontage | Main Street | 289 Feet |
| Secondary Road Frontage | 7th Avenue | 145 Feet |
| Additional Road Frontage | 8th Avenue | 145 Feet |
| Excess Land Area | 0.24 Acres | 10,454 Sq. Ft. |
| Surplus Land Area | None | n/a |
| Shape | Rectangular | |
| Topography | Generally Level | |
| Parcel Number(s) | 03-29-16-96498-027-0080 | |
| | | |
| Zoning District | MSM, Main Street Marketplace | |
| Flood Map Panel No. & Date | 12103C0127H | 24-Aug-21 |
| Flood Zone | Zone X (Unshaded) | |
| Adjacent Land Uses | Retail/Commercial uses | |
| Earthquake Zone | n/a | |

**Comparative Analysis** — **Rating**

| | |
|---|---|
| Visibility | Average |
| Functional Utility | Assumed Adequate |
| Traffic Volume | Average |
| Adequacy of Utilities | Assumed Adequate |
| Landscaping | Average |
| Drainage | Assumed Adequate |

**Utilities** — **Provider** — **Availability**

| | | |
|---|---|---|
| Water | City of Safety Harbor | Yes |
| Sewer | City of Safety Harbor | Yes |
| Electricity | Duke Engergy | Yes |
| Telephone | Various | Yes |
| Mass Transit | PSTA | Yes |

**Other** — **Yes** — **No** — **Unknown**

| | Yes | No | Unknown |
|---|---|---|---|
| Detrimental Easements | | | X |
| Encroachments | | | X |
| Deed Restrictions | | | X |
| Reciprocal Parking Rights | | | X |

---

Various sources compiled by CBRE

## Ingress/Egress

Ingress and egress is available via one access point along Main Street as well as one access point along 7th Avenue North.

## Easements and Encroachments

There are no known easements or encroachments impacting the site that are considered to affect the marketability or highest and best use.  It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.

## Covenants, Conditions and Restrictions

There are no known covenants, conditions or restrictions impacting the site that are considered to affect the marketability or highest and best use.  It is recommended that the client/reader obtain a copy of the current covenants, conditions and restrictions, if any, prior to making a business decision.

## Environmental Issues

Although CBRE was not provided an Environmental Site Assessment (ESA), a tour of the site did not reveal any obvious issues regarding environmental contamination or adverse conditions.

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site.  The existence of hazardous materials or underground storage tanks may affect the value of the property.  For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## Conclusion

The subject site has good frontage along Main Street and the access is considered average. There are no known detrimental uses in the immediate vicinity.  Overall, there are no known factors which are considered to prevent the site from development to its highest and best use, as vacant.

## Plat Map



## Flood Plain Map



# Improvements Analysis

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Retail | (Freestanding Retail) |
| Number of Buildings | 1 | |
| Number of Stories | 2 | |
| Gross Leasable Area | 7,753 SF | |
| Area Breakdown by Market Rent Categories | | |
| Retail Space - Medium | 3,789 SF | |
| Retail Space - Small | 437 SF | |
| Office Space | 3,527 SF | |
| Site Coverage | 25.6% | |
| Parking Improvements | Open | |
| Parking Spaces: | 30 | |
| Parking Ratio (per 1,000 SF GLA ) | 3.87 | |
| Year Built / Renovated | 1963 / 2019 | |
| Actual Age | 61 Years | |
| Effective Age | 15 Years | |
| Total Economic Life | 45 Years | |
| Remaining Economic Life | 30 Years | |
| Age/Life Depreciation | 33.3% | |
| Functional Utility | Typical | |
| Source:  Various sources compiled by CBRE | | |

| IMPROVEMENT DESCRIPTION & RATING | | |
|---|---|---|
| Improvement Summary | Description | Comparative Rating |
| Foundation | Concrete slab on grade | Average |
| Frame | Masonry/Concrete | Average |
| Exterior Walls | Masonry | Average |
| Interior Walls | Painted Drywall | Average |
| Roof | Flat and gabled shingle | Average |
| Ceiling | Open ceiling and suspended acoustical tile | Average |
| HVAC System | Ground mounted HVAC | Average |
| Exterior Lighting | Mercury vapor fixtures | Average |
| Interior Lighting | Recessed flourescent and incandescent lighting | Average |
| Flooring | Carpet, ceramic tile, and wood flooring | Average |
| Plumbing | Assumed adequate | Average |
| Stairwells | One exterior stairwell and one interior stairwell | Average |
| Elevators | N/A | Average |
| Smoke Detectors | Yes | Average |
| Sprinkler System | Yes | Average |
| Furnishings | Personal property excluded | Average |
| Parking | Paved open parking | Average |
| Landscaping | Tress, grass, and irrigated plant beds | Average |
| Source:  Various sources compiled by CBRE | | |

## Subject Layout/Utility

The subject site is improved with a building that is currently used as a multi-tenant mixed-use retail and office building.  The building contains a one-story restaurant located on the western side of the building. Directly adjacent to the restaurant on east is a smaller retail unit that is currently used as a salon and was

renovated in 2016. The remainder of the building on the eastern portion is a two-story retail/office area that contains multiple suites and was extensively renovated between 2018 and 2022.

The building contains a total gross area of 9,027 square feet and a leasable area of 7,753 square feet. The design of this building is not as efficient for a typical retail strip center as the units are not uniformly carved out of the space.  The building appears as though it may have at one time been a single user building and subsequent building additions and interior divisions have resulted in the current configuration.  This has resulted in a portion of the interior area used for common area hallways, storage and restrooms and there is no elevator access for the second-floor tenants.  However, style of the building is desirable by users in the market as evidenced by the occupancy level in this building.

As mentioned, the subject is currently under contract to the Rachel Wilson. The buyer is the owner of Gigglewaters Restaurant who leases 3,018 square feet of the first floor of the subject. Upon closing the buyer will assume the two current owner-occupied units totaling 3,527 square feet. The buyer mentioned they plan to occupy the second-floor office space totaling 1,496 square feet. In addition, they will owner-operate the OfficeWerks space totaling 2,031 square feet. In additional, there will be no costs associated with occupying these spaces and no renovations will be required. Therefore, 6,545 square feet or 84.4% of the property will be owner-occupied upon closing.

## Deferred Maintenance

None noted.

## Condition Analysis

Although CBRE was not provided a Property Condition Assessment (PCA), a tour of the improvements did not reveal any significant maintenance issues. Our tour of the improvements included a cursory inspection of the buildings, surface parking, office, and retail space.

## Conclusion

The improvements are considered to be in average overall condition and are considered to be somewhat atypical in regard to improvement layout, however is considered desirable in the market.  Overall, there are no known factors that could be considered to adversely impact the marketability of the improvements.

## Improvements Layout – First Floor



Note: There is a diffence between our estimate and the square footage above. This is because the estimate for Suite D above includes patio space which we have excluded from the gross leasable area.

## Improvements Layout – Second Floor



SUITE D (2ND FLOOR) = 1,429 SQ.FT.

SECOND FLOOR PLAN
SCALE: 3/16" = 1'-0"

# Zoning

The following chart summarizes the subject's zoning requirements.

| ZONING SUMMARY | |
|---|---|
| Current Zoning | MSM, Main Street Marketplace |
| Legally Conforming | Yes |
| Uses Permitted | Various retail/commercial uses are permitted in the MSM zoning district. Some of these uses include retail and restaurant uses, office, and residential uses. |
| Zoning Change | Not likely |

| Category | Zoning Requirement |
|---|---|
| Minimum Lot Size | None |
| Minimum Lot Width | None |
| Maximum Height | 35 Feet |
| Minimum Setbacks | |
|    Front Yard | 5 Feet |
|    Street Side Yard | 0 Feet |
|    Interior Side Yard | 0 Feet |
|    Rear Yard | 10 Feet |
| Maximum FAR/Density | 1.00 : 1 |
| Parking Requirements | 1 per 1,000 SF or fee in leiu of parking |
| Subject's Actual Parking | 3.87 |

Source: Planning & Zoning Dept.

## Analysis and Conclusion

The improvements represent a legally conforming use and, if damaged, may be restored without special permit application. Additional information may be obtained from the appropriate governmental authority. For purposes of this appraisal, CBRE has assumed the information obtained is correct.

## Zoning Map



# Tax Assessment Data

The following summarizes the local assessor's estimate of the subject's market value, assessed value, and taxes, and does not include any furniture, fixtures or equipment. The property is currently assessed for ad valorem taxes by Pinellas County. The County Commission sets the millage rate to be used in calculating the tax bill in September or October of each year.  The County Tax Collector issues the tax bills providing for a 4% discount for payment in November, a 3% discount for payment in December, a 2% discount for payment in January and a 1% discount for payment in February.  All tax bills are delinquent after March 31 of the following year.

| | | | | | Pro Forma - Main Site | Pro Forma - Excess Land |
|---|---|---|---|---|---|---|
| **AD VALOREM TAX INFORMATION** | | | | | | |
| Parcel | Assessor's Parcel No. | Parcel Description | 2023 | 2024 | | |
| 1 | 3-29-16-96498-027-0080 | | 1,850,000 | 1,920,000 | | |
| | Subtotal | | $1,850,000 | $1,920,000 | 1,920,000 | $450,000 |
| | % of Assessed Value | | 100% | 100% | 100% | 75% |
| | Final Assessed Value | | 1,850,000 | 1,920,000 | $1,920,000 | $337,500 |
| | General Tax Rate (per $1,000 A.V.) | | 17.341200 | 17.013100 | 17.013100 | 17.013100 |
| | General Tax: | | $32,081 | $32,665 | $32,665 | $5,742 |
| | Effective Tax Rate | (per $1,000 A.V.) | 16.647552 | 16.332576 | 16.332576 | 17.013100 |
| | **Total Taxes (Inclusive of 4% Discount)** | | **$30,798** | **$31,359** | **$31,359** | **$5,742** |
| | Taxes per SF | | $3.97 | $4.04 | $4.04 | $0.74 |
| Source:  Assessor's Office | | | | | | |

In the State of Florida, real estate is assessed at 100% of the property appraiser's estimate of "fair market value", typically resulting in an assessment that is somewhat lower than actual market value. It is commonly viewed a lower assessment in the 65%-85% range of market value helps reduce the frequency of tax appeals and revisions to the budget after the millage rate has been set. As well, in the State of Florida, a 4.0% early-payment discount is available to property owners who pay their real estate taxes prior to a pre-established deadline. Within our analysis we have assumed that prudent management would act to realize the full 4.0% early-payment discount for the subject property. However, due to the subject's use as a school, it is exempt from real estate taxes.

## Delinquency

None Noted.

## Conclusion

The current assessed value equates to 80% of our estimated market value. The current ratio is considered reasonable, as typical assessment ratios range from 60% to 85%.  Therefore, we have adopted the subjects current assessment. This results in a tax liability of $31,359 net of the 4% discount for early payment.

# Market Analysis

The market analysis forms a basis for assessing market area boundaries, supply and demand factors, and indications of financial feasibility.  Primary data sources utilized for this analysis include Costar.

The subject is in the North Pinellas submarket and is considered a Class C Retail/Office Building.

## Metropolitan Tampa - FL USA Retail Market Overview

### Recent Performance

The following table summarizes historical and projected performance for the overall metropolitan Tampa - FL USA retail market, as reported by Costar.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **TAMPA - FL USA RETAIL MARKET** | | | | | | | | |
| Year Ending | Inventory (SF) | Completions (SF) | Occupied Stock (SF) | Occupancy | Asking Rent ($/SF NNN) | Asking Rent Change | Net Absorption (SF) | Transaction Price Per Area (SF) |
| 2014 | 168,689,554 | 1,009,669 | 158,889,776 | 94.2% | $15.47 | 2.45% | 2,002,599 | $87.86 |
| 2015 | 170,310,711 | 1,621,157 | 161,468,384 | 94.8% | $15.93 | 3.01% | 2,577,824 | $159.43 |
| 2016 | 171,237,472 | 926,761 | 163,309,232 | 95.4% | $16.58 | 4.04% | 1,847,555 | $177.54 |
| 2017 | 172,749,524 | 1,512,052 | 165,580,528 | 95.9% | $17.47 | 5.41% | 2,315,871 | $154.59 |
| 2018 | 173,898,061 | 1,120,294 | 166,370,784 | 95.7% | $18.42 | 5.41% | 763,299 | $179.39 |
| 2019 | 174,920,262 | 1,016,082 | 168,045,440 | 96.1% | $19.45 | 5.60% | 1,671,483 | $203.42 |
| 2020 | 175,286,766 | 340,883 | 167,887,776 | 95.8% | $20.43 | 5.05% | -179,084 | $188.68 |
| 2021 | 176,201,115 | 912,234 | 169,787,248 | 96.4% | $21.80 | 6.69% | 1,899,764 | $232.09 |
| 2022 | 176,920,361 | 719,246 | 171,516,224 | 96.9% | $23.62 | 8.34% | 1,730,060 | $241.86 |
| Q1 2023 | 177,101,131 | 180,770 | 171,806,848 | 97.0% | $24.09 | 1.98% | 290,613 | $216.35 |
| Q2 2023 | 177,316,451 | 215,320 | 171,908,272 | 97.0% | $24.52 | 1.81% | 101,431 | $317.89 |
| Q3 2023 | 177,272,271 | -44,180 | 171,956,608 | 97.0% | $24.99 | 1.90% | 48,338 | $276.58 |
| Q4 2023 | 177,528,378 | 256,107 | 171,971,872 | 96.9% | $25.47 | 1.95% | 15,262 | $287.85 |
| 2023 | 177,528,378 | 608,017 | 171,971,872 | 96.9% | $25.47 | 7.86% | 455,644 | $287.85 |
| Q1 2024 | 177,709,639 | 181,261 | 172,155,216 | 96.9% | $25.94 | 1.83% | 183,337 | $272.39 |
| Q2 2024 | 178,024,159 | 314,520 | 172,575,744 | 96.9% | $26.08 | 0.53% | 420,528 | $265.23 |
| Q3 2024* | 178,268,217 | 244,058 | 173,022,912 | 97.1% | $26.36 | 1.09% | 447,172 | - |
| Q4 2024* | 178,494,711 | 226,494 | 173,033,776 | 96.9% | $26.61 | 0.93% | 12,184 | - |
| 2024* | 178,494,711 | 966,333 | 173,033,776 | 96.9% | $26.61 | 4.44% | 1,063,221 | - |
| 2025* | 178,489,200 | -5,511 | 173,075,552 | 97.0% | $27.61 | 3.77% | 60,607 | - |
| 2026* | 178,709,787 | 220,587 | 173,282,128 | 97.0% | $28.52 | 3.28% | 198,085 | - |
| 2027* | 179,015,075 | 305,288 | 173,442,608 | 96.9% | $29.26 | 2.62% | 131,180 | - |
| 2028* | 179,392,226 | 377,151 | 173,702,272 | 96.8% | $30.02 | 2.59% | 231,912 | - |
| 2029* | 179,963,695 | 571,469 | 174,156,592 | 96.8% | $30.75 | 2.44% | 426,112 | - |
| * Future Projected Data according to Costar | | | | | | | | |
| Source: Costar, 2nd Quarter 2024 | | | | | | | | |

The Tampa - FL USA retail market consists of approximately 178,024,159 square feet of retail space. The following observations are noted from the table above:

- As of 2nd Quarter 2024, there was approximately 172,575,744 square feet of occupied retail space (including sublet space), resulting in an occupancy rate of 96.9% for the metro area. This reflects no change from the previous quarter's occupancy of 96.9%, and no change from an occupancy rate of 96.9% from last year.
- The area experienced positive 420,528 square feet of net absorption for the current quarter. This indicates an improvement from the previous quarter's positive 183,337 square feet of net absorption, and a decline from the positive 455,644 square feet of net absorption from last year.

- The area had completions of positive 314,520 square feet for the current quarter, which indicates an increase from the previous quarter's completions of positive 181,261 square feet, and indicates a decline from completions of positive 608,017 square feet from last year.
- The area achieved average asking rent of $26.08 per square foot, which indicates an increase from the previous quarter's asking rent of $25.94 per square foot, and an increase from the asking rent of $25.47 per square foot from last year.

## Historical Inventory – Market



Inventory is projected to be 178,494,711 square feet at the end of the current year, which represents an increase from the previous year's inventory of 177,528,378 square feet. Inventory for next year is projected to be 178,489,200 square feet, reflecting a decrease from the current year.

## Historical Occupancy - Market



At the end of the current year, the occupancy rate is projected to be 96.9%, which reflects no change from the 96.9% occupancy rate at the end of last year. Occupancy for next year is projected to be 97.0%, reflecting a small increase from the current year.

## Historical Net Absorption - Market



At the end of the current year, the area is projected to experience positive 1,063,221 square feet of net absorption, which indicates an improvement from the positive 455,644 square feet of net absorption for the previous year. The area is projected to experience positive 60,607 square feet of net absorption as of the end of next year, which indicates a decline from the current year.

## Historical Completions - Market



The area is projected to achieve completions of positive 966,333 square feet for the current year, which indicates an improvement from the previous year's completions of positive 608,017 square feet. The area is projected to experience completions of negative 5,511 square feet as of the end of next year, which indicates a decline from the current year.

## Historical Asking Rent - Market



**ASKING RENT: TAMPA - FL USA RETAIL MARKET**

\* Future Projected Data according to Costar

Source: Costar, 2nd Quarter 2024

The area is projected to achieve average asking rent of $26.61 per square foot at the end of the current year, which indicates an increase from the previous year's asking rent of $25.47 per square foot. The area is projected to achieve asking rent of $27.61 per square foot by the end of next year, indicating an increase from the current year.

## Submarket Snapshot

The following table summarizes the supply of retail square footage for each submarket within the Tampa - FL USA market as of 2nd Quarter 2024.

| SUBMARKET SNAPSHOT | | | | |
|---|---|---|---|---|
| Submarket | Inventory (SF) | Completions* (SF) | Asking Rent ($/SF NNN) | Occupancy |
| Bayside | 3,298,510 | 4,720 | $27.02 | 96.8% |
| Downtown Clearwater | 1,681,811 | 0 | $23.62 | 98.6% |
| Downtown St Petersburg | 2,198,882 | 8,686 | $38.53 | 89.8% |
| Downtown Tampa | 4,095,455 | 31,612 | $33.84 | 97.6% |
| Eastern Outlying | 8,396,897 | 43,563 | $23.87 | 98.2% |
| East Tampa | 13,502,101 | 73,191 | $26.35 | 99.1% |
| Gateway | 3,636,138 | 29,618 | $24.24 | 96.7% |
| Hernando County | 9,920,591 | 0 | $20.90 | 98.0% |
| Mid-Pinellas | 12,068,582 | -2,732 | $23.79 | 96.2% |
| Northeast Tampa | 13,334,699 | 15,933 | $24.27 | 97.6% |
| North Pinellas | 16,132,818 | -25,899 | $25.78 | 95.3% |
| Northwest Tampa | 20,120,251 | 8,056 | $26.48 | 97.4% |
| Pasco County | 30,265,921 | 480,192 | $22.77 | 96.1% |
| Southeast Hillsborough | 3,665,321 | 54,185 | $26.14 | 98.2% |
| South Pinellas | 20,270,421 | 62,470 | $26.85 | 96.4% |
| South Tampa | 6,264,706 | -82,887 | $32.03 | 96.5% |
| Westshore | 9,167,579 | 7,000 | $37.87 | 98.1% |
| *Completions include trailing 4 quarters | | | | |
| Source: Costar, 2nd Quarter 2024 | | | | |

Add comments as necessary.

## North Pinellas Submarket

Important characteristics of the North Pinellas retail market are summarized below:

| NORTH PINELLAS RETAIL SUBMARKET | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year Ending | Inventory (SF) | Completions (SF) | Occupied Stock (SF) | Occupancy | Asking Rent ($/SF NNN) | Asking Rent Change | Net Absorption (SF) |
| Q1 2023 | 16,158,717 | 24,100 | 15,500,507 | 95.9% | $23.82 | 1.85% | 16,283 |
| Q2 2023 | 16,158,717 | 0 | 15,498,003 | 95.9% | $24.26 | 1.81% | -2,504 |
| Q3 2023 | 16,158,717 | 0 | 15,472,617 | 95.8% | $24.74 | 1.99% | -25,386 |
| Q4 2023 | 16,158,717 | 0 | 15,403,258 | 95.3% | $25.25 | 2.06% | -69,359 |
| 2023 | 16,158,717 | 24,100 | 15,403,258 | 95.3% | $25.25 | 7.94% | -80,966 |
| Q1 2024 | 16,132,818 | -25,899 | 15,375,465 | 95.3% | $25.68 | 1.71% | -27,793 |
| Q2 2024 | 16,132,818 | 0 | 15,376,318 | 95.3% | $25.78 | 0.41% | 853 |
| Q3 2024* | 16,140,264 | 7,446 | 15,394,544 | 95.4% | $26.05 | 1.02% | 18,226 |
| Q4 2024* | 16,134,586 | -5,678 | 15,370,173 | 95.3% | $26.28 | 0.90% | -24,254 |
| *Future Projected Data according to Costar | | | | | | | |
| Source: Costar, 2nd Quarter 2024 | | | | | | | |

The North Pinellas retail submarket consists of approximately 16,132,818 square feet of retail space. The current submarket inventory represents approximately 9.1% of the overall market inventory. The following observations were noted from the table above:

- As of 2nd Quarter 2024, there was approximately 15,376,318 square feet of occupied retail space (including sublet space), resulting in an occupancy rate of 95.3% for the submarket. This reflects no change from the previous quarter's occupancy of 95.3%, and no change from an occupancy rate of 95.3% from last year. The submarket occupancy is below the 96.9% market occupancy.

- The submarket experienced positive 853 square feet of net absorption for the current quarter. This indicates an improvement from the previous quarter's negative 27,793 square feet of net absorption, and an improvement from the negative 80,966 square feet of net absorption from a year ago. Overall, the submarket has experienced negative 26,940 square feet of net absorption for the current year-to-date period. The submarket's current net absorption of positive 853 square feet is below the overall market net absorption of positive 420,528 square feet.

- The submarket had zero completions for the current quarter, which indicates an increase from the previous quarter's completions of negative 25,899 square feet, and no change from the zero completions from last year.

- The submarket achieved average asking rent of $25.78 per square foot, which indicates an increase from the previous quarter's asking rent of $25.68 per square foot, and an increase from the asking rent of $25.25 per square foot from last year. The submarket's current asking rent of $25.78 per square foot is below the overall market asking rent of $26.08 per square foot.

## Historical Inventory - Submarket



*Future Projected Data according to Costar

Source: Costar, 2nd Quarter 2024

Submarket Inventory is projected to be 16,134,586 square feet at the end of the current year, which represents a small decrease from the previous year's submarket inventory of 16,158,717 square feet. Inventory for next year is projected to be 16,122,237 square feet, reflecting a small decrease from the current year.

## Historical Occupancy - Submarket



Submarket occupancy is projected to be 95.3% at the end of the current year, which represents no change from the previous year's submarket occupancy of 95.3%. Submarket occupancy for next year is projected to be 95.1%, reflecting a small decrease from the current year.

## Historical Net Absorption - Submarket



Net absorption in the submarket is projected to be negative 32,968 square feet at the end of the current year, reflecting an improvement from the previous year's net absorption of negative 80,966 square feet. Net absorption for next year is projected to be negative 31,539 square feet, indicating an improvement from the current year.

## Historical Completions - Submarket



The submarket is projected to achieve completions of negative 24,131 square feet at the end of the current year, which indicates a decline from the previous year's completions of positive 24,100 square feet. The submarket is projecting completions of negative 12,349 square feet for next year, which indicates an improvement from the current year.

## Historical Asking Rent - Submarket



The submarket is projected to achieve average asking of $26.28 per square foot at the end of the current year, which represents an increase from the previous year's asking rent of $25.25 per square foot. The submarket is projecting to achieve average asking rent of $27.24 per square foot, reflecting an increase from the current year.

## Competitive Properties

Comparable properties were surveyed in order to identify the current occupancy within the competitive market. The comparable data is summarized in the following table:

| Comp. No. | Name | Location | Overall Occupancy |
|---|---|---|---|
| **SUMMARY OF COMPARABLE RETAIL RENTALS** | | | |
| 1 | 380 Park Place | 380 Park Place Boulevard, Clearwater, FL | 96% |
| 2 | Countryside Corporate Centre | 2536 Countryside Boulevard, Clearwater, FL | 53% |
| 3 | Plaza 935 | 935 Main Street, Safety Harbor, FL | 100% |
| 4 | Dog Bar | 660 2nd Street, Safety Harbor, FL | 100% |
| 5 | 318 Main Street | 318 Main Street, Safety Harbor, FL | 40% |
| 6 | Northwood Oaks Shopping Center | 2519 McMullen Booth Road, Clearwater, FL | 96% |
| 7 | Clearwater Mall | 20505 US Highway 19 N, Clearwater, FL | 87% |
| Subject | Safety Harbor Retail Center | 737 Main Street, Safety Harbor, Florida | 100% |
| Compiled by CBRE | | | |

The comparable properties indicated an average occupancy rate of 82% and represent single and multi-tenant retail and office buildings that are either fully occupied, or have vacancies with space available for lease.

## Subject Analysis

### Occupancy

Based on the foregoing analysis, CBRE's conclusion of stabilized occupancy for the subject is illustrated in the following table. This estimate considers both the physical and economic factors of the market.

| OCCUPANCY CONCLUSIONS | |
|---|---|
| Tampa MSA | 96.5% |
| Submarket | 96.5% |
| Rent Comparables | 84.7% |
| Subject's Current Occupancy | 100.0% |
| Subject's Stabilized Occupancy | 95.0% |
| Compiled by CBRE | |

## Conclusion

The area's overall office and retail market and submarket is exhibiting a generally stabilized occupancy and upward trending rental rates.  The most recent submarket data indicates a net positive absorption of space over the last several years.  Considering the recent trends, the local market area should maintain a stabilized occupancy position.  The long-term projection for the subject submarket is for continued stability.

With respect to the subject property in particular, we believe the subject is well located for a retail/office property.  The site is conveniently located with respect to major roadways, and is in a desirable area in Clearwater. Based upon our analysis, the subject property should enjoy adequate market acceptance and generally be viewed as an average competitive position in the market.

# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based.  The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

The highest and best use analysis of the subject is discussed below.

## As Vacant

The property is zoned for retail/commercial use and is of sufficient size to accommodate various types of development.  The immediate area includes various retail/commercial land uses.  Considering the surrounding land uses, location attributes, legal restrictions and other factors, it is our opinion that a retail/commercial oriented use would be reasonable and appropriate.  Therefore, it is our opinion that the highest and best use would be for retail/commercial-related use, time and circumstances warranting.

## As Improved

As improved, the subject involves a retail/commercial-oriented facility.  The current use is legally permissible and physically possible.  The improvements continue to contribute value to the property and based on our analysis, the existing use is financially feasible however, is not the maximal use as there is excess land associated with the site.  The most likely buyer for the subject property is as follows:

- Investor-Local

Therefore, it is our opinion that the highest and best use of the subject, as improved, is for continued retail/commercial related use with 0.24 acres of excess land available for future development.

# Insurable Replacement Cost

Insurable Replacement Cost is defined as follows:

> *Replacement Cost for Insurance Purposes* - The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). [6]

CBRE, Inc. has followed traditional appraisal standards to develop a reasonable calculation based upon industry practices and industry-accepted publications such as the Marshall Valuation Service. The methodology employed is a derivation of the cost approach and is not reliable for Insurable Replacement Cost estimates. Actual construction costs and related estimates can vary greatly from this estimate.

The Insurable Replacement Cost estimate presented herein is intended to reflect the value of the destructible portions of the subject, based on the replacement of physical items that are subject to loss from hazards (excluding indestructible items such as basement excavation, foundation, site work, land value and indirect costs).  In the case of the subject, this estimate is based upon the base building costs (direct costs) as obtained via the Marshall Valuation Service cost guide, with appropriate deductions.

This analysis should not be relied upon to determine proper insurance coverage as only consultants considered experts in cost estimation and insurance underwriting are qualified to provide an Insurable Replacement Cost. It is provided to aid the client/reader/user as part of their overall decision-making process and no representations or warranties are made by CBRE, Inc. regarding the accuracy of this estimate.  It is strongly recommended that other sources be utilized to develop any estimate of Insurable Replacement Cost.

---

[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 163.

## INSURABLE REPLACEMENT COST

| | | | |
|---|---|---|---|
| Primary Building Type: | Retail | Height per Story: | 15' |
| Effective Age: | 15 YRS | Number of Buildings: | 1 |
| Condition: | Average | Gross Building Area: | 9,027 SF |
| Exterior Wall: | Concrete | Net Rentable Area: | 7,753 SF |
| Number of Stories: | 2 | Average Floor Area: | 4,514 SF |

| | |
|---|---|
| **MVS Sec/Page** | 13/26 |
| **Quality/Bldg. Class** | Good/C |
| **Building Component** | Retail Store |
| **Component Sq. Ft.** | 9,027 SF |
| **Base Square Foot Cost** | $154.00 |
| | |
| **Square Foot Refinements** | |
| Heating and Cooling | |
| Sprinklers | |
| Subtotal | $154.00 |
| | |
| **Height and Size Refinements** | |
| Number of Stories Multiplier | 1.000 |
| Height per Story Multiplier | 1.064 |
| Floor Area Multiplier | 1.000 |
| Subtotal | $163.86 |
| | |
| **Cost Multipliers** | |
| Current Cost Multiplier | 1.03 |
| Local Multiplier | 0.98 |
| **Final Square Foot Cost** | $165.40 |
| | |
| **Base Component Cost** | **$1,493,032** |

| | | |
|---|---|---|
| **Base Building Cost** | *(via Marshall Valuation Service cost data)* | $1,493,032 |
| | | |
| **Insurable Exclusions** | 10.0% of Total Building Cost | ($149,303) |
| | | |
| **Indicated Insurable Replacement Cost** | | **$1,343,729** |
| **Rounded** | | **$1,340,000** |
| **Value Per SF** | | **$172.84** |

Compiled by CBRE

# Surplus Land Value

The following map and table summarize the comparable data used in the valuation of the subject's vacant surplus land area.  A detailed description of each transaction is included in the addenda.



| SUMMARY OF COMPARABLE LAND SALES (EXCESS LAND) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| No. | Property Location | Transaction Type | Date | Interest Transferred | Zoning | Actual Sale Price | Adjusted Sale Price [1] | Size (SF) | Price Per SF |
| 1 | 28660 US Highway 19 N Clearwater, FL 33761 | Sale | Mar-24 | Fee Simple/Freehold | CP, Commercial Parkway | $1,000,000 | $1,000,000 | 30,000 | $33.33 |
| 2 | 900 22nd Avenue East Land Tampa, FL 33605 | Available/ Listing | Nov-24 | Fee Simple/Freehold | CG, Commercial General | $246,000 | $246,000 | 5,473 | $44.95 |
| 3 | 2305 Nebraska Avenue Tampa, FL 33602 | Sale | Aug-22 | Fee Simple/Freehold | YC-5 | $1,350,000 | $1,350,000 | 42,587 | $31.70 |
| 4 | 7925 4th St N St. Petersburg, FL 33702 | Sale | Jul-22 | Fee Simple/Freehold | CCS-1 (Corridor Commercial Suburban) and NT-1 (Neighborhood Traditional Single-Family) | $850,000 | $850,000 | 19,724 | $43.09 |
| 5 | 9299 4th Street North Saint Petersburg, FL 33702 | Sale | May-22 | Fee Simple/Freehold | CCS-1, Commercial Corridor Suburban | $805,000 | $805,000 | 15,672 | $51.37 |
| Subject | 737 Main Street, Safety Harbor, Florida | --- | --- | | MSM, Main Street Marketplace | --- | --- | 10,454 | --- |

[1] Adjusted sale price for cash equivalency and/or development costs (where applicable)
Compiled by CBRE

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| LAND SALES ADJUSTMENT GRID (SURPLUS LAND) | | | | | | |
|---|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | 5 | Subject |
| Transaction Type | Sale | Available/Listing | Sale | Sale | Sale | --- |
| Transaction Date | Mar-24 | Nov-24 | Aug-22 | Jul-22 | May-22 | --- |
| Interest Transferred | Fee Simple/Freehold | Fee Simple/Freehold | Fee Simple/Freehold | Fee Simple/Freehold | Fee Simple/Freehold | |
| Zoning | CP, Commercial Parkway | CG, Commercial General | YC-5 | CCS-1 (Corridor Commercial Suburban) and NT-1 (Neighborhood Traditional Single-Family) | CCS-1, Commercial Corridor Suburban | MSM, Main Street Marketplace |
| Actual Sale Price | $1,000,000 | $246,000 | $1,350,000 | $850,000 | $805,000 | --- |
| Adjusted Sale Price [1] | $1,000,000 | $246,000 | $1,350,000 | $850,000 | $805,000 | --- |
| Size (Acres) | 0.69 | 0.13 | 0.98 | 0.45 | 0.36 | 0.24 |
| Size (SF) | 30,000 | 5,473 | 42,587 | 19,724 | 15,672 | 10,454 |
| Price Per SF | $33.33 | $44.95 | $31.70 | $43.09 | $51.37 | --- |
| Price ($ PSF) | $33.33 | $44.95 | $31.70 | $43.09 | $51.37 | |
| Property Rights Conveyed | 0% | 0% | 0% | 0% | 0% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | 0% | |
| Conditions of Sale | 0% | -5% | 0% | 0% | 0% | |
| Market Conditions | 0% | 0% | 0% | 0% | 0% | |
| Subtotal | $33.33 | $42.70 | $31.70 | $43.09 | $51.37 | |
| Size | 5% | -5% | 10% | 5% | 5% | |
| Shape | 0% | 0% | 0% | 0% | 0% | |
| Corner | 0% | 0% | 0% | 0% | 0% | |
| Frontage | 0% | 0% | 0% | -5% | -5% | |
| Topography | 0% | 0% | 0% | 0% | 0% | |
| Location | 10% | 0% | 0% | 0% | 0% | |
| Zoning/Density | 0% | 0% | 0% | 0% | 0% | |
| Utilities | 0% | 0% | 0% | 0% | 0% | |
| Highest & Best Use | 0% | 0% | 0% | 0% | 0% | |
| Total Other Adjustments | 15% | -5% | 10% | 0% | 0% | |
| **Value Indication for Subject** | **$38.33** | **$40.57** | **$34.87** | **$43.09** | **$51.37** | |
| Absolute Adjustment | 15% | 10% | 10% | 10% | 10% | |

[1] Adjusted sale price for cash equivalency and/or development costs (where applicable)
Compiled by CBRE

## Conclusion

Prior to adjustment, the comparables range from $31.70 to $51.37 per square foot with an average of $40.89 per square foot. After adjustment, the comparables range from $38.33 to $51.37 per square foot with an average of $41.65 per square foot.  In conclusion, a price per square foot indication towards the middle of the adjusted range was most appropriate for the subject. The following table presents the valuation conclusion:

| Surplus Land Value | | | | |
|---|---|---|---|---|
| $ PSF | | Subject SF | | Total |
| $40.00 | x | 10,454 | = | $418,160 |
| $45.00 | x | 10,454 | = | $470,430 |
| Rounded: | | | | $450,000 |
| | | (Rounded $ PSF) | | $43.05 |
| Compiled by CBRE | | | | |

# Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject.  A detailed description of each transaction is included in the addenda.



| | | | **SUMMARY OF COMPARABLE RETAIL SALES** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **No.** | **Property Name** | **Transaction Type** | **Transaction Date** | **Interest Transferred** | **YOC / Reno'd** | **Property Subtype** | **GLA (SF)** | **Actual Sale Price** | **Adjusted Sale Price [1]** | **Price Per SF [1]** | **Occ.** | **NOI Per SF** | **OAR** |
| 1 | Gandy Retail Center, 4005 West Gandy Boulevard Tampa, FL 33611 | Sale | Jun-24 | Leased Fee | 1974 / 1994 | Un-Anchored Retail Strip | 16,827 | $3,750,000 | $3,750,000 | $222.86 | 100% | $13.57 | 6.09% |
| 2 | John's Pass Retail, 13003 Village Boulevard Madeira Beach, FL 33708 | Sale | Dec-23 | Leased Fee | 1979 | Misc. Freestanding Retail | 4,240 | $1,700,000 | $1,800,000 | $424.53 | 64% | $25.66 | 6.04% |
| 3 | West Busch Boulevard Strip Retail, 2501 West Busch Boulevard Tampa, FL 33618 | Sale | Apr-23 | Leased Fee | 1966 | Un-Anchored Retail Strip | 4,589 | $1,025,000 | $1,025,000 | $223.36 | 100% | $14.90 | 6.67% |
| 4 | Largo Retail, 12955 Seminole Boulevard Largo, FL 33778 | Sale | May-23 | Leased Fee | 2018 | Un-Anchored Retail Strip | 13,046 | $3,469,000 | $3,469,000 | $265.91 | 85% | $17.94 | 6.75% |
| 5 | St. Petersburg Strip Plaza, 2930 - 2966 Dr Martin Luther King Jr Blvd. Saint Petersburg, FL 33704 | Sale | Apr-23 | Leased Fee | 1929 / 2001 | Un-Anchored Retail Strip | 5,455 | $1,400,000 | $1,400,000 | $256.65 | 100% | $18.44 | 7.18% |
| 6 | Citrus Falls Commons, 11901 Sheldon Road Tampa, FL 33626 | Sale | Sep-22 | Leased Fee | 2005 | Un-Anchored Retail Strip | 30,477 | $10,200,000 | $10,200,000 | $334.68 | 95% | $22.81 | 6.81% |
| Subj. Pro Forma | Safety Harbor Retail Center, 737 Main Street Safety Harbor, FL 34695 | --- | --- | --- | 1963 / 2019 | Freestanding Retail | 7,753 | --- | --- | --- | 95.00% | $22.79 | --- |

[1] Adjusted sale price for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

# Discussion/Analysis of Improved Sales

## Improved Sale One

This comparable represents a 16,827-square foot retail property (un-anchored retail strip center) located at 4005 West Gandy Boulevard in Tampa, Florida. The improvements were constructed in 1974, renovated in 1994 and are situated on a 0.96-acre site. The property is 100% leased and occupied by four local tenants: DOMA Home Furnishings (8,400 SF), Architectural Granite & Marble (2,526 SF), Dance Center (3,836 SF) and Depth Perception Dive Center (2,065 SF). The current tenant base at the property operates on short-term, NNN leases and each of the tenants are set to expire within the next 2.5 years. The property sold at a reported consideration of $3,750,000 or $222.86 per square foot. The current operating NOI reflects a cap rate of 6.09%.

Upon comparison with the subject, this comparable was considered inferior in terms of size and received an upward adjustment for this characteristic due to having significantly more square footage than the subject property.  In terms of age/condition, this comparable was judged inferior due to older construction and more long-lived physical deterioration and received an upward adjustment for this characteristic.  A functional utility category adjustment was considered appropriate for this comparable given the diminished functional utility of the subject given its unique layout.  Because of this superior trait, a downward adjustment was considered appropriate.  Overall, this comparable was deemed inferior in comparison to the subject and an upward net adjustment was warranted to the sales price indicator.

## Improved Sale Two

The comparable is a 4,240-square foot mixed-use retail and apartment property located at 13003 Village Blvd in Madeira Beach, Florida. The improvements were constructed in 1979 and are situated on a 0.09-acre site in a tourist attraction known as Johns Pass. The first floor features two retail units that are 1,360-square feet each with the second story featuring a 1,520-square foot three bedroom/two bathroom apartment. The upstairs had some fire damage and was restored; however, requires build-out of the interior prior to leasing. The two retail units are leased by month-to-month tenants and the tenants are considered local in nature. According to a prior appraisal report and the property records, the subject had fire damage in August of 2021 and was renovated in December 2021 for fire/smoke restoration at a cost of approximately $25,000. The interior of the apartment still needs to be built-out which the buyer projects three months to complete. The buyer stated that he believes he'd be able to renovate the apartment for $80,000 to $110,000. We have estimated that the cost to renovate the apartment to be $100,000 based the MVS cost manual. The buyer stated that the property is leased at $4,500 per month, triple net by the two retail tenants. It should be noted that the buyer is the brother of one of the tenants. The buyer's brother was approached by the current owner about purchasing the property and as such, it was not marketed.

The downward adjustment for location reflects this comparable's superior feature with respect to this comparables superior location in john's pass which features higher rents and surrounding land values.  In terms of age/condition, this comparable was judged inferior due to older construction and more long-lived physical deterioration and received an upward adjustment for this characteristic.  With respect to tenancy, this comparable was considered inferior in this aspect and received an upward adjustment because of the lower occupancy of this comparable.  A functional utility category adjustment was considered appropriate for this comparable given the diminished functional utility of the subject given its unique layout.  Because of this superior trait, a downward adjustment was considered appropriate.  Overall, this comparable was deemed superior in comparison to the subject and a downward net adjustment was warranted to the sales price indicator.

## Improved Sale Three

This comparable represents the sale of a 4,589-square foot strip retail building located at 2501 West Busch Boulevard in Tampa, Florida. The improvements were constructed in 1966 and are situated on a

0.41-acre site. The center is broken out into five suites and is in average overall condition. The property sold on April 14, 2023 at a 6.67% cap rate.

The upward adjustment for location reflects this comparable's inferior feature with respect to the subject's superior location in safety harbor which features higher rents and surrounding land values.  In terms of age/condition, this comparable was judged inferior due to older construction and more long-lived physical deterioration and received an upward adjustment for this characteristic.  A functional utility category adjustment was considered appropriate for this comparable given the diminished functional utility of the subject given its unique layout. Overall, this comparable was deemed inferior in comparison to the subject and an upward net adjustment was warranted to the sales price indicator.

### Improved Sale Four

This comparable represents a 13,046-square foot strip retail center located at 12955 Seminole Boulevard, at the signalized intersection of Seminole Boulevard and Lark Drive in Largo, Florida. The improvements were constructed in 2018 and the site features convenient access to Ulmerton Road, a major east-west Largo thoroughfare connecting Tampa Bay to the Gulf of Mexico. The location features a proposed single-story addition and proposed building with a drive-thru. The property sold for $3,469,000 or $265.91 per square foot at a 6.75% cap rate.

The upward adjustment for location reflects this comparable's inferior feature with respect to the subject's superior location in safety harbor which features higher rents and surrounding land values.  Upon comparison with the subject, this comparable was considered inferior in terms of size and received an upward adjustment for this characteristic due to having significantly more square footage than the subject property.  With respect to tenancy, this comparable was considered inferior in this aspect and received an upward adjustment because of the lower occupancy of this comparable.  A functional utility category adjustment was considered appropriate for this comparable given the diminished functional utility of the subject given its unique layout.  Overall, this comparable was deemed inferior in comparison to the subject and an upward net adjustment was warranted to the sales price indicator.

### Improved Sale Five

This is the April 2023 sale of a 2-building retail plaza located at the lighted intersection of Dr. Martin Luther King Jr. Street and 30th Avenue North. The property consists of a 3-unit strip plaza and a freestanding, full-service restaurant. It was 100% occupied at the time of sale. The primary difference between the net rentable area and gross building area is attributed to a covered patio utilized by the restaurant for outdoor dining purposes.

The upward adjustment for location reflects this comparable's inferior feature with respect to the subject's superior location in safety harbor which features higher rents and surrounding land values.  In terms of age/condition, this comparable was judged inferior due to older construction and more long-lived physical deterioration and received an upward adjustment for this characteristic.  A functional utility category adjustment was considered appropriate for this comparable given the diminished functional utility of the subject given its unique layout.  Overall, this comparable was deemed inferior in comparison to the subject and an upward net adjustment was warranted to the sales price indicator.

### Improved Sale Six

Citrus Falls Commons is a 30,477-square foot strip retail center located at 11959-11971 Sheldon Road in Tampa, Florida. The improvements were constructed in 2002 and are situated on a 6.24-acre site. The center features a diverse mix of local retailers, medical professionals, and restaurants. The property sold for $10,200,000 or $334.68 per square foot at a 6.81% cap rate. The buyer is a local Florida-based private investor.

Upon comparison with the subject, this comparable was considered inferior in terms of size and received an upward adjustment for this characteristic due to having significantly more square footage than the

subject property. A functional utility category adjustment was considered appropriate for this comparable given the diminished functional utility of the subject given its unique layout. Overall, this comparable was deemed inferior in comparison to the subject and an upward net adjustment was warranted to the sales price indicator.

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| RETAIL SALES ADJUSTMENT GRID | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | 5 | 6 | Subj. Pro Forma |
| Transaction Type | Sale | Sale | Sale | Sale | Sale | Sale | --- |
| Transaction Date | Jun-24 | Dec-23 | Apr-23 | May-23 | Apr-23 | Sep-22 | --- |
| Interest Transferred | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | --- |
| Year Built/Renovated | 1974 / 1994 | 1979 | 1966 | 2018 | 1929 / 2001 | 2005 | 1963 / 2019 |
| Property Subtype | Un-Anchored Retail Strip | Misc. Freestanding Retail | Un-Anchored Retail Strip | Un-Anchored Retail Strip | Un-Anchored Retail Strip | Un-Anchored Retail Strip | Freestanding Retail |
| GLA (SF) | 16,827 | 4,240 | 4,589 | 13,046 | 5,455 | 30,477 | 7,753 |
| Actual Sale Price | $3,750,000 | $1,700,000 | $1,025,000 | $3,469,000 | $1,400,000 | $10,200,000 | --- |
| Adjusted Sale Price [1] | $3,750,000 | $1,800,000 | $1,025,000 | $3,469,000 | $1,400,000 | $10,200,000 | --- |
| Price Per SF [1] | $222.86 | $424.53 | $223.36 | $265.91 | $256.65 | $334.68 | --- |
| Occupancy | 100% | 64% | 100% | 85% | 100% | 95% | 95% |
| NOI Per SF | $13.57 | $25.66 | $14.90 | $17.94 | $18.44 | $22.81 | $22.79 |
| OAR | 6.09% | 6.04% | 6.67% | 6.75% | 7.18% | 6.81% | --- |
| Adj. Price Per SF | $222.86 | $424.53 | $223.36 | $265.91 | $256.65 | $334.68 | |
| Property Rights Conveyed | 0% | 0% | 0% | 0% | 0% | 0% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | 0% | 0% | |
| Conditions of Sale | 0% | 0% | 0% | 0% | 0% | 0% | |
| Market Conditions (Time) | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Subtotal - Price Per SF | $222.86 | $424.53 | $223.36 | $265.91 | $256.65 | $334.68 | |
| Location | 0% | -10% | 10% | 10% | 5% | 0% | |
| Size | 5% | 0% | 0% | 5% | 0% | 10% | |
| Age/Condition | 5% | 5% | 10% | 0% | 5% | 0% | |
| Quality of Construction | 0% | 0% | 0% | 0% | 0% | 0% | |
| Parking | 0% | 0% | 0% | 0% | 0% | 0% | |
| Tenancy | 0% | 5% | 0% | 5% | 0% | 0% | |
| Funtional Utility | -5% | -5% | -5% | -5% | -5% | -5% | |
| Total Other Adjustments | 5% | -5% | 15% | 15% | 5% | 5% | |
| Indicated Value Per SF | $234.00 | $403.30 | $256.86 | $305.80 | $269.48 | $351.41 | |
| Absolute Adjustment | 15% | 25% | 25% | 25% | 15% | 15% | |

[1] Adjusted for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

## Secondary Sales Comparables

As the subject will be majority owner occupied upon closing we have also included the sales of similar single tenant retail properties that sold to end users which are located in major retail nodes. These sales indicate a range of $315.32 to $358.42 per square foot and an average of $326.42 per square foot and have been given secondary emphasis in our analysis.

## Retail Sale Summary

| No. | Primary Image | Name and Location<br>Gov./Tax ID | Property Subtype<br>Building Area<br>Land Area - Net<br>Year Built / Reno.<br>Floor Count<br>Parking Ratio | Buyer<br>Seller<br>Listing Broker<br>Selling Broker<br>Marketing Time<br>Verification | Trans. Type<br>Date<br>Interest Tran.<br>GLA Purchased | Adj. Sales Price<br>NOI<br>NIY/Cap Rt.<br>EGIM<br>Occ. At Sale<br>Price/Area | Detailed Map |
|---|---|---|---|---|---|---|---|
| 7 |  | 4th Street Retail<br>8461 4th Street North<br>Saint Petersburg, 33702<br>United States<br><br>30-30-17-75672-025-0350 | Misc. Freestanding Retail<br>4,185 sf<br>0.219 ac<br>1964<br>1<br>2.39/1,000 sf | Par Builders<br>Jill Bench<br>N/A<br>N/A<br>N/A<br>Deed | Sale<br>10/2022<br>Fee Simple/Freehold<br>N/A | $1,500,000<br>N/A<br>N/A<br>N/A<br>100%<br>$358.42/sf |  |
| | | Primary Static Analysis Method | N/A | | | | |
| 8 |  | La Segunda Bakery<br>5150 North Florida Avenue<br>Tampa, 33603<br>United States<br><br>164991-0000 | Misc. Freestanding Retail<br>6,300 sf<br>0.425 ac<br>1953<br>1<br>3.17/1,000 sf | N/A<br>N/A<br>N/A<br>N/A<br>N/A<br>Deed | Sale<br>04/2022<br>Fee Simple/Freehold<br>N/A | $1,950,000<br>N/A<br>N/A<br>N/A<br>100%<br>$309.52/sf |  |
| | | Primary Static Analysis Method | N/A | | | | |
| 9 |  | Henderson Retail<br>4227 Henderson Boulevard<br>Tampa, 33629<br>United States<br><br>120052-0100 | Misc. Freestanding Retail<br>4,032 sf<br>0.286 ac<br>1965<br>1<br>2.98/1,000 sf | N/A<br>N/A<br>Property Pro, 813-8335-7747<br>N/A<br>N/A<br>Deed | Sale<br>04/2023<br>Fee Simple/Freehold<br>N/A | $1,300,000<br>N/A<br>N/A<br>N/A<br>100%<br>$322.42/sf |  |
| | | Primary Static Analysis Method | N/A | | | | |
| 10 |  | Former West Coast Kayaks<br>3350 Tyrone Boulevard<br>Saint Petersburg, FL 33710<br>United States<br><br>07-31-16-49914-001-0080 | Misc. Freestanding Retail<br>5,550 sf<br>0.604 ac<br>1996 / 2016<br>1<br>0.00/1,000 sf | Arthur Murray Dance Centers<br>N/A<br>Bridgewater Commercial Real Estate, 813-541-4254<br>N/A<br>N/A<br>Deed | Sale<br>07/2023<br>Fee Simple/Freehold<br>5,550 sf | $1,750,000<br>N/A<br>N/A<br>N/A<br>100%<br>$315.32/sf |  |
| | | Primary Static Analysis Method | N/A | | | | |

## Sale Price Per Square Foot Conclusion

After adjustment the comparables indicate a value range from $234.00  to $403.30 per square foot and an average of $303.48  per square foot.  Equal weight has been placed on all of the comparables with secondary emphasis placed on the fee simple retail sales.  The following chart presents the valuation conclusion:

| **SALES COMPARISON APPROACH** | | | | |
|---|---|---|---|---|
| **GLA (SF)** | **X** | **Value Per SF** | **=** | **Value** |
| 7,753 | X | $310.00 | = | $2,403,430 |
| 7,753 | X | $340.00 | = | $2,636,020 |

| **VALUE CONCLUSION** | |
|---|---|
| **Indicated Stabilized Value** | $2,500,000 |
| **Rounded** | **$2,500,000** |
| Leased Fee Adjustment | (30,000) |
| **Indicated Value As Is** | **2,470,000** |
| **Rounded** | **$2,450,000** |
| **Value Per SF** | **$316.01** |

Compiled by CBRE

# Income Capitalization Approach

The following map and table summarize the primary comparable data used in the valuation of the subject. A detailed description of each transaction is included in the addenda.



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **SUMMARY OF COMPARABLE RETAIL RENTALS** | | | | | | | | | | |
| No. | Property Name and Location | YOC / Reno'd | Property Type | Tenant Name | Lease Area (SF) | Lease Date | Lease Term | Base Rent | Reimbursements | Reimbursement Rent Adjustment | Modified Gross Rent |
| 1 | 380 Park Place 380 Park Place Boulevard, Clearwater, FL 33759 | 2001 | Office | Available Available Boos Development Hestia Healthcare | 11,805 3,107 8,000 5,319 | Oct-24 Mar-24 Oct-23 Jan-23 | 5.0 Yrs. 5.0 Yrs. 3.3 Yrs. 2.0 Yrs. | $28.00 PSF $28.00 PSF $27.50 PSF $27.00 PSF | Full Service Full Service Full Service Full Service | ($2.75) ($2.75) ($2.75) ($2.75) | $25.25 PSF $25.25 PSF $24.75 PSF $24.25 PSF |
| 2 | Countryside Corporate Centre 2536 Countryside Boulevard, Clearwater, FL 33763 | 1974 / 2020 | Office | Available Available Raymond James Ziebell Realty | 2,135 15,546 7,294 2,165 | May-24 May-24 Nov-23 Sep-23 | 3.0 Yrs. 5.0 Yrs. 7.0 Yrs. 3.2 Yrs. | $24.00 PSF $24.00 PSF $24.00 PSF $24.00 PSF | Full Service Full Service Full Service Full Service | ($2.75) ($2.75) ($2.75) ($2.75) | $21.25 PSF $21.25 PSF $21.25 PSF $21.25 PSF |
| 3 | Plaza 935 935 Main Street, Safety Harbor, FL 34695 | 1980 | Office | Office User | 800 | Jun-24 | 5.0 Yrs. | $33.00 PSF | Modified Gross | $0.00 | $33.00 PSF |
| 4 | Dog Bar 660 2nd Street, Safety Harbor, FL 34695 | 0 | Retail | Dog Bar | 1,000 | Jun-23 | 5.0 Yrs. | $30.00 PSF | NNN | $9.25 | $39.25 PSF |
| 5 | 318 Main Street 318 Main Street, Safety Harbor, FL 34695 | 1955 | Retail | Spice of the Harbor | 750 | Oct-20 | 5.0 Yrs. | $29.00 PSF | NNN | $9.25 | $38.25 PSF |
| 6 | Northwood Oaks Shopping Center 2519 McMullen Booth Road, Clearwater, FL 33761 | 1984 / 2003 | Retail | Manga Tea | 788 | Jan-24 | 5.0 Yrs. | $30.00 PSF | NNN | $9.25 | $39.25 PSF |
| Subj. | Safety Harbor Retail Center 737 Main Street, Safety Harbor, Florida | 1963 / 2019 | Retail | | | | | --- | --- | | |

Compiled by CBRE

## Discussion/Analysis of Rent Comparables

The majority of the retail comparables are leased on a triple net basis (NNN) whereby the tenants are responsible their prorate share of operating expenses. For comparison purposes, we have adjusted the comparable which are leased on a NNN basis upward to a modified gross basis similar to that of the subject. The total estimated expenses of the subject are approximately $12.00, however, approximately $2.75 of these expenses are reimbursed. We have utilized these adjustments for our comparables.

Comparables 1 through 3 represent office rent comparables in the subject market and reflect an adjusted for expenses range of $21.25 to $33.00 per square foot on a modified gross basis. Based on the subjects characteristics we would anticipate the subject office rent to fall towards the middle to upper end of the range, or $30.00 per square foot on a modified gross basis.

Comparables 4 through 6 represent retail rental rates in the subject market and reflect an adjusted for expenses range of $38.25 to $39.25 per square foot on modified gross basis. Based on the subjects characteristics we would anticipate the subject retail rent to fall towards the lower end of the range for the middle size suites and the middle to upper end of the range for the smaller suites, or $38.00 and $39.00 per square foot respectively on a modified gross basis.

## Market Rent Conclusions

The following chart shows the market rent conclusions for the subject:

| MARKET RENT CONCLUSIONS | | | |
|---|---|---|---|
| Category | Retail Space - Medium | Retail Space - Small | Office Space |
| Gross Leasable Area (SF) | 3,789 | 437 | 3,527 |
| Percent of Total SF | 48.9% | 5.6% | 45.5% |
| Market Rent ($/SF/Yr.) | $38.00 | $39.00 | $30.00 |
| Reimbursements | Modified Gross | Modified Gross | Modified Gross |
| Escalations | 3%/Yr. | 3%/Yr. | 3%/Yr. |
| Average Lease Term | 60 Months | 60 Months | 60 Months |
| Compiled by CBRE | | | |

## Rent Roll Analysis

The subject's rent roll is illustrated as follows:

| | | | | | | | | | Market Rent | | Market | Contract Rent | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RENT ROLL ANALYSIS FOR SAFETY HARBOR RETAIL CENTER | | | | | | | | | | | | | |
| Suite No. | Tenant | Tenant Type | Lease Start | Lease Expiration | Term (Mos.) | Size (GLA) SF | % Total | $/SF/Yr. | $/Yr. | Expense Basis | $/SF/Yr. | $/Yr. |
| A/B | Gigglewaters Restaurant | Retail Space - Medium | Mar-22 | Feb-27 | 60 | 3,018 | 38.9% | $38.00 | $114,684 | Modified Gross | $22.64 | $68,329 |
| C | Tamar Dupre Salon | Retail Space - Medium | Apr-16 | May-26 | 122 | 771 | 9.9% | $38.00 | $29,298 | Modified Gross | $24.62 | $18,984 |
| D1 | OfficeWerks | Office Space | N/A | N/A | N/A | 2,031 | 26.2% | $30.00 | $60,930 | Modified Gross | | N/A Owner Occupied |
| D2 | Ice Barr | Retail Space - Small | Aug-21 | Sep-25 | 50 | 437 | 5.6% | $39.00 | $17,043 | Modified Gross | $34.32 | $15,000 |
| D3 | Fiduciary Tax & Accounting Services | Office Space | N/A | N/A | N/A | 1,496 | 19.3% | $30.00 | $44,880 | Modified Gross | | N/A Owner Occupied |
| Occupied Subtotals | | | | | | 7,753 | 100.0% | | | | $13.20 | $102,313 |
| Property Totals - Contract Rent | | | | | | 7,753 | 100.0% | | | | $13.20 | $102,313 |
| Property Totals - Market Rent | | | | | | 7,753 | 100.0% | $34.42 | $266,835 | | $34.42 | |
| Compiled by CBRE | | | | | | | | | | | | |

As mentioned, the owner currently occupies Suites D1 and D3, or approximately 3,527 square feet which equates to 45.50% of the subject property. Upon closing the buyer will assume the two current owner-occupied units totaling 3,527 square feet. Therefore, 6,545 square feet or 84.4% of the property will be owner-occupied upon closing.

For purposes of this analysis, we have applied market rent for the owner-occupied suites. In addition, the leased suites are all deemed to be below market. We have therefore utilized market rent for the leased spaces and have deducted the rent loss shortfall over the remaining term below the line. Therefore, the we have entirely utilized market rent for the subject and have deducted the rent shortfall of the remaining terms of the below market leases.

Based on these factors, we have estimated a total potential rental income of $266,835 or $34.42 per square foot on a modified gross basis for Year 1.

## Potential Rental Income Conclusion

Within this analysis, potential rental income is estimated based upon the forward looking market rent.

| POTENTIAL RENTAL INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| **CBRE Estimate** | **$266,835** | **$34.42** |
| Compiled by CBRE | | |

## Operating History

Although requested, we were not provided a detailed operating history or budget for the subject property. As previously mentioned, the subject leases are structed where the tenant reimburses for electric and utilities in addition to a base year stop reimbursement for property taxes and insurance. The expense reimbursement category includes utilities, property tax, and insurance bill back income, as a result of the increases over base year stops.

## Vacancy and Credit Loss

The subject's estimated stabilized occupancy rate was previously discussed in the market analysis.  The credit loss estimate is an allowance for nonpayment of rent or other income. The subject's vacancy and credit loss is detailed as follows:

| VACANCY & CREDIT LOSS | | |
|---|---|---|
| Year | Total | % of PGI |
| **CBRE Estimate** | **($16,010)** | **6.0%** |
| Compiled by CBRE | | |

## Expense Reimbursements

The subject's leases are based on a modified gross basis where the tenants pay their pro rata share of electric and utilities in addition to their pro rata share of increases over a base year stop reimbursement for property taxes and insurance.

## Effective Gross Income

The subject's effective gross income is detailed as follows:

| EFFECTIVE GROSS INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| **CBRE Estimate** | **$269,238** | **$34.73** |
| Compiled by CBRE | | |

## Operating Expense Analysis

### Expense Comparables

The following chart summarizes expenses obtained from comparable properties. The comparable data and projections for the subject are summarized as follows:

| EXPENSE COMPARABLES | | | | |
|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | Subject |
| Location | Florida | Florida | Florida | Safety Harbor, FL |
| GLA (SF) | 25,185 | 28,515 | 74,824 | 7,753 |
| Period | 2023 | 2023 | 2022 | Pro Forma |
| *Revenues* | $/SF | $/SF | $/SF | $/SF |
| **Effective Gross Income** | **$53.37** | **$43.34** | **$8.54** | **$34.73** |
| *Expenses* | | | | |
|     Real Estate Taxes | $6.34 | $4.69 | $3.04 | $4.04 |
|     Property Insurance | $1.89 | $1.98 | $2.07 | $2.00 |
|     Common Area Maintenance | $4.42 | $4.41 | $6.70 | $4.75 |
|     Management Fee | $1.34 | $1.14 | $0.93 | $1.04 |
|     Replacement Reserves | $0.46 | $0.37 | $0.10 | $0.10 |
| **Total Operating Expenses** | **$14.45** | **$12.59** | **$12.84** | **$11.94** |
| Compiled by CBRE | | | | |

The subject's per square foot operating expense pro forma is in line with the total per square foot operating expenses indicated by the expense comparables.

## Operating Expenses

The comparable data and projections for the subject are summarized as follows:

| TOTAL OPERATING EXPENSES | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| Expense Comparable 1 | --- | $14.45 |
| Expense Comparable 2 | --- | $12.59 |
| Expense Comparable 3 | --- | $12.84 |
| **CBRE Estimate** | **$92,544** | **$11.94** |
| Compiled by CBRE | | |

## Net Operating Income Conclusion

The comparable data and projections for the subject are summarized as follows:

| NET OPERATING INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| **CBRE Estimate** | **$176,695** | **$22.79** |
| Compiled by CBRE | | |

## Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication.

### Comparable Sales

The overall capitalization rates (OARs) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:

| | | COMPARABLE CAPITALIZATION RATES | | | |
|---|---|---|---|---|---|
| Sale | Sale Date | Sale Price $/SF | Occupancy | Buyer's Primary Analysis | OAR |
| 1 | Jun-24 | $222.86 | 100% | Trailing Actuals | 6.09% |
| 2 | Dec-23 | $424.53 | 64% | Pro Forma (Stabilized) | 6.04% |
| 3 | Apr-23 | $223.36 | 100% | Trailing Actuals | 6.67% |
| 4 | May-23 | $265.91 | 85% | Trailing Actuals | 6.75% |
| 5 | Apr-23 | $256.65 | 100% | Trailing Actuals | 7.18% |
| **Indicated OAR:** | | | 94% | | **6.04%-7.18%** |
| Compiled by CBRE | | | | | |

### Published Investor Surveys

The results of the most recent investor surveys are summarized in the following chart.

### OVERALL CAPITALIZATION RATES

| Investment Type | OAR Range | Average |
|---|---|---|
| *CBRE Urban Office* | | |
| Class A | 6.00% - 12.00% | 8.32% |
| Class B | 7.50% - 14.00% | 9.43% |
| Class C | 8.50% - 16.00% | 11.19% |
| *RealtyRates.com* | | |
| Retail | 5.95% - 14.22% | 9.93% |
| Anchored | 5.95% - 12.94% | 10.14% |
| Un-Anchored | 6.49% - 14.22% | 10.81% |
| Free Standing | 6.22% - 13.58% | 10.48% |
| Convenience/Gas | 6.63% - 13.74% | 8.44% |
| *PwC Net Lease* | | |
| National Data | 6.25% - 9.00% | 7.51% |
| **Indicated OAR:** | | **6.25% - 7.50%** |
| Compiled by CBRE | | |

## Band of Investment

The band of the investment technique has been utilized as a crosscheck to the foregoing techniques. The Mortgage Interest Rate and the Equity Dividend Rate (EDR) are based upon current market yields for similar investments.  The analysis is shown in the following table.

### BAND OF INVESTMENT

| | | | | |
|---|---|---|---|---|
| Mortgage Interest Rate | 6.00% | | | |
| Mortgage Term (Amortization Period) | 30 Years | | | |
| Mortgage Ratio (Loan-to-Value) | 70% | | | |
| Mortgage Constant (monthly payments) | 0.07195 | | | |
| Equity Dividend Rate (EDR) | 7.00% | | | |
| | | | | |
| Mortgage Requirement | 70% | x | 0.07195 = | 0.05037 |
| Equity Requirement | 30% | x | 0.07000 = | 0.02100 |
| | 100% | | | 0.07137 |
| **Indicated OAR:** | | | | **7.10%** |
| Compiled by CBRE | | | | |

## Debt Coverage Ratio

The debt coverage ratio (DCR) is the ratio of net operating income to annual debt service and measures the ability of a given property to meet its debt service out of net operating income. Utilizing data obtained from knowledgeable mortgage finance professionals, the subject's projected NOI can be tested for reasonableness against the market's typical loan parameters to determine whether or not the DCR is positive.  This analysis is shown in the following table.

| DEBT COVERAGE RATIO ANALYSIS | |
|---|---|
| Estimated As Is Value | $2,700,000 |
| Mortgage Ratio (Loan-to-Value) | 70% |
| Estimated Mortgage Loan Amount | $1,890,000 |
| Mortgage Interest Rate | 6.00% |
| Mortgage Term (Amortization Period) | 30 Years |
| Mortgage Constant (monthly payments) | 0.07195 |
| Annual Debt Service (monthly payments) | $135,978 |
| Estimated NOI | $176,695 |
| Estimated Debt Coverage Ratio (DCR) | 1.30 |
| Market Debt DCR | 1.30 |
| Positive DCR? (Y or N) | No |
| Compiled by CBRE | |

## Capitalization Rate Conclusion

The following chart summarizes the OAR conclusions.

| OVERALL CAPITALIZATION RATE - CONCLUSION | |
|---|---|
| Source | Indicated OAR |
| Comparable Sales | 6.04%-7.18% |
| Published Surveys | 6.25% - 7.50% |
| Band of Investment | 7.10% |
| **CBRE Estimate** | **6.50%** |
| Compiled by CBRE | |

Overall, an OAR in the middle portion of the range is considered appropriate due to upward trending interest rates which are causing cap rates to increase.

We have also considered recent events and prevailing market conditions with respect to capitalization rates. This includes a combination of inflationary pressures and higher cost of capital (considering interest rates as well as risk spreads). While the overall long-term outlook for commercial real estate remains positive, the full effect of these factors may not yet be reflected in transactional data. Overall, we view uncertainty and the higher cost of capital to have an upward influence on capitalization rates which is considered with respect to our conclusion herein.

## Leased Fee Adjustment

As was discussed previously in this report, we have concluded that the subject has a below market rental rate in place currently on the leased suites.  In this analysis, we have utilized market rent to arrive at the hypothetical "fee simple" value for the subject property.  We then accounted for the "below market rent" over the remaining lease term based upon the difference between current market rent and in place rent. We discounted the "below market rent" over the remaining terms of the leases to arrive at the indicated leased fee adjustment to apply in order to arrive at an indicated "leased fee" value for the subject in this analysis.  The leased fee adjustment charts are shown below.

### LEASED FEE ADJUSTMENT ANALYSIS

| Suite C | | 771 | Market Rent ($/SF) | | $38.00 |
|---|---|---|---|---|---|
| Base Discount Rate | | 8.50% | Current Rent ($/SF) | | $24.62 |
| Rent Escalation Per Year | | 3.00% | | | |
| Year | Market Rent | Scheduled Rent | Indicated Loss | Discount Factor | Net Present Value |
| 1 | $29,298 | $18,984 | -$10,314 | 0.9217 | -$9,506 |
| 2 | $30,177 | $19,554 | -$10,623 | 0.8495 | -$9,024 |
| 3 | $15,541 | $10,070 | -$5,471 | 0.7829 | -$4,283 |
| **Total Income Loss (PV):** | | | | | -$22,813 |
| **TOTAL LEASED FEE ADJUSTMENT (ROUNDED):** | | | | | $22,800 |
| *Rent Escalation is based on historical levels at approximately 3% every year | | | | | |
| Compiled by: CBRE | | | | | |

### LEASED FEE ADJUSTMENT ANALYSIS

| Suite D2 | | 437 | Market Rent ($/SF) | | $39.00 |
|---|---|---|---|---|---|
| Base Discount Rate | | 8.50% | Current Rent ($/SF) | | $28.60 |
| Rent Escalation Per Year | | 3.00% | | | |
| Year | Market Rent | Scheduled Rent | Indicated Loss | Discount Factor | Net Present Value |
| 1 | $17,043 | $12,500 | -$4,543 | 0.9217 | -$4,187 |
| **Total Income Loss (PV):** | | | | | -$4,187 |
| **TOTAL LEASED FEE ADJUSTMENT (ROUNDED):** | | | | | $4,200 |
| *Rent Escalation is based on historical levels at approximately 3% every year | | | | | |
| Compiled by: CBRE | | | | | |

### Leased Fee Adjustment

| Tenant | Adjustment |
|---|---|
| Suite C | ($22,800) |
| Suite D2 | ($4,200) |
| **Total** | ($27,000) |
| **Rounded** | **($30,000)** |
| Compiled by CBRE | |

In order to determine the Leased Fee value, you must deduct the Leased Fee Adjustment to the Fee Simple Value.

## Direct Capitalization Summary

A summary of the direct capitalization is illustrated in the following chart.

## DIRECT CAPITALIZATION SUMMARY

| Income | | $/SF/Yr | Total |
|---|---|---|---|
| Potential Rental Income | | $34.42 | $266,835 |
| Vacancy & Credit Loss | 6.00% | (2.07) | (16,010) |
| **Net Rental Income** | | **$32.35** | **$250,825** |
| Expense Reimbursements | | 2.38 | 18,413 |
| **Effective Gross Income** | | **$34.73** | **$269,238** |
| | | | |
| **Expenses** | | | |
| Real Estate Taxes | | $4.04 | $31,359 |
| Property Insurance | | 2.00 | 15,506 |
| Common Area Maintenance | | 4.75 | 36,827 |
| Management Fee | 3.00% | 1.04 | 8,077 |
| Replacement Reserves | | 0.10 | 775 |
| **Total Operating Expenses** | | **$11.94** | **$92,544** |
| Operating Expenses Excluding Taxes | | $8 | $61,185 |
| **Operating Expense Ratio** | | | 34.37% |
| **Net Operating Income** | | **$22.79** | **$176,695** |
| **OAR** | | ÷ | **6.50%** |
| **Indicated Fee Simple Value** | October 31, 2024 | | **$2,718,377** |
| **Rounded** | | | **$2,725,000** |
| Leased Fee Adjustment | | | (30,000) |
| **Indicated Value As Is - Leased Fee** | October 31, 2024 | | **$2,688,377** |
| **Rounded** | | | **$2,700,000** |
| **Value Per SF** | | | **$348.25** |

Compiled by CBRE

# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

| SUMMARY OF VALUE CONCLUSIONS | | | | | |
|---|---|---|---|---|---|
| Appraisal Premise | As of Date | Land Value | Sales Comparison Approach | Income Approach | Reconciled Value |
| As Is | October 31, 2024 | | $2,320,000 | $2,700,000 | $2,700,000 |
| As Is - Excess Land | October 31, 2024 | $450,000 | N/A | N/A | $450,000 |
| Compiled by CBRE | | | | | |

In the sales comparison approach, the subject is compared to similar properties that have been sold recently or for which listing prices or offers are known.  The sales used in this analysis are considered highly comparable to the subject. In addition, market participants are currently analyzing purchase prices on investment properties as they relate to available substitutes in the market.  Therefore, the sales comparison approach is considered to provide a reliable value indication but has been given secondary emphasis in the final value reconciliation.

The income capitalization approach is applicable to the subject since it is an income producing property leased in the open market.  Market participants are primarily analyzing properties based on their income generating capability.  Therefore, the income capitalization approach is considered a reasonable and substantiated value indicator and has been given primary emphasis in the final value estimate.

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | October 31, 2024 | $2,700,000 |
| As Is - Surplus Land | Fee Simple Estate | October 31, 2024 | $450,000 |
| Compiled by CBRE | | | |

# Assumptions and Limiting Conditions

1.  CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.

2.  The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3.  Unless otherwise expressly noted in the Report, CBRE has assumed that:

    (i)     Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

    (ii)    Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

    (iii)   Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

    (iv)    Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

    (v)     No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

    (vi)    There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

    (vii)   All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

    (viii)  The subject property is managed and operated in a prudent and competent manner, neither inefficiently, nor super-efficiently.

    (ix)    The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

    (x)     The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

(xi)  All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property, nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report and any conclusions stated therein. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4.  CBRE has assumed that all documents, data and information furnished by or on behalf of the client, property owner or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report and any conclusions stated therein. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5.  CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including, without limitation, any termite inspection, survey or occupancy permit.

6.  All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7.  Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. This Report has been prepared in good faith, based on CBRE's current anecdotal and evidence-based views of the commercial real estate market. Although CBRE believes its views reflect market conditions on the date of this Report, they are subject to significant uncertainties and contingencies, many of which are beyond CBRE's control. In addition, many of CBRE's views are opinion and/or projections based on CBRE's subjective analyses of current market circumstances. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections. Further, other firms may have different opinions, projections and analyses, and actual market conditions in the future may cause CBRE's current views to later change or be incorrect. CBRE has no obligation to update its views herein if its opinions, projections, analyses or market circumstances later change.

8.  The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9.  No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge including, but not limited to, environmental, social, and governance principles ("ESG"), beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10.  CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.

13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.

15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

# Addenda

# Addendum A

## Land Sale Data Sheets

| Sale | Land - Retail / Commercial | No. 1 |
|------|---------------------------|-------|

| | |
|---|---|
| Property Name | Clearwater Commercial Site |
| Address | 28660 US Highway 19 N<br>Clearwater, FL 33761<br>United States |
| Government Tax Agency | Pinellas |
| Govt./Tax ID | 19-28-16-00000-310-0400 |



### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.689 | 30,000 |
| Land Area Gross | 0.689 | 30,000 |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| | |
|---|---|
| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| | | |
|---|---|---|
| Frontage Distance/Street | 100 ft | US Hwy 19 |
| Frontage Distance/Street | 300 ft | Curlew Ave |
| Frontage Distance/Street | 100 ft | Myrtle St |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | CP, Commercial Parkway |
| Entitlement Status | N/A |

## Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Countryside Glass & Mirror Inc. | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | End User |
| Recorded Seller | Chong Ku & Y.H., LLC | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Listing Broker |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Office | Date | 3/8/2024 |
| Proposed Use | Commercial | Sale Price | $1,000,000 |
| Listing Broker | Mike Heley | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $1,000,000 |
| Doc # | 22729/1 | Capital Adjustment | $0 |
| | | Adjusted Price | $1,000,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 03/2024 | Sale | Countryside Glass & Mirror Inc. | Chong Ku & Y.H., LLC | $1,000,000 | $1,452,011 / $33.33 |



| Sale | Land – Retail / Commercial | No. 1 |
|---|---|---|

**Units of Comparison**

| | |
|---|---|
| $33.33  / sf | N/A  / Unit |
| $1,452,011.04  / ac | N/A  / Allowable Bldg. Units |
| | N/A  / Building Area |

**Financial**

<b>No information recorded</b>

**Map & Comments**



This comparable represents a 0.69-acre site that is located at 28660 US Hwy 19 N in Clearwater, Florida. This rectangular shaped site features CP zoning allowing for a wide range of uses. The site was improved with a small 1,272-square foot office space that was built in 1956; however, this property was purchased for the land value and the improvements would be demolished for redevelopment, according to the broker.  Any contributory value of the existing improvements is considered to be offset by demolition costs.  The site features frontage and direct access off of US Highway 19, a primary commercial thoroughfare for the area featuring traffic counts of 102,000 vehicles per day. The property was purchased for $1,000,000 or $33.33 per square foot of land area.



| Available/Listing | Land - Retail / Commercial | No. 2 |
| --- | --- | --- |

| Property Name | 900 22nd Ave Land |
| --- | --- |
| Address | 900 22nd Avenue East Land |
| | Tampa, FL 33605 |
| | United States |



| Government Tax Agency | Hillsborough |
| --- | --- |
| Govt./Tax ID | 186581-0000 |

**Site/Government Regulations**

| | Acres | Square feet |
| --- | --- | --- |
| Land Area Net | 0.126 | 5,473 |
| Land Area Gross | 0.126 | 5,473 |

| Site Development Status | Raw |
| --- | --- |
| Shape | Irregular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| Maximum FAR | N/A |
| --- | --- |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| General Plan | N/A |
| --- | --- |
| Specific Plan | N/A |
| Zoning | CG, Commercial General |
| Entitlement Status | N/A |

**Sale Summary**

| Recorded Buyer | Confidential | Marketing Time | 18 Month(s) |
| --- | --- | --- | --- |
| True Buyer | N/A | Buyer Type | Developer |
| Recorded Seller | Raul C. Rodriguez Trustee | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | N/A |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Available/Listing |
| Current Use | Vacant Land | Date | 11/10/2024 |
| Proposed Use | Commercial | Sale Price | $246,000 |
| Listing Broker | N/A | Financing | N/A |
| Selling Broker | N/A | Cash Equivalent | $246,000 |
| Doc # | TBD | Capital Adjustment | $0 |
| | | Adjusted Price | $246,000 |

**Transaction Summary plus Five-Year CBRE View History**

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
| --- | --- | --- | --- | --- | --- |
| 11/2024 | Available/Listing | Confidential | Raul C. Rodriguez Trustee | $246,000 | $1,958,599 / $44.95 |



## Available/Listing            Land - Retail / Commercial            No. 2

### Units of Comparison

|  |  |
|---|---|
| $44.95  / sf | N/A  / Unit |
| $1,958,598.73  / ac | N/A  / Allowable Bldg. Units |
|  | N/A  / Building Area |

### Financial

**No information recorded**

### Map & Comments



This comparable represents a former contract on a 0.126-acre, 5,473-square foot, vacant site located at 900 22nd Avenue in Tampa, Florida. The site is currently listed for $246,000, or $44.95 per square foot of land area and was previously under contract for a reported consideration of $246,000, to a confidential buyer in May 2023. The site is zoned CG-Commercial General and is expected to be developed with commercial uses.



| Sale | Land - Retail / Commercial | No. 3 |
|---|---|---|

| Property Name | 2305 Nebraska Ave Land |
|---|---|
| Address | 2305 Nebraska Avenue |
| | Tampa, FL 33602 |
| | United States |

| Government Tax Agency | Hillsborough |
|---|---|
| Govt./Tax ID | Multiple |

**Site/Government Regulations**



| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.978 | 42,587 |
| Land Area Gross | 0.978 | 42,587 |

| Site Development Status | Raw |
|---|---|
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | N/A |

| Maximum FAR | N/A |
|---|---|
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| General Plan | N/A |
|---|---|
| Specific Plan | N/A |
| Zoning | YC-5 |
| Entitlement Status | N/A |

| **Sale Summary** | | | |
|---|---|---|---|
| Recorded Buyer | Shiver Ybor Properties, Inc | Marketing Time | 8 Month(s) |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Freeman Family Properties, LLC | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Deed |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 8/26/2022 |
| Proposed Use | Commercial | Sale Price | $1,350,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $1,350,000 |
| Doc # | 2022503835 | Capital Adjustment | $0 |
| | | Adjusted Price | $1,350,000 |

| **Transaction Summary plus Five-Year CBRE View History** | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Transaction Type** | **Buyer** | **Seller** | **Price** | **Price/ac and /sf** |
| 08/2022 | Sale | Shiver Ybor Properties, Inc | Freeman Family Properties, LLC | $1,350,000 | $1,380,792 / $31.70 |



## Sale | Land – Retail / Commercial | No. 3

### Units of Comparison

| | |
|---|---|
| $31.70  / sf | N/A  / Unit |
| $1,380,791.65  / ac | N/A  / Allowable Bldg. Units |
| | N/A  / Building Area |

### Financial

**No information recorded**

### Map & Comments



This comparable represents the sale of 3 parcels located at 2305 North Nebraska Avenue in Tampa, Florida. In total, the site is 0.977-acres (42,587-square feet) and is zoned YC-5. The site sold in August 2022 for $1,350,000, or $31.70 per square foot to Shiver Ybor Properties, Inc for redevelopment into a commercial use.



| Sale | Land - Retail / Commercial | No. 4 |
|------|----------------------------|-------|



**Property Name**  Commercial Land
**Address**  7925 4th St N
St. Petersburg, FL 33702
United States

**Government Tax Agency**  Pinellas
**Govt./Tax ID**  Multiple

**Site/Government Regulations**

|  | Acres | Square feet |
|--|-------|-------------|
| Land Area Net | 0.453 | 19,724 |
| Land Area Gross | 0.453 | 19,724 |

| Site Development Status | Finished |
|-------------------------|----------|
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All access |

| Maximum FAR | N/A |
|-------------|-----|
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| Frontage Distance/Street | 120 ft  4th St N |
|--------------------------|------------------|
| Frontage Distance/Street | 160 ft  80th Ave N |

| General Plan | N/A |
|--------------|-----|
| Specific Plan | N/A |
| Zoning | CCS-1 (Corridor Commercial Suburban) and NT-1 (Neighborhood Traditional Single-Family) |
| Entitlement Status | N/A |

## Sale Summary

| Recorded Buyer | ONC Realty, LLC | Marketing Time | N/A |
|----------------|-----------------|----------------|-----|
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | Bruce Evensen | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Listing Broker |

| Interest Transferred | Fee Simple/Freehold | Type | Sale |
|----------------------|---------------------|------|------|
| Current Use | Commercial | Date | 7/6/2022 |
| Proposed Use | Redevelopment | Sale Price | $850,000 |
| Listing Broker | Peter Bursik | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $850,000 |
| Doc # | 22416/1128 | Capital Adjustment | $0 |
|  |  | Adjusted Price | $850,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|------------------|------------------|-------|--------|-------|------------------|
| 07/2022 | Sale | ONC Realty, LLC | Bruce Evensen | $850,000 | $1,877,208 / $43.09 |



| Sale | Land - Retail / Commercial | No. 4 |
|---|---|---|

**Units of Comparison**

| | | | |
|---|---|---|---|
| $43.09 | / sf | N/A | / Unit |
| $1,877,208.48 | / ac | N/A | / Allowable Bldg. Units |
| | | N/A | / Building Area |

**Financial**

**No information recorded**

**Map & Comments**



This comparable represents a retail/office building located at 7925 4th St, Saint Petersburg, Florida. The 2,404-square foot improvements were built in 1948 and are situated on 0.45-acres. The broker stated that the property was sold for the purpose of redevelopment. The property was acquired for $850,000 or $43.09 per square foot. The seller was represented by Peter Bursik of Rainier Realty, Inc..



| Sale | Land - Retail / Commercial | No. 5 |
|---|---|---|



**Property Name**   Proposed Scooter's Coffee
**Address**   9299 4th Street North
Saint Petersburg, FL 33702
United States

**Government Tax Agency**   Pinellas
**Govt./Tax ID**   19-30-17-64924-001-0010

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.360 | 15,672 |
| Land Area Gross | 0.360 | 15,672 |

| | |
|---|---|
| Site Development Status | Raw |
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | N/A |

| | |
|---|---|
| Maximum FAR | 0.23 |
| Min Land to Bldg Ratio | 4.33:1 |
| Maximum Density | N/A |

| | | |
|---|---|---|
| Frontage Distance/Street | 114 ft | 4th Street North |
| Frontage Distance/Street | 105 ft | 93rd Ave N |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | CCS-1, Commercial Corridor Suburban |
| Entitlement Status | N/A |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Smart Starz, LLC | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | McKay Creek Land, LLC | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Deed |

| | | | |
|---|---|---|---|
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Vacant | Date | 5/26/2022 |
| Proposed Use | Retail | Sale Price | $805,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $805,000 |
| Doc # | 2022171581 | Capital Adjustment | $0 |
| | | Adjusted Price | $805,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 05/2022 | Sale | Smart Starz, LLC | McKay Creek Land, LLC | $805,000 | $2,237,354 / $51.37 |



| Sale | Land - Retail / Commercial | No. 5 |

### Units of Comparison

| | |
|---|---|
| $51.37 / sf | N/A / Unit |
| $2,237,354.09 / ac | N/A / Allowable Bldg. Units |
| | $222.50 / Building Area |

### Financial

**No information recorded**

### Map & Comments



This comparable is a 0.3598-acre (15,672 square foot) vacant commercial land site located at 9299 4th Street North in Saint Petersburg, Pinellas County, Florida. The property was purchased for development of a 3,618 square foot Scooter's Coffee restaurant. The property in March 2021 for $805,000 which equates to or $51.37 per square foot of site area or $222.50 per square foot of proposed building area.



# Addendum B

## Improved Sale Data Sheets

© 2024 CBRE, INC

| Sale | Retail - Un-Anchored Retail Strip | No. 1 |
| --- | --- | --- |

| Property Name | Gandy Retail Center |
| --- | --- |
| Address | 4005 West Gandy Boulevard |
| | Tampa, FL 33611 |
| | United States |



| Government Tax Agency | N/A |
| --- | --- |
| Govt./Tax ID | 129170-0000 |

**Site/Government Regulations**

| | Acres | Square feet |
| --- | --- | --- |
| Land Area Net | 0.958 | 41,740 |
| Land Area Gross | 0.958 | 41,740 |
| Excess Land Area | N/A | N/A |

| Site Development Status | Finished |
| --- | --- |
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All |

| Maximum Floor Area | N/A |
| --- | --- |
| Maximum FAR | N/A |
| Actual FAR | 0.40 |

| Frontage Distance/Street | 205 ft West Gandy Boulevard |
| --- | --- |

| Zoning | CI, Commercial Intensive |
| --- | --- |
| General Plan | N/A |

| Improvements | | | |
| --- | --- | --- | --- |
| Gross Leasable Area (GLA) | 16,827 sf | Floor Count | 1 |
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 3.09/1,000 sf |
| Year Built | 1974 | Condition | Average |
| Year Renovated | 1994 | Exterior Finish | Masonry |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

| Sale Summary | | | |
| --- | --- | --- | --- |
| Recorded Buyer | FL Real Estate Fund 2, LP | Marketing Time | N/A |
| True Buyer | Amherst Plaza Real Estate | Buyer Type | Private Investor |
| Recorded Seller | H S W Associates, Inc. | Seller Type | Private Investor |
| True Seller | | Primary Verification | CBRE Appraisal, PSA, Franklin Street |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | N/A | Date | 6/3/2024 |
| Proposed Use | N/A | Sale Price | $3,750,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $3,750,000 |
| Doc # | 2024234758 | Capital Adjustment | $0 |
| | | Adjusted Price | $3,750,000 |



| Sale | Retail - Un-Anchored Retail Strip | No. 1 |
|---|---|---|

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 06/2024 | Sale | FL Real Estate Fund 2, LP | H S W Associates, Inc. | $3,750,000 | $222.86 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 6.09% | Adjusted Price / sf | $222.86 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $3,750,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $228,366 |
| NOI / sf | $13.57 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 6.09% |

### Map & Comments



This comparable represents a 16,827-square foot retail property (un-anchored retail strip center) located at 4005 West Gandy Boulevard in Tampa, Florida. The improvements were constructed in 1974, renovated in 1994 and are situated on a 0.96-acre site. The property is 100% leased and occupied by four local tenants: DOMA Home Furnishings (8,400 SF), Architectural Granite & Marble (2,526 SF), Dance Center (3,836 SF) and Depth Perception Dive Center (2,065 SF). The current tenant base at the property operates on short-term, NNN leases and each of the tenants are set to expire within the next 2.5 years. The property sold at a reported consideration of $3,750,000 or $222.86 per square foot. The current operating NOI reflects a cap rate of 6.09%.



| Sale | Retail - Misc. Freestanding Retail | No. 2 |
|---|---|---|

**Property Name** John's Pass Retail
**Address** 13003 Village Boulevard
Madeira Beach, FL 33708
United States

**Government Tax Agency** Pinellas
**Govt./Tax ID** 15-31-15-97812-000-0110

### Site/Government Regulations

|  | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.092 | 4,000 |
| Land Area Gross | 0.092 | 4,000 |
| Excess Land Area | N/A | N/A |

| Site Development Status | Finished |
|---|---|
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All access |

| Maximum Floor Area | N/A |
|---|---|
| Maximum FAR | N/A |
| Actual FAR | 1.06 |

| Frontage Distance/Street | 40 ft  Village Blvd |
|---|---|
| Frontage Distance/Street | 40 ft  Pelican Ln |

| Zoning | C-1 Tourist Commercial |
|---|---|
| General Plan | N/A |



## Improvements

| Gross Leasable Area (GLA) | 4,240 sf | Floor Count | 2 |
|---|---|---|---|
| Status | Existing | Parking Type | On-Street |
| Occupancy Type | Multi-tenant | Parking Ratio | 1.42/1,000 sf |
| Year  Built | 1979 | Condition | Average |
| Year Renovated | N/A | Exterior Finish | Concrete Block |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |

| Anchor | N/A |
|---|---|
| Junior Anchor | N/A |
| National | N/A |

## Sale Summary

| Recorded Buyer | Alex Bousfiha | Marketing Time | N/A |
|---|---|---|---|
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Parob LTD | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Buyer |

| Interest Transferred | Leased Fee | Type | Sale |
|---|---|---|---|
| Current Use | Retail and Apartment | Date | 12/21/2023 |
| Proposed Use | Retail and Apartment | Sale Price | $1,700,000 |
| Listing Broker | None | Financing | Market Rate Financing |
| Selling Broker | None | Cash Equivalent | $1,700,000 |
| Doc # | TBD | Capital Adjustment | $0 |
| | | Adjusted Price | $1,800,000 |

CBRE

| Sale | Retail - Misc. Freestanding Retail | No. 2 |
|---|---|---|

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 12/2023 | Sale | Alex Bousfiha | Parob LTD | $1,700,000 | $400.94 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 6.04% | Adjusted Price / sf | $424.53 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 64% | | |

### Financial

| Revenue Type | Pro Forma Stabilized |
|---|---|
| Period Ending | N/A |
| Source | Buyer |
| Price | $1,800,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $108,800 |
| NOI / sf | $25.66 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 6.04% |

### Map & Comments



The comparable is a 4,240-square foot mixed-use retail and apartment property located at 13003 Village Blvd in Madeira Beach, Florida. The improvements were constructed in 1979 and are situated on a 0.09-acre site in a tourist attraction known as Johns Pass. The first floor features two retail units that are 1,360-square feet each with the second story featuring a 1,520-square foot three bedroom/two bathroom apartment. The upstairs had some fire damage and was restored; however, requires build-out of the interior prior to leasing. The two retail units are leased by month-to-month tenants and the tenants are considered local in nature. According to a prior appraisal report and the property records, the subject had fire damage in August of 2021 and was renovated in December 2021 for fire/smoke restoration at a cost of approximately $25,000. The interior of the apartment still needs to be built-out which the buyer projects three months to complete. The buyer stated that he believes he'd be able to renovate the apartment for $80,000 to $110,000. We have estimated that the cost to renovate the apartment to be $100,000 based the MVS cost manual. The buyer stated that the property was leased at $4,500 per month, triple net by the two retail tenants. It should be noted that the buyer is the brother of one of the tenants. The buyer's brother was approached by the current owner about purchasing the property and as such, it was not marketed.

CBRE

| Sale | Retail - Un-Anchored Retail Strip | No. 3 |
|---|---|---|

| Property Name | West Busch Boulevard Strip Retail |
| Address | 2501 West Busch Boulevard |
| | Tampa, FL 33618 |
| | United States |
| | |
| Government Tax Agency | Hillsborough |
| Govt./Tax ID | A-22-28-18-158-000002-00010.0, U-22-28-18-158-000002-00010.1 |



### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.410 | 17,860 |
| Land Area Gross | 0.410 | 17,860 |
| Excess Land Area | N/A | N/A |

| Site Development Status | Finished |
|---|---|
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| Maximum Floor Area | N/A |
|---|---|
| Maximum FAR | N/A |
| Actual FAR | 0.29 |

| Zoning | Commercial |
|---|---|
| General Plan | N/A |

### Improvements

| Gross Leasable Area (GLA) | 4,589 sf | Floor Count | 1 |
|---|---|---|---|
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 0.00/1,000 sf |
| Year Built | 1966 | Condition | Average |
| Year Renovated | N/A | Exterior Finish | Masonry |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| | | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

### Sale Summary

| Recorded Buyer | Roshan Hospitality #5 | Marketing Time | N/A |
|---|---|---|---|
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | H S W Associates Inc | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Deed, Marcus & Millichap |
| | | | |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | N/A | Date | 4/14/2023 |
| Proposed Use | N/A | Sale Price | $1,025,000 |
| Listing Broker | N/A | Financing | N/A |
| Selling Broker | N/A | Cash Equivalent | $1,025,000 |
| Doc # | 2023164228 | Capital Adjustment | $0 |
| | | Adjusted Price | $1,025,000 |



| Sale | Retail - Un-Anchored Retail Strip | No. 3 |
|------|-----------------------------------|-------|

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 04/2023 | Sale | Roshan Hospitality #5 | H S W Associates Inc | $1,025,000 | $223.36 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 6.67% | Adjusted Price / sf | $223.36 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $1,025,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $68,370 |
| NOI / sf | $14.90 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 6.67% |

### Map & Comments



This comparable represents the sale of a 4,589-square foot strip retail building located at 2501 West Busch Boulevard in Tampa, Florida. The improvements were constructed in 1966 and are situated on a 0.41-acre site. The center is broken out into five suites and is in average overall condition. The property sold on April 14, 2023 at a 6.67% cap rate.



| Sale | Retail - Un-Anchored Retail Strip | No. 4 |
|---|---|---|



**Property Name** Largo Retail
**Address** 12955 Seminole Boulevard
Largo, FL 33778
United States

**Government Tax Agency** Pinellas
**Govt./Tax ID** 10-30-15-00000-130-0200

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 2.010 | 87,556 |
| Land Area Gross | 2.010 | 87,556 |
| Excess Land Area | N/A | N/A |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.15 |

| | |
|---|---|
| Zoning | Commercial |
| General Plan | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 13,046 sf | Floor Count | 1 |
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 0.00/1,000 sf |
| Year Built | 2018 | Condition | Good |
| Year Renovated | N/A | Exterior Finish | Masonry |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | REM Properties VII, LLC | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | N/A | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Cushman & Wakefield |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | N/A | Date | 5/26/2023 |
| Proposed Use | N/A | Sale Price | $3,469,000 |
| Listing Broker | N/A | Financing | N/A |
| Selling Broker | N/A | Cash Equivalent | $3,469,000 |
| Doc # | 22457-0757 | Capital Adjustment | $0 |
| | | Adjusted Price | $3,469,000 |



| Sale | Retail - Un-Anchored Retail Strip | No. 4 |
| --- | --- | --- |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
| --- | --- | --- | --- | --- | --- |
| 05/2023 | Sale | REM Properties VII, LLC | N/A | $3,469,000 | $265.91 |

### Units of Comparison

| | | | |
| --- | --- | --- | --- |
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 6.75% | Adjusted Price / sf | $265.91 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 85% | | |

### Financial

| Revenue Type | Trailing Actuals |
| --- | --- |
| Period Ending | N/A |
| Source | N/A |
| Price | $3,469,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $234,000 |
| NOI / sf | $17.94 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 6.75% |

### Map & Comments



This comparable represents a 13,046-square foot strip retail center located at 12955 Seminole Boulevard, at the signalized intersection of Seminole Boulevard and Lark Drive in Largo, Florida. The improvements were constructed in 2018 and the site features convenient access to Ulmerton Road, a major east-west Largo thoroughfare connecting Tampa Bay to the Gulf of Mexico. The location features a proposed single-story addition and proposed building with a drive-thru. The property sold for $3,469,000 or $265.91 per square foot at a 6.75% cap rate.



| Sale | Retail - Un-Anchored Retail Strip | No. 5 |
|---|---|---|

Property Name    St. Petersburg Strip Plaza
Address    2930 - 2966 Dr Martin Luther King Jr Blvd.
   Saint Petersburg, FL 33704
   United States

Government Tax Agency    Pinellas
Govt./Tax ID    12-31-16-69570-002-0100, 12-31-16-69570-002-0110



**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.520 | 22,651 |
| Land Area Gross | 0.520 | 22,651 |
| Excess Land Area | N/A | N/A |

| Site Development Status | Finished |
|---|---|
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| Maximum Floor Area | N/A |
|---|---|
| Maximum FAR | N/A |
| Actual FAR | 0.24 |

| Zoning | Commercial |
|---|---|
| General Plan | N/A |

## Improvements

| Gross Leasable Area (GLA) | 5,455 sf | Floor Count | 1 |
|---|---|---|---|
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 0.00/1,000 sf |
| Year Built | 1929 | Condition | Average |
| Year Renovated | 2001 | Exterior Finish | Masonry |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

## Sale Summary

| Recorded Buyer | MGK Real Estate 1, LLC | Marketing Time | N/A |
|---|---|---|---|
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Arthur Charles Hanson | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Deed, Rahhul Gupta - Buyer |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | | Date | 4/6/2023 |
| Proposed Use | N/A | Sale Price | $1,400,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $1,400,000 |
| Doc # | 22403/1462 | Capital Adjustment | $0 |
| | | Adjusted Price | $1,400,000 |



| Sale | Retail - Un-Anchored Retail Strip | No. 5 |
|---|---|---|

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 04/2023 | Sale | MGK Real Estate 1, LLC | Arthur Charles Hanson | $1,400,000 | $256.65 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Price (Primary Unit of Comparison) | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 7.18% | Adjusted Price / sf | $256.65 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $1,400,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $100,566 |
| NOI / sf | $18.44 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 7.18% |

### Map & Comments



This is the April 2023 sale of a 2-building retail plaza located at the lighted intersection of Dr. Martin Luther King Jr. Street and 30th Avenue North. The property consists of a 3-unit strip plaza and a freestanding, full-service restaurant. It was 100% occupied at the time of sale. The primary difference between the net rentable area and gross building area is attributed to a covered patio utilized by the restaurant for outdoor dining purposes.



| Sale | Retail - Un-Anchored Retail Strip | No. 6 |
| --- | --- | --- |

| Property Name | Citrus Falls Commons |
| --- | --- |
| Address | 11901 Sheldon Road |
| | Tampa, FL 33626 |
| | United States |

| Government Tax Agency | Hillsborough |
| --- | --- |
| Govt./Tax ID | 003558.5500 |



**Site/Government Regulations**

| | Acres | Square feet |
| --- | --- | --- |
| Land Area Net | 6.240 | 271,814 |
| Land Area Gross | N/A | N/A |
| Excess Land Area | N/A | N/A |

| Site Development Status | Finished |
| --- | --- |
| Shape | Rectangular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| Maximum Floor Area | N/A |
| --- | --- |
| Maximum FAR | N/A |
| Actual FAR | 0.11 |

| Zoning | Commercial |
| --- | --- |
| General Plan | N/A |

## Improvements

| Net Rentable Area (NRA) | 30,477 sf | Floor Count | 1 |
| --- | --- | --- | --- |
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 0.00/1,000 sf |
| Year Built | 2005 | Condition | Average |
| Year Renovated | N/A | Exterior Finish | Masonry |
| Total Anchor Rentable Area | N/A | Number of Buildings | 2 |
| Total In Line Rentable Area | 34,000 sf | | |

| Anchor | N/A |
| --- | --- |
| Junior Anchor | N/A |
| National | N/A |

## Sale Summary

| Recorded Buyer | PengCheng, LLC | Marketing Time | N/A |
| --- | --- | --- | --- |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | CFC Syndicate LLC | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Deed, LandQwest |

| Interest Transferred | Leased Fee | Type | Sale |
| --- | --- | --- | --- |
| Current Use | | Date | 9/21/2022 |
| Proposed Use | N/A | Sale Price | $10,200,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $10,200,000 |
| Doc # | 2022461515 | Capital Adjustment | $0 |
| | | Adjusted Price | $10,200,000 |



| Sale | Retail - Un-Anchored Retail Strip | No. 6 |
|---|---|---|

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 09/2022 | Sale | PengCheng, LLC | CFC Syndicate LLC | $10,200,000 | $334.68 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 6.81% | Adjusted Price / sf | $334.68 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 95% | | |

### Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $10,200,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $695,043 |
| NOI / sf | $22.81 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 6.81% |

### Map & Comments



Citrus Falls Commons is a 30,477-square foot strip retail center located at 11959-11971 Sheldon Road in Tampa, Florida. The improvements were constructed in 2002 and are situated on a 6.24-acre site. The center features a diverse mix of local retailers, medical professionals, and restaurants. The property sold for $10,200,000 or $334.68 per square foot at a 6.81% cap rate. The buyer is a local Florida-based private investor.



# Addendum C

## Rent Comparable Data Sheets

© 2024 CBRE, INC

| Comparable | Office - Multi Tenant | No. 1 |
|---|---|---|

| | | |
|---|---|---|
| Property Name | 380 Park Place | |
| Address | 380 Park Place Boulevard | |
| | Clearwater, FL 33759 | |
| | United States | |
| | | |
| Government Tax Agency | Pinellas | |
| Govt./Tax ID | 17-29-16-00000-230-0100 | |



**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 5.919 | 257,819 |
| Land Area Gross | 6.809 | 296,587 |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Irregular |
| Topography | Level, At Street Grade |
| Utilities | All available |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.33 |

| | |
|---|---|
| Frontage Distance/Street | 60 ft  Internal access drive |
| Frontage Distance/Street | 142 ft  US19 Service Road |

| | |
|---|---|
| Zoning | US 19 (Regional Center) |
| General Plan | N/A |

## Improvements

| | | | |
|---|---|---|---|
| Primary Building Area | 84,642 sf | Floor Count | 3 |
| Net Rentable Area (NRA) | 84,642 sf | Parking Type | Surface |
| Usable Area | N/A | Parking Ratio | 4.42/1,000 sf |
| Load Factor | N/A | Condition | Average |
| Status | Existing | Exterior Finish | Tilt-up Concrete |
| Occupancy Type | Multi-tenant | Investment Class | B |
| Year  Built | 2001 | Number of Buildings | 1 |
| Year Renovated | N/A | | |
| Amenities | N/A | | |

## Contact

| | | | |
|---|---|---|---|
| Recorded Owner | Reva Clearwater, LLC | Leasing Agent | Matt Alexander |
| True Owner | Reva Properties | Company | Franklin Street |

## Rental Survey

| | | | |
|---|---|---|---|
| Occupancy | 96% | Tenant Size | 3,107 - 11,805 sf |
| | | Lease Term | 60 Mo(s). |
| Reimbursements | Full Service | Annual Base Rent | $28.00 per sf |
| Rent Changes/Steps | 3% per year | Free Rent | 0 - 4 Mo(s). |
| Survey Date | 11/2024 | TI Allowance | $0.00 - $25.00 per sf |
| Survey Notes | N/A | Reimbursement Amount | N/A |
| | | Total Oper. & Fixed Exp. | $10.46 per sf |



| Comparable | Office - Multi Tenant | No. 1 |
|---|---|---|

**Actual Leases**

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Annual Base Rate per sf | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Available | Office | 11,805 | 60 | Available | 10/1/2024 | $28.00 | Full Service | 3% per year | N/A | N/A |
| Available | Office | 3,107 | 60 | Available | 3/1/2024 | $28.00 | Full Service | 3.0% per year | N/A | N/A |
| Boos Development | Office | 8,000 | 40 | New | 10/1/2023 | $27.50 | Full Service | 3.0% per year | 4 | $15.00 |
| Hestia Healthcare | Office | 5,319 | 62 | New | 1/1/2023 | $27.00 | Full Service | 3.0% per year | 2 | $5.00 |

**Map & Comments**


 Map data ©2024 Google

This property is an 84,642-square foot, three-story, suburban office building located at 380 Park Place Boulevard in Clearwater, Florida. The improvements were constructed in 2001 and are situated on a 6.81-acre site. The building is currently 96% occupied with one vacant space.  This space is being offered at $28.00 per square foot, on a full-service basis with a base year stop on all operating expenses.  The leasing agent stated that a typical lease would include a five-year term with up to four months of free rent and up to $25 per square foot in tenant improvement allowances.

CBRE

| Comparable | Office - Multi Tenant | No. 2 |
|---|---|---|

| | |
|---|---|
| Property Name | Countryside Corporate Centre |
| Address | 2536 Countryside Boulevard |
| | Clearwater, FL 33763 |
| | United States |
| | |
| Government Tax Agency | Pinellas |
| Govt./Tax ID | 30-28-16-00000-430-0200 |



**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 4.000 | 174,240 |
| Land Area Gross | 4.000 | 174,240 |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Irregular |
| Topography | Generally Level |
| Utilities | All available |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.53 |

| | |
|---|---|
| Frontage Distance/Street | 252 ft Countryside Blvd |
| Frontage Distance/Street | 348 ft U.S. Hwy 19 |

| | |
|---|---|
| Zoning | US 19 (Regional Center) |
| General Plan | N/A |

**Improvements**

| | | | |
|---|---|---|---|
| Primary Building Area | 91,518 sf | Floor Count | 6 |
| Net Rentable Area (NRA) | 81,977 sf | Parking Type | Surface |
| Usable Area | N/A | Parking Ratio | 4.00/1,000 sf |
| Load Factor | N/A | Condition | Average |
| Status | Existing | Exterior Finish | Stucco |
| Occupancy Type | Multi-tenant | Investment Class | B |
| Year Built | 1974 | Number of Buildings | 1 |
| Year Renovated | 2020 | | |
| Amenities | On-Site Management | | |

**Contact**

| | | | |
|---|---|---|---|
| Recorded Owner | Countryside Towers, LLC | Leasing Agent | Rick Williams |
| True Owner | Grove Gate Financial | Company | Main Street Real Estate |

**Rental Survey**

| | | | |
|---|---|---|---|
| Occupancy | 53% | Tenant Size | 2,135 - 15,546 sf |
| Reimbursements | Full Service | Lease Term | 36 - 60 Mo(s). |
| Rent Changes/Steps | 3% per year | Annual Base Rent | $24.00 per sf |
| Survey Date | 05/2024 | Free Rent | 0 - 4 Mo(s). |
| Survey Notes | N/A | TI Allowance | $0.00 - $38.00 per sf |
| | | Reimbursement Amount | N/A |
| | | Total Oper. & Fixed Exp. | $8.50 per sf |



| Comparable | Office - Multi Tenant | | | | | | | | No. 2 |
|:---|:---:|---|---|---|---|---|---|---|---:|

**Actual Leases**

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Annual Base Rate per sf | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Available | Office | 15,546 | 60 | Available | 5/1/2024 | $24.00 | Full Service | 3% per year | N/A | N/A |
| Available | Office | 2,135 | 36 | Available | 5/1/2024 | $24.00 | Full Service | 3% per year | N/A | N/A |
| Raymond James | Office | 7,294 | 84 | New | 11/1/2023 | $24.00 | Full Service | 3% per year | 4 | N/A |
| Ziebell Realty | Office | 2,165 | 38 | New | 9/1/2023 | $24.00 | Full Service | 3% per year | 2 | $18.00 |

**Map & Comments**




This property is an 81,977-square foot, six-story, suburban office building located at 2536 Countryside Boulevard in Clearwater, Florida. The improvements were constructed in 1974, renovated in 2020-2023 and are situated on a 4.0-acre site. The property has a surface parking lot with a ratio of four spaces per 1,000-square feet of rentable area. The property was acquired by ownership in November 2019 and has been undergoing renovations and lease-up. The first round of renovations included upgrades to the lobby, elevators, HVAC and signage. More recent renovations included the replacement of the roof and renovation of the commons areas and restrooms. It was reported that the vacant space is dated as the prior owner had not been providing any tenant improvement allowances. The current asking rent for vacant spaces (ranging from 2,135 to 15,546 square feet) is $24.00 per square foot, full-service with a base year stop. Tenant improvement allowances and free rent are negotiable based on the tenant strength and lease term.



| Comparable | Office - Multi Tenant | No. 3 |
|---|---|---|

| | |
|---|---|
| Property Name | Plaza 935 |
| Address | 935 Main Street |
| | Safety Harbor, FL 34695 |
| | United States |
| Government Tax Agency | Pinellas |
| Govt./Tax ID | N/A |



**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 2.240 | 97,574 |
| Land Area Gross | 2.240 | 97,574 |

| | |
|---|---|
| Site Development Status | N/A |
| Shape | Rectangular |
| Topography | Generally Level |
| Utilities | All available |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | N/A |

| | |
|---|---|
| Zoning | SR-1 |
| General Plan | N/A |

**Improvements**

| | | | |
|---|---|---|---|
| Primary Building Area | N/A | Floor Count | 1 |
| Net Rentable Area (NRA) | N/A | Parking Type | Surface |
| Usable Area | N/A | Parking Ratio | N/A |
| Load Factor | N/A | Condition | Average |
| Status | Existing | Exterior Finish | Stucco |
| Occupancy Type | Multi-tenant | Investment Class | N/A |
| Year Built | 1980 | Number of Buildings | 1 |
| Year Renovated | N/A | | |
| Amenities | N/A | | |

**Contact**

| | | | |
|---|---|---|---|
| Recorded Owner | N/A | Leasing Agent | N/A |
| True Owner | N/A | Company | N/A |

**Rental Survey**

| | | | |
|---|---|---|---|
| Occupancy | 100% | | |
| | | Tenant Size | 800 sf |
| Reimbursements | Modified Gross | Lease Term | 60 Mo(s). |
| Rent Changes/Steps | 3%/Year | Annual Base Rent | $33.00 per sf |
| Survey Date | 11/2024 | Free Rent | N/A |
| Survey Notes | N/A | TI Allowance | N/A |
| | | Reimbursement Amount | N/A |
| | | Total Oper. & Fixed Exp. | N/A |



## Comparable — Office - Multi Tenant — No. 3

### Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Annual Base Rate per sf | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Office User | Office | 800 | 60 | New | 6/1/2024 | $33.00 | Modified Gross | 3%/Year | N/A | N/A |

### Map & Comments



| Comparable | Retail – Misc. Freestanding Retail | No. 4 |
|---|---|---|

**Property Name** Dog Bar
**Address** 660 2nd Street
Safety Harbor, FL 34695
United States

**Government Tax Agency** Pinellas
**Govt./Tax ID** 03-29-16-84295-004-0040

**Site/Government Regulations**



| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.110 | 4,792 |
| Land Area Gross | 0.110 | 4,792 |
| Excess Land Area | N/A | N/A |

| Site Development Status | N/A |
|---|---|
| Shape | Rectangular |
| Topography | N/A |
| Utilities | All available |

| Maximum Floor Area | N/A |
|---|---|
| Maximum FAR | N/A |
| Actual FAR | 0.43 |

| Zoning | N/A |
|---|---|
| General Plan | N/A |

**Improvements**

| | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 2,050 sf | Floor Count | N/A |
| Status | Existing | Parking Type | Surface |
| Occupancy Type | N/A | Parking Ratio | 0.00/1,000 sf |
| Year Built | N/A | Condition | N/A |
| Year Renovated | N/A | Exterior Finish | N/A |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

**Contact**

| | | | |
|---|---|---|---|
| Recorded Owner | N/A | Leasing Agent | N/A |
| True Owner | N/A | Company | N/A |

**Rental Survey**

| | | | |
|---|---|---|---|
| Occupancy | 100% | Tenant Size | 1,000 - 1,050 sf |
| In Line Retail Occupancy | N/A | Lease Term | 60 Mo(s). |
| Reimbursements | NNN | Annual Base Rent | $30.00 per sf |
| Rent Changes/Steps | 3%/Year | Free Rent | N/A |
| Survey Date | 11/2024 | TI Allowance | N/A |
| Survey Notes | N/A | Reimbursement Amount | N/A |
| | | Total Oper. & Fixed Exp. | N/A |



## Comparable    Retail - Misc. Freestanding Retail    No. 4

### Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Annual Base Rate per sf | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Dog Bar | Retail | 1,000 | 60 | New | 6/3/2023 | $30.00 | NNN | 3%/Year | N/A | N/A |

### Map & Comments



CBRE

| Comparable | Retail – Misc. Freestanding Retail | No. 5 |
|---|---|---|



**Property Name** 318 Main Street
**Address** 318 Main Street
Safety Harbor, FL 34695
United States

**Government Tax Agency** Pinellas
**Govt./Tax ID** 03-29-16-33372-014-0011

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.070 | 3,049 |
| Land Area Gross | 0.070 | 3,049 |
| Excess Land Area | N/A | N/A |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Rectangular |
| Topography | Generally Level |
| Utilities | All available |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.40 |

| | |
|---|---|
| Zoning | C-1 |
| General Plan | N/A |

| Improvements | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 1,208 sf | Floor Count | 1 |
| Status | Existing | Parking Type | N/A |
| Occupancy Type | Multi-tenant | Parking Ratio | 0.00/1,000 sf |
| Year Built | 1955 | Condition | Average |
| Year Renovated | N/A | Exterior Finish | N/A |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

| Contact | | | |
|---|---|---|---|
| Recorded Owner | N/A | Leasing Agent | N/A |
| True Owner | N/A | Company | N/A |

| Rental Survey | | | |
|---|---|---|---|
| Occupancy | 40% | Tenant Size | 750 sf |
| In Line Retail Occupancy | N/A | Lease Term | 36 - 60 Mo(s). |
| Reimbursements | NNN | Annual Base Rent | $29.00 per sf |
| Rent Changes/Steps | 3%/Yr. | Free Rent | N/A |
| Survey Date | 03/2022 | TI Allowance | N/A |
| Survey Notes | N/A | Reimbursement Amount | N/A |
| | | Total Oper. & Fixed Exp. | N/A |



| Comparable | Retail - Misc. Freestanding Retail | No. 5 |
|---|---|---|

**Actual Leases**

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Annual Base Rate per sf | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Spice of the Harbor | Retail | 750 | 60 | New | 10/1/2020 | $29.00 | NNN | 3%/Yr. | N/A | N/A |

**Map & Comments**



This comparable is a 1,208 square foot two tenant retail property located at 318 Main Street in downtown Safety Harbor. The improvements were constructed in 1955 and are situated on a 0.07 acre site. A retail tenant signed a lease in October of 2020 at a rate of $29.00 per square foot on a triple net basis for a 5 year term.

CBRE

| Comparable | Retail – Neighborhood / Community | No. 6 |
|---|---|---|

Property Name | Northwood Oaks Shopping Center
Address | 2519 McMullen Booth Road
 | Clearwater, FL 33761
 | United States



Government Tax Agency | Pinellas
Govt./Tax ID | 28/28/16/00000/340/0300

**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 8.377 | 364,880 |
| Land Area Gross | 8.377 | 364,880 |
| Excess Land Area | N/A | N/A |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Irregular |
| Topography | Level, At Street Grade |
| Utilities | All Available |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.24 |

| | | |
|---|---|---|
| Frontage Distance/Street | 477 ft | Enterprise Rd |
| Frontage Distance/Street | 450 ft | McMullen Booth Rd |

| | |
|---|---|
| Zoning | C-1A (Restricted Commercial) |
| General Plan | N/A |

| Improvements | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 86,775 sf | Floor Count | 1 |
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 4.15/1,000 sf |
| Year Built | 1984 | Condition | Average |
| Year Renovated | 2003 | Exterior Finish | Concrete Block |
| Total Anchor Rentable Area | 35,315 sf | Number of Buildings | 1 |
| Total In Line Rentable Area | 51,460 sf | | |
| Anchor | Winn Dixie | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

| Contact | | | |
|---|---|---|---|
| Recorded Owner | ECA Elle Northwood Partners, LLC | Leasing Agent | Allison Almerico |
| True Owner | N/A | Company | East Coast Acquisitions |

| Rental Survey | | | |
|---|---|---|---|
| Occupancy | 96% | Tenant Size | 975 sf |
| In Line Retail Occupancy | 94% | Lease Term | 60 Mo(s). |
| Reimbursements | NNN | Annual Base Rent | $30.00 per sf |
| Rent Changes/Steps | CPI | Free Rent | 0 Mo(s). |
| Survey Date | 11/2024 | TI Allowance | $0.00 per sf |
| Survey Notes | N/A | Reimbursement Amount | $6.00 per sf |
| | | Total Oper. & Fixed Exp. | N/A |



| Comparable | Retail - Neighborhood / Community | No. 6 |
|---|---|---|

**Actual Leases**

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Annual Base Rate per sf | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Manga Tea | Retail | 788 | 60 | New | 1/1/2024 | $30.00 | NNN | N/A | N/A | N/A |
| Floyd's 99 Barbershop | Retail | 1,600 | 120 | New | 4/1/2023 | $30.00 | NNN | N/A | N/A | N/A |

**Map & Comments**



Northwood Oaks Shopping Center is a 86,775-square foot shopping center is located at 2519 McMullen Booth Road, the northeast corner of Enterprise and McMullen Booth Road in Clearwater, Florida, across from Northwood Plaza. The improvements were constructed in 1984, renovated in 2003, and are situated on an 8.38-acre site. The building is oriented toward McMullen Booth Road and has above average exposure per being positioned on a corner lot. Multiple points of ingress/egress on both streets allow for easy access to and from the center. The center currently is 96% leased. Available space at the center is being marketed at $30.00 per square foot, NNN.



# Addendum D

## Legal Description

# Addendum E

## Client Contract Information



**ENGAGEMENT LETTER**

10/18/2024

Kristin Repp
Report Signatory: Kristin Repp, MAI
CBRE [FLORIDA]
111 W Oak Ave, Suite 100
Tampa, Florida 33602

Borrower Name(s):  Wilson ETBF
Property Address: 737 MAIN ST, Safety Harbor, Florida, 34695

Dear Kristin Repp,

This letter authorizes you to provide appraisal services in accordance with the terms and conditions stated herein, in compliance with minimum standards of the Uniform Standards of Professional Appraisal Practice (USPAP), Title XI of FIRREA. Questions regarding the assignment or preparation of the report should be directed to Leslie McKeon, MAI at (727) 210-4341.

Basic assignment information as follows:

| | |
|---|---|
| **File No:** | 32894 |
| **Appraisal Fee:** | $3,500 |
| **Due Date:** | 11/08/2024, immediately contact Leslie McKeon, MAI in the event of access or other delays expected to impact timely assignment completion and delivery. Due date extensions are granted at sole discretion of Valley Bank, effective only when confirmed in writing or by issuance of a revised engagement letter. |
| **Payment of Fee:** | Payment will be made by Valley Bank after acceptance of the assignment. Valley Bank reserves the right to accept or reject the assignment, if rejected, the bank would not be responsible for payment of fees or expenses incurred. Disclaimers or other verbiage limiting professional liability to service fees or other unauthorized amounts is unacceptable. Unauthorized delivery delays could result in fee deductions up to $150.00 per day. |
| **Property Address:** | 737 MAIN ST, Safety Harbor, Florida, 34695 |
| **Parcel #:** | 03-29-16-96498-027-0080 |
| **Lot #:** | |
| **Block:** | |
| **Property Type:** | Neighborhood Shopping Center |
| **Multiple Buildings on Property:** | No |
| **# of Buildings:** | 1 |
| **Ownership Type:** | Owner Occupied & Leased |
| **Borrowers Name(s):** | Wilson ETBF |
| **Property Contact:** | Rachel Wilson, (212) 203-2449,  , |
| | *Valley Bank is your client, the property contact, borrower or other parties outside of the bank are not. Inspection must be scheduled through the property contact within 48 hours of award, access delays or significant deviations from your perception of the assignment and requests for additional information should be immediately reported to the job manager. The appraiser holding the appropriate state license and certification must inspect the subject property, unlicensed analysts or trainees must be accompanied by the licensed appraiser. The assignment cannot be subcontracted to another individual or firm without prior written consent of the bank. |
| **Report Option:** | Appraisal Report |
| **Report Signatory:** | Kristin Repp, MAI |
| **Approaches to Value:** | Sales Comparison, Income Capitalization, Insurable Value |
| **Interest(s) Appraised:** | Fee Simple, Leased Fee |
| **Interest Appraised Addendum:** | In the event leased fee value is estimated to be above the fee simple value, the fee simple value must also be presented in the appraisal report.  Market rent should be assigned to owner occupied/vacant space. |
| **Appraisal Premise:** | As Is, As Stabilized |



| | |
|---|---|
| **Leases:** | A minimum of 3 closed/executed comparable leases are required to be presented in the analysis of market rent as opposed to relying solely on current asking rents. |
| **Scope of Work:** | Under contract. This loan will have SBA involvement. The appraisal must be addressed to the following parties as well as being identified as intended users of the appraisal:<br>Valley National Bank,<br>U.S. Small Business Administration (SBA) and<br>Florida Business Development Corporation (FBDC)<br><br>The subject property is a commercial property fronting Main Street in Safety Harbor (south half of an entire city block). The total site size contains 40,791 SF. The west portion of the property is vacant and reflects excess land. The balance of the site is improved with a masonry/frame commercial building (one and two stories) containing 8,327 SF of heated area and 9,027 SF of GBA (per tax roll). The building was constructed in 1963 and appears to have been renovated. Appraiser to confirm year of renovation. Per an older rent roll, the property is divided into multiple retail/office spaces. Current rent roll and leases have been requested. Reportedly, the buyer is one of the tenants (restaurant) and they plan to expand into one of the other spaces (cosmetic renovation only) as well as expand outdoor patio space. The purchase and sale agreement is available. Reportedly, the buyer plans to rent the excess land area to the city for events. If the excess land area is deemed to be independently developable, please value the excess land separately. Values requested:<br>Fee simple "as is" value of excess land<br>Leased Fee "as is" value of the builidng improvements<br>Prospective "As Stabilized" value of the building improvements with proposed restaurant expansion and stabilization of other tenant spaces (as applicable). There is no budget for restaurant expansion.<br>Insurable Value of all permanent structures.<br>FIRREA Checklist and Appraiser Independence Form must be completed and included within the report. Covid impacts must be considered and discussed within the report. Please utilize the intender user statement located within the letter of engagement. Signatory, as identified in the letter of engagement, must sign the report.<br>Contact Leslie McKeon, MAI at (727) 210-4341 should assignment terms and conditions require modification, or the initial scope of work revised. |
| **Additional Scope of Work:** | The Appraisal Report must include the following sections:<br><br>1) SWOT (Strength Weakness Opportunity Threat) Analysis<br>2) Market Participant Survey providing insight into current market conditions that might not be represented by older sales and rent data such as pricing, time on market, offering activity, and specific operational trends such as vacancy, rent growth/contraction, overall capitalization rates, etc. |
| **FIRREA Checklist and Appraiser Independence Certification:** | *The FIRREA checklist and Appraiser Independence Certification must be incorporated into the body of the Report (checklist and certificate are included as attachments in the Report Submission email).* |
| **Electronic Copies:** | Separate PDF files of the finalized report and coordinating invoice should be delivered to the bank by 5pm EST on the due date. |
| **Address Report to:** | Leslie McKeon, MAI<br>Senior Staff Appraiser, Team Lead FL<br>Valley Bank<br>180 Fountain Parkway<br>St. Petersburg, FL 33716 |
| **Purpose of Appraisal:** | The purpose of the appraisal is to provide a supported opinion of the Market Value of the real estate as of the date of inspection, in accordance with the appraisal policies and procedures of Valley Bank, and as defined. Please make every effort to establish the current effective date as close to the report date as possible. |
| **Marketing Status:** | Under Contract |
| **Intended Use:** | The report will be used for loan underwriting and credit decisions. |
| **Appraisal Client:** | Valley National Bank |
| **Intended Users:** | Valley National Bank,<br>U.S. Small Business Administration (SBA) and Florida Business Development Corporation (FBDC)<br><br>Valley National Bank, its affiliates other lenders including prospective, current and future loan participants involved or considering involvement in a participation, syndication, or co-lending scenario and their respective successors and/or assigns (collectively, "Intended Users") are intended users of the appraisal. Further, the appraiser agrees to cooperate in answering questions by any parties in connection with any participation or syndication. No entity other than Valley National Bank and other Intended Users may use or rely on the information, opinions and conclusions contained in the appraisal. The appraisal may be disclosed without reliance to the Borrower, or other parties at the discretion of |



Valley National Bank.

| | |
|---|---|
| **SBA Involvement:** | Yes |
| **Involvement Type:** | 504C |
| **Certified Development Company (CDC):** | FBDC |

**Syndication/Participation:**

**Is Bank Agent:**

**Agent Bank:**

**Confidentiality:** It is understood by you that any private, confidential or proprietary information provided or created for this assignment will be kept strictly confidential. This includes but is not limit to, memoranda, reports and technical, business and financial information from whatever source. **Valley Bank reserves the right to accept or reject the report.** The appraiser will be provided an opportunity to answer any questions the bank has during review.

**The report, at a minimum, must include the following (not necessary for a Residential Appraisal):**

1**.** A signed copy of this engagement letter and any other written instructions from the Bank.
2. The report must reference your compliance with the Commercial Appraisal Reporting Guidelines AND the prevailing guidelines issued under Title XI of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) as well as the prevailing standards outlined in the Uniform Standards for Professional Appraisal Practice.
3. A copy of your state certificate (license) and qualifications in the addendum.
4. Reference the type of appraisal report performed:  Appraisal Report.
5. Competency Provision - in terms of property type and location.
6. Special assumptions, extraordinary assumptions and hypothetical conditions must be addressed in the appraisal- if any are included, they should be clearly identified in the Letter of Transmittal.
7. FF&E - the effect of personal property, fixtures or intangible items; this must be discussed.
8. Identification and description of the subject site and proposed improvements: A) legal description, B) flood zone, C) zoning regulations, D) property rights appraised, E) assessed value, taxes payable and balance of special assessments, F) deferred maintenance, G) effective age, H) below market financing including impacts on market value, I) easements, and J) a copy of plans/specification and approval status, K) status of utilities to site.
9. You shall make note of any evidence of possible hazardous waste contamination. The Bank recognizes that as an appraiser you are not an expert on the existence of hazardous waste or does the appraisal assignment require an analysis of such possible contamination. However, if physical signs are evident, a notation of such should be incorporated.
10. Photos - subject property, comparable rentals - (plat maps for land comps).
11. Maps - A) Region, Area, Neighborhood, B) Zoning, C) Flood, D) Plat and/or Survey, E) Rentals.
12. Area Analysis: Region, City and Neighborhood Data. Neighborhood area analysis at a minimum should identify and analyze Supply/Demand specifically discussing competition/related development proposed, pending or under construction.
13. Market area analysis at a minimum should include (Absorption rates, vacancy rates, rental rates, etc.).
14. Exposure Time and Marketing Time.
15. If the reported marketing period is greater than 12 months, market supported explanation is required.
16. Highest and Best Use - as vacant and as is.
17. Sales Comparison Approach - A) address, B) sale dates, C) adjustments.
18. Income Approach - A) historical operating history, B) market rent, vacancy, expenses, C) Cap rate comps and survey support D) commission, E) lease up costs, and F) concessions.
19. Property History- prior sales or current agreements (Grantors/Grantees, sale dates, terms, disclosure of related parties).
20. Reconciliation A) including reconciliation between the approaches to value as well as B) the market value compared to any current or pending purchase agreement or sale.
21. Replacement Cost/Insurable Value.
22. Your signed certification of the appraisal must A) be signed, B) state who did or did not inspect the site and C) state specifically that the appraisal assignment was not based on a minimum value, a specific value, or approval of a loan.
23. And that neither you, nor your current employer, have been sued by a regulatory agency or financial Institution for fraud or negligence involving an appraisal report.
24. A statement indicating whether or not your firm has appraised the property within the past 3 years.

Should the scope of work be more limited, the exceptions should be identified in the letter of transmittal.

Electronic acceptance of the assignment certifies your competency in accordance with the Competency Provision in USPAP, affirms you are appropriately state certified in the subject property's jurisdiction, and certifies that you have read this engagement letter and agree to provide credible appraisal services in accordance with its specifications.

Respectfully,

Leslie McKeon, MAI



Senior Staff Appraiser, Team Lead FL
Valley Bank
180 Fountain Parkway
St. Petersburg, FL 33716
(727) 210-4341

# Addendum F

## Qualifications

# PROFILES





VALUATION & ADVISORY SERVICES

# Justin Watts

**Senior Valuation Associate – Florida Caribbean Region**
**M**  +1 813 388 1207
**E**  Justin.Watts@cbre.com

## Professional Experience

Justin Watts is a Valuation Associate of the Valuation & Advisory Services for the Florida-Caribbean Region. Justin Watts is located in Tampa and his primary geographical focus encompasses the West Coast of Florida.

Justin Watts graduated with a B.S. in Finance from University of Florida's College of Business in May 2016. He is currently in pursuit of his general appraiser certification. His appraisal experience encompasses a wide variety of property types including: single- and multi-tenant office, medical office, surgery centers, industrial, motorcycle and auto dealerships, quick-service restaurants, free-standing retail, multi-tenant retail, branch banks, mobile home communities, multi-unit residential, fractured condos, car-wash facilities, and entitled vacant land.

## Clients Represented

- Key Bank
- Truist Bank
- Fifth Third Bank
- Bank OZK
- Valley National Bank
- Bank United

## Pro Affiliations / Accreditations

- Registered Trainee Appraiser, State of Florida, #RI24479

## Education

- • University of Florida, Bachelor of Science, Finance, 2016
  • Appraisal Institute Coursework

©2022 CBRE, INC.

Ron DeSantis, Governor

Melanie S. Griffin, Secretary

Florida
**dbpr**

# STATE OF FLORIDA
# DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

## FLORIDA REAL ESTATE APPRAISAL BD

THE REGISTERED TRAINEE APPRAISER HEREIN HAS REGISTERED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

# WATTS, JUSTIN

5700  MARINER STREET
TAMPA              FL 33609

**LICENSE NUMBER: RI24479**

**EXPIRATION DATE:  NOVEMBER 30, 2024**

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# PROFILES



VALUATION & ADVISORY SERVICES

# Trey Starling

**Vice President, Florida – Caribbean Region**
**T**   +1 813 868 8013
**M**  +1 813 328 0033
**E**   Trey.Starling@cbre.com

## Clients Represented

– First American Bank
– Grandbridge RE Capital
– Great Southern Bank
– Guggenheim Trust
– Huntington Bank
– Key Bank
– UPS Capital
– Sunlife
– Walker & Dunlop

## Pro Affiliations / Accreditations

– Certified General Real Estate Appraiser, State of Florida, RZ2485
– Appraisal Institute Associate Member
– International Council of Shopping Centers (ICSC) Member

## Education

Florida State University, Bachelor of Science, Real Estate Appraisal Institute Coursework

## Professional Experience

Trey Starling is a Vice President with over 25 years of real estate appraisal and consulting experience. Mr. Starling is part of the Valuation & Advisory Services Group's Tampa office in the Florida Region. Since 2000, Mr. Starling has been performing appraisal assignments on all property types covering the entire State of Florida and over the course of the last fifteen years worked primarily along the West Coast of Florida.

Mr. Starling is a member of CBRE's Retail Valuation Group (RVG) which is comprised of 50 national appraisers who have significant experience in retail valuation. As a member of the RVG, Mr. Starling specializes in multi-tenant and single tenant retail property types along Florida's West Coast as well as other areas of Florida and has experience appraising the following retail property types; Regional Malls, Outlet Malls, Lifestyle Centers, Power Centers, Community Centers, Neighborhood Centers, Strip Centers, Mixed Use Developments, Main Street and CBD Retail, Freestanding Retail, Superstores, Theatres, Restaurants (Site Down, Quick Casual & Quick Service) and convenience Stores/Service Stations.

©2022 CBRE, INC.

Ron DeSantis, Governor

Halsey Beshears, Secretary

Florida
**dbpr**

# STATE OF FLORIDA
# DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

## FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

# STARLING, HOYD KENNED III

101 E KENNEDY BLVD SUITE 1500
TAMPA          FL 33602

**LICENSE NUMBER: RZ2485**

**EXPIRATION DATE:  NOVEMBER 30, 2022**

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# PROFILES



VALUATION & ADVISORY SERVICES

# Kristin Repp, MAI

**Managing Director**
**T**   +1 305 381 6408
**M**  +1 813 410 1847
**E**   Kristin.repp@cbre.com

## Clients Represented

– Key Bank
– Truist Bank
– Fifth Third Bank
– Bank OZK
– Valley National Bank
– Bank United

## Pro Affiliations / Accreditations

– MAI, Appraisal Institute
– Certified General Real Estate Appraiser, State of Florida, RZ2454
– CREW Network
– Appraisal Institute – South Florida Chapter
– CBRE Women's Network
– Appraisal Institute Candidate Advisor

## Education

– University of Wisconsin BBA, Real Estate and Finance

## Professional Experience

Kristin B. Repp is the Managing Director for CBRE Valuation and Advisory Services covering the South and West Florida markets. As the market leader with over 25 years of commercial real estate experience, Ms. Repp oversees VAS operations in South and West Florida with offices in Miami, Fort Lauderdale, Boca Raton, West Palm Beach and Tampa.

Ms. Repp leads a team of professionals that provide valuation and advisory services involving all property types. Ms. Repp has extensive valuation experience and has served a broad range of clients including commercial and investment banks, REITs, insurance companies, private corporations, investors, owners, developers, and attorneys. Her expertise incorporates all types of valuation services including appraisals, market and feasibility studies, real estate portfolios, financial reporting, estate planning, property tax consulting, and litigation support.

Ms. Repp was previously a Vice President with CBRE in Tampa. Prior to joining CBRE, Ms. Repp gained a broad range of commercial real estate experience through various roles in financial analysis, consulting, acquisitions, due diligence, development, construction, and brokerage.

## Awards

Top 3 Market Producer (Tampa), 2018 and 2020

Ron DeSantis, Governor

Melanie S. Griffin, Secretary

Florida
dbpr

# STATE OF FLORIDA
# DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

## FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## REPP, KRISTIN B

201 E KENNEDY BLVD SUITE 250
TAMPA          FL 33602

**LICENSE NUMBER: RZ2454**

EXPIRATION DATE:  NOVEMBER 30, 2024

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

CBRE Valuation & Advisory Services



# Delivering more than just a number

At CBRE, we offer more than expert appraisal services, we consult and advise to help you see the full picture of a property or portfolio.

### Valuation & Appraisal
Understand all aspects of value

— Lending & Debt Valuations
— Portfolio Valuations
— Institutional Fund Valuations
— Litigation Support & Testimony
— Right-of-Way & Eminent Domain
— Evaluations/Alternative Valuations

**cbre.com/appraisal**

### Assessment & Consulting
Understand all aspects of value

— Property Condition Assessments
— Environmental Site Assessments
— Land Surveying
— Seismic Risk Analysis
— Radon, Asbestos, Indoor Air Quality
— Zoning Reports & Compliance

**cbre.com/assessment**

### Property & Transaction Tax
Understand all aspects of value

— Assessment Reviews & Appeals
— Real Estate Transaction Tax
— Property Tax Payment Services
— Pre-Acquisition Due Diligence
— Pre-Construction Due Diligence
— Budgeting & Accruals

**cbre.com/propertytax**

## Quality You Can Count On

Reliable valuations depend on accurate insights. Our quality and risk management (QRM) framework ensures the highest-quality reports and analyses, giving you confidence in our calculations.



Upfront conflict and qualification checks



Embedded risk detection and leadership reviews



Landmark training, practice guidelines and governance



Dedicated, global team of QRM experts

Industry-leading people, data and technologies

## Experience You Can Trust

CBRE is the global leader in commercial real estate services, with more than 100 years of industry experience. We provide unmatched market coverage and sector expertise across every dimension of our Valuation & Advisory Services, delivering insights you can't get anywhere else

| 90+ | 80K+ | 600k+ | 200+ |
|---|---|---|---|
| U.S. Valuation Offices | U.S. Yearly Assignments | Global Yearly Assignments | Global Valuation Offices |

# Exhibit D

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

IN RE:                                                    Case No. 8:24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                              Chapter 11

      Debtor.

_____/

**ORDER GRANTING CHAPTER 11 TRUSTEE'S AGREED EMERGENCY MOTION**
**TO APPROVE ESCROW OF SALE PROCEEDS OF 737 MAIN STREET LLC**

Upon the agreed emergency motion (the "Motion") of the Chapter 11 Trustee[1] for the entry

of an order approving the escrow of sale proceeds of 737 Main Street, LLC ("737 Main"); and it

appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334;

and that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that venue of

this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409;

and due and proper notice of the Motion having been given; and after due deliberation and it

appearing that sufficient cause exists for granting the requested relief; and that the relief requested

under the Motion is in the best interests of the Debtor's estate and creditors; and that proper and

adequate notice of the Motion has been given and that no other or further notice is necessary; and

---

[1] Capitalized terms used but not specifically defined herein shall have the respective meanings ascribed to them in the Motion.

78795448;1

that 737 Main has consented to the relief requested in the Motion.  Upon review of the record before the Court, good and sufficient cause exists to grant the relief requested. Accordingly, it is

**ORDERED** that:

1.    The Motion is **GRANTED**.

2.    Upon the closing of the sale of the real property located at 737 Main Street, Safety Harbor, Florida 34695 owned by 737 Main Street, the net sales proceeds due and owing to 737 Main shall be placed in escrow with the Chapter 11 Trustee's counsel, Akerman LLP, in its interest bearing trust account, until such time as the parties agree or the Court determines the ownership and appropriate disposition of the sale proceeds.

3.    The Chapter 11 Trustee is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion, including the execution of a release of the Notice of Entry of Order Granting Summary Judgment as to Liability which was recorded  in the public records of Pinellas County and created a cloud on the title to the Property.

4.    The Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Steven R. Wirth, Esq. is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this order.

78795448;1