UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                                  Chapter 11

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                        Case No. 8:24-bk-676-RCT

      Debtor.

_____/

**SUPPLEMENT TO EMERGENCY MOTION TO COMPEL EXPUNGEMENT
OF NOTICE OF ENTRY OF ORDER GRANTING SUMMARY JUDGMENT
AS TO LIABILITY AND REPLY TO CHAPTER 11 TRUSTEE'S RESPONSE**

COMES NOW Propertycraft Enterprises, LLC ("Propertycraft"), by and through its undersigned counsel, and supplements the Emergency Motion to Compel Expungement of Notice of Entry of Order Granting Summary Judgment as to Liability (Doc. No. 437) (the "Motion") and further replies to the Chapter 11 Trustee's Response to Emergency Motion to Compel Expungement of Notice of Entry of Order Granting Summary Judgment as to Liability (Doc. No. 444) (the "Response") on the following grounds:

1.      The Property at issue is subject to a First Amended Temporary Injunction (the "Injunction") entered by the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, attached hereto as Exhibit A. As set forth in the Injunction, the Property is to be sold and all of the proceeds are to be paid to the Directed Benefits Foundation, Inc., for the benefit of other trust beneficiaries. Specifically, the Property is identified in Paragraph 3 and, in Paragraph 5, it states that the parcels have to be sold for fair market value, "the proceeds of which will be deposited in the designated depository after the payment of known liens and encumbrances and selling costs, including commissions." The Notice is preventing such a sale.

2.      Further, Paragraph 7 provides: "the Foundation shall transfer and otherwise deliver all available funds of any beneficiary to a named successor trustee pursuant to a lawful request or court order, including, but not limited to, the following," which is a list of beneficiaries of trusts.

3.      A copy of the pending asset purchase agreement is attached as Exhibit B.

4.      Pursuant to the Injunction, none of the proceeds will go into the pockets of Leo Govoni but will be paid to trust beneficiaries.

*5.*      The Trustee argues in the Response that the Motion should have been filed as an adversary proceeding.  Propertycraft disagrees because the Motion is directed to the validity of the Notice, which is a legally improper attempt at a *lis pendens*.

*6.*      In any event, there is authority for the proposition that a motion initiating a contested matter can be treated as an adversary proceeding if it otherwise affords the protections of an adversary proceeding.

*7.*      As set forth in *In re Eddy,* 572 B.R. 774, 781 (Bankr. M.D. Fla. 2017):

Despite the Debtors' argument to the contrary however, the requirement that an adversary proceeding be filed is not absolute. Even if a matter should, under the Bankruptcy Rules, be tried in the context of an adversary proceeding rather than a contested matter, where the parties have received sufficient due process, a court will not elevate form over substance and may consider the claim on its merits. In doing so, courts have found that where the record demonstrates that (i) an evidentiary hearing was held (ii) the parties were on notice that the issue was being litigated and (iii) the parties had ample opportunity to present their positions so that no prejudice occurred, sufficient due process has been served and the court should proceed on the merits.

8.      In the present case, the Trustee has been afforded due process and the parties will have ample opportunity to present their positions.  Accordingly, Propertycraft requests that the Court rule on the papers without the need for the added expenses of the filing of an adversary proceeding.

WHEREFORE, Propertycraft respectfully requests the Court enter an order granting the Motion and granting such other and further relief to which it may be entitled.

DATED:  December 12, 2024.

> */s/ Edward J. Peterson*
> Edward J. Peterson (FBN 014612)
> Johnson Pope Bokor Ruppel & Burns, LLP
> 400 N. Ashley Drive, Suite 3100
> Tampa, Florida 33602
> Telephone: (813) 225-2500
> Email: edwardp@jpfirm.com
> Attorneys for Propertycraft Enterprises, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on December 12, 2024, by the Court's CM/ECF electronic noticing system to all parties receiving electronic noticing.

> */s/ Edward J. Peterson*
> Edward J. Peterson

EXHIBIT A

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

OFFICE OF THE ATTORNEY GENERAL,
DEPARTMENT OF LEGAL AFFAIRS

        Plaintiff,

v.                                   Case No. 2024-CA-002321-CI

THE DIRECTED BENEFITS
FOUNDATION, INC.,
LEO JOSEPH GOVONI, JR.;
KAREN FISHER, ELIZABETH SAUER,
BOSTON FINANCE GROUP, LLC,

        Defendants.

_____/

## FIRST AMENDED TEMPORARY INJUNCTION

This matter initially came before the Court, on May 28, 2024, upon the PLAINTIFF's VERIFIED EMERGENCY MOTION FOR TEMPORARY INJUNCTION WITHOUT NOTICE AND FOR APPOINTMENT OF RECEIVER OR CUSTODIAN ("Motion").

The Court has reviewed the Motion, Complaint, and the Consent Final Judgment and Stipulated Permanent Injunction Against Defendant Karen Fisher (entered July 17, 2024) submitted herein. The Parties collectively request this Court to modify the Temporary Injunction entered by this Court on May 30, 2024 ("Temporary Injunction"), and this Court finds as follows:

1.     The Temporary Injunction is hereby terminated, and this First Amended Temporary Injunction is hereby entered. This First Amended Temporary Injunction does not affect the Consent Final Judgment and Stipulated Permanent Injunction Against Defendant Karen Fisher (entered July 17, 2024).

2.      The Parties will agree on a financial institution to be designated as a depository for assets ("Depository") under this First Amended Temporary Injunction. The Depository shall be appointed by separate order upon the filing of a PETITION FOR ORDER DESIGNATING DEPOSITORY FOR ASSETS, by Defendant, The Directed Benefits Foundation, Inc. (the "FOUNDATION").

3.      Plaintiff has identified the following parcels ("Parcels"), the net market value of which the Defendants estimate to be worth, based on commercial real estate listing services, $2,200,000.00 after deducting any known liens or encumbrances:

| PARCEL ID: | ADDRESS |
|---|---|
| 02-30-16-27438-007-0040 | 13851 Lake Point Drive, Clearwater, Florida |
| 30-2023-003-00 | 545 Beech St, Versailles, Kentucky |
| 30-2023-005-00 | 549 Beech St, Versailles, Kentucky |
| 30-2023-006-00 | 551 Beech St, Versailles, Kentucky |
| 30-2023-007-00 | 553 Beech St, Versailles, Kentucky |
| 30-4027-012-00 | 798 Nancy St, Versailles, Kentucky |
| 05-30-15-08712-001-0081 | 3256 Adrian Avenue, Largo, Florida |
| 05-30-15-08712-001-0080 | 3258 Adrian Avenue, Largo, Florida |
| 34-29-15-76536-016-0110 | 725 2nd Avenue, Units A and B, Largo, Florida |
| PPC 000 0000 0008 | 610 Charlotte Street, Punta Gorda, Florida |
| 09-30-16-20295-000-0010 | 12705 Daniel Drive, Clearwater, Florida |

4.      Each of the Parcels shall be encumbered with mortgage liens in favor of the FOUNDATION, with each lien in the amount of $200,000.00.

5.      Defendant, Leo Joseph Govoni ("GOVONI") has represented to the Parties that he will cause the entities that own the subject properties to list all of the Parcels for immediate sale for fair market value, the proceeds of which will be deposited in the designated Depository after the payment of known liens and encumbrances and selling costs, including commissions.

6.     As part of the sale of the Parcels, the FOUNDATION will deliver to the Parcel owner or designated closing agent a satisfaction of the mortgage lien encumbering said Parcel, without regard to the amount of the net proceeds deposited in the designated Depository from such sale.

7.     The FOUNDATION shall transfer and otherwise deliver all available funds of any beneficiary to a named successor trustee pursuant to a lawful request or court order, including but not limited to the following:

   a.  Beneficiary Sean M. Burke, to trustee Hancock Whitney Bank. *See* Final Judgment Removing Trustee and Appointing Successor Trustee, *Burke v. The Directed Benefits Foundation, Inc.*, Case No. 2024-2635-CI (Pinellas Cir. Ct.) (entered July 24, 2024).

   b.  Beneficiary Gregory Michael Keane, to trustee Legacy Enhancement Trust, 2020 Beaver Avenue, Suite 206, Monaca, Pennsylvania 15061.

   c.  Beneficiary Peter Landrau to himself. *See* Order to Terminate Trust, *In Re: The Peter Landau Settlement Preservation Trust Dated November 15, 2023*, Case No. 24-005894(Pinellas Cir. Ct.) (entered July 20, 2024).

   d.  Beneficiaries Reginald Kendall, Jr. and Natalia Kendall to themselves. *See* Order, *In Re: The Kendall Family Settlement Preservation Trust v. The Directed Benefits Foundation*, Case No. 24-006200 (Pinellas Cir. Ct., Probate Div.) (entered July 15, 2024).

   e.  Beneficiary Leslie Blankenship to Legacy Enhancement Trust, 2020 Beaver Avenue, Suite 206, Monaca, Pennsylvania 15061. *See* Order Removing Trustee, *In Re: Leslie Blankenship Special Needs Trust*, Case No. 24-004635 (Pinellas Cir. Ct.) (entered July 1, 2024).

3

    f.   Beneficiary Mia McDowell to Family Network on Disabilities, 26750 U.S.

Highway 19 North, Suite 410, Clearwater, Florida 33761.

Should funds be unavailable to effectuate such complete transfers of beneficiary funds, the

FOUNDATION shall transfer all available funds pursuant to instructions from a person or entity

authorized to provide them or court order and identify the amount of any remaining funds which

are unavailable in correspondence to the beneficiary and file such correspondence with this Court,

redacting confidential information. The FOUNDATION shall advise any beneficiary requesting

transfer of funds to seek legal advice regarding such transfer as to whether the transfer will incur

any further financial consequences to the beneficiary.

8.    Until such time as the FOUNDATION receives a lawful request or court order to transfer

a trust and funds to a replacement trustee, the FOUNDATION will provide the designated

Depository information concerning beneficiary expenses. Such expenses shall be described in the

forthcoming PETITION FOR ORDER DESIGNATING DEPOSITORY FOR ASSETS to be filed

by the FOUNDATION pursuant to this First Amended Temporary Injunction.

9.    Good cause exists to protect the remaining assets of the FOUNDATION and Defendant,

Boston Finance Group, LLC ("BFG"), from being sold, transferred, alienated or otherwise

dissipated until the resolution of the instant proceeding or further order of this Court.

10.    Plaintiff Office of the Attorney General, Department of Legal Affairs ("OAG") has

demonstrated a likelihood of success on the merits of its action under the Florida Anti-Fencing

Act, section 812.014, Florida Statutes (Theft); the Florida Deceptive and Unfair Trade Practices

Act, Chapter 501, Part II, Florida Statutes, and the Florida Not for Profit Corporation Act, Chapter

617.

a.      According to the OAG, in response to the OAG's official inquiry, the FOUNDATION provided a "balance sheet" identified by filename DBF00001710.xlsx. The balance sheet purportedly contained all the bank accounts of the FOUNDATION, including a non-interest-bearing bank account with American Momentum Bank, account number x6016 (the "6016 Beneficiaries' Trust Account").  Later records produced by the FOUNDATION indicate that the predecessor to this account was an interest-bearing, money market trust account x1390 at American Momentum Bank, followed by the creation of an interest-bearing, money market trust account x3130 at Bank OZK.  These accounts are no longer active according to the FOUNDATION, but the banking history of trust account x1390, and both the accounts x1390 and x3130, and finally trust account x6016, represent the banking history of the beneficiaries' trust accounts according to the FOUNDATION.  They include the initial corpus that funded the Foundation Trusts.

b.      The FOUNDATION provided to the OAG certain accountings (signed under penalty of perjury by Karen Fisher) that stated that the 6016 Beneficiaries' Trust Account balances were "[a]ssets on hand."  Other FOUNDATION accountings provided to the OAG indicate that the 6016 Beneficiaries' Trust Account balance for a beneficiary's account were "current assets."

c.      According to the OAG, of the 48 Foundation Trusts, 45 were identified in the balance sheet of the FOUNDATION as having various amounts in the 6016 Beneficiaries' Trust Account.  According to the FOUNDATION's "balance sheet" provided to the OAG, the 6016 Beneficiaries' Trust Account reflected an ending balance of $2,402,812.09.

d.      According to the OAG, the "balance sheet" of the FOUNDATION, specifically the 6016 Beneficiaries' Trust Account, shows amounts allocated to beneficiaries ranging from

5

a deficiency of $55.20, to a high of $1,434,516.29, totaling $2,402,812.09.   The actual balance of the 6016 Beneficiaries' Trust Account does not contain the monies reflected on the FOUNDATION's balance sheet.   The OAG also subpoenaed the most recent account statement of American Momentum Bank, and the balance of the 6016 Beneficiaries' Trust Account as of March 29, 2024, was only $168,324.47.   The balance as of April 23, 2024, was only $318,176.63.   Thus, based on the FOUNDATION's corporate records, over $2,000,000 of the 6016 Beneficiaries' Trust Account is otherwise unaccounted for on the FOUNDATION's accounting records/balance sheet, and these monies are inaccessible to the Foundation Trust beneficiaries.   Thus, the balance of the 6016 Beneficiaries' Trust Account on the "balance sheet" is incorrect, and the FOUNDATION's balance sheet provided to the OAG was a false record.   No authorization or explanation for the missing monies has been provided to the OAG.

e.       According to the OAG, numerous transfers were made from the FOUNDATION to BFG between September 30, 2022, and December 2023, totaling over $2,000,000, and none of these transfers are recorded on the FOUNDATION's balance sheet.   These amounts included the trust funds of J.A., who had a settlement preservation trust established with the FOUNDATION.   In an Annual Accounting addressed to J.A. directly by Karen Fisher, the FOUNDATION assured J.A. that he had "cash and other assets" "on hand" in the amount of $1,474,603.77.   The FOUNDATION's balance sheet provided to the OAG falsely stated that this principal was on hand and safe within the 6016 Beneficiaries' Trust Account.

f.       According to the OAG, these transfers to BFG are not documented in the balance sheet of the FOUNDATION, or in the accountings of the beneficiaries.

g.      According to the OAG, the FOUNDATION has other unexplained and undocumented transfers of beneficiary trust monies, including on February 10, 2023, when it made an apparent cash withdrawal of $125,000.00 "per customer" from the x3130 trust account.

h.      Not for profit corporations must maintain accurate accounting records. § 617.1601, Fla. Stat. A "balance sheet" that is incorrect by over $2,000,000 is not an accurate accounting record.

i.      The injuries caused by the FOUNDATION affect an extremely vulnerable population of beneficiaries, many of whom are young, disabled, SSI-Related Medicaid recipients that depend on these funds for the provision of basic or life-sustaining services. *See* Fla. R. Civ. P. 1.610(a)(2).

11.     Plaintiff is the enforcing authority under sections 812.035(5), 501.207, 617.2003, 617.0304(c), Florida Statutes. The Court takes note that the enforcing authority's sole burden in establishing its right to a temporary injunction is to establish that it has a clear legal right to a temporary injunction by demonstrating a substantial likelihood of success on the merits. *See E-Racer Tech, LLC v. Office of the Attorney General, Department of Legal Affairs,* 198 So. 3d 1107, 1110 (Fla. 4th D.C.A. 2016) ("The AG does not have to establish irreparable harm, lack of an adequate legal remedy, or public interest as ordinarily required for a temporary injunction," but instead need only "demonstrate a substantial likelihood of success on the merits."); *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Attorney Gen.,* 761 So.2d 1256, 1260 (Fla. 3d DCA 2000) ("[B]ecause section 501.207(1)(b) expressly authorizes the Department to seek injunctive relief on behalf of the state, ... [t]he Department's sole burden at a temporary injunction hearing under FDUTPA is to establish that it has a clear legal right to a temporary injunction.").

12.    Under 617.1431, Florida Statutes, in this proceeding for judicial dissolution, this court may issue injunctions and take other action required to preserve the assets of the FOUNDATION wherever located.

13.    Plaintiff has demonstrated that irreparable harm will result absent the entry of a temporary injunction. Beneficiaries' funds provided to Defendants may be dissipated, transferred, and lost. More beneficiaries may provide trust funds to the FOUNDATION if a temporary injunction is not entered. Fla. R. Civ. P. 1.610(a)(2).

14.    Plaintiff has demonstrated that it lacks an adequate remedy at law. Plaintiff has demonstrated that a temporary injunction is necessary to preserve the status quo and protect beneficiaries from further losses.

15.    Plaintiff has demonstrated that the public interest favors entry of a temporary injunction under the circumstances presented in the instant action. The public interest favors protecting consumers and beneficiaries from trust administration schemes that falsely account for trust proceeds, take monies in an unauthorized manner, and do not deliver trust services as promised.

16.    Accordingly, the Court hereby ORDERS AND ADJUDGES:

A.    The sequestration or freezing of all assets of Defendants The Directed Benefits Foundation, Inc. (EIN 46-2831101) and Boston Finance Group, LLC (EIN 26-4511901), including but not limited to any bank accounts or business accounts in their names or their business' names, including but not limited to accounts at American Momentum Bank, Fidelity Investments, Fidelity Brokerage Service LLC, Wells Fargo Clearing Services, LLC (Wells Fargo Advisors) any other bank or financial institution, investment accounts, offices, the contents of such offices where the business of Defendants has been conducted, until further order of this Court, with the exception of the ongoing expenses and $250,000

8

cash deposit identified in the forthcoming Order Designating Depository for Assets.

B.       Defendants, The Directed Benefits Foundation, Inc. (EIN 46-2831101) and Boston Finance Group, LLC (EIN 26-4511901), separately and/or by or through their trustees, agents, employees or other persons who act under, by, through or on behalf of either or all of them, are hereby ENJOINED from transferring, conveying, encumbering, disposing of or otherwise alienating their bank accounts or business accounts, including but not limited to accounts at American Momentum Bank, Fidelity Investments, Fidelity Brokerage Service LLC, Wells Fargo Clearing Services, LLC (Wells Fargo Advisors) and any other bank or financial institution, until further order of this Court, with the exception of the ongoing expenses identified in the forthcoming Order Designating Depository for Assets.

C.       Defendants, The Directed Benefits Foundation, Inc. (EIN 46-2831101) and Boston Finance Group, LLC (EIN 26-4511901) separately and/or by or through their trustees, agents, employees or other persons who act under, by, through or on behalf of either or all of them or the Defendants, are hereby ENJOINED from transferring, conveying, encumbering, disposing of or otherwise alienating automobiles, motorcycles, or any other personal property or real property owned by The Directed Benefits Foundation, Inc. (EIN 46-2831101) or Boston Finance Group, LLC (EIN 26-4511901) and automobiles, motorcycles, or any other personal property or real property purchased or obtained using money received from beneficiaries in The Directed Benefits Foundation, Inc. (EIN 46-2831101) or Boston Finance Group, LLC (EIN 26-4511901) until further order of this Court.

D.       Defendants, The Directed Benefits Foundation, Inc. (EIN 46-2831101), Leo Joseph Govoni, Elizabeth Sauer and Boston Finance Group, LLC (EIN 26-4511901) individually

9

and/or by or through their spouses, trustees, agents, employees or other persons who act under, by, through or on behalf of either or all of them or the Defendants, are hereby ENJOINED from receiving directly or indirectly any money, property, or accounts from any beneficiaries of any settlement agreement or special needs settlement or trust, or their representatives, until further order of this Court. Nothing in this First Amended Temporary Injunction prevents beneficiaries of The Directed Benefits Foundation, Inc. (EIN 46-2831101) from receiving accurate information, trust accountings or statements from any Defendant.

E.      Defendants, The Directed Benefits Foundation, Inc. (EIN 46-2831101), Leo Joseph Govoni, Elizabeth Sauer and Boston Finance Group, LLC (EIN 26-4511901)individually and/or by or through their spouses, trustees, agents, employees or other persons who act under, by, through or on behalf of either or all of them or the Defendants, are hereby ENJOINED from soliciting any person or entity to use any services of The Directed Benefits Foundation, Inc. or provide any monies to The Directed Benefits Foundation, Inc. until further order of this Court.

F.      The Directed Benefits Foundation, Inc. (EIN 46-2831101), Leo Joseph Govoni, Elizabeth Sauer and Boston Finance Group, LLC (EIN 26-4511901) individually and/or by or through their spouses, trustees, agents, employees or other persons who act under, by, through or on behalf of either or all of them or the Defendants, are hereby ENJOINED from destroying, mutilating, concealing, altering, or disposing of, in any manner, any of the books, records, papers, computer disks, computer memory retention devices or the like, computers, documents, correspondence, obligations or other property of the Defendants herein until further order of this Court.

10

G.    The Plaintiff, Office of the Attorney General, Department of Legal Affairs, is an

agency of the State of Florida and, in recognition of the public interest served by this action,

no bond shall be required with respect to the relief granted herein.  Fla. R. Civ. P. 1.610(b).

DONE AND ORDERED in Chambers, at Pinellas County, Florida, on this _____ day of

_____, 2024

Electronically Conformed 8/17/2024
Cynthia Newton

_____
The Hon. Cynthia Newton
CIRCUIT JUDGE

11

EXHIBIT B

## Commercial Contract
FLORIDA ASSOCIATION OF REALTORS®

1* **1. PARTIES AND PROPERTY:** Robert and Cindy Briesacher Trust _____ ("**Buyer**")

2* agrees to buy and  Propertycraft Enterprises LLC _____ ("**Seller**")

3* agrees to sell the property described as: Street Address:  12705 DANIEL DR CLEARWATER, FL 33762 _____

4* _____

5* Legal Description:  DANIEL'S INDUSTRIAL PARK N 312FT OF LOT 1 & THAT PT LOT 13 PINELLAS GROVES ALL DESC IN SEC 09-30-16

6* BEG NE COR OF SD LOT 1 FOR POB TH S00D07'30"W 312 FT TH W 162.6FT TH N00D06'11"W 322FT TH S89D57'22"E 162.6FT TH S00D0

7* ~~and the following Personal Property:~~  07'30"W 10FT TO POB _____

8* _____

9 (all collectively referred to as the "**Property**") on the terms and conditions set forth below.

10* **2. PURCHASE PRICE:**                                                                          $ _____ 2,225,000

11* **(a)** Deposit held in escrow by  Michelle King 17724 Hunting Bow Circle, Suite 102 Lutz,    $ _____ 100,000

12 ("**Escrow Agent**")  (checks are subject to actual and final collection)

13* Escrow Agent's address:  Florida 33558 (First American Title)    Phone:  813-371-8320

14* **(b)** Additional deposit to be made to Escrow Agent within _____ days after Effective Date    $ _____

15* **(c)** Additional deposit to be made to Escrow Agent within _____ days after Effective Date    $ _____

16* **(d)** Total financing (see Paragraph 5)                                                        $ _____

17* **(e)** Other _____                                                   $ _____

18 **(f)** All deposits will be credited to the purchase price at closing. Balance to close, subject

19* to adjustments and prorations, to be paid with locally drawn cashier's or official bank    $ _____ 2,125,000

20 check(s) or wire transfer.

21 **3. TIME FOR ACCEPTANCE; EFFECTIVE DATE; COMPUTATION OF TIME:** Unless this offer is signed by **Seller** and **Buyer**

22* and an executed copy delivered to all parties on or before  10/6/2024 , this offer will be withdrawn and the

23 **Buyer's**  deposit, if any, will be returned. The time for acceptance of any counter offer will be 3 days from the date the counter

24 offer is delivered. **The "Effective Date" of this Contract is the date on which the last one of the Seller and Buyer has signed**

25 **or initialed and delivered this offer or the final counter offer.** Calendar days will be used when computing time periods, except

26 time periods of 5 days or less. Time periods of 5 days or less will be computed without including Saturday, Sunday, or national

27 legal holidays. Any time period ending on a Saturday, Sunday, or national legal holiday will extend until 5:00 p.m. of the next

28 business day. **Time is of the essence in this Contract.**

29 **4. CLOSING DATE AND LOCATION:**

30* **(a) Closing Date:** This transaction will be closed on  11/20/2024 _____ (Closing Date), unless specifically

31 extended by other provisions of this Contract. The Closing Date will prevail over all other time periods including, but not limited

32 to, Financing and Due Diligence periods. In the event insurance underwriting is suspended on Closing Date and **Buyer** is unable

33 to obtain property insurance, **Buyer** may postpone closing up to 5 days after the insurance underwriting suspension is lifted.

34* **(b) Location:** Closing will take place in  Pinellas _____ County, Florida. (If left blank,

35 closing will take place in the county where the Property is located.) Closing may be conducted by mail or electronic means.

36* **Buyer** ( _RB_ ) ( _____ ) and **Seller** ( _____ ) acknowledge receipt of a copy of this page, which is Page 1 of 7 Pages.

CC-3    Rev. 10/09    © 2009    Florida Association of REALTORS®    All Rights Reserved

37  **5. THIRD PARTY FINANCING:**

38* **BUYER'S OBLIGATION:** Within _____ days (5 days if left blank) after Effective Date, **Buyer** will apply for third party financing in an
39* amount not to exceed _____% of the purchase price or $ _____, with a fixed interest rate not to exceed _____%
40* per year or with an initial variable interest rate not to exceed _____%, with points or commitment or loan fees not to exceed _____%
41* of the principal amount, for a term of _____ years, and amortized over _____ years, with additional terms as follows: _____
42* _____.

43  **Buyer** will timely provide any and all credit, employment, financial and other information reasonably required by any lender. **Buyer**
44* will use good faith and reasonable diligence to (i) obtain Loan Approval within _____ days (45 days if left blank) from Effective Date
45  (Loan Approval Date), (ii) satisfy terms and conditions of the Loan Approval, and (iii) close the loan. **Buyer** will keep **Seller** and
46  Broker fully informed about loan application status and authorizes the mortgage broker and lender to disclose all such information
47  to **Seller** and Broker. **Buyer** will notify **Seller** immediately upon obtaining financing or being rejected by a lender.
48  **CANCELATION:** If **Buyer**, after using good faith and reasonable diligence, fails to obtain Loan Approval by Loan Approval Date,
49* **Buyer** may within _____ days (3 days if left blank) deliver written notice to **Seller** stating **Buyer** either waives this financing
50  contingency or cancels this Contract. If **Buyer** does neither, then **Seller** may cancel this Contract by delivering written notice
51  to **Buyer** at any time thereafter. Unless this financing contingency has been waived, this Contract shall remain subject to the
52  satisfaction, by closing, of those conditions of Loan Approval related to the Property.
53  **DEPOSIT(S) (for purposes of Paragraph 5 only):** If **Buyer** has used good faith and reasonable diligence but does not obtain Loan
54  Approval by Loan Approval Date and thereafter either party elects to cancel this Contract as set forth above or the lender fails or
55  refuses to close on or before the Closing Date without fault on **Buyer's** part, the Deposit(s) shall be returned to **Buyer**, whereupon
56  both parties will be released from all further obligations under this Contract, except for obligations stated herein as surviving the
57  termination of this Contract. If neither party elects to terminate this Contract as set forth above or **Buyer** fails to use good faith or
58  reasonable diligence as set forth above, **Seller** will be entitled to retain the Deposit(s) if the transaction does not close.

59* **6. TITLE:** **Seller** has the legal capacity to and will convey marketable title to the Property by ✓ statutory warranty deed
60* ❑ other _____, free of liens, easements and encumbrances of record or known to **Seller**,
61  but subject to property taxes for the year of closing; covenants, restrictions and public utility easements of record; existing zoning
62* and governmental regulations; and (list any other matters to which title will be subject) _____
63* _____
64* _____;
65  provided there exists at closing no violation of the foregoing and none of them prevents **Buyer's** intended use of the Property as
66* _____.

67  **(a) Evidence of Title:** The party who pays the premium for the title insurance policy will select the closing agent and pay for
68* the title search and closing services. **Seller** will, at (check one) ❑ **Seller's** ✓ **Buyer's** expense and within _10_ days ❑ after
69* Effective Date ❑ or at least _____ days before Closing Date deliver to **Buyer** (check one)
70* ✓ (i.) a title insurance commitment by a Florida licensed title insurer and, upon **Buyer** recording the deed, an owner's policy
71  in the amount of the purchase price for fee simple title subject only to exceptions stated above. If **Buyer** is paying for the
72  evidence of title and **Seller** has an owner's policy, **Seller** will deliver a copy to **Buyer** within 15 days after Effective Date.
73* ❑ (ii.) an abstract of title, prepared or brought current by an existing abstract firm or certified as correct by an existing firm.
74  However, if such an abstract is not available to **Seller**, then a prior owner's title policy acceptable to the proposed insurer as
75  a base for reissuance of coverage may be used. The prior policy will include copies of all policy exceptions and an update
76  in a format acceptable to **Buyer** from the policy effective date and certified to **Buyer** or **Buyer's** closing agent together with
77  copies of all documents recited in the prior policy and in the update. If such an abstract or prior policy is not available to
78  **Seller** then (i.) above will be the evidence of title.

79  **(b) Title Examination: Buyer** will, within 15 days from receipt of the evidence of title deliver written notice to **Seller** of title
80  defects. Title will be deemed acceptable to **Buyer** if (1) **Buyer** fails to deliver proper notice of defects or (2) **Buyer** delivers proper
81* written notice and **Seller** cures the defects within _7___ days from receipt of the notice ("Curative Period"). If the defects are
82  cured within the Curative Period, closing will occur within 10 days from receipt by **Buyer** of notice of such curing. **Seller** may
83  elect not to cure defects if **Seller** reasonably believes any defect cannot be cured within the Curative Period. If the defects are
84  not cured within the Curative Period, **Buyer** will have 10 days from receipt of notice of **Seller's** inability to cure the defects to
85  elect whether to terminate this Contract or accept title subject to existing defects and close the transaction without reduction in
86  purchase price.

87  **(c) Survey:** (check applicable provisions below)
88* ✓ **Seller** will, within _3___ days from Effective Date, deliver to **Buyer** copies of prior surveys, plans, specifications, and
89* engineering documents, if any, and the following documents relevant to this transaction: _____
90* _____, prepared for **Seller** or in **Seller's**

91* Buyer (_KB_) (_____) and Seller (_JJ_) (_____) acknowledge receipt of a copy of this page, which is Page 2 of 7 Pages.

CC-3    Rev. 10/09    © 2009    Florida Association of REALTORS®    All Rights Reserved

92    possession, which show all currently existing structures. In the event this transaction does not close, all documents provided
93    by **Seller** will be returned to **Seller** within 10 days from the date this Contract is terminated.

94*   ☑ **Buyer** will, at ❑ **Seller's** ☑ **Buyer's** expense and within the time period allowed to deliver and examine title evidence,
95    obtain a current certified survey of the Property from a registered surveyor. If the survey reveals encroachments on the
96*   Property or that the improvements encroach on the lands of another, ❑ **Buyer** will accept the Property with existing
97*   encroachments ☑ such encroachments will constitute a title defect to be cured within the Curative Period.

98    **(d) Ingress and Egress:  Seller** warrants that the Property presently has ingress and egress.

99    **7. PROPERTY CONDITION:  Seller** will deliver the Property to **Buyer** at the time agreed in its present "as is" condition, ordinary
100   wear and tear excepted, and will maintain the landscaping and grounds in a comparable condition. **Seller** makes no warranties
101   other than marketability of title. By accepting the Property "as is," **Buyer** waives all claims against **Seller** for any defects in the
102   Property. (Check **(a)** or **(b)**)

103*  ❑ **(a) As Is:  Buyer** has inspected the Property or waives any right to inspect and accepts the Property in its "as is" condition.

104*  ☑ **(b) Due Diligence Period: Buyer** will, at **Buyer's** expense and within __30__ days from Effective Date ("Due Diligence
105   Period"), determine whether the Property is suitable, in **Buyer's** sole and absolute discretion, for **Buyer's** intended use and
106   development of the Property as specified in Paragraph 6. During the Due Diligence Period, **Buyer** may conduct any tests,
107   analyses, surveys and investigations ("Inspections") which **Buyer** deems necessary to determine to **Buyer's** satisfaction the
108   Property's engineering, architectural, environmental properties; zoning and zoning restrictions; flood zone designation and
109   restrictions; subdivision regulations; soil and grade; availability of access to public roads, water, and other utilities; consistency
110   with local, state and regional growth management and comprehensive land use plans; availability of permits, government
111   approvals and licenses; compliance with American with Disabilities Act; absence of asbestos, soil and ground water
112   contamination; and other inspections that **Buyer** deems appropriate to determine the suitability of the Property for **Buyer's**
113   intended use and development. **Buyer** will deliver written notice to **Seller** prior to the expiration of the Due Diligence Period
114   of **Buyer's** determination of whether or not the Property is acceptable. **Buyer's** failure to comply with this notice requirement
115   will constitute acceptance of the Property in its present "as is" condition. **Seller** grants to **Buyer**, its agents, contractors and
116   assigns, the right to enter the Property at any time during the Due Diligence Period for the purpose of conducting Inspections;
117   provided, however, that **Buyer**, its agents, contractors and assigns enter the Property and conduct Inspections at their own
118   risk. **Buyer** will indemnify and hold **Seller** harmless from losses, damages, costs, claims and expenses of any nature, including
119   attorneys' fees at all levels, and from liability to any person, arising from the conduct of any and all inspections or any work
120   authorized by **Buyer**. **Buyer** will not engage in any activity that could result in a mechanic's lien being filed against the Property
121   without **Seller's** prior written consent. In the event this transaction does not close, (1) **Buyer** will repair all damages to the
122   Property resulting from the Inspections and return the Property to the condition it was in prior to conduct of the Inspections, and
123   (2) **Buyer** will, at **Buyer's** expense, release to **Seller** all reports and other work generated as a result of the Inspections. Should
124   **Buyer** deliver timely notice that the Property is not acceptable, **Seller** agrees that **Buyer's** deposit will be immediately returned
125   to **Buyer** and the Contract terminated.

126   **(c) Walk-through Inspection: Buyer** may, on the day prior to closing or any other time mutually agreeable to the parties,
127   conduct a final "walk-through" inspection of the Property to determine compliance with this paragraph and to ensure that all
128   Property is on the premises.

129   **8. OPERATION OF PROPERTY DURING CONTRACT PERIOD:  Seller** will continue to operate the Property and any business
130   conducted on the Property in the manner operated prior to Contract and will take no action that would adversely impact the
131   Property, tenants, lenders or business, if any. Any changes, such as renting vacant space, that materially affect the Property or
132*  **Buyer's** intended use of the Property will be permitted ☑ only with **Buyer's** consent ❑ without **Buyer's** consent.

133   **9. CLOSING PROCEDURE:**

134   **(a) Possession and Occupancy: Seller** will deliver possession and occupancy of the Property to **Buyer** at closing. **Seller** will
135   provide keys, remote controls, and any security/access codes necessary to operate all locks, mailboxes, and security systems.

136   **(b) Costs: Buyer** will pay buyer's attorneys' fees, taxes and recording fees on notes, mortgages and financing statements and
137   recording fees for the deed. **Seller** will pay seller's attorneys' fees, taxes on the deed and recording fees for documents needed
138   to cure title defects. If **Seller** is obligated to discharge any encumbrance at or prior to closing and fails to do so, **Buyer** may use
139   purchase proceeds to satisfy the encumbrances.

140   **(c) Documents: Seller** will provide the deed; bill of sale; mechanic's lien affidavit; originals of those assignable service and
141   maintenance contracts that will be assumed by **Buyer** after the Closing Date and letters to each service contractor from **Seller**

142*  Buyer (_RB_) (_____) and Seller (_J.P.___) acknowledge receipt of a copy of this page, which is Page 3 of 7 Pages.

143 advising each of them of the sale of the Property and, if applicable, the transfer of its contract, and any assignable warranties or
144 guarantees received or held by **Seller** from any manufacturer, contractor, subcontractor, or material supplier in connection with
145 the Property; current copies of the condominium documents, if applicable; assignments of leases, updated rent roll; tenant and
146 lender estoppel letters; assignments of permits and licenses; corrective instruments; and letters notifying tenants of the change
147 in ownership/rental agent. If any tenant refuses to execute an estoppel letter, **Seller** will certify that information regarding the
148 tenant's lease is correct. If **Seller** is a corporation, **Seller** will deliver a resolution of its Board of Directors authorizing the sale
149 and delivery of the deed and certification by the corporate Secretary certifying the resolution and setting forth facts showing the
150 conveyance conforms to the requirements of local law. **Seller** will transfer security deposits to **Buyer**. **Buyer** will provide the
151 closing statement, mortgages and notes, security agreements, and financing statements.

152 **(d) Taxes and Prorations:** Real estates taxes, personal property taxes on any tangible personal property, bond payments
153 assumed by **Buyer**, interest, rents, association dues, insurance premiums acceptable to **Buyer**, and operating expenses will be
154 prorated through the day before closing. If the amount of taxes for the current year cannot be ascertained, rates for the previous
155 year will be used with due allowance being made for improvements and exemptions. Any tax proration based on an estimate
156 will, at request of either party, be readjusted upon receipt of current year's tax bill; this provision will survive closing.

157 **(e) Special Assessment Liens:** Certified, confirmed, and ratified special assessment liens as of the Closing Date will be paid
158 by **Seller**. If a certified, confirmed, or ratified special assessment is payable in installments, **Seller** will pay all installments due
159 and payable on or before the Closing Date, with any installment for any period extending beyond the Closing Date prorated,
160 and **Buyer** will assume all installments that become due and payable after the Closing Date. **Buyer** will be responsible for all
161 assessments of any kind which become due and owing after Closing Date, unless an improvement is substantially completed as
162 of Closing Date. If an improvement is substantially completed as of the Closing Date but has not resulted in a lien before closing,
163 **Seller** will pay the amount of the last estimate of the assessment.

164 **(f) Foreign Investment In Real Property Tax Act (FIRPTA):** If **Seller** is a "foreign person" as defined by FIRPTA, **Seller** and
165 **Buyer** agree to comply with Section 1445 of the Internal Revenue Code. **Seller** and **Buyer** will complete, execute, and deliver
166 as directed any instrument, affidavit, or statement reasonably necessary to comply with the FIRPTA requirements, including
167 delivery of their respective federal taxpayer identification numbers or Social Security Numbers to the closing agent. If **Buyer**
168 does not pay sufficient cash at closing to meet the withholding requirement, **Seller** will deliver to **Buyer** at closing the additional
169 cash necessary to satisfy the requirement.

170 **10. ESCROW AGENT:** **Seller** and **Buyer** authorize Escrow Agent (Agent) to receive, deposit, and hold funds and other property
171 in escrow and, subject to collection, disburse them in accordance with the terms of this Contract. The parties agree that Agent
172 will not be liable to any person for misdelivery of escrowed items to **Seller** or **Buyer**, unless the misdelivery is due to Agent's willful
173 breach of this Contract or gross negligence. If Agent has doubt as to Agent's duties or obligations under this Contract, Agent may,
174 at Agent's option, (a) hold the escrowed items until the parties mutually agree to its disbursement or until a court of competent
175 jurisdiction or arbitrator determines the rights of the parties or (b) deposit the escrowed items with the clerk of the court having
176 jurisdiction over the matter and file an action in interpleader. Upon notifying the parties of such action, Agent will be released from
177 all liability except for the duty to account for items previously delivered out of escrow. If Agent is a licensed real estate broker,
178 Agent will comply with Chapter 475, Florida Statutes. In any suit in which Agent interpleads the escrowed items or is made a party
179 because of acting as Agent hereunder, Agent will recover reasonable attorney's fees and costs incurred, with these amounts to be
180 paid from and out of the escrowed items and charged and awarded as court costs in favor of the prevailing party.

181 **11. CURE PERIOD:** Prior to any claim for default being made, a party will have an opportunity to cure any alleged default. If
182 a party fails to comply with any provision of this Contract, the other party will deliver written notice to the non-complying party
183* specifying the non-compliance. The non-complying party will have _____ days (5 days if left blank) after delivery of such notice to
184 cure the non-compliance.

185 **12. RETURN OF DEPOSIT:** Unless otherwise specified in the Contract, in the event any condition of this Contract is not met
186 and **Buyer** has timely given any required notice regarding the condition having not been met, **Buyer's** deposit will be returned in
187 accordance with applicable Florida laws and regulations.

188 **13. DEFAULT:**

189 **(a)** In the event the sale is not closed due to any default or failure on the part of **Seller** other than failure to make the title
190 marketable after diligent effort, **Buyer** may either (1) receive a refund of **Buyer's** deposit(s) or (2) seek specific performance. If
191 **Buyer** elects a deposit refund, **Seller** will be liable to Broker for the full amount of the brokerage fee.

192 **(b)** In the event the sale is not closed due to any default or failure on the part of **Buyer**, **Seller** may either (1) retain all deposit(s)
193 paid or agreed to be paid by **Buyer** as agreed upon liquidated damages, consideration for the execution of this Contract, and

194* Buyer (__RB__) (_____) and Seller (__JJ?__)(_____) acknowledge receipt of a copy of this page, which is Page 4 of 7 Pages.

CC-3    Rev. 10/09    © 2009    Florida Association of REALTORS®    All Rights Reserved

195  in full settlement of any claims, upon which this Contract will terminate or (2) seek specific performance. If **Seller** retains the
196  deposit, **Seller** will pay the Brokers named in Paragraph 20 fifty percent of all forfeited deposits retained by **Seller** (to be split
197  equally among the Brokers) up to the full amount of the brokerage fee.

198  **14. ATTORNEY'S FEES AND COSTS:**  In any claim or controversy arising out of or relating to this Contract, the prevailing party,
199  which for purposes of this provision will include **Buyer**, **Seller** and Broker, will be awarded reasonable attorneys' fees, costs, and
200  expenses.

201  **15. NOTICES:**  All notices will be in writing and may be delivered by mail, personal delivery, or electronic means. Parties agree to
202  send all notices to addresses specified on the signature page(s). Any notice, document, or item given by or delivered to an attorney
203  or real estate licensee (including a transaction broker) representing a party will be as effective as if given by or delivered to that party.

204  **16. DISCLOSURES:**

205  **(a) Commercial Real Estate Sales Commission Lien Act:** The Florida Commercial Real Estate Sales Commission Lien Act
206  provides that when a broker has earned a commission by performing licensed services under a brokerage agreement with you,
207  the broker may claim a lien against your net sales proceeds for the broker's commission. The broker's lien rights under the act
208  cannot be waived before the commission is earned.

209  **(b) Special Assessment Liens Imposed by Public Body:** The Property may be subject to unpaid special assessment lien(s)
210  imposed by a public body. (A public body includes a Community Development District.) Such liens, if any, shall be paid as set
211  forth in Paragraph 9.(e).

212  **(c) Radon Gas:** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities,
213  may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines
214  have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your
215  county public health unit.

216  **(d) Energy-Efficiency Rating Information: Buyer** acknowledges receipt of the information brochure required by Section
217  553.996, Florida Statutes.

218  **17. RISK OF LOSS:**

219  **(a)** If, after the Effective Date and before closing, the Property is damaged by fire or other casualty, **Seller** will bear the risk of
220  loss and **Buyer** may cancel this Contract without liability and the deposit(s) will be returned to **Buyer**. Alternatively, **Buyer** will
221  have the option of purchasing the Property at the agreed upon purchase price and **Seller** will transfer to **Buyer** at closing any
222  insurance proceeds, or **Seller's** claim to any insurance proceeds payable for the damage. **Seller** will cooperate with and assist
223  **Buyer** in collecting any such proceeds.

224  **(b)** If, after the Effective Date and before closing, any part of the Property is taken in condemnation or under the right of eminent
225  domain, or proceedings for such taking will be pending or threatened, **Buyer** may cancel this Contract without liability and the
226  deposit(s) will be returned to **Buyer**. Alternatively, **Buyer** will have the option of purchasing what is left of the Property at the
227  agreed upon purchase price and **Seller** will transfer to the **Buyer** at closing the proceeds of any award, or **Seller's** claim to any
228  award payable for the taking. **Seller** will cooperate with and assist **Buyer** in collecting any such award.

229  **18. ASSIGNABILITY; PERSONS BOUND:**  This Contract may be assigned to a related entity, and otherwise ❏ is not assignable
230  ☑ is assignable. The terms "**Buyer**," "**Seller**" and "**Broker**" may be singular or plural. This Contract is binding upon **Buyer**, **Seller**
231  and their heirs, personal representatives, successors and assigns (if assignment is permitted).

232  **19. MISCELLANEOUS:**  The terms of this Contract constitute the entire agreement between **Buyer** and **Seller**. Modifications of
233  this Contract will not be binding unless in writing, signed and delivered by the party to be bound. Signatures, initials, documents
234  referenced in this Contract, counterparts and written modifications communicated electronically or on paper will be acceptable
235  for all purposes, including delivery, and will be binding. Handwritten or typewritten terms inserted in or attached to this Contract
236  prevail over preprinted terms. If any provision of this Contract is or becomes invalid or unenforceable, all remaining provisions will
237  continue to be fully effective. This Contract will be construed under Florida law and will not be recorded in any public records.

238  **Buyer** ( RB ) (        ) and **Seller** ( JI J ) (        ) acknowledge receipt of a copy of this page, which is Page 5 of  7 Pages.

CC-3    Rev. 10/09    © 2009    Florida Association of REALTORS®    All Rights Reserved

**20. BROKERS:** Neither **Seller** nor **Buyer** has used the services of, or for any other reason owes compensation to, a licensed real
estate Broker other than:

**(a) Seller's Broker:** _____ Marcus & Millichap _____ , _____ James Defusto _____ ,
(Company Name)                                         (Licensee)

201 North Franklin St, Suite 1100, Tampa, FL 33602   813-387-4784   james.defusto@marcusmillichap.com ,
(Address, Telephone, Fax, E-mail)

who ☑ is a single agent ☐ is a transaction broker ☐ has no brokerage relationship and who will be compensated by ☑ **Seller**
☐ **Buyer** ☐ both parties pursuant to ☐ a listing agreement ☐ other (specify) _____

_____

**(b) Buyer's Broker:** _____ , _____ ,
(Company Name)                                         (Licensee)

_____
(Address, Telephone, Fax, E-mail)

who ☐ is a single agent ☐ is a transaction broker ☐ has no brokerage relationship and who will be compensated by ☐ **Seller's**
**Broker** ☐ **Seller** ☐ **Buyer** ☐ both parties pursuant to ☐ an MLS offer of compensation ☐ other (specify)

_____

(collectively referred to as "Broker") in connection with any act relating to the Property, including but not limited to inquiries,
introductions, consultations, and negotiations resulting in this transaction. **Seller** and **Buyer** agree to indemnify and hold Broker
harmless from and against losses, damages, costs and expenses of any kind, including reasonable attorneys' fees at all levels,
and from liability to any person, arising from (1) compensation claimed which is inconsistent with the representation in this
Paragraph, (2) enforcement action to collect a brokerage fee pursuant to Paragraph 10, (3) any duty accepted by Broker at the
request of **Seller** or **Buyer**, which is beyond the scope of services regulated by Chapter 475, Florida Statutes, as amended, or (4)
recommendations of or services provided and expenses incurred by any third party whom Broker refers, recommends, or retains
for or on behalf of **Seller** or **Buyer**.

**21. OPTIONAL CLAUSES:** (Check if any of the following clauses are applicable and are attached as an addendum to this Contract):
☐ Arbitration                    ☐ Seller Warranty                    ☐ Existing Mortgage
☐ Section 1031 Exchange          ☐ Coastal Construction Control Line  ☐ Buyer's Attorney Approval
☐ Property Inspection and Repair ☐ Flood Area Hazard Zone             ☐ Seller's Attorney Approval
☐ Seller Representations         ☐ Seller Financing                   ☐ Other _____

**22. ADDITIONAL TERMS:**

Seller at close of escrow pre-pay rent of $100,000. The money will be taken out of escrow funds.

Seller shall upon close of escrow enter into a 6 month sale leaseback.

Leaseback is subject to seller & buyer agreeing on a form of lease prior to the expiration of DD period. The lease will provide that seller shall

have no obligation to pay rent or any additional charges during the 6 months lease term; expect that seller must continue to pay for its utilities

during the lease term.

Upon end of 6 month lease, tenant will vacate and remove all inventory/ equipment inside.

Seller will be responsible to close out all open/expired permits and code violations prior to close of escrow.

Seller will compensate broker, James Defusto of Marcus & Millichap 4% of gross sales price.

_____

_____

**THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE
OF AN ATTORNEY PRIOR TO SIGNING. BROKER ADVISES BUYER AND SELLER TO VERIFY ALL FACTS AND
REPRESENTATIONS THAT ARE IMPORTANT TO THEM AND TO CONSULT AN APPROPRIATE PROFESSIONAL
FOR LEGAL ADVICE (FOR EXAMPLE, INTERPRETING CONTRACTS, DETERMINING THE EFFECT OF LAWS ON
THE PROPERTY AND TRANSACTION, STATUS OF TITLE, FOREIGN INVESTOR REPORTING REQUIREMENTS,
ETC.) AND FOR TAX, PROPERTY CONDITION, ENVIRONMENTAL AND OTHER ADVICE. BUYER ACKNOWLEDGES
THAT BROKER DOES NOT OCCUPY THE PROPERTY AND THAT ALL REPRESENTATIONS (ORAL, WRITTEN OR
OTHERWISE) BY BROKER ARE BASED ON SELLER REPRESENTATIONS OR PUBLIC RECORDS UNLESS BROKER
INDICATES PERSONAL VERIFICATION OF THE REPRESENTATION. BUYER AGREES TO RELY SOLELY ON SELLER,
PROFESSIONAL INSPECTORS AND GOVERNMENTAL AGENCIES FOR VERIFICATION OF THE PROPERTY CONDITION,
SQUARE FOOTAGE AND FACTS THAT MATERIALLY AFFECT PROPERTY VALUE.**

**Buyer** ( ___ ) ( ___ ) and **Seller** ( ___ ) ( ___ ) acknowledge receipt of a copy of this, which is Page 6 of 7 Pages.

CC-3    Rev. 10/09    © 2009    Florida Association of REALTORS®    All Rights Reserved

291  Each person signing this Contract on behalf of a party that is a business entity represents and warrants to the other party that
292  such signatory has full power and authority to enter into and perform this Contract in accordance with its terms and each person
293  executing this Contract and other documents on behalf of such party has been duly authorized to do so.

Signed by:

*Robert Briesacher*
16AD45E6423F4E4...

294*  _____    Date: _____ 10/6/2024 | 12:51:01 PDT _____
295  (Signature of **Buyer**)

296  Robert Briesacher
297  (Typed or Printed Name of **Buyer**)    Tax ID No.: _____

298* Title: _____    Telephone: _____

299*  _____    Date: _____
300  (Signature of **Buyer**)

301*  _____    Tax ID No.: _____
302  (Typed or Printed Name of **Buyer**)

303* Title: _____    Telephone: _____

304* **Buyer's** Address for purpose of notice: _____

305* Facsimile: _____    E-mail: _____

DocuSigned by:

93B49333C094453...

306*  _____    Date: _____ 10/6/2024 | 18:55:20 EDT _____
307  (Signature of **Seller**)

Leo Joseph Govoni
308*  _____
309  (Typed or Printed Name of **Seller**)    Tax ID No.: _____

310* Title: _____    Telephone: _____

311*  _____    Date: _____
312  (Signature of **Seller**)

313*  _____    Tax ID No.: _____
314  (Typed or Printed Name of **Seller**)

315* Title: _____    Telephone: _____

316* **Seller's** Address for purpose of notice: _____

317* Facsimile: _____    E-mail: _____

The Florida Association of REALTORS® makes no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by real estate licensees who are members of the NATIONAL ASSOCIATION OF REALTORS® and who subscribe to its Code of Ethics.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means including facsimile or computerized forms.

318* **Buyer** (_RB_) (_____) and **Seller** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 7 of 7 Pages.

CC-3    Rev. 10/09    © 2009    Florida Association of REALTORS®    All Rights Reserved